SZAFERMAN, LAKIND, BLUMSTEIN & BLADER, P.C.
101 Grovers Mill Road, Suite 200
Lawrenceville, NJ 08648
By:  Robert L. Lakind
      Arnold C. Lakind
Tel: (609) 275-0400
Fax: (609) 275-4511

ZWERLING, SCHACHTER & ZWERLING, LLP
41 Madison Avenue
New York, NY 10010
By: Robin F. Zwerling
    Jeffrey C. Zwerling
    Susan Salvetti
    Andrew W. Robertson
Tel: (212) 223-3900
Fax: (212) 371-5969

*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| Owen Clancy and Jack Hornstein, | Civil No. |
|     Plaintiffs, | **COMPLAINT** |
| v. | Jury Trial Demanded |
| BlackRock Investment Management, LLC, BlackRock Advisors, LLC, and BlackRock International Limited, | |
|     Defendants. | |

Plaintiff Owen Clancy, whose street address is 2468 Jerusalem Avenue, North Bellmore, New York, and Plaintiff Jack Hornstein, whose street address is 65 South Park Drive, Old Bethpage, New York, (together, "Plaintiffs") bring this action against Defendant BlackRock Investment Management, LLC ("BRIM"), which has its principal office at 1 University Square Drive, Princeton, New Jersey, Defendant BlackRock Advisors, LLC ("BRA"), which maintains

an office at 1 University Square Drive, Princeton, New Jersey, and Defendant BlackRock International Limited ("BRIL," and together with BRA and BRIM, "Defendants" or "BlackRock"), which has its principal office at 40 Torphichen Street, Edinburgh, United Kingdom. Plaintiffs allege the following upon information and belief except for those allegations as to themselves, which are alleged upon personal knowledge. The allegations are based upon an investigation conducted by and through Plaintiffs' counsel, which included, *inter alia*, a review of documents filed with the Securities and Exchange Commission (the "SEC") and other public information.

## OVERVIEW OF ACTION

1.      Plaintiffs bring this action against Defendants on behalf of and for the benefit of the BlackRock Global Allocation Fund, Inc. (the "Fund") pursuant to Section 36(b) of the Investment Company Act of 1940 (the "1940 Act"), 15 U.S.C. § 80a-35(b).

2.      Defendants are investment advisers to the Fund and receive an annual fee for providing investment advisory services, including managing the Fund's portfolio of assets.

3.      Under Section 36(b), Defendants owe a fiduciary duty to the Fund with respect to the investment advisory fees paid by the Fund.

4.      Defendants breached that fiduciary duty by receiving investment advisory fees that are so disproportionately large that they bear no reasonable relationship to the value of the services provided to the Fund and could not have been the product of arm's-length bargaining.

5.      The investment advisory fee rate charged to the Fund is as much as 109% higher than the rates negotiated at arm's length by BlackRock with other clients for the same or substantially the same investment advisory services.

6.     As a result of its higher fee rate, the Fund pays as much as $198 million more in fees each year than it would pay for BlackRock's investment advisory services had the fee arrangement been negotiated at arm's length.

7.     The Fund's investment advisory fee arrangement has enabled BlackRock to retain for itself the vast majority of the benefits of economies of scale resulting from increases in the Fund's assets under management during recent years, without appropriately sharing those benefits with the Fund.

8.     The amount of investment advisory fees paid by the Fund has increased by more than 202% in recent years, from approximately $121 million in fiscal year 2007 to more than $365 million in the Fund's most recently reported fiscal year ended October 31, 2013.

9.     The increase in the fees paid by the Fund was not accompanied by a proportionate increase in the services provided by BlackRock or the cost of providing investment advisory services to the Fund.

10.     The increase in fees paid by the Fund resulted in increased profits for BlackRock at the expense of the Fund.

11.     Plaintiffs bring this action to recover for the Fund the excessive and unlawful investment advisory fees charged in violation of Section 36(b), as well as lost profits and other actual damages caused by the Fund's payment of those fees.

## JURISDICTION AND VENUE

12.     The claim asserted herein arises under Section 36(b) of the 1940 Act, 15 U.S.C. § 80a-35(b).

13.     This Court has jurisdiction of the claim pursuant to Sections 36(b)(5) and 44 of the 1940 Act, 15 U.S.C. §§ 80a-35(b)(5), 80a-43, and 28 U.S.C. § 1331.

14.     Venue is proper in this judicial district pursuant to Section 44 of the 1940 Act, 15 U.S.C. § 80a-43, and 28 U.S.C. § 1391 because Defendants are inhabitants of this district, maintain offices in this district, and/or transact business in this district, and because certain of the acts and transactions giving rise to Plaintiffs' claim occurred in this district.

## PARTIES

15.     Plaintiff Owen Clancy is a shareholder in the Fund and has continuously owned shares in the Fund since at least October 2011.

16.     Plaintiff Jack Hornstein is a shareholder in the Fund and has continuously owned shares in the Fund since at least October 2011.

17.     Defendant BRIM is a limited liability company organized under Delaware law. BRIM's principal office is located within this judicial district.

18.     Defendant BRA is a limited liability company organized under Delaware law. BRA maintains an office within this judicial district.

19.     Defendant BRIL is a foreign corporation organized under the law of the United Kingdom.  BRIL's principal office is located in Edinburgh, United Kingdom.

## THE FUND'S ORGANIZATION AND OPERATIONS

20.     The Fund is an open-end management investment company, also known as a "mutual fund," registered under the 1940 Act.

21.     The Fund is organized as a corporation under Maryland law.

22.     Like other mutual funds, the Fund is a type of collective investment that pools money from investors and invests the money in a portfolio of securities.

23.     The Fund issues shares to investors, such as Plaintiffs, who invest money in the Fund, and those investors become shareholders in the Fund.  Each share issued by the Fund

represents, and may be redeemed for, a *pro rata* interest in the Fund's underlying portfolio of securities (less any fees and other liabilities).

24.    Like most other mutual funds, the Fund does not have employees or facilities of its own.  Rather, the Fund's operations are conducted by external service providers pursuant to contracts with the Fund.

25.    Defendants serve as the Fund's investment advisers and, in that capacity, are responsible for managing the Fund's portfolio of securities, including researching potential investments and deciding which securities will be purchased for or sold from the portfolio.

26.    Other service providers, including certain of BlackRock's affiliates, provide other services to the Fund and its shareholders, such as communicating with shareholders about the Fund, maintaining records of each shareholder's ownership of Fund shares, and managing the process by which Fund shares are purchased by or redeemed from shareholders.

27.    The Fund is overseen by a Board of Directors, which is responsible for selecting and monitoring the Fund's service providers, among other things.

28.    The same Board of Directors oversees more than 80 other mutual funds managed by BlackRock or its affiliates.

## DEFENDANTS' INVESTMENT ADVISORY SERVICES TO THE FUND

29.    Defendants BRA and BRIM serve as investment advisers to the Fund pursuant to an Investment Management Agreement between BRA and the Fund initially dated September 29, 2006 (the "IMA") and a subadvisory agreement between BRA and BRIM also dated September 29, 2006.

30.    Until July 1, 2013, Defendant BRIL also served as investment adviser to the Fund pursuant to a subadvisory agreement between BRA and BRIL dated December 31, 2008.

31.     The IMA requires certain investment advisory services to be provided to the Fund, including: (a) "supervis[ing] and manag[ing] the investment and reinvestment of the Fund's assets"; (b) "supervis[ing] continuously the investment program of the Fund and the composition of its investment portfolio"; (c) "arrang[ing] . . . for the purchase and sale of securities and other assets held in the investment portfolio of the Fund"; and (d) "voting, exercising consents and exercising all other rights appertaining to such securities . . . on behalf of the Fund."

32.     The IMA requires that certain books and records relating to the investment advisory services be maintained.

33.     The Fund's prospectus, filed with the SEC annually, provides additional information about the investment advisory services to be provided to the Fund, including the Fund's investment objective, the types of securities in which it invests, and the strategies to be employed.

34.     According to the Fund's most recent prospectus filed with the SEC on February 28, 2013 (the "Prospectus"), BlackRock invests in the following types of securities and employs the following investment strategies in managing the Fund:

> Generally, the Fund's portfolio will include both equity and debt securities. Equity securities include common stock, preferred stock, securities convertible into common stock, rights and warrants or securities or other instruments whose price is linked to the value of common stock. At any given time, however, the Fund may emphasize either debt securities or equity securities. In selecting equity investments, the Fund mainly seeks securities that Fund management believes are undervalued.
>
> The Fund may buy debt securities of varying maturities, debt securities paying a fixed or fluctuating rate of interest, and debt securities of any kind, including, by way of example, securities issued or guaranteed by the U.S. Government or its agencies or instrumentalities, by foreign governments or international agencies

or supranational entities, or by domestic or foreign private issuers, debt securities convertible into equity securities, inflation-indexed bonds, structured notes, loan assignments and loan participations. In addition, the Fund may invest up to 35% of its total assets in "junk bonds," corporate loans and distressed securities. The Fund may also invest in Real Estate Investment Trusts ("REITs") and securities related to real assets (like real estate- or precious metals-related securities) such as stock, bonds or convertible bonds issued by REITs or companies that mine precious metals.

When choosing investments, Fund management considers various factors, including opportunities for equity or debt investments to increase in value, expected dividends and interest rates. The Fund generally seeks diversification across markets, industries and issuers as one of its strategies to reduce volatility. The Fund has no geographic limits on where it may invest. This flexibility allows the Fund management to look for investments in markets around the world, including emerging markets, that it believes will provide the best asset allocation to meet the Fund's objective. The Fund may invest in the securities of companies of any market capitalization.

Generally, the Fund may invest in the securities of corporate and governmental issuers located anywhere in the world. The Fund may emphasize foreign securities when Fund management expects these investments to outperform U.S. securities. When choosing investment markets, Fund management considers various factors, including economics and political conditions, potential for economic growth and possible changes in currency exchange rates. In addition to investing in foreign securities, the Fund actively manages its exposure to foreign currencies through the use of forward currency contracts and other currency derivatives. The Fund may own foreign cash equivalents or foreign bank deposits as part of the Fund's investment strategy. The Fund will also invest in non-U.S. currencies. The Fund may underweight or overweight a currency based on the Fund management team's outlook . . . .

Under normal circumstances, the Fund will continue to allocate a substantial amount (approximately 40% or more—unless market conditions are not deemed favorable by BlackRock, in which case the Fund would invest at least 30%)—of its total assets in securities of (i) foreign government issuers, (ii) issuers organized or located outside the U.S., (iii) issuers which primarily trade in a market located outside the U.S., or (iv) issuers doing a substantial amount of business outside the U.S., which the Fund considers to be companies that derive at least 50% of their revenue or profits

from business outside the U.S. or have at least 50% of their sales
or assets outside the U.S. The Fund will allocate its assets among
various regions and countries including the United States (but in no
[sic] less than three different countries) . . . .

The Fund may use derivatives, including options, futures, indexed
securities, inverse securities, swaps and forward contracts both to
seek to increase the return of the Fund and to hedge (or protect) the
value of its assets against adverse movements in currency
exchange rates, interest rates and movements in the securities
markets.

The Fund may seek to provide exposure to the investment returns
of real assets that trade in the commodity markets through
investment in commodity-linked derivative instruments and
investment vehicles that exclusively invest in commodities such as
exchange traded funds, which are designed to provide this
exposure without direct investment in physical commodities. The
Fund may also gain exposure to commodity markets by investing
up to 25% of its total assets in BlackRock Cayman Global
Allocation Fund I, Ltd. (the "Subsidiary"), a wholly owned
subsidiary of the Fund formed in the Cayman Islands, which
invests primarily in commodity-related instruments.

35.     The team of BlackRock portfolio managers, analysts, research associates, and

traders who are responsible for providing investment advisory services to the Fund is known as

the Global Allocation Team.

36.     The Global Allocation Team manages global multi-asset portfolios for the Fund

and other BlackRock clients.

37.     The Global Allocation Team is led by portfolio managers Dennis Stattman, Dan

Chamby, and Aldo Roldan, who are principally responsible for BlackRock's investment advisory

services to the Fund.

38.     In providing investment advisory services to the Fund, BlackRock must comply

with the 1940 Act and related rules and regulations issued by the SEC, as well as with various

provisions of federal tax law.

39.     The Global Allocation Team is supported by a staff of legal, compliance, and administrative personnel, who are responsible for ensuring that BlackRock's investment advisory services comply with applicable law, including the 1940 Act, and for maintaining books and records relating to BlackRock's provision of investment advisory services to the Fund.

## INVESTMENT ADVISORY FEES
## CHARGED TO THE FUND BY BLACKROCK

40.     In exchange for the investment advisory services provided by BlackRock to the Fund, the IMA requires the Fund to pay BRA an annual fee that is calculated as a percentage of the Fund's assets under management or "AUM."

41.     BRA, in turn, allocates a portion of the investment advisory fee it receives from the Fund to BRIM and (until July 1, 2013) BRIL pursuant to the subadvisory agreements among Defendants.

42.     The Fund's investment advisory fee rate is determined according to the following breakpoint schedule, which reduces the rate paid as the Fund's AUM increase:

| AUM | Fee Rate |
| --- | --- |
| up to $10 billion | 0.75% |
| from $10 billion to $15 billion | 0.69% |
| from $15 billion to $20 billion | 0.68% |
| from $20 billion to $25 billion | 0.67% |
| from $25 billion to $30 billion | 0.65% |
| from $30 billion to $40 billion | 0.63% |
| from $40 billion to $60 billion | 0.62% |
| from $60 billion to $80 billion | 0.61% |
| over $80 billion | 0.60% |

43.     Prior to May 13, 2008, the Fund's investment advisory fee rate was determined by a different, more favorable breakpoint schedule, which provided greater reductions to the Fund's fee rate at lower levels of AUM.

| AUM | Fee Rate |
|---|---|
| up to $2.5 billion | 0.75% |
| from $2.5 billion to $5 billion | 0.70% |
| from $5 billion to $7.5 billion | 0.65% |
| from $7.5 billion to $10 billion | 0.625% |
| from $10 billion to $15 billion | 0.60% |
| over $15 billion | 0.575% |

44.     According to the Prospectus, the Fund paid an effective investment advisory fee rate of 67 basis points, or 0.67%, during fiscal year 2012 pursuant to the fee schedule set forth in ¶ 42.  Also called a "blended" rate, the effective investment advisory fee rate of 67 basis points is the weighted average of the rates paid by the Fund on each level of AUM—*i.e.*, 75 basis points on the first $10 billion, 69 basis points on the next $5 billion, 68 basis points on the next $5 billion, *etc.*

45.     During fiscal year 2013, the Fund was subject to the same fee schedule set forth in ¶ 42, but the effective investment advisory fee rate paid by the Fund during that year has not been disclosed.

46.     The Fund paid more than $365,000,000 in investment advisory fees during fiscal year 2013.

**BLACKROCK PROVIDES THE SAME OR SUBSTANTIALLY THE SAME INVESTMENT ADVISORY SERVICES TO SUBADVISED FUNDS FOR LOWER FEES**

47.     BlackRock provides investment advisory services to other clients.

48.     Those clients include three mutual funds:  (a) the JNL/BlackRock Global Allocation Fund (the "JNL Subadvised Fund"); (b) the AZL BlackRock Global Allocation Fund (the "AZL Subadvised Fund"); and (c) the Transamerica Global Allocation Fund (the "Transamerica Subadvised Fund").  These funds are collectively referred to herein as the "Subadvised Funds."

49.     Each of the Subadvised Funds was organized and sponsored by a financial institution independent of BlackRock.

50.     Like the Fund, each of the Subadvised Funds is an open-end management investment company and is registered under the 1940 Act.

51.     Like the Fund, each of the Subadvised Funds is part of a business trust or corporation organized under state law.

52.     Like the Fund, each of the Subadvised Funds issues shares to investors who invest money in the fund, and each share represents, and may be redeemed for, a *pro rata* interest in the Subadvised Fund's underlying portfolio of securities (less any fees and other liabilities).

53.     The Subadvised Funds' financial institution sponsors nominally serve as the funds' investment advisers.  They have investment advisory contracts with the funds, and receive investment advisory fees from the funds.

54.     Each of the financial institution sponsors has subcontracted with BRIM to provide investment advisory services to the Subadvised Funds.  Pursuant to subadvisory agreements between BRIM and each of the financial institution sponsors, BRIM acts as a subadviser and provides investment advisory services to each Subadvised Fund in exchange for a fee.

55.     The fees that BRIM receives for providing investment advisory services to the Subadvised Funds are paid by the financial institution sponsors of those funds.

56.     The investment advisory services that BRIM provides as subadviser to the Subadvised Funds are the same or substantially the same as the investment advisory services BlackRock provides to the Fund.

57.     The subadvisory agreements require BRIM to provide the same or substantially the same investment advisory services as are required by the Fund's IMA.  For example, like the Fund's IMA, the subadvisory agreement for the AZL Subadvised Fund requires BRIM to: (a) "manage the investment operations and the composition of" the AZL Subadvised Fund's investment portfolio; (b) "determine from time to time what investments and securities will be purchased, retained, or sold" for the fund's portfolio; (c) "place orders with or through . . . persons, brokers, dealers, or futures commission merchants" on behalf of the fund; and (d) "vote, or abstain from voting, all proxies, if applicable, with respect to companies whose securities are held" by the fund.

58.     Like the Fund's IMA, the subadvisory agreements require BRIM to maintain books and records relating to its provision of investment advisory services to the Subadvised Funds.

59.     BRIM employs the same or substantially the same investment strategies and invests in the same or substantially the same types of securities on behalf of the Subadvised Funds as BlackRock does on behalf of the Fund.  For example, the AZL Subadvised Fund's most recent prospectus includes the following description of the investment advisory services to be provided, which is substantively identical to the description in the Fund's Prospectus (*see* ¶ 34, *supra*):

> Generally, the Fund's portfolio will include both equity and debt securities.  Equity securities include common stock, preferred stock, securities convertible into common stock, rights and warrants or securities or other instruments whose price is linked to

12

the value of common stock.  At any given time, however, the Fund may emphasize either debt securities or equity securities.  In selecting equity investments, the Fund mainly seeks securities that the Fund's subadviser believes are undervalued.

The Fund may buy debt securities of varying maturities, debt securities paying a fixed or fluctuating rate of interest, and debt securities of any kind, including by way of example, securities issued or guaranteed by the U.S. Government or its agencies or its instrumentalities, by foreign governments or international agencies or supranational entities, or by domestic or foreign private issuers, mortgage-backed or other asset-backed securities, debt securities convertible into equity securities, inflation-indexed bonds, structured notes, loan assignments and loan participations.  The Fund may invest up to 35% of its net assets in "junk bonds," corporate loans and distressed securities.  The Fund may also invest in real estate investment trusts ("REITs").

When choosing investments, the subadviser considers various factors, including opportunities for equity or debt investments to increase in value, expected dividends and interest rates.  The Fund generally seeks diversification across markets, industries and issuers as one of its strategies to reduce volatility.  The Fund has no geographic limits on where it may invest.  This flexibility allows the subadviser to look for investments in markets around the world, including emerging markets, that it believes will provide the best asset allocation to meet the Fund's objective.  The Fund may invest in the securities of companies of any market capitalization.

Generally, the Fund may invest in the securities of corporate and governmental issuers located anywhere in the world.  The Fund may emphasize foreign securities when the subadviser expects these investments to outperform U.S. securities.  When choosing investment markets, the subadviser considers various factors, including economic and political conditions, potential for economic growth and possible changes in currency exchange rates.  In addition to investing in foreign securities, the Fund actively manages its exposure to foreign currencies through the use of forward currency contracts and other currency derivatives.  The Fund may own foreign cash equivalents or foreign bank deposits as part of the Fund's investment strategy.  The Fund will also invest in non-U.S. currencies.  The Fund may underweight or overweight a currency based on the subadviser's outlook.

Under normal circumstances, the Fund will allocate a substantial amount (approximately 40% or more—unless market conditions are not deemed favorable by the subadviser, in which case the Fund would invest at least 30%)—of its net assets in securities of (i) foreign government issuers, (ii) issuers organized or located outside the United States, (iii) issuers which primarily trade in a market located outside the United States, or (iv) issuers doing a substantial amount of business outside the United States, which the Fund considers to be companies that derive at least 50% of their revenue or profits from business outside the United States, or have at least 50% of their sales or assets outside the United States.  The Fund will allocate its assets among various regions and countries, including the United States (but in no [sic] less than three different countries).

The Fund may seek to provide exposure to the investment returns of real assets that trade in the commodity markets through investment in commodity-linked derivative instruments and investment vehicles that exclusively invest in commodities such as exchange traded funds, which are designed to provide this exposure without direct investment in physical commodities.  The Fund may also gain exposure to commodity markets by investing up to 25% of its total assets in the AZL Cayman Global Allocation Fund I, Ltd. (the "Subsidiary"), a wholly owned subsidiary of the Fund formed in the Cayman Islands, which invests primarily in commodity-related instruments . . . .

60.   The Global Allocation Team, led by portfolio managers Stattman, Chamby, and Roldan, manages each Subadvised Fund's investment portfolio.

61.   The Global Allocation Team uses the same or substantially the same investment strategies, research and analysis, and systems, technology, and other resources in providing investment advisory services to the Subadvised Funds as it uses in providing investment advisory services to the Fund.

62.   In providing investment advisory services to the Subadvised Funds, BRIM must comply with the same or substantially the same provisions of the 1940 Act, SEC regulations, and federal tax law as apply to BlackRock in providing investment advisory services to the Fund.

14

63.     The same or substantially the same legal, compliance, and administrative personnel are responsible for ensuring that BRIM's investment advisory services comply with applicable law and for maintaining books and records relating to BRIM's provision of investment advisory services to the Subadvised Funds.  They use the same or substantially the same systems, technology, and other resources in performing those tasks for the Subadvised Funds as they use for the Fund.

64.     The fees that BRIM receives for providing investment advisory services to the Subadvised Funds are lower than the fees paid by the Fund for the same or substantially the same services.

65.     As shown in the following chart, the Fund's effective investment advisory fee rate for fiscal year 2012 of 67 basis points is up to 109% higher than the fee rates paid on behalf of the Subadvised Funds.

| Fund | Fee Rate | Difference (%) |
| --- | --- | --- |
| BlackRock Global Allocation Fund | 0.67% | |
| JNL Subadvised Fund | 0.42% on AUM up to $500 million; 0.40% on AUM from $500 million to $1.5 billion; and 0.375% on AUM over $1.5 billion | 60% - 79% |
| AZL Subadvised Fund | 0.42% on AUM up to $500 million; 0.40% on AUM from $500 million to $1.5 billion; and 0.375% on AUM over $1.5 billion | 60% - 79% |
| Transamerica Subadvised Fund | 0.44% on AUM up to $100 million; and 0.32% on AUM over $100 million | 52% - 109% |

66.     If the Fund's investment advisory fees were calculated using the fee rates for the Subadvised Funds, the Fund would pay up to $198 million less in fees annually at current asset levels (approximately $58 billion in AUM), as shown in the following chart.

| Fee Schedule | Fees Paid (at $58 billion in AUM) | Difference ($) |
|---|---|---|
| BlackRock Global Allocation Fund | $384,100,000 | |
| JNL Subadvised Fund | $217,975,000 | $166,125,000 |
| AZL Subadvised Fund | $217,975,000 | $166,125,000 |
| Transamerica Subadvised Fund | $185,720,000 | $198,380,000 |

67.     The higher fees paid by the Fund pursuant to the IMA as set forth in the preceding paragraphs are not justified by any additional services provided to the Fund by Defendants or their affiliates.

68.     In addition to the investment advisory services discussed above, the IMA purportedly requires certain administrative services to be provided to the Fund.  The administrative services include overseeing the daily pricing of the Fund's portfolio securities, overseeing the maintenance of certain books and records by the Fund's other service providers, overseeing the preparation and filing of the Fund's tax returns, preparing financial information for the Fund's shareholder reports and other required SEC filings, and responding to shareholder inquiries about the Fund or referring those inquiries to the Fund's other service providers.

69.     The same or substantially the same administrative services covered by the IMA can be obtained from unaffiliated service providers through arm's-length negotiations for less than 5 basis points, or 0.05% of AUM, according to publicly disclosed administrative services agreements for other mutual funds.

70.    The Fund's effective fee rate under the IMA is 23 to 35 basis points higher than the fee rates paid by the Subadvised Funds.  Even assuming the Fund's higher fee rate reflects additional administrative services not provided to the Subadvised Funds, the Fund is paying an effective fee rate for those administrative services that is at least 4 to 7 times higher than what could be negotiated at arm's length for the same or substantially the same services.

71.    Further, BlackRock receives additional compensation, separate and apart from the fees paid by the Fund under the IMA, for certain of the administrative services purportedly provided under the IMA.

72.    For example, as shown in the following chart, the Fund paid BlackRock more than $3 million during its five most recently reported fiscal years for purported "accounting services."  This accounting service fee is in addition to the amounts the Fund paid under the IMA purportedly for preparing the Fund's tax returns and financial information for the Fund's required filings.

| Fiscal Year Ending Oct. 31, | Accounting Service Fees Paid to BlackRock |
|---|---|
| 2009 | $517,263 |
| 2010 | $754,296 |
| 2011 | $618,009 |
| 2012 | $536,923 |
| 2013 | $615,357 |
| Total: | $3,041,848 |

73.    In addition, as shown in the following chart, the Fund paid BlackRock more than $3.9 million during its five most recently reported fiscal years for "maintain[ing] a call center, which is responsible for providing certain shareholder services to the Fund, such as responding to shareholder inquiries . . . ."  This call center fee is in addition to the amounts the Fund paid

17

under the IMA purportedly for responding to shareholder inquiries about the Fund or referring those inquiries to the Fund's other service providers.

| Fiscal Year Ending Oct. 31, | Call Center Fees Paid to BlackRock |
|---|---|
| 2009 | $647,885 |
| 2010 | $823,729 |
| 2011 | $885,546 |
| 2012 | $783,498 |
| 2013 | $764,594 |
| Total: | $3,905,252 |

74.     The Fund has a separate Administrative Services Agreement with State Street Bank and Trust ("State Street") that requires State Street to provide many of the same administrative services to the Fund that are purportedly provided under the IMA, and requires the Fund to pay a separate fee to State Street for those services.

75.     The fees paid by the Fund to State Street under the Administrative Services Agreement are in addition to the amounts the Fund paid under the IMA purportedly for providing administrative services.

76.     As shown in the following chart, many of the administrative services purportedly covered by the IMA are essentially identical to services provided by State Street to the Fund under the Administrative Services Agreement.

| Administrative Services Agreement with State Street | Investment Management Agreement |
|---|---|
| "Oversee the maintenance by the Fund's custodian of certain books and records of the Fund as required by Rule 31a-1(b) of the 1940 Act" | "Oversee the maintenance by the Fund's Custodian and Transfer Agent and Dividend Disbursing Agent of certain books and records of the Fund as required under Rule 31a-1(b)(4) of the 1940 Act" |

18

| Administrative Services Agreement with State Street | Investment Management Agreement |
| --- | --- |
| "Prepare for review and approval by officers of the Fund financial information for the Fund's semi-annual and annual reports, proxy statements and other communications required or otherwise to be sent to Fund shareholders" | "Prepare for review and approval by officers of the Fund financial information for the Fund's semiannual and annual reports, proxy statements and other communications with shareholders required or otherwise to be sent to Fund shareholders" |
| "Prepare and file, following review by an officer of and legal counsel for the Fund, the Fund's periodic financial reports required to be filed with the [SEC] on Form N-SAR and prepare financial information required by Form N-1A, Form N-2, and other regulatory filings and such other financial reports, forms or filings as may be mutually agreed upon" | "Prepare for review by an officer of the Fund the Fund's periodic financial reports required to be filed with the [SEC] on Form N-SAR, Form N-CSR, Form N-PX, Form N-Q and such other reports, forms and filings, as may be mutually agreed upon" |
| "Make such reports and recommendations to the Board of Directors of the Fund concerning the performance of the Fund's independent accountants as the Board may reasonably request" | "Make such reports and recommendations to the Board of Directors concerning the performance of the independent accountants as the Board of Directors may reasonably request or deems appropriate" |
| "Make such reports and recommendations to the Board concerning the performance and fees of the Fund's custodian and transfer and dividend disbursing agent as the Board may reasonably request or deem appropriate" | "Make such reports and recommendations to the Board of Directors concerning the performance and fees of the Fund's Custodian and Transfer Agent and Dividend Disbursing Agent as the Board of Directors may reasonably request or deems appropriate" |
| "Calculate and publish daily net asset value" | "Oversee the determination and publication of the Fund's net asset value" |
| "Calculate, submit for approval by officers of the Fund and arrange for payment of the Fund's expenses" | "Review the appropriateness of and arrange for payment of the Fund's expenses" |

77.     During its five most recently reported fiscal years, the Fund paid State Street more than $23.8 million pursuant to the Administrative Services Agreement, as shown in the following chart.

| Fiscal Year Ending Oct. 31, | Accounting Fees Paid to State Street |
|---|---|
| 2009 | $3,797,590 |
| 2010 | $5,109,794 |
| 2011 | $5,021,449 |
| 2012 | $4,988,445 |
| 2013 | $4,931,591 |
| Total: | $23,848,869 |

78.     Insofar as Defendants or their affiliates provide other services to the Fund, beyond the investment advisory and administrative services discussed above, those services are provided pursuant to separate contracts for separate compensation, in addition to the fees paid under the IMA.

## DEFENDANTS HAVE NOT ADEQUATELY SHARED THE BENEFITS OF ECONOMIES OF SCALE WITH THE FUND

79.     The Fund's assets have increased in the past several years, with AUM growing from approximately $23 billion as of October 31, 2007 to approximately $58 billion as of the end of fiscal year 2013 on October 31, 2013.

80.     As a result of the increase in AUM, the amount of investment advisory fees paid by the Fund increased by more than 202%, from approximately $121 million in fiscal year 2007 to more than $365 million in fiscal year 2013.

81.     The increase in investment advisory fees paid by the Fund was not accompanied by a proportionate increase in the effort or cost by BlackRock to provide investment advisory services to the Fund.

82.     BlackRock realized economies of scale as the Fund's AUM increased, which reduced the cost, as a percentage of the Fund's AUM, of providing investment advisory services to the Fund, and increased the profitability to BlackRock of providing those services.

83.    Because investment advisers realize economies of scale as AUM increase, mutual fund investment advisory fee schedules often include breakpoints, which reduce a fund's fee rate as AUM increase.  Breakpoints enable a fund to share in the benefits of economies of scale by reducing the fee rate it pays as AUM increase.

84.    Absent breakpoints, or if the breakpoints do not appropriately reduce the effective fee rate paid by a fund, the benefits of economies of scale accrue to a fund's investment adviser in the form of higher fees and profits.

85.    Although the Fund's investment advisory fee schedule (*see* ¶ 42, *supra*) includes breakpoints, the breakpoints fail to provide the Fund with an appropriate share of the benefits of economies of scale.

86.    Under the Fund's fee schedule, very large increases in AUM result in very small decreases in the Fund's investment advisory fee rate.

87.    The first breakpoint does not take effect until $10 billion in AUM, and that breakpoint reduces the fee rate on AUM over $10 billion by 6 basis points, from 0.75% to 0.69%.

88.    Subsequent breakpoints take effect at intervals of $5 billion up to $30 billion in AUM, with each breakpoint reducing the fee rate by 1 or 2 basis points, to 0.68% on AUM from $15 billion to $20 billion, 0.67% on AUM from $20 billion to $25 billion, and 0.65% on AUM from $25 billion to $30 billion.

89.    The investment advisory fee schedule includes another breakpoint at $30 billion, which again reduces the fee rate by 2 basis points, from 0.65% to 0.63%, on AUM from $30 billion to $40 billion.

90.     Thereafter, breakpoints take effect at intervals of $20 billion in AUM, with each breakpoint again reducing the fee rate by 1 basis point, to 0.62% on AUM from $40 billion to $60 billion, 0.61% on AUM from $60 billion to $80 billion, and 0.60% on AUM over $80 billion.

91.     The investment advisory fee rate paid by the Fund has not allowed the Fund to appropriately benefit from economies of scale as the Fund's AUM have increased in recent years.

92.     For example, the Fund's AUM increased from approximately $45.7 billion on October 31, 2010 to approximately $52.4 billion on October 31, 2011.  At the same time, breakpoints in the Fund's fee schedule reduced the Fund's effective investment advisory fee rate by 1 basis point, from 0.68% to 0.67%.

93.     The 1 basis point decrease in the Fund's effective investment advisory fee rate during fiscal year 2011 translates into a savings to the Fund of approximately $5.2 million based on AUM as of the end of fiscal year 2011.

94.     In contrast, due to the increase in AUM during fiscal year 2011, the dollar amount of fees paid by the Fund increased by approximately $77.4 million, from $267.2 million in fiscal year 2010 to $344.6 million in fiscal year 2011.

95.     Thus, the increase in the Fund's AUM during fiscal year 2011 produced benefits to BlackRock (increased advisory fees) that were more than 14 times greater than the benefits to the Fund (reductions in the advisory fee rate).

96.     The breakpoints in the Fund's fee schedule are less significant and provide less sharing of economies of scale than the breakpoints in the Subadvised Funds' fee schedules.

97.     For example, the following chart compares the Fund's fee schedule to the fee schedule for the Transamerica Subadvised Fund.

| BlackRock Global Allocation Fund | Transamerica Subadvised Fund |
|---|---|
| 0.75% on AUM up to $10 billion | 0.44% on AUM up to $100 million |
| 0.69% on AUM from $10 billion to $15 billion | 0.32% on AUM over $100 million |
| 0.68% on AUM from $15 billion to $20 billion | |
| 0.67% on AUM from $20 billion to $25 billion | |
| 0.65% on AUM from $25 billion to $30 billion | |
| 0.63% on AUM from $30 billion to $40 billion | |
| 0.62% on AUM from $40 billion to $60 billion | |
| 0.61% on AUM from $60 billion to $80 billion | |
| 0.60% on AUM over $80 billion | |

98.     The Transamerica Subadvised Fund benefits from a breakpoint at $100 million in AUM.  In contrast, the Fund does not benefit from a breakpoint until it reaches $10 billion in AUM, 100 times more than the Transamerica Subadvised Fund.

99.     The Transamerica Subadvised Fund's breakpoint at $100 million in AUM reduces that fund's fee rate by 12 basis points.  In contrast, the Fund's first breakpoint at $10 billion in AUM reduces the Fund's fee rate by 6 basis points, half as much as the Transamerica Subadvised Fund's breakpoint.  The Fund does not benefit from a 12 basis point reduction until it reaches $30 billion in AUM, 300 times more than the Transamerica Subadvised Fund.

100.     The 12 basis point decrease in the Transamerica Subadvised Fund's fee at $100 million in AUM represents a more than 27% reduction from that fund's initial fee rate of 44 basis points.  In contrast, the 6 basis point decrease in the Fund's fee at $10 billion in AUM

represents only an 8% reduction from the Fund's initial fee rate of 75 basis points, less than one third of the relative decrease for the Transamerica Subadvised Fund.

101.    Regardless of the amount of the Fund's AUM, it never receives the full 27% reduction from its initial fee rate that the Transamerica Subadvised Fund receives at only $100 million in AUM. Even if the Fund were to grow to more than $80 billion in AUM, thus triggering the final breakpoint in its fee schedule, the total decrease in the Fund's fee rate would be 15 basis points, representing a 20% reduction from the Fund's initial fee rate of 75 basis points.

## THE FEES BLACKROCK IS PAID BY THE FUND ARE NOT NEGOTIATED AT ARM'S LENGTH

102.    The investment advisory fees paid by the Fund under the IMA are determined by BlackRock.

103.    The Fund's Board of Directors (the "Board") is required to approve the IMA and the fees paid by the Fund under the IMA on an annual basis.

104.    The Board has approved the IMA each year without devoting the time and attention necessary to independently assess the investment advisory fees paid by the Fund or to effectively represent the interests of Fund shareholders *vis-à-vis* Defendants.

105.    Serving on the Board is a part-time job for the Directors, most of whom are employed full-time in senior-level positions in management, finance, or academia, and serve on the boards of directors of other public and privately-held companies and institutions.

106.    The Board meets five times a year, and during the five meetings each year, the Board is required to conduct its oversight responsibilities not only for the Fund, but also for the more than 80 other BlackRock-managed mutual funds it oversees. This includes approving investment advisory and other services contracts for each fund, as well as other oversight

responsibilities, including, among many others, monitoring each fund's compliance with federal and state law and its stated investment policies, overseeing the daily pricing of each fund's security holdings, and approving each fund's prospectus, annual and semi-annual shareholder reports, and other required regulatory filings.

107.    In approving the IMA, the Board has relied on information and analyses that were prepared by BlackRock or were designed to support BlackRock's rationalization for the fees charged to the Fund.

108.    The Board has not considered information or analyses reflecting the interests of the Fund or its shareholders with respect to the investment advisory fees or critically assessing BlackRock's rationalization for those fees.

109.    For example, with respect to the fees paid by other clients, the Board has accepted BlackRock's representations that the lower fees paid by other clients reflect differences in the services provided to those clients.  The Board has not appropriately examined whether the investment advisory services provided to those clients are different from the services provided to the Fund under the IMA or the extent of any such differences.  Nor has the Board considered appropriate information about the cost of providing any additional services required by the IMA to assess whether the difference in fees is warranted by any such differences in the services provided.

110.    The Board has not solicited proposals from other advisers to provide investment advisory services to the Fund.

111.    The Board has not negotiated a "most favored nation" provision into the IMA, which would require that the fee rates paid by the Fund be at least as favorable as the lowest rate other clients pay for the same or substantially the same investment advisory services.

112.    The Board has approved the payment by the Fund of investment advisory fees that are higher than the fees other clients pay for the same or substantially the same investment advisory services.

113.    The Board has approved an investment advisory fee arrangement that enables BlackRock to retain for itself the vast majority of the benefits of economies of scale resulting from increases in the Fund's AUM without appropriately sharing those benefits with the Fund.

114.    In contrast, BRIM's fees for providing investment advisory services to the Subadvised Funds are determined by negotiations between two sophisticated financial institutions:  BRIM on the one hand and the sponsor of the Subadvised Fund on the other.

115.    The sponsors of the Subadvised Funds negotiate at arm's length with BRIM regarding the fees paid for providing investment advisory services to the Subadvised Funds.

116.    The Subadvised Fund sponsors retain as profit any portion of the investment advisory fees received from the funds that remains after the sponsors pay BRIM's subadvisory fees.  By negotiating lower subadvisory fees, the Subadvised Fund sponsors increase the amount of their retained profits.

117.    The Subadvised Fund sponsors select investment advisers through a competitive selection process, with multiple candidates submitting proposals.

118.    The Subadvised Fund sponsors negotiate with investment advisers regarding the fees to be charged at the outset of the relationship and when contracts are subject to renewal. The negotiations include exchanges of proposals and counterproposals, resulting in reductions in the fee rates paid by the sponsors to the investment advisers.

## THE EXCESSIVE INVESTMENT ADVISORY FEES HARM THE FUND

119.    The investment advisory fees are paid out of the Fund's assets.  Each dollar in fees paid by the Fund directly reduces the value of the Fund's investment portfolio.

120.    The payment of excessive investment advisory fees to Defendants harms the Fund on a going forward basis because the Fund loses investment returns and profits it could earn on the amounts paid out as fees if those amounts remained in the Fund's portfolio and available for investment.

121.    The Fund has sustained millions of dollars in damages due to the excessive investment advisory fees paid to Defendants.

## COUNT I
## AGAINST ALL DEFENDANTS FOR VIOLATION OF SECTION 36(b)

122.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

123.    Plaintiffs assert this Count on behalf of and for the benefit of the Fund.

124.    Defendants are investment advisers to the Fund.

125.    Under Section 36(b), Defendants owe a fiduciary duty to the Fund with respect to their receipt of investment advisory fees and other compensation from the Fund.

126.    Defendants breached their fiduciary duty under Section 36(b) by charging investment advisory fees to the Fund that are so disproportionately large that they bear no reasonable relationship to the value of the services provided by BlackRock and could not have been the product of arm's-length bargaining

127.    As a direct, proximate, and foreseeable result of Defendants' breach of their fiduciary duty under Section 36(b), the Fund has sustained millions of dollars in damages.

27

128.    Pursuant to Section 36(b)(3), Plaintiffs seek to recover, on behalf of and for the benefit of the Fund, the actual damages resulting from Defendants' breach of their fiduciary duty, including the excessive investment advisory fees paid by the Fund to Defendants and investment returns that would have accrued to the Fund had those fees remained in the portfolio and available for investment.

129.    Alternatively, under Section 47 of the 1940 Act, 15 U.S.C. § 80a-46, Plaintiffs seek rescission of the IMA and restitution of all excessive investment advisory fees paid by the Fund pursuant to the IMA.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment on behalf of and for the benefit of the Fund as follows:

A.    declaring that Defendants have violated Section 36(b), 15 U.S.C. § 80a-35(b), through the receipt of excessive investment advisory fees from the Fund;

B.    preliminarily and permanently enjoining Defendants from further violations of Section 36(b);

C.    awarding compensatory damages against Defendants, including repayment to the Fund of all unlawful and excessive investment advisory fees paid by the Fund from one year prior to the commencement of this action through the date of trial, lost investment returns on those amounts, and interest thereon;

D.    rescinding the IMA pursuant to Section 47 of the 1940 Act, 15 U.S.C. § 80a-46, including restitution to the Fund of the excessive investment

28

advisory fees paid by the Fund from one year prior to the commencement of this action through the date of trial, lost investment returns on those amounts, and interest thereon;

E.    awarding Plaintiffs reasonable costs in this action, including attorneys' fees, expert witness fees, and such other items as may be allowed to the maximum extent permitted by law; and

F.    such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiffs demand a trial by jury.

Dated:  February 21, 2014

**SZAFERMAN, LAKIND, BLUMSTEIN &
BLADER, P.C.**

_____
Robert L. Lakind
Arnold C. Lakind
101 Grovers Mill Road, Suite 200
Lawrenceville, NJ 08648
Tel: (609) 275-0400
Fax: (609) 275-4511

**ZWERLING, SCHACHTER &
ZWERLING, LLP**

Robin F. Zwerling
Jeffrey C. Zwerling
Susan Salvetti
Andrew W. Robertson
41 Madison Avenue
New York, NY 10010
Tel: (212) 223-3900
Fax: (212) 371-5969

_Attorneys for Plaintiffs_
