SZAFERMAN, LAKIND, BLUMSTEIN & BLADER, P.C.
101 Grovers Mill Road, Suite 200
Lawrenceville, NJ 08648
By:  Robert L. Lakind
       Arnold C. Lakind
Tel: (609) 275-0400
Fax: (609) 275-4511

*Local Counsel for Plaintiffs*

[Additional Counsel on Signature Page]

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| In re BLACKROCK MUTUAL FUNDS ADVISORY FEE LITIGATION | Master File No. 3:14-cv-01165-JAP-DEA<br><br>**CONSOLIDATED COMPLAINT**<br><br>Jury Trial Demanded |

Plaintiff Owen Clancy, whose street address is 2468 Jerusalem Avenue, North Bellmore, New York; Plaintiff Jack Hornstein, whose street address is 65 South Park Drive, Old Bethpage, New York; Plaintiff Brendan Foote, in his capacity as Trustee on behalf of the Separate Property TR U/A DTD 10-26-12, whose street address is 2593 Via Pisa, Del Mar, California; and Plaintiff Amy Fox, whose street address is 3917 Canning Avenue, San Diego, California (together, "Plaintiffs") bring this action against Defendant BlackRock Investment Management, LLC ("BRIM"), which has its principal office at 1 University Square Drive, Princeton, New Jersey, Defendant BlackRock Advisors, LLC ("BRA"), which maintains an office at 1 University Square Drive, Princeton, New Jersey, and Defendant BlackRock International Limited ("BRIL," and together with BRA and BRIM, "Defendants" or "BlackRock"), which has its principal office at 40 Torphichen Street, Edinburgh, United Kingdom.  Plaintiffs allege the following upon information and belief except for those allegations as to themselves, which are alleged upon

personal knowledge.  The allegations are based upon an investigation conducted by and through Plaintiffs' counsel, which included, *inter alia*, a review of documents filed with the Securities and Exchange Commission (the "SEC") and other public information.

## OVERVIEW OF ACTION

1. Plaintiffs bring this action against Defendants on behalf of and for the benefit of the BlackRock Global Allocation Fund, Inc. (the "Global Allocation Fund") and the BlackRock Equity Dividend Fund (the "Equity Dividend Fund") (each a "Fund," and together, the "Funds") pursuant to Section 36(b) of the Investment Company Act of 1940 (the "1940 Act"), 15 U.S.C. § 80a-35(b).

2. Defendants are investment advisers to the Funds and receive an annual fee from each of the Funds for providing investment advisory services, including managing each Fund's portfolio of assets.

3. Under Section 36(b), Defendants owe a fiduciary duty to each of the Funds with respect to the investment advisory fees paid by such Fund.

4. Defendants breached that fiduciary duty by receiving investment advisory fees from each of the Funds that are so disproportionately large that they bear no reasonable relationship to the value of the services provided by Defendants and could not have been the product of arm's-length bargaining.

5. The investment advisory fee rates charged to the Funds are as much as 106% higher than the rates negotiated at arm's length by BlackRock with other clients for the same or substantially the same investment advisory services.

6.      As a result of their higher fee rates, the Funds collectively pay as much as $280 million more in fees each year than they would pay for BlackRock's investment advisory services had the fee arrangements been negotiated at arm's length.

7.      The Funds' investment advisory fee arrangements have enabled BlackRock to retain for itself the vast majority of the benefits of economies of scale resulting from increases in the Funds' assets under management during recent years, without appropriately sharing those benefits with the Funds.

8.      The aggregate amount of investment advisory fees paid by the Funds has increased by more than 299% in recent years, from approximately $127.5 million in fiscal year 2007 to more than $508.9 million in fiscal year 2013.

9.      The increase in the fees paid by each of the Funds was not accompanied by a proportionate increase in the services provided by BlackRock or the cost of providing investment advisory services to the Funds.

10.     The increase in fees paid by each of the Funds resulted in increased profits for BlackRock at the expense of the Funds.

11.     Plaintiffs bring this action to recover for each of the Funds the excessive and unlawful investment advisory fees charged in violation of Section 36(b) of the 1940 Act, as well as lost profits and other actual damages caused by each Fund's payment of those fees.

## JURISDICTION AND VENUE

12.     The claims asserted herein arise under Section 36(b) of the 1940 Act, 15 U.S.C. § 80a-35(b).

13.     This Court has jurisdiction of the claims pursuant to Sections 36(b)(5) and 44 of the 1940 Act, 15 U.S.C. §§ 80a-35(b)(5), 80a-43, and 28 U.S.C. § 1331.

14.     Venue is proper in this judicial district pursuant to Section 44 of the 1940 Act, 15 U.S.C. § 80a-43, and 28 U.S.C. § 1391 because Defendants are inhabitants of this district, maintain offices in this district, and/or transact business in this district, and because certain of the acts and transactions giving rise to Plaintiffs' claims occurred in this district.

## PARTIES

15.     Plaintiff Owen Clancy is a shareholder in the Global Allocation Fund and has continuously owned shares in such Fund since at least October 2011.

16.     Plaintiff Jack Hornstein is a shareholder in the Global Allocation Fund and has continuously owned shares in such Fund since at least October 2011.

17.     Plaintiff Brendan Foote, in his capacity as trustee of the Separate Property TR U/A DTD 10-26-12, is a shareholder in the Global Allocation Fund and has continuously owned shares in such Fund since at least June 2012.

18.     Plaintiff Amy Fox is a shareholder in the Equity Dividend Fund and has continuously owned shares in such Fund since at least September 2011.

19.     Defendant BRIM is a limited liability company organized under Delaware law. BRIM's principal office is located within this judicial district.

20.     Defendant BRA is a limited liability company organized under Delaware law. BRA maintains an office within this judicial district.

21.     Defendant BRIL is a foreign corporation organized under the law of the United Kingdom.  BRIL's principal office is located in Edinburgh, United Kingdom.

## THE FUNDS' ORGANIZATION AND OPERATIONS

22.     Each of the Funds is an open-end management investment company, also known as a "mutual fund," registered under the 1940 Act.

4

23.     The Global Allocation Fund is organized as a corporation under Maryland law.

24.     The Equity Dividend Fund is organized as a business trust under Massachusetts law.

25.     Like other mutual funds, the Funds are collective investments that pool money from investors and invest the money in a portfolio of securities.

26.     Each Fund issues shares to investors, such as Plaintiffs, who invest money in the Fund, and those investors become shareholders in the Fund.  Each share issued by a Fund represents, and may be redeemed for, a *pro rata* interest in the Fund's underlying portfolio of securities (less any fees and other liabilities).

27.     Like most other mutual funds, the Funds do not have employees or facilities of their own.  The Funds' operations are conducted by external service providers pursuant to contracts with the Funds.

28.     Defendants serve as each Fund's investment advisers and, in that capacity, are responsible for managing each Fund's portfolio of securities, including researching potential investments and deciding which securities will be purchased for or sold from the portfolio.

29.     Other service providers, including certain of BlackRock's affiliates, provide other services to the Funds and their shareholders, such as communicating with shareholders about the Funds, maintaining records of each shareholder's ownership of Fund shares, and managing the process by which Fund shares are purchased by or redeemed from shareholders.

30.     The Global Allocation Fund is overseen by a Board of Directors, and the Equity Dividend Fund is overseen by a Board of Trustees.  The same individuals who serve on the Board of Directors of the Global Allocation Fund also serve on the Board of Trustees of the Equity Dividend Fund.  These individuals are hereinafter referred to as the "Board."

31.    The Board is responsible for selecting and monitoring each Fund's service providers, among other things.

32.    The same Board oversees more than 80 other mutual funds managed by BlackRock or its affiliates.

## DEFENDANTS' INVESTMENT ADVISORY SERVICES TO THE FUNDS

33.    Defendants BRA and BRIM serve as investment advisers to the Global Allocation Fund pursuant to an Investment Management Agreement between BRA and the Global Allocation Fund (the "Global Allocation IMA") and a subadvisory agreement between BRA and BRIM.

34.    Until July 1, 2013, Defendant BRIL also served as investment adviser to the Global Allocation Fund pursuant to a subadvisory agreement between BRA and BRIL dated December 31, 2008.

35.    Defendants BRA and BRIM serve as investment advisers to the Equity Dividend Fund pursuant to an Investment Management Agreement between BRA and the Equity Dividend Fund (the "Equity Dividend IMA," and together with the Global Allocation IMA, the "IMAs") and a subadvisory agreement between BRA and BRIM.

36.    The  IMAs require certain investment advisory services to be provided to each Fund, including:  (a) "supervis[ing] and manag[ing] the investment and reinvestment of the Fund's assets";  (b) "supervis[ing] continuously the investment program of the Fund and the composition of its investment portfolio"; (c) "arrang[ing] . . . for the purchase and sale of securities and other assets held in the investment portfolio of the Fund"; and (d) "voting, exercising consents and exercising all other rights appertaining to such securities . . . on behalf of the Fund."

37.     The IMAs require that certain books and records relating to the investment advisory services provided to each Fund be maintained.

38.     Each Fund's prospectus, filed with the SEC annually, provides additional information about the investment advisory services to be provided to the Funds, including each Fund's investment objective, the types of securities in which each Fund invests, and the strategies to be employed in managing each Fund.

**Global Allocation Fund**

39.     According to the Global Allocation Fund's most recent prospectus, dated April 10, 2014 (the "Global Allocation Prospectus"), BlackRock invests in the following types of securities and employs the following investment strategies in managing the Global Allocation Fund:

> Generally, the Fund's portfolio will include both equity and debt securities.  Equity securities include common stock, preferred stock, securities convertible into common stock, rights and warrants or securities or other instruments whose price is linked to the value of common stock.  At any given time, however, the Fund may emphasize either debt securities or equity securities.  In selecting equity investments, the Fund mainly seeks securities that Fund management believes are undervalued.
>
> The Fund may buy debt securities of varying maturities, debt securities paying a fixed or fluctuating rate of interest, and debt securities of any kind, including, by way of example, securities issued or guaranteed by the U.S. Government or its agencies or instrumentalities, by foreign governments or international agencies or supranational entities, or by domestic or foreign private issuers, debt securities convertible into equity securities, inflation-indexed bonds, structured notes, loan assignments and loan participations. In addition, the Fund may invest up to 35% of its total assets in "junk bonds," corporate loans and distressed securities.  The Fund may also invest in Real Estate Investment Trusts ("REITs") and securities related to real assets (like real estate- or precious metals-related securities) such as stock, bonds or convertible bonds issued by REITs or companies that mine precious metals.

When choosing investments, Fund management considers various factors, including opportunities for equity or debt investments to increase in value, expected dividends and interest rates. The Fund generally seeks diversification across markets, industries and issuers as one of its strategies to reduce volatility. The Fund has no geographic limits on where it may invest. This flexibility allows the Fund management to look for investments in markets around the world, including emerging markets, that it believes will provide the best asset allocation to meet the Fund's objective. The Fund may invest in the securities of companies of any market capitalization.

Generally, the Fund may invest in the securities of corporate and governmental issuers located anywhere in the world. The Fund may emphasize foreign securities when Fund management expects these investments to outperform U.S. securities. When choosing investment markets, Fund management considers various factors, including economic and political conditions, potential for economic growth and possible changes in currency exchange rates. In addition to investing in foreign securities, the Fund actively manages its exposure to foreign currencies through the use of forward currency contracts and other currency derivatives. The Fund may own foreign cash equivalents or foreign bank deposits as part of the Fund's investment strategy. The Fund will also invest in non-U.S. currencies. The Fund may underweight or overweight a currency based on the Fund management team's outlook . . . .

Under normal circumstances, the Fund will continue to allocate a substantial amount (approximately 40% or more—unless market conditions are not deemed favorable by BlackRock, in which case the Fund would invest at least 30%)—of its total assets in securities of (i) foreign government issuers, (ii) issuers organized or located outside the U.S., (iii) issuers which primarily trade in a market located outside the U.S., or (iv) issuers doing a substantial amount of business outside the U.S., which the Fund considers to be companies that derive at least 50% of their revenue or profits from business outside the U.S. or have at least 50% of their sales or assets outside the U.S. The Fund will allocate its assets among various regions and countries including the United States (but in no less than three different countries) . . . .

The Fund may use derivatives, including options, futures, indexed securities, inverse securities, swaps and forward contracts both to seek to increase the return of the Fund and to hedge (or protect) the value of its assets against adverse movements in currency

exchange rates, interest rates and movements in the securities markets.

The Fund may seek to provide exposure to the investment returns of real assets that trade in the commodity markets through investment in commodity-linked derivative instruments and investment vehicles such as exchange traded funds that exclusively invest in commodities and are designed to provide this exposure without direct investment in physical commodities. The Fund may also gain exposure to commodity markets by investing up to 25% of its total assets in BlackRock Cayman Global Allocation Fund I, Ltd. (the "Subsidiary"), a wholly owned subsidiary of the Fund formed in the Cayman Islands, which invests primarily in commodity-related instruments.

40.     The team of BlackRock portfolio managers, analysts, research associates, and traders who are responsible for providing investment advisory services to the Global Allocation Fund is known as the Global Allocation Team.

41.     The Global Allocation Team is led by portfolio managers Dennis Stattman, Dan Chamby, and Aldo Roldan, who are principally responsible for BlackRock's investment advisory services to the Global Allocation Fund.

**Equity Dividend Fund**

42.     According to the Equity Dividend Fund's most recent prospectus, dated April 9, 2014 (the "Equity Dividend Prospectus"), BlackRock invests in the following types of securities and employs the following investment strategies in managing the Equity Dividend Fund:

BlackRock chooses investments for the Fund that it believes will both increase in value over the long term and provide current income, focusing on investments that will do both instead of those that will favor current income over capital appreciation. Total return consists of increases in value from both capital appreciation and income. The Fund will focus on issuers that have good prospects for capital appreciation. In selecting portfolio securities, the Fund will generally employ a value-oriented analysis, but may purchase equity securities based on a growth-oriented analysis when such securities pay dividends or Fund management believes

9

such securities have particularly good prospects for capital appreciation.

Fund management believes that stocks that have yields often provide more attractive long-term total return and greater price stability during periods of downward movements in market prices than stocks that do not pay dividends.  In certain market cycles, such as periods of high growth or high interest rates on bonds, dividend paying stocks could go out of favor.  During such periods, the Fund may underperform other equity funds that do not emphasize dividend paying stocks.

The Fund has no stated minimum holding period for investments and will buy or sell securities whenever Fund management sees an appropriate opportunity.  For example, the Fund may sell shares of a company when the company's prospects for capital appreciation deteriorate or when its dividend rates become unattractive or when the Fund identifies another company with more attractive prospects.

The Fund seeks to achieve its objective by investing primarily in a diversified portfolio of equity securities.  Under normal circumstances, the Fund will invest at least 80% of its assets in equity securities and at least 80% of its assets in dividend paying securities.  Equity securities include common stock, preferred stock, securities convertible into common stock, or securities or other instruments whose price is linked to the value of common stock.  The Fund will focus on issuers that have good prospects for capital appreciation and current income.  Although the Fund invests primarily in dividend paying securities, portions of the distributions paid by the Fund may not be subject to the lower income tax rates applicable to dividends.

The Fund may invest in securities of companies with any market capitalization, but will generally focus on large cap securities.  The Fund's portfolio, in the aggregate, will be structured in a manner designed to seek long-term capital appreciation as well as net portfolio yield in excess of the average yield of mutual funds invested primarily in U.S. equities.

The Fund may also invest in securities convertible into common stock and non-convertible preferred stock.  Convertible securities are generally debt securities or preferred stock that may be converted into common stock.  Convertible securities typically pay current income as either interest (debt security convertibles) or dividends (preferred stock).  A convertible's value usually reflects

both the stream of current income payments and the market value of the underlying common stock. Preferred stock is a class of stock that often pays dividends at a specified rate and has preference over common stock in dividend payments and liquidation of assets. Preferred stock may also be convertible into common stock.

The Fund may invest up to 25% of its total assets in securities of foreign issuers. The Fund may invest in securities from any country. The Fund may invest in securities denominated in both U.S. dollars and non-U.S. dollar currencies.

43. The team of BlackRock portfolio managers, analysts, research associates, and traders who are responsible for providing investment advisory services to the Equity Dividend Fund is known as the Equity Dividend Team.

44. The Equity Dividend Team is led by portfolio managers Robert Shearer, Kathleen Anderson, and David Cassese, who are principally responsible for BlackRock's investment advisory services to the Equity Dividend Fund.

45. In providing investment advisory services to the Funds, BlackRock must comply with the 1940 Act and related rules and regulations issued by the SEC, as well as with various provisions of federal tax law.

46. The Global Allocation Team and the Equity Dividend Team are supported by a staff of legal, compliance, and administrative personnel, who are responsible for ensuring that BlackRock's investment advisory services comply with applicable law, including the 1940 Act, and for maintaining books and records relating to BlackRock's provision of investment advisory services to the Funds.

## INVESTMENT ADVISORY FEES
## CHARGED TO THE FUNDS BY BLACKROCK

47.     In exchange for the investment advisory services provided by BlackRock to the Funds, the IMAs require each Fund to pay BRA an annual fee that is calculated as a percentage of the Fund's assets under management or "AUM."

48.     BRA, in turn, allocates a portion of the investment advisory fee it receives from each Fund to BRIM and (for the Global Allocation Fund until July 1, 2013) BRIL pursuant to the subadvisory agreements among Defendants.

**Global Allocation Fund**

49.     The Global Allocation Fund's investment advisory fee rate is determined according to the following breakpoint schedule, which reduces the rate paid as the Global Allocation Fund's AUM increase:

| AUM | Fee Rate |
| --- | --- |
| up to $10 billion | 0.75% |
| from $10 billion to $15 billion | 0.69% |
| from $15 billion to $20 billion | 0.68% |
| from $20 billion to $25 billion | 0.67% |
| from $25 billion to $30 billion | 0.65% |
| from $30 billion to $40 billion | 0.63% |
| from $40 billion to $60 billion | 0.62% |
| from $60 billion to $80 billion | 0.61% |
| over $80 billion | 0.60% |

50.     Prior to May 13, 2008, the Global Allocation Fund's investment advisory fee rate was determined by a different, more favorable breakpoint schedule, which provided greater reductions to the Global Allocation Fund's fee rate at lower levels of AUM.

| AUM | Fee Rate |
|-----|----------|
| up to $2.5 billion | 0.75% |
| from $2.5 billion to $5 billion | 0.70% |
| from $5 billion to $7.5 billion | 0.65% |
| from $7.5 billion to $10 billion | 0.625% |
| from $10 billion to $15 billion | 0.60% |
| over $15 billion | 0.575% |

51.     The Global Allocation Fund paid an effective investment advisory fee rate of 66 basis points, or 0.66%, during its most recently reported fiscal year ended October 31, 2013 pursuant to the fee schedule set forth in ¶ 49.  Also called a "blended" rate, the effective investment advisory fee rate of 66 basis points is the weighted average of the rates paid by the Global Allocation Fund on each level of AUM—*i.e.*, 75 basis points on the first $10 billion, 69 basis points on the next $5 billion, 68 basis points on the next $5 billion, *etc*.

52.     The Global Allocation Fund paid more than $365,000,000 in investment advisory fees during fiscal year 2013.

**Equity Dividend Fund**

53.     The Equity Dividend Fund's investment advisory fee rate is determined according to the following breakpoint schedule, which reduces the rate paid as the Equity Dividend Fund's AUM increase:

| AUM | Fee Rate |
|-----|----------|
| up to $8 billion | 0.60% |
| from $8 billion to $10 billion | 0.56% |
| from $10 billion to $12 billion | 0.54% |

| from $12 billion to $17 billion | 0.52% |
|---|---|
| from $17 billion to $25 billion | 0.51% |
| from $25 billion to $35 billion | 0.50% |
| from $35 billion to $50 billion | 0.49% |
| over $50 billion | 0.48% |

54.     The Equity Dividend Fund paid an effective investment advisory fee rate of 54 basis points, or 0.54%, during its most recently reported fiscal year ended July 31, 2013 pursuant to the fee schedule set forth in ¶ 53.

55.     The Equity Dividend Fund paid more than $143,000,000 in investment advisory fees during fiscal year 2013.

### BLACKROCK PROVIDES THE SAME OR SUBSTANTIALLY THE SAME INVESTMENT ADVISORY SERVICES TO SUBADVISED FUNDS

56.     BlackRock provides investment advisory services to other clients.

57.     Those clients include the following mutual funds:  (a) the JNL/BlackRock Global Allocation Fund (the "JNL Subadvised Global Allocation Fund"); (b) the AZL BlackRock Global Allocation Fund (the "AZL Subadvised Global Allocation Fund"); (c) the Transamerica Global Allocation Fund (the "Transamerica Subadvised Global Allocation Fund"); (d) the LVIP BlackRock Equity Dividend RPM Fund (the "LVIP Subadvised Equity Dividend Fund"); and (e) the VALIC Dividend Value Fund (the "VALIC Subadvised Equity Dividend Fund").  These funds are collectively referred to herein as the "Subadvised Funds."

58.     Each of the Subadvised Funds was organized and sponsored by a financial institution independent of BlackRock.

14

59.     Like the Funds, each of the Subadvised Funds is an open-end management investment company and is registered under the 1940 Act.

60.     Like the Funds, each of the Subadvised Funds is part of a business trust or corporation organized under state law.

61.     Like the Funds, each of the Subadvised Funds issues shares to investors who invest money in the fund, and each share represents, and may be redeemed for, a *pro rata* interest in the Subadvised Fund's underlying portfolio of securities (less any fees and other liabilities).

62.     The Subadvised Funds' financial institution sponsors nominally serve as the funds' investment advisers.  They have investment advisory contracts with the Subadvised Funds, and receive investment advisory fees from the Subadvised Funds.

63.     Each of the financial institution sponsors has subcontracted with BRIM to provide investment advisory services to the Subadvised Funds.  Pursuant to subadvisory agreements between BRIM and each of the financial institution sponsors, BRIM acts as a subadviser and provides investment advisory services to each of the Subadvised Funds in exchange for a fee.

64.     The fees that BRIM receives for providing investment advisory services to the Subadvised Funds are paid by the financial institution sponsors of those funds.

65.     The investment advisory services that BRIM provides as subadviser to the Subadvised Funds are the same or substantially the same as the investment advisory services BlackRock provides to the Funds.

66.     The subadvisory agreements require BRIM to provide the same or substantially the same investment advisory services as are required by the Funds' IMAs.  For example, like the Funds' IMAs, the subadvisory agreement for the AZL Subadvised Global Allocation Fund requires BRIM to:  (a) "manage the investment operations and the composition of" the fund's

investment portfolio; (b) "determine from time to time what investments and securities will be purchased, retained, or sold" for the fund's portfolio; (c) "place orders with or through . . . persons, brokers, dealers, or futures commission merchants" on behalf of the fund; and (d) "vote, or abstain from voting, all proxies, if applicable, with respect to companies whose securities are held" by the fund.

67. Like the Funds' IMAs, the subadvisory agreements require BRIM to maintain books and records relating to its provision of investment advisory services to the Subadvised Funds.

**Subadvised Global Allocation Funds**

68. BRIM employs the same or substantially the same investment strategies and invests in the same or substantially the same types of securities on behalf of the JNL Subadvised Global Allocation Fund, the AZL Subadvised Global Allocation Fund, and the Transamerica Subadvised Global Allocation Fund (collectively, the "Subadvised Global Allocation Funds") as BlackRock does on behalf of the Global Allocation Fund. For example, the AZL Subadvised Global Allocation Fund's most recent prospectus includes the following description of the investment advisory services to be provided, which is substantively identical to the description in the Global Allocation Fund's Prospectus (*see* ¶ 39, *supra*):

> Generally, the Fund's portfolio will include both equity and debt securities. Equity securities include common stock, preferred stock, securities convertible into common stock, rights and warrants or securities or other instruments whose price is linked to the value of common stock. At any given time, however, the Fund may emphasize either debt securities or equity securities. In selecting equity investments, the Fund mainly seeks securities that the Fund's subadviser believes are undervalued.

> The Fund may buy debt securities of varying maturities, debt securities paying a fixed or fluctuating rate of interest, and debt securities of any kind, including by way of example, securities

issued or guaranteed by the U.S. Government or its agencies or instrumentalities, by foreign governments or international agencies or supranational entities, or by domestic or foreign private issuers, mortgage-backed or other asset-backed securities, debt securities convertible into equity securities, inflation-indexed bonds, structured notes, loan assignments and loan participations. The Fund may invest up to 35% of its net assets in "junk bonds," corporate loans and distressed securities. The Fund may also invest in real estate investment trusts ("REITs") and securities related to real assets (like real estate- or precious metals-related securities) such as stocks, bonds or convertible bonds issued by REITs or companies that mine precious metals.

When choosing investments, the subadviser considers various factors, including opportunities for equity or debt investments to increase in value, expected dividends and interest rates. The Fund generally seeks diversification across markets, industries and issuers as one of its strategies to reduce volatility. The Fund has no geographic limits on where it may invest. This flexibility allows the subadviser to look for investments in markets around the world, including emerging markets, that it believes will provide the best asset allocation to meet the Fund's objective. The Fund may invest in the securities of companies of any market capitalization.

Generally, the Fund may invest in the securities of corporate and governmental issuers located anywhere in the world. The Fund may emphasize foreign securities when the subadviser expects these investments to outperform U.S. securities. When choosing investment markets, the subadviser considers various factors, including economic and political conditions, potential for economic growth and possible changes in currency exchange rates. In addition to investing in foreign securities, the Fund actively manages its exposure to foreign currencies through the use of forward currency contracts and other currency derivatives. The Fund may own foreign cash equivalents or foreign bank deposits as part of the Fund's investment strategy. The Fund will also invest in non-U.S. currencies. The Fund may underweight or overweight a currency based on the subadviser's outlook.

Under normal circumstances, the Fund will allocate a substantial amount (approximately 40% or more—unless market conditions are not deemed favorable by the subadviser, in which case the Fund would invest at least 30%)—of its total assets in securities of (i) foreign government issuers, (ii) issuers organized or located outside the United States, (iii) issuers which primarily trade in a

market located outside the United States, or (iv) issuers doing a substantial amount of business outside the United States, which the Fund considers to be companies that derive at least 50% of their revenue or profits from business outside the United States, or have at least 50% of their sales or assets outside the United States. The Fund will allocate its assets among various regions and countries, including the United States (but in no less than three different countries). The Fund may use derivatives, including options, futures, indexed securities, inverse securities, swaps and forward contracts both to seek to increase the return of the Fund and to hedge (or protect) the value of its assets against adverse movements in currency exchange rates, interest rates and movements in the securities markets.

The Fund may seek to provide exposure to the investment returns of real assets that trade in the commodity markets through investment in commodity-linked derivative instruments and investment vehicles such as exchange traded funds, [sic] and are designed to provide this exposure without direct investment in physical commodities. The Fund may also gain exposure to commodity markets by investing up to 25% of its total assets in the AZL Cayman Global Allocation Fund I, Ltd. (the "Subsidiary"), a wholly owned subsidiary of the Fund formed in the Cayman Islands, which invests primarily in commodity-related instruments . . . .

69. The Global Allocation Team, led by portfolio managers Dennis Stattman, Dan Chamby, and Aldo Roldan, manages each Subadvised Global Allocation Fund's investment portfolio.

70. The Global Allocation Team uses the same or substantially the same investment strategies, research and analysis, and systems, technology, and other resources in providing investment advisory services to the Subadvised Global Allocation Funds as it uses in providing investment advisory services to the Global Allocation Fund.

**Subadvised Equity Dividend Funds**

71. BRIM employs the same or substantially the same investment strategies and invests in the same or substantially the same types of securities on behalf of the LVIP

18

Subadvised Equity Dividend Fund and the VALIC Subadvised Equity Dividend Fund (collectively, the "Subadvised Equity Dividend Funds") as BlackRock does on behalf of the Equity Dividend Fund.  For example, the LVIP Subadvised Equity Dividend Fund's most recent prospectus includes the following description of the investment advisory services to be provided, which is substantively identical to the description in the Equity Dividend Fund's Prospectus (*see* ¶ 42, *supra*):

> The Fund seeks to achieve its objective by investing primarily in a diversified portfolio of equity securities.  The sub-adviser, under normal circumstances, will invest at least 80% of the sub-adviser's portion of assets in equity securities and at least 80% of the sub-adviser's portion of assets in dividend paying securities.  Equity securities include common stock, preferred stock, securities convertible into common stock, or securities or other instruments whose price is linked to the value of common stock.  The sub-adviser will focus on issuers that have good prospects for capital appreciation.  Although the sub-adviser invests primarily in dividend paying securities, portions of the distributions paid by the Fund may not be subject to the lower income tax rates applicable to dividends.
>
> The sub-adviser may invest in securities of companies with any market capitalization, but will generally focus on large cap securities.  The sub-adviser's portfolio, in the aggregate, will be structured in a manner designed to seek long-term capital appreciation as well as net portfolio yield in excess of the average yield of mutual funds invested primarily in U.S. equities.
>
> The sub-adviser also may invest in securities convertible into common stock and non-convertible preferred stock.  Convertible securities typically pay current income as either interest ("debt security convertibles") or dividends ("preferred stock").  A convertible's value usually reflects both the stream of current income payments and the market value of the underlying common stock.  Preferred stock is a class of stock that often pays dividends at a specified rate and has preference over common stock in dividend payments and liquidation of assets.  Preferred stock may also be convertible into common stock.
>
> The sub-adviser may invest up to 25% of the Fund's assets in securities of foreign issuers.  The sub-adviser also may invest in

securities from any country.   The sub-adviser may invest in securities denominated in both U.S. dollars and non-U.S. dollar currencies.

The sub-adviser chooses investments that it believes will both increase in value over the long term and provide current income, focusing on investments that will do both instead of those that will favor current income over capital appreciation.   Total return consists of increases in value from both capital appreciation and income.   The sub-adviser focuses on issuers that it believes have good prospects for capital appreciation.   In selecting portfolio securities, the sub-adviser will generally employ a value-oriented analysis, but may purchase equity securities based on a growth-oriented analysis when such securities pay dividends or when the sub-adviser believes such securities have particularly good prospects for capital appreciation.

The sub-adviser believes that stocks that have yields often provide more attractive long-term total return and greater price stability during periods of downward movements in market prices than stocks that do not pay dividends.   In certain market cycles, such as periods of high growth or high interest rates on bonds, dividend paying stocks could go out of favor.   During such periods, the Fund may underperform other equity funds that do not emphasize investments in dividend paying stocks.

The Fund has no minimum holding period for investments and the sub-adviser will buy or sell securities when it sees an appropriate opportunity.   For example, the sub-adviser may sell shares of a company when the company's prospects for capital appreciation deteriorate or when its dividend rates become unattractive or when the sub-adviser identifies another company with more attractive prospects.

72.   The Equity Dividend Team, led by portfolio managers Robert Shearer, Kathleen Anderson, and David Cassese, manages each Subadvised Equity Dividend Fund's investment portfolio.

73.   The Equity Dividend Team uses the same or substantially the same investment strategies, research and analysis, and systems, technology, and other resources in providing

investment advisory services to the Subadvised Equity Dividend Funds as it uses in providing investment advisory services to the Equity Dividend Fund.

74.    In providing investment advisory services to the Subadvised Funds, BRIM must comply with the same or substantially the same provisions of the 1940 Act, SEC regulations, and federal tax law as apply to BlackRock in providing investment advisory services to the Funds.

75.    The same or substantially the same legal, compliance, and administrative personnel are responsible for ensuring that BRIM's investment advisory services comply with applicable law and for maintaining books and records relating to BRIM's provision of investment advisory services to the Subadvised Funds.   The personnel use the same or substantially the same systems, technology, and other resources in performing those tasks for the Subadvised Funds as they use for the Funds.

**THE FUNDS PAY HIGHER FEES THAN THE SUBADVISED FUNDS
FOR BLACKROCK'S INVESTMENT ADVISORY SERVICES**

76.    The fees that BRIM receives for providing investment advisory services to the Subadvised Funds are lower than the fees paid by the Funds for the same or substantially the same services.

**Global Allocation Fund**

77.    As shown in the following chart, the Global Allocation Fund's effective investment advisory fee rate for fiscal year 2013 of 66 basis points is up to 106% higher than the fee rates paid on behalf of the Subadvised Global Allocation Funds.

| Fund | Fee Rate | Difference (%) |
|------|----------|----------------|
| BlackRock Global Allocation Fund | 0.66% | |
| JNL Subadvised Global Allocation Fund | 0.42% on AUM up to $500 million; 0.40% on AUM from $500 million to $1.5 billion; and 0.375% on AUM over $1.5 billion | 57% - 76% |
| AZL Subadvised Global Allocation Fund | 0.42% on AUM up to $500 million; 0.40% on AUM from $500 million to $1.5 billion; and 0.375% on AUM over $1.5 billion | 57% - 76% |
| Transamerica Subadvised Global Allocation Fund | 0.44% on AUM up to $100 million; and 0.32% on AUM over $100 million | 50% - 106% |

78.    If the Global Allocation Fund's investment advisory fees were calculated using the fee rates for the Subadvised Global Allocation Funds, the Global Allocation Fund would pay as much as $201 million less in fees annually at current asset levels (approximately $59 billion in AUM as of March 31, 2014), as shown in the following chart.

| Fee Schedule | Fees Paid (at $59 billion in AUM) | Difference ($) |
|--------------|-----------------------------------|----------------|
| BlackRock Global Allocation Fund | $390,300,000 | |
| JNL Subadvised Global Allocation Fund | $221,725,000 | $168,575,000 |
| AZL Subadvised Global Allocation Fund | $221,725,000 | $168,575,000 |
| Transamerica Subadvised Global Allocation Fund | $188,920,000 | $201,380,000 |

**Equity Dividend Fund**

79.     As shown in the following chart, the Equity Dividend Fund's effective investment advisory fee rate for fiscal year 2013 of 54 basis points is up to 96% higher than the fee rates paid on behalf of the Subadvised Equity Dividend Funds.

| Fund | Fee Rate | Difference (%) |
|------|----------|----------------|
| BlackRock Equity Dividend Fund | 0.54% | |
| LVIP Subadvised Equity Dividend Fund | 0.32% on all AUM | 69% |
| VALIC Subadvised Equity Dividend Fund | 0.35% on AUM up to $250 million; 0.325% on AUM from $250 million to $500 million; 0.30% on AUM from $500 million to $1 billion; and 0.275% on AUM over $1 billion | 54% - 96% |

80.     If the Equity Dividend Fund's investment advisory fees were calculated using the fee rates for the Subadvised Equity Dividend Funds, the Equity Dividend Fund would as much as $79 million less in fees annually at current asset levels (approximately $30 billion in AUM as of March 31, 2014), as shown in the following chart.

| Fee Schedule | Fees Paid (at $30 billion in AUM) | Difference ($) |
|--------------|-----------------------------------|----------------|
| BlackRock Equity Dividend Fund | $161,800,000 | |
| LVIP Subadvised Equity Dividend Fund | $96,000,000 | $65,800,000 |
| VALIC Subadvised Equity Dividend Fund | $82,937,500 | $78,862,500 |

81.     The higher fees paid by the Funds pursuant to the IMAs as set forth in the preceding paragraphs are not justified by any additional services provided to the Funds by Defendants or their affiliates.

82.     In addition to the investment advisory services discussed above, the IMAs purportedly require certain administrative services to be provided to the Funds.   The administrative services include overseeing the daily pricing of the Funds' portfolio securities, overseeing the maintenance of certain books and records by the Funds' other service providers, overseeing the preparation and filing of the Funds' tax returns, preparing financial information for the Funds' shareholder reports and other required SEC filings, and responding to shareholder inquiries about the Funds or referring those inquiries to the Funds' other service providers.

83.     The same or substantially the same administrative services purportedly required by the IMAs can be obtained from unaffiliated service providers through arm's-length negotiations for less than 5 basis points, or 0.05% of AUM, according to publicly disclosed administrative services agreements for other mutual funds.

84.     The Global Allocation Fund's effective fee rate under its IMA is 22 to 34 basis points higher than the fee rates paid by the Subadvised Global Allocation Funds (*see* ¶ 77, *supra*), and the Equity Dividend Fund's effective fee rate under its IMA is 19 to 26.5 basis points higher than the fee rates paid by the Subadvised Equity Dividend Funds (*see* ¶ 79, *supra*).

85.     Even assuming the Funds' higher fee rates reflect additional administrative services not provided to the Subadvised Funds, the Funds are paying effective fee rates under the IMAs for those administrative services that are at least 3 to 6 times higher than what could be negotiated at arm's length for the same or substantially the same services.

86.     Further, BlackRock receives additional compensation from each Fund, separate and apart from the fees paid by the Funds under the IMAs, for certain of the administrative services purportedly provided under the IMAs.

87.     For example, as shown in the following charts, the Global Allocation Fund paid BlackRock more than $3 million during its five most recently reported fiscal years, and the Equity Dividend Fund paid BlackRock more than $809,000 during its five most recently reported fiscal years, for purported "accounting services."  These accounting service fees are in addition to the amounts the Funds paid under the IMAs purportedly for preparing the Funds' tax returns and financial information for the Funds' required filings.

| Global Allocation Fund | |
| --- | --- |
| Fiscal Year Ending Oct. 31, | Accounting Service Fees Paid to BlackRock |
| 2009 | $517,263 |
| 2010 | $754,296 |
| 2011 | $618,009 |
| 2012 | $536,923 |
| 2013 | $615,357 |
| Total: | $3,041,848 |

| Equity Dividend Fund | |
| --- | --- |
| Fiscal Year Ending July 31, | Accounting Service Fees Paid to BlackRock |
| 2009 | $78,945 |
| 2010 | $135,494 |
| 2011 | $145,190 |
| 2012 | $170,944 |
| 2013 | $278,805 |
| Total: | $809,378 |

88.     In addition, as shown in the following charts, the Global Allocation Fund paid BlackRock more than $3.9 million during its five most recently reported fiscal years, and the Equity Dividend Fund paid BlackRock more than $1 million during its five most recently reported fiscal years, for "maintain[ing] a call center, which is responsible for providing certain shareholder services to the Fund, such as responding to shareholder inquiries . . . ."  These call center fees are in addition to the amounts the Funds paid under the IMAs purportedly for responding to shareholder inquiries about the Funds or referring those inquiries to the Funds' other service providers.

| Global Allocation Fund | |
|---|---|
| **Fiscal Year Ending Oct. 31,** | **Call Center Fees Paid to BlackRock** |
| 2009 | $647,885 |
| 2010 | $823,729 |
| 2011 | $885,546 |
| 2012 | $783,498 |
| 2013 | $764,594 |
| Total: | $3,905,252 |

| Equity Dividend Fund | |
|---|---|
| **Fiscal Year Ending July 31,** | **Call Center Fees Paid to BlackRock** |
| 2009 | $172,715 |
| 2010 | $155,512 |
| 2011 | $177,268 |
| 2012 | $197,548 |
| 2013 | $370,634 |
| Total: | $1,073,713 |

89.     The Funds have a separate Administrative Services Agreement with State Street Bank and Trust ("State Street") that requires State Street to provide many of the same

administrative services to the Funds that are purportedly provided under the IMAs, and requires the Funds to pay separate fees to State Street for those services.

90.     The fees paid by the Funds to State Street under the Administrative Services Agreement are in addition to the amounts the Funds paid under the IMAs purportedly for providing administrative services.

91.     As shown in the following chart, many of the administrative services purportedly covered by the IMAs are essentially identical to services provided by State Street to the Funds under the Administrative Services Agreement.

| Administrative Services Agreement with State Street | Investment Management Agreements |
|---|---|
| "Oversee the maintenance by the Fund's custodian of certain books and records of the Fund as required by Rule 31a-1(b) of the 1940 Act" | "Oversee the maintenance by the Fund's Custodian and Transfer Agent and Dividend Disbursing Agent of certain books and records of the Fund as required under Rule 31a-1(b)(4) of the 1940 Act" |
| "Prepare for review and approval by officers of the Fund financial information for the Fund's semi-annual and annual reports, proxy statements and other communications required or otherwise to be sent to Fund shareholders" | "Prepare for review and approval by officers of the Fund financial information for the Fund's semiannual and annual reports, proxy statements and other communications with shareholders required or otherwise to be sent to Fund shareholders" |
| "Prepare and file, following review by an officer of and legal counsel for the Fund, the Fund's periodic financial reports required to be filed with the [SEC] on Form N-SAR and prepare financial information required by Form N-1A, Form N-2, and other regulatory filings and such other financial reports, forms or filings as may be mutually agreed upon" | "Prepare for review by an officer of the Fund the Fund's periodic financial reports required to be filed with the [SEC] on Form N-SAR, Form N-CSR, Form N-PX, Form N-Q and such other reports, forms and filings, as may be mutually agreed upon" |
| "Make such reports and recommendations to the Board of Directors of the Fund concerning the performance of the Fund's independent accountants as the Board may reasonably request" | "Make such reports and recommendations to the Board of Directors concerning the performance of the independent accountants as the Board of Directors may reasonably request or deems appropriate" |

| Administrative Services Agreement with State Street | Investment Management Agreements |
|---|---|
| "Make such reports and recommendations to the Board concerning the performance and fees of the Fund's custodian and transfer and dividend disbursing agent as the Board may reasonably request or deem appropriate" | "Make such reports and recommendations to the Board of Directors concerning the performance and fees of the Fund's Custodian and Transfer Agent and Dividend Disbursing Agent as the Board of Directors may reasonably request or deems appropriate" |
| "Calculate and publish daily net asset value" | "Oversee the determination and publication of the Fund's net asset value" |
| "Calculate, submit for approval by officers of the Fund and arrange for payment of the Fund's expenses" | "Review the appropriateness of and arrange for payment of the Fund's expenses" |

92.     As shown in the following charts, the Global Allocation Fund paid State Street more than $23.8 million pursuant to the Administrative Services Agreement during its five most recently reported fiscal years, and the Equity Dividend Fund paid State Street more than $6.8 million pursuant to the Administrative Services Agreement during its five most recently reported fiscal years.

| Global Allocation Fund | |
|---|---|
| Fiscal Year Ending Oct. 31, | Accounting Fees Paid to State Street |
| 2009 | $3,797,590 |
| 2010 | $5,109,794 |
| 2011 | $5,021,449 |
| 2012 | $4,988,445 |
| 2013 | $4,931,591 |
| Total: | $23,848,869 |

| Equity Dividend Fund | |
|---|---|
| Fiscal Year Ending July 31, | Accounting Fees Paid to State Street |
| 2009 | $540,484 |
| 2010 | $770,583 |
| 2011 | $1,189,071 |
| 2012 | $1,973,529 |
| 2013 | $2,331,969 |
| Total: | $6,805,636 |

93.     Insofar as Defendants or their affiliates provide other services to the Funds, beyond the investment advisory and administrative services discussed above, those services are provided pursuant to separate contracts for separate compensation, in addition to the fees paid under the IMAs.

## DEFENDANTS HAVE NOT ADEQUATELY SHARED
## THE BENEFITS OF ECONOMIES OF SCALE WITH THE FUNDS

94.     The Global Allocation Fund's assets have increased in the past several years, with AUM growing from approximately $23 billion as of October 31, 2007 to approximately $58 billion as of the end of fiscal year 2013 on October 31, 2013.  As of March 31, 2014, the Global Allocation Fund's assets had increased to approximately $59 billion.

95.     As a result of the increase in AUM, the amount of investment advisory fees paid by the Global Allocation Fund increased by more than 202%, from approximately $121 million in fiscal year 2007 to more than $365 million in fiscal year 2013.

96.     The Equity Dividend Fund's assets have increased from approximately $1.5 billion as of July 31, 2007 to approximately $29.9 billion as of the end of fiscal year 2013 on July 31, 2013.  As of March 31, 2014, the Equity Dividend Fund's assets were approximately $30.5 billion.

29

97.     As a result of the increase in AUM, the amount of investment advisory fees paid by the Equity Dividend Fund increased by more than 1,993%, from approximately $6.9 million in fiscal year 2007 to more than $143 million in fiscal year 2013.

98.     The increase in investment advisory fees paid by each Fund as detailed in the preceding paragraphs was not accompanied by a proportionate increase in the work or cost by BlackRock to provide investment advisory services to the Funds.

99.     BlackRock realized economies of scale as the Funds' AUM increased, which reduced the cost, as a percentage of the Funds' AUM, of providing investment advisory services to each Fund, and increased the profitability to BlackRock of providing those services.

100.     Because investment advisers realize economies of scale as AUM increase, mutual fund investment advisory fee schedules often include breakpoints, which reduce a fund's fee rate as AUM increase.  Breakpoints enable a fund to share in the benefits of economies of scale by reducing the fee rate it pays as AUM increase.

101.     Absent breakpoints, or if the breakpoints do not appropriately reduce the effective fee rate paid by a fund, the benefits of economies of scale accrue to a fund's investment adviser in the form of higher fees and profits.

102.     Although the Funds' investment advisory fee schedules include breakpoints (*see* ¶¶ 49, 53, *supra*), the breakpoints fail to provide the Funds with an appropriate share of the benefits of economies of scale.

**Global Allocation Fund**

103.     For example, the Global Allocation Fund's AUM increased from approximately $45.7 billion on October 31, 2010 to approximately $57.8 billion on October 31, 2013.  At the

same time, breakpoints in the Global Allocation Fund's fee schedule reduced the Fund's effective investment advisory fee rate by 2 basis point, from 0.68% to 0.66%.

104.     The 2 basis points decrease in the Global Allocation Fund's effective investment advisory fee rate from 2010 to 2013 translates into a savings to the Fund of approximately $11.6 million per year based on AUM as of the end of fiscal year 2013.

105.     In contrast, due to the increase in AUM from 2010 to 2013, the dollar amount of fees paid by the Global Allocation Fund each year increased by approximately $98.3 million, from $267.2 million in fiscal year 2010 to $365.5 million in fiscal year 2013.

106.     Thus, the increase in the Global Allocation Fund's AUM from 2010 to 2013 produced benefits to BlackRock (increased advisory fees) that were more than 8.5 times greater than the benefits to the Global Allocation Fund (reductions in the advisory fee rate).

**Equity Dividend Fund**

107.     The Equity Dividend Fund's AUM increased from approximately $8.6 billion on July 31, 2010 to approximately $29.9 billion on July 31, 2013.  At the same time, breakpoints in the Equity Dividend Fund's fee schedule reduced the Fund's effective investment advisory fee rate by 5 basis points, from 0.59% to 0.54%.

108.     The 5 basis points decrease in the Equity Dividend Fund's effective investment advisory fee rate from 2010 to 2013 translates into a savings to the Fund of approximately $14.9 million per year based on AUM as of the end of fiscal year 2013.

109.     In contrast, due to the increase in AUM from 2010 to 2013, the dollar amount of fees paid by the Equity Dividend Fund each year increased by approximately $102.6 million, from $40.9 million in fiscal year 2010 to $143.5 million in fiscal year 2013.

110.    Thus, the increase in the Equity Dividend Fund's AUM from 2010 to 2013 produced benefits to BlackRock (increased advisory fees) that were more than 6.8 times greater than the benefits to the Equity Dividend Fund (reductions in the advisory fee rate).

111.    The breakpoints in the Funds' fee schedules are less significant and provide less sharing of economies of scale than the breakpoints in the Subadvised Funds' fee schedules.

**Global Allocation Fund**

112.    The following chart compares the Global Allocation Fund's fee schedule to the fee schedule for the Transamerica Subadvised Global Allocation Fund.

| BlackRock Global Allocation Fund | Transamerica Subadvised Global Allocation Fund |
|---|---|
| 0.75% on AUM up to $10 billion | 0.44% on AUM up to $100 million |
| 0.69% on AUM from $10 billion to $15 billion | 0.32% on AUM over $100 million |
| 0.68% on AUM from $15 billion to $20 billion | |
| 0.67% on AUM from $20 billion to $25 billion | |
| 0.65% on AUM from $25 billion to $30 billion | |
| 0.63% on AUM from $30 billion to $40 billion | |
| 0.62% on AUM from $40 billion to $60 billion | |
| 0.61% on AUM from $60 billion to $80 billion | |
| 0.60% on AUM over $80 billion | |

113.    The Transamerica Subadvised Global Allocation Fund benefits from a breakpoint at $100 million in AUM.  In contrast, the Global Allocation Fund does not benefit from a breakpoint until it reaches $10 billion in AUM, 100 times more than the Transamerica Subadvised Global Allocation Fund.

114.    The Transamerica Subadvised Global Allocation Fund's breakpoint at $100 million in AUM reduces that fund's fee rate by 12 basis points.  In contrast, the Global Allocation Fund's first breakpoint at $10 billion in AUM reduces the Fund's fee rate by 6 basis points, half as much as the Transamerica Fund's breakpoint.  The Global Allocation Fund does not benefit from a 12 basis point reduction until it reaches $30 billion in AUM, 300 times more than the Transamerica Fund.

115.    The 12 basis point decrease in the Transamerica Subadvised Global Allocation Fund's fee at $100 million in AUM represents a more than 27% reduction from that fund's initial fee rate of 44 basis points.  In contrast, the 6 basis point decrease in the Global Allocation Fund's fee at $10 billion in AUM represents only an 8% reduction from the Fund's initial fee rate of 75 basis points, less than one third of the relative decrease for the Transamerica Fund.

116.    Regardless of the amount of the Global Allocation Fund's AUM, it never receives the full 27% reduction from its initial fee rate that the Transamerica Subadvised Global Allocation Fund receives at only $100 million in AUM.  Even if the Global Allocation Fund were to grow to more than $80 billion in AUM, thus triggering the final breakpoint in its fee schedule, the total decrease in the Fund's fee rate would be 15 basis points, representing a 20% reduction from the Fund's initial fee rate of 75 basis points.

**Equity Dividend Fund**

117.    The following chart compares the Equity Dividend Fund's fee schedule to the fee schedule for the VALIC Subadvised Equity Dividend Fund.

| BlackRock Equity Dividend Fund | VALIC Subadvised Equity Dividend Fund |
|---|---|
| 0.60% on AUM up to $8 billion | 0.35% on AUM up to $250 million |
| 0.56% on AUM from $8 billion to $10 billion | 0.325% on AUM from $250 million to $500 million |
| 0.54% on AUM from $10 billion to $12 billion | 0.30% on AUM from $500 million to $1 billion |
| 0.52% on AUM from $12 billion to $17 billion | 0.275% on AUM over $1 billion |
| 0.51% on AUM from $17 billion to $25 billion | |
| 0.50% on AUM from $25 billion to $35 billion | |
| 0.49% on AUM from $35 billion to $50 billion | |
| 0.48% on AUM over $50 billion | |

118.    The VALIC Subadvised Equity Dividend Fund benefits from a breakpoint at $250 million in AUM.  In contrast, the Equity Dividend Fund does not benefit from a breakpoint until it reaches $8 billion in AUM, 32 times more than the VALIC Fund.

119.    By the time the VALIC Subadvised Equity Dividend Fund reaches $1 billion in AUM, breakpoints reduce that fund's fee by 7.5 basis points, a reduction of more than 21.4% relative to that fund's initial fee rate of 35 basis points.  In contrast, the Equity Dividend Fund does not benefit from a 7.5 basis point reduction until it reaches $12 billion in AUM, 12 times as much as the VALIC Fund.

120.    Regardless of the amount of the Equity Dividend Fund's AUM, it never receives the full 21.4% reduction from its initial fee rate that the VALIC Subadvised Equity Dividend Fund receives at only $1 billion in AUM.  Even if the Equity Dividend Fund were to grow to more than $50 billion in AUM, thus triggering the final breakpoint in its fee schedule, the total

decrease in the Fund's fee rate would be 12 basis points, representing a 20% reduction from the Fund's initial fee rate of 60 basis points.

## THE FEES BLACKROCK IS PAID BY THE FUNDS
## ARE NOT NEGOTIATED AT ARM'S LENGTH

121.   The investment advisory fees paid by the Funds under the IMAs are determined by BlackRock.

122.   The Funds' Board is required to approve the IMAs and the fees paid by each Fund under the IMAs on an annual basis.

123.   The Board has approved the IMAs each year without devoting the time and attention necessary to independently assess the investment advisory fees paid by the Funds or to effectively represent the interests of Fund shareholders *vis-à-vis* Defendants.

124.   Serving on the Board is a part-time job for the Board members, most of whom are employed full-time in senior-level positions in management, finance, or academia, and serve on the boards of directors of other public and privately-held companies and institutions.

125.   The Board meets five times a year, and during the five meetings each year, the Board is required to conduct its oversight responsibilities not only for each of the Funds, but also for the more than 80 other BlackRock-managed mutual funds it oversees.   This includes approving investment advisory and other services contracts for each fund, as well as other oversight responsibilities, including, among many others, monitoring each fund's compliance with federal and state law and its stated investment policies, overseeing the daily pricing of each fund's security holdings, and approving each fund's prospectus, annual and semi-annual shareholder reports, and other required regulatory filings.

126.    In approving the IMAs, the Board has relied on information and analyses that were prepared by BlackRock or were designed to support BlackRock's rationalization for the fees charged to the Funds.

127.    The Board has not considered information or analyses reflecting the interests of the Funds or their shareholders with respect to the investment advisory fees or critically assessing BlackRock's rationalization for those fees.

128.    For example, with respect to the fees paid by other clients, the Board has accepted BlackRock's representations that the lower fees paid by other clients reflect differences in the services provided to those clients.  The Board has not appropriately examined whether the investment advisory services provided to those clients are different from the services provided to the Funds under the IMAs or the extent of any such differences.  Nor has the Board considered appropriate information about the cost of providing any additional services required by the IMAs to assess whether the difference in fees is warranted by any such differences in the services provided.

129.    The Board has not solicited proposals from other advisers to provide investment advisory services to the Funds.

130.    The Board has not negotiated a "most favored nation" provision into the IMAs, which would require that the fee rates paid by each of the Funds be at least as favorable as the lowest rate other clients pay for the same or substantially the same investment advisory services.

131.    The Board has approved the payment by each of the Funds of investment advisory fees that are higher than the fees other clients pay for the same or substantially the same investment advisory services.

132.   The Board has approved an investment advisory fee arrangement that enables BlackRock to retain for itself the vast majority of the benefits of economies of scale resulting from increases in each of the Funds' AUM without appropriately sharing those benefits with the Funds.

133.   In contrast, BRIM's fees for providing investment advisory services to the Subadvised Funds are determined by negotiations between two sophisticated financial institutions:  BRIM on the one hand and the sponsor of the Subadvised Fund on the other.

134.   The sponsors of the Subadvised Funds negotiate at arm's length with BRIM regarding the fees paid for providing investment advisory services to the Subadvised Funds.

135.   The Subadvised Fund sponsors retain as profit any portion of the investment advisory fees received from the funds that remains after the sponsors pay BRIM's subadvisory fees.  By negotiating lower subadvisory fees, the Subadvised Fund sponsors increase the amount of their retained profits.

136.   The Subadvised Fund sponsors select investment advisers through a competitive selection process, with multiple candidates submitting proposals.

137.   The Subadvised Fund sponsors negotiate with investment advisers regarding the fees to be charged at the outset of the relationship and when contracts are subject to renewal. The negotiations include exchanges of proposals and counterproposals, resulting in reductions in the fee rates paid by the sponsors to the investment advisers.

**THE EXCESSIVE INVESTMENT ADVISORY FEES HARM THE FUNDS**

138.   The investment advisory fees are paid out of each Fund's assets.  Each dollar in fees paid by a Fund directly reduces the value of the Fund's investment portfolio.

139.    The payment of excessive investment advisory fees to Defendants harms each of the Funds on a going forward basis because each Fund loses investment returns and profits it could earn on the amounts paid out as fees if those amounts remained in the Fund's portfolio and available for investment.

140.    Each Fund has sustained millions of dollars in damages due to the excessive investment advisory fees paid to Defendants.

### COUNT I
### ON BEHALF OF THE GLOBAL ALLOCATION FUND
### AGAINST ALL DEFENDANTS FOR VIOLATION OF SECTION 36(b)

141.    Plaintiffs repeat and reallege each and every allegation contained in ¶¶ 1-23, 25-34, 36-41, 45-52, 56-70, 74-78, 81-95, 98-106, 111-116, and 121-140 above as if fully set forth herein.

142.    Plaintiffs assert this Count on behalf of and for the benefit of the Global Allocation Fund.

143.    Defendants are investment advisers to the Global Allocation Fund.

144.    Under Section 36(b) of the 1940 Act, Defendants owe a fiduciary duty to the Global Allocation Fund with respect to their receipt of investment advisory fees and other compensation from the Fund.

145.    Defendants breached their fiduciary duty under Section 36(b) of the 1940 Act by charging investment advisory fees to the Global Allocation Fund that are so disproportionately large that they bear no reasonable relationship to the value of the services provided by BlackRock and could not have been the product of arm's-length bargaining

146.     As a direct, proximate, and foreseeable result of Defendants' breach of their fiduciary duty under Section 36(b) of the 1940 Act, the Global Allocation Fund has sustained millions of dollars in damages.

147.     Pursuant to Section 36(b)(3) of the 1940 Act, Plaintiffs seek to recover, on behalf of and for the benefit of the Global Allocation Fund, the actual damages resulting from Defendants' breach of their fiduciary duty, including the excessive investment advisory fees paid by the Global Allocation Fund to Defendants and investment returns that would have accrued to the Global Allocation Fund had those fees remained in the portfolio and available for investment.

148.     Alternatively, under Section 47 of the 1940 Act, 15 U.S.C. § 80a-46, Plaintiffs seek rescission of the Global Allocation IMA and restitution of all excessive investment advisory fees paid by the Global Allocation Fund pursuant to the IMA.

**COUNT II**
**ON BEHALF OF THE EQUITY DIVIDEND FUND**
**AGAINST ALL DEFENDANTS FOR VIOLATION OF SECTION 36(b)**

149.     Plaintiffs repeat and reallege each and every allegation contained in ¶¶ 1-22, 24-32, 35-38, 42-48, 53-67, 71-76, 79-93, 96-102, 107-111, and 117-140 above as if fully set forth herein.

150.     Plaintiffs assert this Count on behalf of and for the benefit of the Equity Dividend Fund.

151.     Defendants are investment advisers to the Equity Dividend Fund.

152.     Under Section 36(b) of the 1940 Act, Defendants owe a fiduciary duty to the Equity Dividend Fund with respect to their receipt of investment advisory fees and other compensation from the Fund.

153.    Defendants breached their fiduciary duty under Section 36(b) of the 1940 Act by charging investment advisory fees to the Equity Dividend Fund that are so disproportionately large that they bear no reasonable relationship to the value of the services provided by BlackRock and could not have been the product of arm's-length bargaining

154.    As a direct, proximate, and foreseeable result of Defendants' breach of their fiduciary duty under Section 36(b) of the 1940 Act, the Equity Dividend Fund has sustained millions of dollars in damages.

155.    Pursuant to Section 36(b)(3) of the 1940 Act, Plaintiffs seek to recover, on behalf of and for the benefit of the Equity Dividend Fund, the actual damages resulting from Defendants' breach of their fiduciary duty, including the excessive investment advisory fees paid by the Equity Dividend Fund to Defendants and investment returns that would have accrued to the Equity Dividend Fund had those fees remained in the portfolio and available for investment.

156.    Alternatively, under Section 47 of the 1940 Act, 15 U.S.C. § 80a-46, Plaintiffs seek rescission of the Equity Dividend IMA and restitution of all excessive investment advisory fees paid by the Equity Dividend Fund pursuant to the IMA.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment on behalf of and for the benefit of each of the Funds as follows:

A.    declaring that Defendants have violated Section 36(b) of the 1940 Act, 15 U.S.C. § 80a-35(b), through the receipt of excessive investment advisory fees from each Fund;

B.    permanently enjoining Defendants from further violations of Section 36(b) of the 1940 Act;

40

C.      awarding compensatory damages against Defendants, including repayment
to each Fund of all unlawful and excessive investment advisory fees paid
by such Fund from one year prior to the commencement of this action on
behalf of such Fund through the date of trial, lost investment returns on
those amounts, and interest thereon;

D.      rescinding each IMA pursuant to Section 47 of the 1940 Act, 15 U.S.C.
§ 80a-46, including restitution to each Fund of the excessive investment
advisory fees paid by such Fund from one year prior to the
commencement of this action on behalf of such Fund through the date of
trial, lost investment returns on those amounts, and interest thereon;

E.      awarding Plaintiffs reasonable costs in this action, including attorneys'
fees, expert witness fees, and such other items as may be allowed to the
maximum extent permitted by law; and

F.      such other and further relief as the Court may deem just and proper.

### JURY TRIAL DEMANDED

Plaintiffs demand a trial by jury.

Dated:  May 27, 2014

SZAFERMAN, LAKIND, BLUMSTEIN &
BLADER, P.C.

/s/ Robert L. Lakind
Robert L. Lakind
Arnold C. Lakind
101 Grovers Mill Road, Suite 200
Lawrenceville, NJ 08648
Tel: (609) 275-0400
Fax: (609) 275-4511

*Local Counsel for Plaintiffs*

41

**ZWERLING, SCHACHTER &
ZWERLING, LLP**
Robin F. Zwerling
Jeffrey C. Zwerling
Susan Salvetti
Andrew W. Robertson
41 Madison Avenue
New York, NY 10010
Tel: (212) 223-3900
Fax: (212) 371-5969

*Lead Counsel for Plaintiffs*

**ROBBINS ARROYO LLP**
Stephen J. Oddo
600 B Street, Suite 1900
San Diego, CA 92101
Tel: (619) 525-3990
Fax: (619) 525-3991

*Counsel for Plaintiffs Brendan Foote
and Amy Fox*