SZAFERMAN, LAKIND, BLUMSTEIN & BLADER, P.C.
101 Grovers Mill Road, Suite 200
Lawrenceville, NJ 08648
By:  Robert L. Lakind
       Arnold C. Lakind
Tel: (609) 275-0400
Fax: (609) 275-4511

*Local Counsel for Plaintiffs*

[Additional Counsel on Signature Page]

**UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re BLACKROCK MUTUAL FUNDS ADVISORY FEE LITIGATION | Master File No. 3:14-cv-01165-JAP-DEA<br><br>Motion date: August 18, 2014<br><br>Oral Argument Requested |

**PLANTIFFS' MEMORANDUM OF LAW IN OPPOSITION
TO DEFENDANTS' MOTION FOR JUDGMENT ON THE
<u>PLEADINGS DISMISSING THE COMPLAINT</u>**

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................ 1

BACKGROUND REGARDING § 36(b) ...........................................................3

    Legislative History ...................................................................................3

    Standard of Liability................................................................................5

STATEMENT OF RELEVANT FACTS ............................................................ 6

    Nature and Quality of BlackRock's Investment Advisory Services to the Funds ...............6

    Fees Paid by Other Clients for BlackRock's Investment Advisory Services........................7

    Economies of Scale and Profitability Realized by BlackRock ............................................8

    Board Approval of the Advisory Fees Charged to the Funds ..............................................9

ARGUMENT..................................................................................................... 10

    I.    RULE 8(a) IS SATISFIED WHERE THE FACTS ALLEGED SUPPORT A PLAUSIBLE INFERENCE THAT THE FEES ARE DISPROPORTIONATE TO THE SERVICES AND OUTSIDE THE ARM'S-LENGTH RANGE .............11

    II.    DEFENDANTS CHARGE ADVISORY FEES TO THE FUNDS OUTSIDE THE RANGE OF WHAT COULD BE NEGOTIATED AT ARM'S LENGTH ....13

        A.    The Complaint Alleges a Large Disparity Between the Fees Charged to the BlackRock Funds and to the Subadvised Funds that Cannot Be Explained by Any Difference in the Investment Advisory Services Provided.................14

            1.    The Large Disparity in Fees Charged ................................................... 14

            2.    The Higher Fee Charged to the BlackRock Funds Is Not Due to Any Meaningful Difference in the Investment Advisory Services Provided. .................................................................................................... 14

            3.    The Subadvised Funds' Fees Were Negotiated at Arm's Length.......... 16

            4.    The Subadvised Fund Fee Comparisons Support a Plausible Inference that the Fees Charged to the BlackRock Funds Are Excessive. ............ 16

        B.    Defendants' Argument that the Subadvised Fund Fee Comparisons Are "Not Meaningful" Is Contrary to Applicable Law. ........................................18

        C.    Defendants' Alternative Fee Comparisons Do Not Warrant Dismissal. .........19

III.  DEFENDANTS REALIZED ECONOMIES OF SCALE AND DID NOT APPROPRIATELY SHARE THE BENEFITS WITH THE FUNDS ....................21

    A.  The Complaint Adequately Alleges that BlackRock Realized Economies of Scale and Failed to Appropriately Share the Benefits with the Funds ...........21

    B.  Defendants' Cases Do Not Support Dismissal. ...............................................23

IV.  APPROVAL OF THE ADVISORY FEES BY THE BOARD IS ENTITLED TO LITTLE OR NO DEFERENCE ......................................................................26

    A.  The Board Approval Process Was Deficient. ..................................................26

    B.  The Board's Approval Cannot Be the Basis for Dismissal at the Pleading Stage..................................................................................................................29

CONCLUSION.............................................................................................................. 30

# TABLE OF AUTHORITIES

## Cases

*Amron v. Morgan Stanley Inv. Advisors Inc.*,
  464 F.3d 338 (2d Cir. 2006)..................................................................... 29

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)............................................................................. 11

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007)............................................................................. 11

*Curran v. Principal Mgmt. Corp.*,
  No. 4:09-cv-00433, 2010 WL 2889752 (S.D. Iowa June 8, 2010)................................... *passim*

*Daily Income Fund, Inc. v. Fox*,
  464 U.S. 523 (1984)......................................................................... 3, 4, 26

*DiCarlo v. St. Mary Hosp.*,
  530 F.3d 255 (3d Cir. 2008).................................................................... 10

*Dumond v. Mass. Fin. Servs. Co.*,
  No. Civ. A. 04-11458-GAO, 2006 WL 149038 (D. Mass. Jan. 19, 2006) ...................... 13, 28

*In re Federated Mut. Funds Excessive Fee Litig.*,
  No. 2:04cv352, 2009 WL 5821045 (W.D. Pa. Sept. 30, 2009) ......................................... *passim*

*Gartenberg v. Merrill Lynch Asset Mgmt., Inc.*,
  528 F. Supp. 1038 (S.D.N.Y. 1981)........................................................... 23, 24

*Gartenberg v. Merrill Lynch Asset Mgmt., Inc.*,
  694 F.2d 923 (2d Cir. 1982)..................................................................... 5

*In re Goldman Sachs Mut. Funds Fee Litig.*,
  No. 04 Civ. 2567 (NRB), 2006 WL 126772 (S.D.N.Y. Jan. 17, 2006) ...................... 12, 23, 25

*Hoffman v. UBS-AG*,
  591 F. Supp. 2d. 522 (S.D.N.Y. 2008)........................................................... 25

*Hunt v. Invesco Funds Group, Inc.*,
  No. H-04-02555, 2006 WL 1581846 (S.D. Tex. June 5, 2006).................................. 13, 17, 28

*Indian Harbor Ins. Co. v. NL Envtl. Mgmt. Servs., Inc.*,
  No. 13-cv-1889 (JAP), 2014 WL 791821 (D.N.J. Feb. 25, 2014)........................... 10

*Jones v. Harris Assocs. L.P.*,
  537 F.3d 728 (7th Cir. 2008) .............................................................. 13, 19

*Jones v. Harris Assocs. L.P.,*
    559 U.S. 335 (2010)..................................................................................................*passim*

*Kalish v. Franklin Advisers, Inc.,*
    742 F. Supp. 1222 (S.D.N.Y. 1990)...................................................................... 23

*Kamen v. Kemper Fin. Servs., Inc.,*
    500 U.S. 90 (1991).................................................................................................. 4

*Kasilag v. Hartford Inv. Fin. Servs., LLC,*
    No. 11-1083 (RMB/KMW), 2012 WL 6568409 (D.N.J. Dec. 17, 2012).........................*passim*

*Krinsk v. Fund Asset Mgmt. Inc.,*
    875 F.2d 404 (2d Cir. 1989)............................................................................... 23, 24

*Major Tours, Inc. v. Colorel,*
    720 F. Supp. 2d 587 (D.N.J. 2010) ........................................................................ 11

*McArdle v. Verizon Commc'ns Inc.,*
    No. 13-4207, 2014 WL 2153839 (3d Cir. May 23, 2014) ....................................... 12

*Migdal v. Rowe Price-Fleming Int'l, Inc.,*
    248 F.3d 321 (4th Cir. 2001) ....................................................................... 4, 20, 29

*Mintz v. Baron,*
    No. 05 Civ. 4904 (LTS)(HBP), 2009 WL 735140 (S.D.N.Y. Mar. 20, 2009) ....................... 25

*R.W. Grand Lodge of F. & A.M. of Penn. v. Salomon Bros. All Cap Value Fund,*
    425 Fed. App'x 25 (2d Cir. 2011) ............................................................... 12, 17, 29

*Rehab. Inst. of N.J., Inc. v. Home Depot Inc.,*
    No. 12–4035, 2012 WL 5944658 (D.N.J. Nov. 27, 2012)....................................... 10

*Reso v. Artisan Partners Ltd. P'ship,*
    No. 11-CV-873-JPS, 2011 WL 5826034 (E.D. Wis. Nov. 18, 2011)................................*passim*

*In re Salomon Smith Barney Mut. Fund Fees Litig.,*
    528 F. Supp. 2d 332 (S.D.N.Y. 2007)..................................................................... 29

*In re Scudder Mut. Funds Fee Litig.,*
    No. 04 Civ. 1921 (DAB), 2007 WL 2325862 (S.D.N.Y. Aug. 14, 2007) ............................... 25

*Sins v. Janus Capital Mgmt., LLC,*
    No. 04-cv-01647-WDM-MEH, 2006 WL 3746130 (D. Colo. Dec. 15, 2006) ................. 13, 17

*Strigliabotti v. Franklin Res., Inc.,*
    No. C 04-00883 SI, 2005 WL 645529 (N.D. Cal. Mar. 7, 2005) ....................... 13, 23

*Thompson v. Real Estate Mortgage Network,*
   748 F.3d 142 (3d Cir. 2014)........................................................................ 11

*Wicks v. Putnam Inv. Mgmt., LLC,*
   No. Civ.A.04-10988-GAO, 2005 WL 705360 (D. Mass. Mar. 28, 2005)......................... 13, 23

**Statutes**

15 U.S.C. § 80a-35(b) ........................................................................*Passim*

**Rules**

Fed. R. Civ. P. 8(a) ........................................................................................ 2

Fed. R. Civ. P.  8(a)(2)................................................................................. 12

Fed. R. Civ. P.  12(c) .............................................................................. 1, 10

**Miscellaneous**

University of Pennsylvania's Wharton School of Finance and Commerce,
   A STUDY OF MUTUAL FUNDS, H.R. REP. NO. 87-2274 (1962)................................... 4

*Senate Committee on Banking & Currency,*
   S. REP. NO. 184, 91st Cong., 1st Sess. (1969) ..................................................*Passim*

Plaintiffs respectfully submit this memorandum of law in opposition to the motion filed by Defendants BlackRock Advisors, LLC ("BRA"), BlackRock Investment Management, LLC ("BRIM"), and BlackRock International Limited ("BRIL") (collectively, "Defendants" or "BlackRock") pursuant to Fed. R. Civ. P. 12(c) seeking dismissal of the claims asserted on behalf of the BlackRock Global Allocation Fund (the "Global Allocation Fund") and the BlackRock Equity Dividend Fund (the "Equity Dividend Fund") (together, the "Funds" or "BlackRock Funds") under Section 36(b) of the Investment Company Act of 1940 (the "1940 Act"), 15 U.S.C. § 80a-35(b) ("§ 36(b)").

## INTRODUCTION

Defendants' investment advisory fee arrangements with the BlackRock Funds epitomize the conflicts of interest and potential for abuse that led Congress to enact § 36(b).  Unconstrained by competitive pressures, Defendants charge the Funds advisory fees that are as much as 106% higher than the fees negotiated at arm's length by other, independent mutual funds (the "Subadvised Funds") for BlackRock's advisory services.  As the BlackRock Funds have grown in recent years, Defendants have captured the benefits of economies of scale for themselves in the form of higher fees and profits, without appropriately sharing those benefits with the Funds. Approval of the fees by the Funds' Boards of Directors/Trustees (the "Board") has not served as an effective check on the fees charged.

The facts and circumstances pertaining to the advisory fees charged to the Funds fall squarely within the standard of liability for evaluating § 36(b) claims established by the U.S. Supreme Court in *Jones v. Harris Assocs. L.P.*, 559 U.S. 335 (2010).  The large disparity between fees charged to the BlackRock Funds and the Subadvised Funds provides direct, concrete support for a plausible inference that the fees charged to the Funds are disproportionate

to the services provided and outside the range of what could be negotiated at arm's length. The substantial increase in fees charged to the Funds, without a corresponding change in the services provided by Defendants or the cost to Defendants of providing those services, further evidences that the resulting fees are disproportionate to the services provided. And the Board's failure to act at arm's length from BlackRock or consider information necessary to properly evaluate BlackRock's advisory fees requires that little deference be given to the Board's approval.

The foregoing facts, taken together and considered as a whole, satisfy the applicable pleading standard under Fed. R. Civ. P. 8(a) by establishing a plausible inference that the fees charged by Defendants to the Funds violate § 36(b). Numerous courts have denied motions to dismiss § 36(b) claims based on virtually identical allegations.

Defendants do not contest the disparity in fees charged to the Funds and the Subadvised Funds, nor do they identify any purported difference in the services that would justify the disparity in fees charged. Rather, Defendants *admit* the core allegations that the same or substantially the same BlackRock personnel provide advisory services to both sets of clients and use the same investment strategies, research and analysis, and systems, technology, and other resources in providing those services.

Unable to contest the sufficiency of these allegations, Defendants ask the court to ignore them and instead focus on comparisons with fees charged by other investment advisers to their captive mutual funds without providing any basis for why such comparisons are valid. Indeed, *Jones* cautions against exactly that type of comparison, and holds that the arm's-length range of fees for services—established here by the fees charged to the Subadvised Funds—is the benchmark for evaluating challenged fees.

Defendants' arguments that the allegations regarding economies of scale and Board approval of the challenged fees are not properly pled seek to impose a heightened pleading standard and require far greater detail than is required by notice pleading applicable to § 36(b) claims. Numerous courts have held that similar allegations are adequately pled and support an inference of liability under § 36(b).

Defendants would require Plaintiffs to *prove* their claims rather than *plead* them. But Plaintiffs need only allege enough factual matter to plausibly state a claim for relief. When read as a whole, the Complaint surely does so.

## BACKGROUND REGARDING § 36(b)

### Legislative History

Congress adopted the 1940 Act to regulate investment companies, including mutual funds. Typically, a mutual fund is created by an investment adviser, which is an entity separate from the fund. *See Jones*, 559 U.S. at 338. "The adviser selects the fund's directors, manages the fund's investments, and provides other services." *Id.* In this sense, a mutual fund is often referred to as "captive" of its adviser. *Id.* at 349. Recognizing that the relationship between an investment adviser and its captive mutual fund is "fraught with potential conflicts of interest," and concerned about the "potential for abuse" in this structure, Congress enacted protections for mutual fund shareholders in the 1940 Act. *Daily Income Fund, Inc. v. Fox*, 464 U.S. 523, 536-38 (1984) (citations omitted).

Congress amended the 1940 Act in 1970 to provide additional protections to shareholders with respect to the fees charged by investment advisers to their captive mutual funds. Among other amendments, Congress added a new § 36(b), which provides:

> [T]he investment adviser of a [mutual fund] shall be deemed to have a fiduciary duty with respect to the receipt of compensation for services, or of payments of a

3

> material nature, paid by [the mutual fund], or by the security holders thereof, to
> such investment adviser or any affiliated person of such investment adviser.

15 U.S.C. § 80a-35(b).  Section 36(b) creates a private right of action for fund shareholders to

enforce the fiduciary duty created by the statute.  *See id.*

Section 36(b) reflects Congress's determination that "the forces of arms-length

bargaining do not work in the mutual fund industry in the same manner as they do in other

sectors of the American economy," S. REP. NO. 91-184, at 4 (1969), *reprinted in* 1970

U.S.C.C.A.N. 4897, 4901.   This conclusion was based in part on a study of the mutual fund

industry by the University of Pennsylvania's Wharton School of Finance and Commerce.  *See* A

STUDY OF MUTUAL FUNDS, H.R. REP. NO. 87-2274 (1962) ("Wharton Report").[1]  The Wharton

Report determined that "investment advisers often charged mutual funds higher fees than those

charged to the advisers' other clients," *Daily Income Fund*, 464 U.S. at 537 (citing Wharton

Report at 34), and the "principal reason for the differences in rates" was that "competitive factors

which tend to influence rates charged other clients have not been substantially operative in fixing

the advisory fee rates paid by mutual funds."  Wharton Report at 493-94.

Section 36(b) also reflects Congress's intent to ensure that investors "share equitably . . .

in the economies available as a result of the growth and general acceptance of mutual funds."  S.

REP. NO. 91-184, at 6 (1969), *reprinted in* 1970 U.S.C.C.A.N. 4897, 4901.  Congress recognized

that investment advisers realize economies of scale because "as mutual funds grew larger, it

became less expensive for investment advisers to provide additional services."  *Migdal v. Rowe

Price-Fleming Int'l, Inc.*, 248 F.3d 321, 326-27 (4th Cir. 2001).

Finally, § 36(b) reflects Congress's conclusion that "shareholders should not have to rely

solely on the fund's directors to assure reasonable adviser fees."  *Kamen v. Kemper Fin. Servs.,*

---

[1]     Also available at: http://www.sechistorical.org/museum/galleries/tbi/gogo_c.php.

*Inc.*, 500 U.S. 90, 108 (1991) (internal quotation marks and citation omitted).   Congress established § 36(b) as a "mechanism by which the fairness of" those fees "could be tested in court." S. REP. NO. 91-184, at 5 (1969), *reprinted in* 1970 U.S.C.C.A.N. 4897, 4901.

**Standard of Liability**

"[T]o face liability under § 36(b), an investment adviser must charge a fee that is so disproportionately large that it bears no reasonable relationship to the services rendered and could not have been the product of arm's length bargaining." *Jones*, 559 U.S. at 346.  This standard of § 36(b) liability was formulated by the Second Circuit in *Gartenberg v. Merrill Lynch Asset Mgmt., Inc.*, 694 F.2d 923 (2d Cir. 1982), and adopted by the Supreme Court. *Jones*, 559 U.S. at 346.  In applying the "*Gartenberg* standard," courts must consider "all relevant circumstances" and "use[] the range of fees that might result from arm's-length bargaining as the benchmark for reviewing challenged fees." *Jones*, 559 U.S. at 347.

Relevant circumstances considered by courts applying the *Gartenberg* standard include, but are not limited to:  (1) the nature and quality of services provided to the fund; (2) fees paid by others, including the adviser's other clients, for comparable services; (3) the profitability of the fund to the adviser; (4) the economies of scale realized by the adviser in providing services to the fund and the extent to which the benefits of those economies of scale have been shared with the fund; (5) any "fall-out benefits" or collateral financial benefits to the adviser from its relationship with the fund; and (6) the independence, expertise, care, and conscientiousness of the fund's board of directors in approving the challenged fees. *See id.* at 344-45.

## STATEMENT OF RELEVANT FACTS

### Nature and Quality of BlackRock's Investment Advisory Services to the Funds

Defendants BRA and BRIM serve as investment advisers to the Funds pursuant to Investment Management Agreements ("IMAs") between BRA and the Funds, and subadvisory agreements between BRA and BRIM.  ¶¶ 33, 35.[2]  Until July 1, 2013, Defendant BRIL also served as an investment adviser to the Global Allocation Fund pursuant to a subadvisory agreement between BRA and BRIL. ¶ 34.

Pursuant to the IMAs and subadvisory agreements, Defendants provide investment advisory services to each Fund, including:  (a) "supervis[ing] and manag[ing] the investment and reinvestment of the Fund's assets"; (b) "supervis[ing] continuously the investment program of the Fund and the composition of its investment portfolio"; (c) "arrang[ing] . . . for the purchase and sale of securities and other assets held in the investment portfolio of the Fund"; and (d) "voting, exercising consents and exercising all other rights appertaining to such securities . . . on behalf of the Fund."  ¶ 36.   The IMAs also require that certain books and records be maintained. ¶ 37.

In exchange for the investment advisory services provided by BlackRock to the Funds, the IMAs require each Fund to pay BRA an annual fee that is calculated as a percentage of the Fund's assets under management or "AUM."  ¶ 47.   BRA, in turn, allocates a portion of the investment advisory fee it receives from each Fund to BRIM, and it allocated a portion of the fee from the Global Allocation Fund to BRIL until July 1, 2013. ¶ 48.

---

[2]     All ¶ references are to the Consolidated Complaint (Dkt. No. 27).

**Fees Paid by Other Clients for BlackRock's Investment Advisory Services**

BlackRock also provides investment advisory services to the Subadvised Funds. ¶¶ 56-57. The Subadvised Funds are organized and sponsored by financial institutions independent of BlackRock. ¶¶ 58, 62. Each of those independent financial institution sponsors, nominally acting as the investment adviser, has subcontracted with BRIM to provide investment advisory services to the Subadvised Funds. ¶¶ 62-63. Pursuant to those subadvisory agreements, BRIM acts as a subadviser and provides investment advisory services to each of the Subadvised Funds in exchange for a fee. ¶ 63.

The subadvisory agreements require the same or substantially the same investment advisory services as required by the Funds' IMAs. ¶ 66. For example, like the Funds' IMAs, the subadvisory agreement for the AZL Subadvised Global Allocation Fund requires BRIM to: (a) "manage the investment operations and the composition of" the fund's investment portfolio; (b) "determine from time to time what investments and securities will be purchased, retained, or sold" for the fund's portfolio; (c) "place orders with or through...persons, brokers, dealers, or futures commission merchants" on behalf of the fund; and (d) "vote, or abstain from voting, all proxies, if applicable, with respect to companies whose securities are held" by the fund. *Id.* Also, like the Funds' IMAs, the subadvisory agreements require BRIM to maintain books and records relating to its provision of investment advisory services to the Subadvised Funds. ¶ 67.

As Defendants admit, the same portfolio managers that manage the BlackRock Funds also mange the Subadvised Funds, and use the same or substantially the same investment strategies, research and analysis, technology, and other resources in managing both sets of funds. ¶¶ 69-70, 72-73; Answer ¶¶ 69-70, 72-73. The same or substantially the same legal, compliance, and administrative personnel also provide services to both sets of funds. ¶ 75.

7

Despite the virtually complete overlap in services provided by BlackRock to the Funds and the Subadvised Funds, the fees charged to the BlackRock Funds are significantly higher than the fees paid by the Subadvised Funds for those services. ¶¶ 76-84.

The Global Allocation Fund's effective advisory fee is as much as 106% higher than the fees paid by comparable Subadvised Funds. ¶ 77. As a result, the Global Allocation Fund pays as much as $201 million more in advisory fees each year than it would pay under a fee arrangement negotiated at arm's length. ¶ 78. The Equity Dividend Fund's effective advisory fee is as much as 96% higher than the fees paid by comparable Subadvised Funds. ¶ 79. As a result, the Equity Dividend Fund pays as much as $79 million more in advisory fees each year than it would pay under a fee arrangement negotiated at arm's length. ¶ 80.

The higher fees paid by the Funds are not justified by any additional services provided to the Funds by Defendants or their affiliates pursuant to the IMAs or otherwise. ¶¶ 81-93.

**Economies of Scale and Profitability Realized by BlackRock**

From 2007-2013, the Global Allocation Fund's AUM increased from $23 billion to $58 billion. ¶ 94. This resulted in an increase in the investment advisory fees charged to the Global Allocation Fund of more than 202% from $121 million to more than $365 million. ¶ 95. During the same approximate time period, the Equity Dividend Fund's AUM increased from $1.5 billion to $29 billion, resulting in an increase in the advisory fees charged to the Equity Dividend Fund of more than 1,999% from $6.9 million to more than $143 million. ¶¶ 96-97.

The dramatic increases in advisory fees charged to the Funds were not accompanied by a proportionate increase in BlackRock's work or cost to provide investment advisory services to the Funds. ¶ 98. BlackRock realized economies of scale as the Funds' AUM increased, which

reduced the cost, as a percentage of the Funds' AUM, of providing investment advisory services to each Fund. ¶ 99. As a result, BlackRock's profits from the advisory fees increased. *Id.*

The breakpoints in the Funds' fee schedules failed to provide the Funds with an appropriate share of the benefits of economies of scale and enabled Defendants to retain those benefits. ¶ 102. From 2010 to 2013, the benefits of economies of scale accruing to BlackRock were more than 8.5 times greater than the benefits shared with the Global Allocation Fund and more than 6.8 times greater than the benefits shared with the Equity Dividend Fund. *See* ¶¶ 103-110.

The breakpoints in the Funds' fee schedules also provide less sharing of economies of scale than the breakpoints in the fee schedules that were negotiated at arm's-length between Defendants and the Subadvised Funds. ¶ 111. The Subadvised Funds benefit from breakpoints that begin at lower levels of AUM, provide more significant fee reductions for a given increase in AUM, and provide more significant overall fee reductions than the breakpoints in the BlackRock Funds' advisory fee schedules. *See* ¶¶ 112-120.

**Board Approval of the Advisory Fees Charged to the Funds**

The Funds' Board has approved the IMAs each year without devoting the time and attention necessary to assess the advisory fees charged to the Funds. ¶¶ 122-125. The Board passively accepted BlackRock's rationalization for the fees charged and did not appropriately examine, among other things, the disparity in fees charged to the BlackRock Funds and the Subadvised Funds or any purported justification for such disparity. ¶¶ 126-128.

As Defendants admit, the Board also did not solicit proposals from other investment advisers to provide advisory services to the Funds.  ¶ 129; Answer ¶¶ 129.  Nor did it negotiate a "most favored nation" provision into the IMAs.  ¶ 130; Answer ¶ 130.[3]

## ARGUMENT

A motion for judgment on the pleadings pursuant to Rule 12(c), "will only be granted where the moving party clearly establishes there are no material issues of fact, and that he or she is entitled to judgment as a matter of law." *Indian Harbor Ins. Co. v. NL Envtl. Mgmt. Servs., Inc.*, No. 13-cv-1889(JAP), 2014 WL 791821, at *2 (D.N.J. Feb. 25, 2014) (quoting *DiCarlo v. St. Mary Hosp.*, 530 F.3d 255, 259 (3d Cir. 2008)).

Where a movant alleges that a complaint fails to state a claim upon which relief can be granted pursuant to Rule 12(c), the court applies the same standards as a motion to dismiss under Rule 12(b)(6) and cannot consider matters outside the pleadings. *Id.*; *see also Rehab. Inst. of N.J., Inc. v. Home Depot Inc.*, No. 12–4035, 2012 WL 5944658, at *2 (D.N.J. Nov. 27, 2012) ("An argument that relies on proof of facts outside the Complaint cannot succeed on a motion to dismiss.").[4]  In addition, the court may not decide issues of fact on this motion.  *See Curran v. Principal Mgmt. Corp.*, No. 4:09-cv-433, 2010 WL 2889752, at *9 (S.D. Iowa June 8, 2010) (finding it inappropriate to undertake fact intensive merits inquiries at the motion to dismiss stage).

---

[3]     Contrary to Defendants' assertion, the Complaint does not reference director compensation, nor do Defendants cite to any such allegations.  *See* Def. Br. at 15.

[4]     Defendants' Answer attaches 23 exhibits (Exhibits A through W).  Of those 23, 13 (Exhibits I, K-M, O-W) are not referenced in the Answer.  Only Exhibits A through H are referenced in the Answer.  Exhibits J and N are cited in the Answer solely in support of an admission of the allegations contained in ¶ 30 of the Complaint.

I.     **RULE 8(a) IS SATISFIED WHERE THE FACTS ALLEGED SUPPORT A PLAUSIBLE INFERENCE THAT THE FEES ARE DISPROPORTIONATE TO THE SERVICES AND OUTSIDE THE ARM'S-LENGTH RANGE**

Fed. R. Civ. P. 8 governs the pleading sufficiency of a § 36(b) claim.  *See In re Federated Mut. Funds Excessive Fee Litig.*, No. 2:04cv352, 2009 WL 5821045, at *3 (W.D. Pa. Sept. 30, 2009).  Fed. R. Civ. P. 8(a)(2) requires only "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2); *see also Thompson v. Real Estate Mortgage Network*, 748 F.3d 142, 147 (3d Cir. 2014) (reiterating that "notice pleading" remains the standard and that a plaintiff "need only put forth allegations that raise a reasonable expectation that discovery will reveal evidence of the necessary element."); *Major Tours, Inc. v. Colorel*, 720 F. Supp. 2d 587, 606 (D.N.J. 2010) (holding that under Rule 8, plaintiffs "must simply allege enough facts to nudge the claim into the realm of the plausible").

This standard "do[es] not require heightened fact pleading specifics." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *see also In re Federated*, 2009 WL 5821045, at *3. Against this criteria, Defendants' proposition that the pleading standard for a § 36(b) claim is a "stringent one" (Def. Br. at 7) is wrong.  Rather, to survive a motion to dismiss, a complaint must simply contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 570).  While this plausibility standard requires a plaintiff to show that success on the merits is more than a "sheer possibility," it is not a "probability requirement."  *Id.*

When reviewing a motion to dismiss on the pleadings, a district court must "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled

11

to relief." *McArdle v. Verizon Comm. Inc.*, No. 13-4207, 2014 WL 2153839, at *2 (3d Cir. May 23, 2014) (citation omitted).

Under § 36(b), the inquiry at the pleading stage is whether Plaintiffs "allege facts which would satisfy the basic standard articulated in *Gartenberg*, 'that the fees are [so] disproportionately large, that they bear no reasonable relationship to the services rendered or that they could not have been the product of arm's-length bargaining.'" *In re Goldman Sachs Mut. Funds Fee Litig.*, 04 Civ. 2567, 2006 WL 126772, at *9 (S.D.N.Y. Jan. 17, 2006) (citation omitted).

Plaintiffs "may state a § 36(b) claim by alleging any combination of facts that plausibly support an inference that a particular fee, given all of the surrounding facts and circumstances, is disproportionately large to the services rendered in exchange for that fee." *Curran,* 2010 WL 2889752, at *9. Contrary to Defendants' attempt to transform the *Gartenberg* factors into pleading requirements, those factors, while pertinent, are "non-exclusive." *See In re Federated*, 2009 WL 5821045, at *3. That is, Plaintiffs are ***not*** required to plead facts with respect to all of the *Gartenberg* factors. *See Kasilag v. Hartford Inv. Fin. Serv., LLC,* No. 11-1083(RMB/KMW), 2012 WL 6568409, at *2 (D.N.J. Dec. 17, 2012); *Curran,* 2010 WL 2889752, at *9; *Reso v. Artisan Partners Ltd. P'ship*, No. 11-CV-873, 2011 WL 5826034, at *5 (E.D. Wis. Nov. 18, 2011). Even Defendants' authorities recognize as much. *See In re Goldman Sachs,* 2006 WL 126772, at *8.

In view of the legislative intent of § 36(b) and the notice pleading standard, courts in this district and throughout the country have regularly denied motions to dismiss § 36(b) claims founded upon allegations similar to those here, as further discussed herein. *See, e.g., R.W. Grand Lodge of F. & A.M. of Penn. v. Salomon Bros. All Cap Value Fund*, 425 Fed. App'x 25

(2d Cir. 2011); *Kasilag,* 2012 WL 6568409; *In re Federated,* 2009 WL 5821045; *Reso,* 2011 WL 5826034; *Curran,* 2010 WL 2889752; *Sins v. Janus Capital Mgmt.,* LLC, No. 04-cv-01647, 2006 WL 3746130 (D. Colo. Dec. 15, 2006); *Hunt v. Invesco Funds Group, Inc.,* No. H-04-02555, 2006 WL 1581846 (S.D. Tex. June 5, 2006); *Dumond v. Mass. Fin. Servs. Co.,* No. Civ. A. 04-11458, 2006 WL 149038 (D. Mass. Jan. 19, 2006); *Wicks v. Putnam Inv. Mgmt., LLC,* No. Civ.A.04-10988, 2005 WL 705360 (D. Mass. Mar. 28, 2005); *Strigliabotti v. Franklin Res., Inc.,* No. C 04-00883, 2005 WL 645529 (N.D. Cal. Mar. 7, 2005).

## II.   DEFENDANTS CHARGE ADVISORY FEES TO THE FUNDS OUTSIDE THE RANGE OF WHAT COULD BE NEGOTIATED AT ARM'S LENGTH

The Supreme Court in *Jones* held that courts considering claims under § 36(b) must "use[] the range of fees that might result from arm's-length bargaining as the benchmark for reviewing challenged fees." *Jones,* 559 U.S. at 347.   The Supreme Court further explained that the fees paid by the adviser-defendant's other clients should be given "the weight that they merit in light of the *similarities and differences between the services* that the clients in question require . . . ." *Id.* at 350 (emphasis added).   The fees paid by other clients are probative of a breach of fiduciary duty under § 36(b) "where plaintiffs have shown a large disparity in fees that cannot be explained by the different services" provided to other clients. *Id.* at 350 n.8.

The Supreme Court emphasized that, in order to be probative under § 36(b), the fees used as comparison points must have been the result of negotiations conducted at arm's-length. *Id.* at 350-51.   *Jones* cautioned that "courts should not rely too heavily on comparisons with fees charged to mutual funds by other advisers." *Id.* at 350.   "These comparisons are problematic because these fees, like those challenged, may not be the product of negotiations conducted at arm's length." *Id.* (citing *Jones v. Harris Assocs. L.P.,* 537 F.3d 728, 732 (7th Cir. 2008) (Posner, J., dissenting).

13

**A.**     **The Complaint Alleges a Large Disparity Between the Fees Charged to the BlackRock Funds and to the Subadvised Funds that Cannot Be Explained by Any Difference in the Investment Advisory Services Provided.**

Consistent with *Jones*, Plaintiffs have alleged that: (1) there is a large disparity between the advisory fees charged to the BlackRock Funds and the fees charged to the Subadvised Funds for BlackRock's investment advisory services; (2) the disparity cannot be explained by any purported differences in the services provided because BlackRock provides the same or substantially the same investment advisory services to the BlackRock Funds and the Subadvised Funds; and (3) the fees charged by BlackRock to the Subadvised Funds were the result of arm's-length negotiations.  These allegations address the *Gartenberg* factors pertaining to the nature and quality of the services provided and comparative fee structures.

**1.     The Large Disparity in Fees Charged.**

Plaintiffs allege that the fees charged to the BlackRock Funds for Defendants' investment advisory services are significantly higher than the fees charged to the Subadvised Funds for the same or substantially the same services.  *See* ¶¶ 76-80.  The Funds' fee rates are as much as 106% higher than the fee rates paid by the Subadvised Funds.  *See* ¶¶ 77, 79.  The difference in fees is even more pronounced in dollars paid, with the Funds collectively paying as much as $280 million more in fees per year for Defendants' investment advisory services than they would pay pursuant to the fee schedules of the Subadvised Funds.  *See* ¶¶ 78, 80.[5]

Defendants do not argue that any of these allegations is not well-pled.  Therefore, the allegations regarding the disparity in fees must be assumed to be true.

**2.     The Higher Fee Charged to the BlackRock Funds Is Not Due to Any Meaningful Difference in the Investment Advisory Services Provided.**

---

[5]     Given the large disparity in fees charged to the Funds and to the Subadvised Funds, the Complaint does not present an issue of "fee parity."  *See* Def. Br. at 7 (quoting *Jones*, 559 U.S. at 350).

14

The Complaint alleges facts demonstrating that Defendants provide the same or substantially the same investment advisory services to the BlackRock Funds and the Subadvised Funds. *See* ¶¶ 36-37, 56-75. The Complaint compares the Funds' IMAs with the Subadvised Funds' subadvisory agreements and shows that both sets of agreements require BlackRock to provide the same or substantially the same types of investment advisory services. *Compare* ¶ 36 *with* ¶ 66. The higher fees charged to the BlackRock Funds, therefore, cannot be explained by any difference in BlackRock's investment advisory services. ¶¶ 65-67.

The disclosures in the prospectuses of the Funds and the Subadvised Funds also show that the services are substantively identical. According to those disclosures, Defendants employ substantially the same investment strategies and invest in substantially the same types of securities for both the Funds and the Subadvised Funds, *compare* ¶¶ 39, 42, *with* ¶¶ 68, 71.

Defendants admit that the same portfolio managers are involved in providing investment advisory services to both sets of Funds, and that both sets of Funds use the same investment strategies, research and analysis, systems, technology, and other resources. *See* ¶¶ 69-70, 72-73; Answer ¶¶ 69-70, 72-73.

Defendants further admit that both the Funds and the Subadvised Funds are mutual funds registered under the 1940 Act, *see* ¶¶ 22-24, 26, 59-61; Answer ¶¶ 22-24, 26, 59-61; and that BlackRock must comply with substantially the same laws and regulations in providing investment advisory services to both sets of funds, *see* ¶ 45; Answer ¶ 45.

Defendants again do not argue that any of these allegations is not well-pled.[6]

---

[6]    Defendants do not address the sufficiency of Plaintiffs' allegations that the difference in fees cannot be explained by administrative services required by the IMAs or by services not covered by the IMAs. *See* ¶¶ 81-93. Many of the administrative services purportedly provided by BlackRock are instead provided by State Street Bank and Trust ("State Street") pursuant to a

### 3.  The Subadvised Funds' Fees Were Negotiated at Arm's Length.

Defendants admit that the fees charged to the Subadvised Funds were the result of arm's-length negotiations. *See* ¶ 134; Answer ¶ 134.  Those fees, therefore, provide a range of fees that could be negotiated at arm's length for BlackRock's investment advisory services.

### 4.  The Subadvised Fund Fee Comparisons Support a Plausible Inference that the Fees Charged to the BlackRock Funds Are Excessive.

That the Funds pay as much as 106% higher fees for BlackRock's advisory services than the Subadvised Funds pay for the same or substantially the same services supports the inference that the Funds' fees are disproportionately large and outside the range of what could be negotiated at arm's length for BlackRock's advisory services. *See Jones*, 559 U.S. at 350 & n.8.

Numerous courts—both before and after *Jones*—have denied motions to dismiss § 36(b) claims where plaintiffs alleged that the adviser-defendant charged lower fees to other clients for the same or substantially the same investment advisory services.  For example, in *Reso*, the plaintiff alleged a § 36(b) claim based on advisory fees which were higher than those charged to other, independent funds managed by the same defendant for comparable services.  2011 WL 5826034, at *2.  The independent funds in *Reso*, like the Subadvised Funds here, were alleged to employ the same managers and investment strategies, but paid lower fees, *id.*, and the defendant provided "similar services to all of the funds" it managed. *Id.* at *8.  In denying defendant's

---

separate Administrative Services Agreement.  *See* ¶¶ 89-93.  The Funds collectively paid State Street more than $30.6 million for the administrative services during the five most recent fiscal years.  *See* ¶ 92.  Insofar as BlackRock is involved in providing certain of the administrative services, it receives additional compensation from each Fund, separate and apart from the advisory fees charged to the BlackRock Funds.  During the five most recent fiscal years, the Funds collectively paid BlackRock more than $8.8 million for administrative services.  *See* ¶¶ 86-88.  In any event, the same administrative services purportedly provided by BlackRock can be obtained from unaffiliated service providers through arm's-length negotiations for less than 5 basis points, a small fraction of the 19 to 34 basis points in additional fees charged to the BlackRock Funds relative to the Subadvised Funds. *See* ¶¶ 82-85.

motion to dismiss, the court held that these allegations "give rise to the inference that [defendant] has comparatively over-charged the funds in this case." *Id. See also In re Federated*, 2009 WL 5821045, at *6-7 (denying motion to dismiss where complaint alleged, *inter alia*, that defendants provide the same advisory services to other clients, who are able to negotiate at arm's-length, for substantially lower fees); *Hunt*, 2006 WL 1581846, *3 (holding that "[t]his Court agrees with other district courts that have found such allegations, that investment managers charge fund shareholders higher fees than other clients for equivalent advisory services, to be indicative of a disproportionate relationship between fees and services."); *Sins*, 2006 WL 3746130, at *3 (finding that "Plaintiffs have alleged that Defendant provides identical services to third parties at a lower cost, which would indicate a disparity").

Courts have also denied motions to dismiss where the investment adviser charged its captive funds an advisory fee rate substantially higher than the fee rate subcontracted with an independent subadviser. *See, e.g., Kasilag*, 2012 WL 6568409, at *3 ("Assuming, as Plaintiffs have alleged, that [defendant] charged the Funds an average of three times what it cost to provide its investment management services, Plaintiffs have raised a plausible inference that [defendant's] fees are excessive under § 36(b)."); *Curran*, 2010 WL 2889752, at *9 (finding allegations that adviser-sponsor "charges more than the subadvisors, who allegedly provide the bulk of investment advice" support the reasonable inference that adviser collected excessive advisory fees).

In an analogous situation, the Second Circuit had "little trouble concluding" that plaintiffs had adequately alleged a claim under § 36(b) where defendant charged its captive funds a transfer agency fee that was significantly higher than the rate it negotiated at arm's length with an unaffiliated entity to provide transfer agency services. *R.W. Grand Lodge*, 425 Fed. App'x at

17

30. The court held that "the transfer agent arrangement . . . constitutes a garden variety breach of fiduciary duty" and stated a claim under § 36(b) because "Defendants knowingly inflated the price of the transfer agent services provided to Plaintiffs and pocketed the difference between what they charged and what the services were worth." *Id.* at 30-31. Plaintiffs here make essentially the same allegation based on the Subadvised Fund fee comparisons.

> ### B. Defendants' Argument that the Subadvised Fund Fee Comparisons Are "Not Meaningful" Is Contrary to Applicable Law.

Defendants attempt to brush aside the Subadvised Fund fee comparisons as "apples to oranges" and "not meaningful" merely because the BlackRock Funds pay an "advisory fee" and the Subadvised Funds pay a "subadvisory fee." Def. Br. at 10. But this is a distinction without a difference—Defendants do not even attempt to argue why it matters here. The fact is, regardless of whether it acted as adviser or subadviser, BlackRock provided the same or substantially the same investment advisory services. A mere difference in nomenclature cannot negate the probative value of the Subadvised Fund fee comparisons in view of the similarity in the services provided by BlackRock. *See Jones*, 559 U.S. at 350 (fee comparisons should be given "the weight that they merit in light of the similarities and differences ***between the services*** that the clients in question require") (emphasis added).

Numerous courts have denied motions to dismiss § 36(b) claims based on comparisons between advisory and subadvisory fees—notwithstanding the difference in nomenclature— because plaintiffs alleged that the ***services provided were comparable*** and that the difference between the advisory and subadvisory fees was not justified by any difference in the services provided. *See, e.g., Kasilag,* 2012 WL 6568409, at *3 (denying motion to dismiss based upon allegations "comparing the language in the sub-advisor contracts with the language in the IMA's" which "provide for essentially the same investment management services").

### C.    Defendants' Alternative Fee Comparisons Do Not Warrant Dismissal.

Defendants submit alternative fee comparisons that they contend support a competing inference that the advisory fees charged to the BlackRock Funds are within the range that could be negotiated at arm's-length and appropriate under § 36(b). *See* Def. Br. at 11-12. However, just like the court found in *Reso*, such comparisons are of "little value." *Reso*, 2011 WL 5826034, at *8.

Defendants' comparison using the advisory fees charged by the adviser-sponsors to the Subadvised Funds (*see* Def. Br. at 11-12) is exactly the type of comparison to fees charged by other advisers to their captive mutual funds that the Supreme Court cautioned against in *Jones* because such fees may not be the product of negotiations conducted at arm's-length. *Jones*, 559 U.S. at 350-51.[7]   Indeed, courts have held that fee arrangements like those between the Subadvised Funds and their adviser-sponsors may themselves violate § 36(b). *See, e.g., Kasilag*, 2012 WL 6568409, at *3; *Curran*, 2010 WL 2889752, at *9.

As summarized in the table below, the record does not include any facts that the advisory fees charged by the adviser-sponsors to the Subadvised Funds are not excessive themselves or were negotiated at arm's-length or that any services provided by the adviser-sponsors to the Subadvised Funds are comparable to the services provided by BlackRock to the Funds, as required under *Jones*.

---

[7]      The Morningstar reports attached to Defendants' Answer (*see* Answer Exs. V-W; Def. Br. at 1-2) and the Lipper analyses referenced in the Funds' annual reports (*see* Answer Exs. L-M; Def. Br. at 15) are not probative for the same reasons. They are based on so-called "peer group" comparisons between the advisory fees charged by BlackRock to the Funds and the fees charged by other adviser-sponsors to their captive funds. As Judge Posner explained in a dissenting opinion cited favorably by the Supreme Court in *Jones*: "The governance structure that enables mutual fund advisers to charge exorbitant fees is industry-wide, so [comparisons to the charged to other mutual funds] would if widely followed allow those fees to become the industry's floor." *Jones*, 537 F.3d at 732.  In any event, such reports present merits issues inappropriate for resolution on this Motion.

| | Fee Challenged: Advisory Fees Charged to BlackRock Funds | Plaintiffs' Comparison: Subadvisory Fees Charged to Subadvised Funds | Defendants' Comparison: Advisory Fees Charged to Subadvised Funds |
|---|---|---|---|
| **Paid to:** | BlackRock (¶¶ 47-48) | BlackRock (¶¶ 63) | Adviser-sponsors of Subadvised Funds (¶ 62) |
| **Determined by:** | BlackRock, subject to approval by Board (¶¶ 121-132) | Arm's-length negotiations between BlackRock and adviser-sponsors of Subadvised Funds (¶¶ 133-137) | No facts in record. |
| **Services covered:** | Investment advisory services covered by IMAs between BlackRock and Funds (¶¶ 36-46) | Investment advisory services covered by Subadvisory Agreements between BlackRock and adviser-sponsors of Subadvised Funds (¶¶ 65-75) | No facts in record. |

Even Defendants' authority recognizes that comparisons to the fees charged by other adviser-sponsors to their captive mutual funds are "not particularly meaningful precisely because [they] do[] not address *the particular services offered by the defendants in this case*." *Migdal*, 248 F.3d at 327 (emphasis added). Defendants tellingly do not cite a single case to support their argument that the advisory fees charged to the Subadvised Funds for services provided *by their adviser-sponsors* provide a meaningful comparison for evaluating the fees charged for *Defendants' advisory services* to the Funds, much less that the comparison is somehow dispositive under § 36(b).[8]

---

[8]  Contrary to Defendants' suggestions, the *Kasilag* decision denying the defendant's motion to dismiss did *not* turn on allegations that "a competing fund paid an advisory fee significantly lower than the fee paid by plaintiffs' fund." Def. Br. at 12 n.4.  The *Kasilag* court expressly held, in light of *Jones*, that the comparison to other captive mutual funds was "extremely limited" and "certainly not decisive." *Kasilag*, 2012 WL 6568409, at *4-5.  Further, the plaintiffs in *Kasilag* made detailed allegations establishing that the fees being challenged and the fees used as comparison points covered comparable services. *See id.*  In contrast, there are no facts before the Court regarding the services provided to the Subadvised Funds by their

Defendants' other comparison—between the subadvisory fees charged to the Subadvised Funds by BRIM and the portion of the advisory fees charged to the BlackRock Funds that is allocated to BRIM—is a red herring and irrelevant.  Even assuming that BRIM provides the same services to the Funds as it provides to the Subadvised Funds (*see* Def. Br. at 11-12), the question remains what services Defendants provide in exchange for the 14 to 36 basis points in advisory fees retained by BRA and BRIL.  Plaintiffs have alleged that there is no discernible difference in the services to justify those additional fees.  Because Plaintiffs have alleged that the total amount of advisory fees charged to the Funds is excessive in relation to the value of the advisory services provided by all of the Defendants, how those fees are allocated among Defendants is irrelevant.[9]

### III.   DEFENDANTS REALIZED ECONOMIES OF SCALE AND DID NOT APPROPRIATELY SHARE THE BENEFITS WITH THE FUNDS

Plaintiffs allege that Defendants realized economies of scale as the Funds' AUM increased in recent years and failed to appropriately share the benefits of those economies of scale with the Funds, resulting in increased profits to Defendants that were not justified by any change in the nature or quality of the services provided to the Funds.  *See* ¶¶ 94-120.

#### A.   The Complaint Adequately Alleges that BlackRock Realized Economies of Scale and Failed to Appropriately Share the Benefits with the Funds.

The factual allegations in the Complaint are more than sufficient to allow this Court to draw the plausible inference that Defendants benefitted from substantial economies of scale and profitability in managing the Funds and did not appropriately share the benefits of economies of

---

adviser-sponsors, let alone facts showing the services are comparable to those provided by BlackRock to the Funds.

[9]   In any event, Defendants' argument raises questions of fact about the allocation of responsibility among Defendants for providing investment advisory services to the BlackRock Funds the resolution of which is inappropriate on this motion.

scale with the Funds, even though much of the financial information necessary to fully assess the economies of scale realized by the Defendants is not publicly available.

Plaintiffs' allegations here are of the same nature and specificity that the court found sufficient in *Kasilag*. As Plaintiffs do here, the plaintiffs in *Kasilag* alleged that the adviser-defendant's costs did not increase proportionately as the funds' AUM increased, resulting in economies of scale to the adviser. 2012 WL 6568409, at *6; *compare* with ¶¶ 98-99.

With respect to sharing of economies of scale, the *Kasilag* plaintiffs alleged, like Plaintiffs do here, that the captive fund's "fee schedule sets the initial breakpoints too high, spaces them too far apart, and reduces the fee by too small an amount to give Plaintiffs any meaningful benefit of economies of scale." 2012 WL 6568409, at *6; *compare* with ¶¶ 102-110. As Plaintiffs do here, the plaintiffs in *Kasilag* bolstered these allegations by calculating the fee reductions resulting from breakpoints in the captive funds' advisory fee schedules and showing that they were not significant. 2012 WL 6568409, at *6; *compare* with ¶¶ 102-110. As Plaintiffs do here, the plaintiffs in *Kasilag* compared the breakpoints in the captive funds' advisory fee schedules to breakpoints in subadvisory fee schedules negotiated at arm's length and showed that the captive funds' fee schedules had less favorable breakpoints than could be negotiated at arm's length. *Compare Kasilag,* 2012 WL 6568409, at *6 *with* ¶¶ 111-120.

*Kasilag* held: "In light of these well-pleaded facts, Plaintiffs have sufficiently alleged that [the adviser-defendant's] breakpoints did not give shareholders meaningful benefits from the economies of scale enjoyed by the Funds . . . . Accordingly, this *Gartenberg* factor weighs in Plaintiffs' favor." 2012 WL 6568409, at *6. As detailed above, Plaintiffs here make essentially the same allegations regarding economies of scale.

Other courts have found similar allegations regarding economies of scale sufficient at the pleading stage. *See, e.g., Reso*, 2011 WL 5826034, at *9 (denying motion to dismiss and noting that plaintiff's "strongest allegations relate[d] to economies of scale factor," where breakpoints provided insufficient economies of scale); *Curran*, 2010 WL 2889752, at *9 (finding that the question of whether shareholders actually benefitted from economies of scale would require a "factual inquiry that would be inappropriate in the context of a Rule 12(b)(6) motion, where the Court must take Plaintiffs' factual allegations as true and make all reasonable inferences in favor of Plaintiffs."); *Wicks*, 2005 WL 705360, at *1 (denying motion to dismiss where plaintiffs alleged, *inter alia*, that "[a]lthough assets held by the funds have increased significantly over time, the nature and quality of the services rendered by the defendants to the Funds has not substantially changed"); *Strigliabotti*, 2005 WL 645529, *3–4.

### B.  Defendants' Cases Do Not Support Dismissal.

None of the authority cited by Defendants warrants a different result.  In fact, one of Defendants' own cases recognizes that allegations similar to those made here are sufficient to plead economies of scale.  *See In re Goldman Sachs*, 2006 WL 126772, at *9 n.24 (acknowledging that, unlike the case before it, the plaintiffs in *Wicks* "met the pleading requirements of *Gartenberg*" by alleging that "though fees had increased significantly over time, the quality of services rendered had not substantially changed"); *compare* ¶ 98.

Of the other cases cited by Defendants on this point, three were dismissed only after trial. *See Krinsk v. Fund Asset Mgmt. Inc.*, 875 F.2d 404 (2d Cir. 1989); *Kalish v. Franklin Advisers, Inc.*, 742 F. Supp. 1222 (S.D.N.Y. 1990); *Gartenberg v. Merrill Lynch Asset Mgmt., Inc.*, 528 F. Supp. 1038 (S.D.N.Y. 1981), *aff'd*, 694 F.2d 923 (2d Cir. 1982).  Those cases provide no support for dismissal of § 36(b) claims at the pleading stage.

Moreover, *Gartenberg* and *Krinsk* involved money market funds, which require different services and involve different costs than mutual funds such as those at issue here.  *See Gartenberg,* 528 F. Supp. at 1040-41; *Krinsk,* 875 F.2d at 406-07.  As the *Gartenberg* court explained, the fees challenged in that case covered not only investment advisory services like those here, but also services to fund shareholders, including processing shareholder transactions and administering shareholder accounts.  *See Gartenberg*, 529 F. Supp. at 1041-42; *see also Krinsk*, 875 F.2d at 406-07.  While the court recognized that defendant had realized economies of scale ***in providing investment advisory services*** (which the court referred to as "portfolio management"), it nevertheless determined that plaintiffs failed to establish economies of scale overall due to the costs incurred by defendant ***in providing shareholder services***:

> While the unit costs of portfolio management and general administrative services almost certainly declined as the Fund has grown, the far greater costs of providing shareholder services appear to have remained relatively stable....That processing costs do not significantly diminish as Fund assets increase accords with logic and common sense.  While it may be almost as easy to invest a block of $100 million as a block of $10 million, it requires substantially more time, money and personnel to process 1 million shareholder orders than 100,000 orders.

*Gartenberg*, 529 F. Supp. at 1055.  Defendants distort the court's holding by the misleading insertion of the word "investment" before "processing costs." *See* Def. Br. at 13. The court in *Gartenberg* is clearly discussing processing costs in relation to shareholder services, ***not*** investment advisory services.

Here, the investment advisory fees charged to the Fund cover investment advisory services, and the Funds pay separate fees for shareholder services. *See, e.g.*, ¶¶ 36, 88, 93. Accordingly, the failure by plaintiffs in *Gartenberg* and *Krinsk* to prove at trial economies of scale with respect to shareholder services in connection with money market funds is irrelevant.

None of the other cases cited by Defendants involves factual allegations similar to those here regarding (i) the impact of breakpoints in reducing the advisory fee rates charged to the Funds relative to the amount of economies of scale accruing to Defendants through increased advisory fees, or (ii) the extent of sharing economies of scale reflected in the fee schedules for comparable services negotiated at arm's length.  Thus, Defendants' cases do not speak to the sufficiency of those allegations.

The allegations in the cases Defendants cite also were deficient for reasons not present here.  *See, e.g., In re Goldman Sachs*, 2006 WL 126772, at *9 ("[P]laintiffs rely on allegations regarding *Rule 12b-1* fees, which are inappropriate to establish that the *advisory* fees were excessive.") (emphasis in original); *In re Scudder Mut. Funds Fee Litig.*, No. 04 Civ. 1921, 2007 WL 2325862, at *16 (S.D.N.Y. Aug. 14, 2007) (allegations regarding economies of scale "pertain[ed] either to Funds in which Named Plaintiffs d[id] not own shares or to time periods outside the statute of limitations"); *Mintz v. Baron*, No. 05 Civ. 4904, 2009 WL 735140, at *4 (S.D.N.Y. Mar. 20, 2009) (dismissing complaint "[i]n the absence of facts sufficient to provide context for any *Gartenberg* factor that would support plaintiffs' claims of excessive fees...." ).

Finally, the plaintiffs in *Hoffman* conceded that the advisers and subadvisers in that case "perform distinct services" and the "differences in services and compensation packages alone justify the different breakpoint arrangements." *See Hoffman v. UBS-AG,* 591 F. Supp. 2d. 522, 540 (S.D.N.Y. 2008).  In contrast, Plaintiffs here allege that BlackRock provides the same or substantially the same services to the Funds and to the Subadvised Funds.  Therefore, breakpoints in the fee schedules for the Subadvised Funds are indicative of the economies of scale realized by BlackRock in providing advisory services and the extent of sharing that could be negotiated at arm's length.

### IV.   APPROVAL OF THE ADVISORY FEES BY THE BOARD IS ENTITLED TO LITTLE OR NO DEFERENCE

With respect to the approval of the challenged fees by a fund's board of directors, the Court in *Jones* held that "a measure of deference to a board's judgment may be appropriate in some instances," but "the appropriate measure of deference varies depending on the circumstances." *Jones*, 559 U.S. at 349.

> [W]here the board's process was deficient or the adviser withheld important information, the court must take a more rigorous look at the outcome. When an investment adviser fails to disclose material information to the board, greater scrutiny is justified because the withheld information might have hampered the board's ability to function as an independent check upon the management.

*Id.* at 352-53 (internal citations and quotations omitted).

Consistent with Congress's intent "not to rely solely on the fund's directors to assure reasonable adviser fees" and to establish § 36(b) as an "independent check[] on excessive fees," *Daily Income Fund*, 464 U.S. at 540-41, the Court in *Jones* emphasized that even a "robust" process will not by itself insulate the adviser from liability for excessive fees. *See Jones*, 559 U.S. at 351 ("This is not to deny that a fee may be excessive even if it was negotiated by a board in possession of all relevant information, but such a determination must be based on evidence that the fee 'is so disproportionately large that it bears no reasonable relationship to the services rendered and could not have been the product of arm's-length bargaining.'") (citation omitted).

### A.   The Board Approval Process Was Deficient.

Plaintiffs adequately allege that the board approval process for the Funds was "deficient," rather than "robust," and, therefore, the Funds' fees should be subject to "greater scrutiny" under *Jones*. The Complaint alleges that the approval process was not competitive or conducted at arm's length, in contrast to the process by which the adviser-sponsors of the Subadvised Funds select investment advisers for those funds. Whereas the adviser-sponsors of the Subadvised

Funds solicited proposals from multiple candidates and negotiated with the candidates regarding the fees to be charged, *see* ¶¶ 134, 136-137, Defendants admit that the Board has not solicited proposals from other investment advisers to provide investment advisory services to the Funds. *See* ¶ 129; Answer ¶ 129.  Defendants also admit that the Board has not negotiated a "most favored nation" provision into the IMAs, which would enable the Funds to benefit from fees negotiated at arm's length even if the Board was not able or willing to engage in such negotiations with BlackRock.  *See* ¶ 130; Answer ¶ 130.

The Complaint further alleges that the Board, *inter alia*:  (i) relied on information and analyses that were prepared by BlackRock or were designed to support BlackRock's rationalization for the fees charged to the Funds; (ii) did not consider information or analyses reflecting the interests of the Funds with respect to the investment advisory fees or critically assessing BlackRock's rationalization for those fees; (iii) approved contracts charging the Funds investment advisory fees as much as 106% higher than the fees other clients pay for the same or substantially the same services; (iv) accepted BlackRock's representations that the lower fees paid by other clients reflect differences in the services provided to those clients without appropriately examining whether the services actually are different and without considering information necessary to assess whether the difference in fees is warranted by any purported differences in the services provided; (v) approved advisory fee arrangements that enable BlackRock to retain for itself the vast majority of the benefits of economies of scale resulting from increases in the Funds' AUM without appropriately sharing those benefits with the Funds; and (vi) did not devote adequate time to their consideration of the Funds' advisory contracts. ¶¶ 123-128, 131-132; *see also* ¶ 77.

Courts have found similar allegations (¶¶ 126-128) sufficient to withstand a motion to dismiss.  For example, in *Reso*, the plaintiff alleged that defendants "fail[ed] to provide the directors with 'sufficient, complete, and/or accurate information' or meaningful information about economies of scale, while also providing 'misleading information to the directors.'"  2011 WL 5826034, at *6.  Recognizing the evidentiary difficulties associated with pleading facts regarding a board of directors' approval process, the court deemed those allegations "to be specific enough to raise an inference of lack of independence."  *Id.*  The court further added that it "cannot expect [plaintiff] to know or outline the exact contours of the directors' decisionmaking processes."  *Id.*

The court in *Kasilag* likewise found allegations similar to those here sufficient to support an inference that the board of directors may not have adequately considered important facts when approving investment management fees.  Among other things, the board in *Kasilag* was alleged to have been responsible for overseeing 85 mutual funds, precluding them from assessing each fund individually, and approving contracts that provided exorbitant fees in relation to the services provided.  *Kasilag*, 2012 WL 6568409, at *7.  The court held that "the directors' approval requires somewhat less deference than it would have had they diligently performed their 'watchdog' role."  *Id.*; *see also Hunt*, 2006 WL 1581846, at *4 (denying motion to dismiss and holding that "a failure of the trustees to receive full information and act conscientiously may be indicative of a breach of fiduciary duty under section 36(b)"); *Dumond*, 2006 WL 149038, at *3 (denying motion to dismiss where plaintiffs alleged that "defendants provided the trustess [sic] with virtually no information regarding the advisory fees being charged to non-MFS Fund clients and the economies of scale or fall-out benefits received by the defendants, the trustees failed to request and evaluate information reasonably necessary to make an informed decision

regarding the MFS Funds' distribution plans, and the trustees rarely, if ever, questioned any information or recommendations provided by the defendants").

The cases cited by Defendants with respect to the board approval process do not support dismissal here.  Defendants cite *Migdal* for the mundane proposition that it is appropriate for the Board to consider information provided by Defendants about BlackRock's investment advisory services in connection with approval of the Funds' advisory fees.  *See* Def. Br. at 15.  But Defendants ignore that there are eleven separate paragraphs in the Complaint setting forth specific allegations of the Board's lack conscientiousness.  *See* ¶¶ 122-132.   Rather than address the totality of the allegations, Defendants cherry-pick one paragraph (¶126), and, out of context, dismiss its import.

Remarkably, Defendants cite *In re Salomon Smith Barney Mutual Fund Fees Litig.*, 528 F. Supp. 2d 332 (S.D.N.Y. 2007) (Def. Br. at 16), but fail to cite, or even mention as subsequent history, the reversal of the District Court's dismissal by the Second Circuit which reinstated certain § 36(b) claims, notwithstanding any purported deficiencies in the allegations about the board approval process.  *See R.W. Grand Lodge*, 425 Fed. App'x at 31.

Further, Plaintiffs here have alleged facts about the information considered and actions taken by the Board in connection with its consideration of the Funds' advisory fees, *see* ¶¶ 123-132, in contrast to the cases cited by Defendants where the plaintiffs "rel[ied] on speculation, inference and generalized observations about the securities industry from public figures." *Amron*, 464 F.3d at 345.

**B.    The Board's Approval Cannot Be the Basis for Dismissal at the Pleading Stage.**

Defendants attempt to defend the conscientiousness of the Board by relying on statements included in the Funds' annual shareholder report.  *See* Def. Br. at 15.  However, the self-serving

recitations in the annual reports, at most, create a factual dispute that cannot be resolved on the pleadings.

In *Curran*, the defendants similarly "ask[ed] the Court to review 'publicly disclosed detailed explanations of the steps taken in setting fees' and 'credit the presumption that these directors are doing their jobs with respect to overseeing the fees paid by the SAM funds.'" *Curran*, 2010 WL 2889752, at *9 (citation omitted). The court rejected defendants' invitation, holding that it would require the court to engage in a factual inquiry that would be inappropriate at the motion to dismiss stage, and noting that these types of "fact-intensive inquiries, suggests [sic] that resolution of the § 36(b) claim against [defendant] is unlikely even at the summary judgment stage of litigation." *Id.*

In any event, even if the board approval process had been "robust," Plaintiffs state a claim under § 36(b) based on allegations that Defendants charge significantly higher fees to the Funds than are charged to the Subadvised Funds for the same or substantially the same services and have failed to appropriately share the benefits of economies of scale with the Funds. *See Jones*, 559 U.S. at 349 ("[A] fee may be excessive even if it was negotiated by a board in possession of all relevant information . . . .").

## CONCLUSION

Judged under the standard set forth in *Jones*, Plaintiffs' Complaint, taken as a whole, states a plausible claim for relief under § 36(b). For the foregoing reasons, Plaintiffs respectfully request that the Court deny Defendants' motion for judgment on the pleadings.

Dated:  July 25, 2014

**SZAFERMAN, LAKIND, BLUMSTEIN & BLADER, P.C.**

/s/ Robert L. Lakind
Robert L. Lakind
Arnold C. Lakind
101 Grovers Mill Road, Suite 200
Lawrenceville, NJ 08648
Tel: (609) 275-0400
Fax: (609) 275-4511

*Local Counsel for Plaintiffs*

**ZWERLING, SCHACHTER & ZWERLING, LLP**
Robin F. Zwerling
Jeffrey C. Zwerling
Susan Salvetti
Andrew W. Robertson
41 Madison Avenue
New York, NY 10010
Tel: (212) 223-3900
Fax: (212) 371-5969

*Lead Counsel for Plaintiffs*

**ROBBINS ARROYO LLP**
Stephen J. Oddo
600 B Street, Suite 1900
San Diego, CA 92101
Tel: (619) 525-3990
Fax: (619) 525-3991

*Counsel for Plaintiffs Brendan Foote and Amy Fox*