NOT FOR PUBLICATION

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| In re BLACKROCK MUTUAL FUNDS ADVISORY FEE LITIGATION, | : : : : | Civil Action No. 14-1165 (FLW) (DEA) **OPINION** |

WOLFSON, District Judge.

Plaintiffs, Owen Clancy, Jack Hornstein, Brendan Foote, and Amy Fox (collectively, "Plaintiffs"), bring this action on behalf of the BlackRock Global Allocation Fund, Inc. (the "BLK Allocation Fund") and the BlackRock Equity Dividend Fund (the "BLK Dividend Fund") (collectively, the "Funds") against BlackRock Advisors, LLC ("BRA"), BlackRock Investment Management, LLC ("BRIM"), and BlackRock International Limited ("BRIL") (together, "Defendants" or "BlackRock"). Plaintiffs assert claims for breach of fiduciary duty under Section 36(b) of the Investment Company Act of 1940 ("ICA"), 15 U.S.C. § 80a-35(b), against BlackRock for charging excessive investment advisory fees. BlackRock has moved to dismiss the Consolidated Complaint pursuant to Federal Rule of Civil Procedure 12(c). Plaintiffs oppose this motion. The Court decides this motion without oral argument pursuant to Federal Rule of Civil Procedure 78. For the reasons set forth below, Defendants' motion is denied.

I.   **Background**[1]

Plaintiffs Owen Clancy and Jack Hornstein are shareholders of the BLK Allocation Fund, Plaintiff Brendan Foote is a trustee of a trust that holds shares of the BLK Allocation Fund, and Plaintiff Amy Fox is a shareholder of the BLK Dividend Fund. *See* Consol. Compl. ¶¶ 15–18.

---

[1] The following allegations are taken from the Consolidated Complaint and must be taken as true in deciding this Motion to Dismiss. *See Newman v. Beard*, 617 F.3d 775, 779 (3d Cir. 2010) ("We accept all factual allegations as true, construe the amended complaint in the light most favorable to [the plaintiff], and determine whether, under any reasonable reading of the…complaint, he may be entitled to relief.").

Both the BLK Allocation Fund and BLK Dividend Fund are members of the BlackRock family of mutual funds.[2]  *See* Consol. Compl. ¶ 22.

Defendant BRA serves as the investment adviser to the Funds, and has entered into Investment Management Agreements ("IMAs") with these Funds.  *See id.* ¶¶ 33, 35.  BRA retained BRIM to serve as a sub-adviser to the Funds pursuant to the Sub-Investment Advisory Agreements ("SAAs") between BRA and BRIM.  *See id.*  Until July 1, 2013, Defendant BRIL also served as an investment adviser to the BLK Allocation Fund pursuant to a sub-advisory agreement dated December 31, 2008.  *Id.* at ¶ 34.  The BLK Allocation Fund is overseen by a Board of Directors and the BLK Dividend Fund is overseen by a Board of Trustees (together, the "Boards").  The Boards are composed of the same individuals, and are tasked with overseeing the business of the Funds.  *See id.* at ¶ 30.

Pursuant to the IMAs and SAAs, Defendants provide investment advisory services to each Fund, including: (a) "supervis[ing] and manag[ing] the investment and reinvestment of the Fund's assets"; (b) "supervis[ing] continuously the investment program of the Fund and the composition of its investment portfolio"; (c) "arrang[ing] . . . for the purchase and sale of securities and other assets held in the investment portfolio of the Fund"; and (d) "voting, exercising consents and exercising all other rights appertaining to such securities . . . on behalf of the Fund."  The IMAs also require that certain books and records be maintained.  *Id.* at ¶ 36–37.

In exchange for the investment services provided by BlackRock to the Funds, the IMAs require each Fund to pay BRA an annual fee that is calculated as a percentage of the Fund's assets

---

[2] Mutual funds, such as the Funds, are investment companies registered with the Securities and Exchange Commission ("SEC"), pursuant to the ICA.  *See Renfro v. Unisys Corp.*, 671 F.3d 314, 318 (3d Cir. 2011).  "A mutual fund is a pool of assets, consisting primarily of a portfolio of securities, and belonging to the individual investors holding shares in the fund."  *Jones v. Harris Assocs. L.P.*, 559 U.S. 335, 338 (2010) (internal alteration omitted).  Each share issued by a mutual fund represents a *pro rata* interest in the mutual fund's underlying portfolio of securities, less any fees and other liabilities.

under management, or "AUM." Defendant BRA, in turn, allocates a portion of the advisory fee it receives from each Fund to BRIM, and, until July 1, 2013, it allocated a portion of the BLK Allocation Fund to BRIL. *See id.* at ¶¶ 47–48. The Boards approve the fees paid to BlackRock for its services under the IMAs each year. *See id.* at ¶ 122. In 2007, the BLK Allocation Fund's AUM was $23 billion; by 2013, its AUM had increased to $58 billion. *See id.* at ¶ 94. During the same approximate time period, the BLK Dividend Fund's AUM increased from $1.5 billion to $29 billion. *Id.* at ¶¶ 96–97.

The BLK Allocation Fund's investment advisory fee rate is determined according to a breakpoint schedule, which reduces the rate paid as the AUM increase. BlackRock receives a fee of 0.75% for the first $10 billion of the Fund's AUM; 0.69% for AUM from $10 billion to $15 billion; 0.68% for AUM between $15 billion to $ 20 billion; 0.67% for AUM form $20 billion to $25 billion; 0.65% for AUM between $25 billion to $30 billion; 0.63% for AUM from $30 billion to $40 billion; 0.62% for AUM from $40 billion to $60 billion; 0.61% AUM from $60 billion to $80 billion; and 0.60% for AUM over $80 billion. The effective investment advisory rate[3] paid by the BLK Allocation Fund was 66 basis points, or .66%, during the fiscal year ending October 31, 2013. *See id.* at ¶¶ 50–51. In that same fiscal year, BRA paid BRIM a sub-advisory fee equal to 46% of BRA's advisory fee. *See* Answer Ex. C, at Schedule A. The BLK Allocation Fund paid more than $365 million in investment advisory fees during the fiscal year 2013. *See* Consol. Compl. ¶ 52.

Likewise, the BLK Dividend Fund's investment advisory fee is determined according to a breakpoint schedule, which reduces the rate paid as the AUM increases. BlackRock receives a fee of 0.60% for the first $8 million of the Fund's AUM; 0.56% for AUM from $8 billion to $10 billion; 0.54% for AUM from $10 billion to $12 billion; 0.52% for UM from $12 billion to $17 billion; 0.51% for AUM from $17 billion to $25 billion; 0.50% for AUM from $25 billion to $25

---

[3] This represents the average of the rates paid by the BLK Allocation Fund on each level of AUM.

billion; 0.49% for AUM from $35 billion to $50 billion; and 0.45% for AUM over $50 billion. The BLK Dividend Fund paid an effective advisory rate of 54 basis points, or 0.54%, during the fiscal year ending October 31, 2013. *See id.* ¶¶ 53–54. In the same fiscal year, BRA paid BRIM a sub-advisory fee equal to 74% of BRA's advisory fee. *See* Answer Ex. E, at Schedule A. The BLK Dividend Fund paid more than $143 million in investment advisory fees during the fiscal year 2013. *See* Consol. Compl. ¶ 55.

Plaintiffs have brought this two-count Consolidated Complaint, alleging that the investment advisory fees charged by BlackRock are excessive, and violate BlackRock's fiduciary duty owed to the Funds under Section 36(b) of the ICA. Specifically, Plaintiffs assert that "Defendants breached their fiduciary duty under Section 36(b) of the [ICA] by charging investment advisory fees to the [Funds] that are so disproportionately large that they bear no reasonable relationship to the value of the services provide by BlackRock and could not have been the product of arm's-length bargaining." *Id.* at ¶¶ 145, 153. The First Count of the Consolidated Complaint asserts that BlackRock breached its fiduciary duty as it relates to the BLK Allocation Fund; Count Two alleges the same as it pertains to the BLK Dividend Fund.

## II.     Standard of Review

Rule 12(c) of the Federal Rules of Civil Procedure allows a party to move for judgment on the pleadings "after the pleadings are closed but within such time as not to delay trial." Fed. R. Civ. P. 12(c). The applicable standard on a motion for judgment on the pleadings is similar to that applied on a motion to dismiss pursuant to Rule 12(b)(6). *Spruill v. Gillis*, 372 F.3d 218, 223 n. 2 (3d Cir. 2004). When reviewing a motion made pursuant to Rule 12(c), a court must take all allegations in the complaint as true, viewed in the light most favorable to the plaintiff. *Gomez v. Toledo*, 446 U.S. 635, 636 n.3 (1980); *Robb v. City of Philadelphia*, 733 F.2d 286, 287 (3d Cir. 1984). All reasonable inferences must be made in the plaintiff's favor. *See In re Ins. Brokerage*

*Antitrust Litig.*, 618 F.3d 300, 314 (3d Cir. 2010). Accordingly, in order to survive a motion for judgment on the pleadings, the plaintiff must provide "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). This standard requires the plaintiff to show "more than a sheer possibility that a defendant has acted unlawfully," but does not create as high of a standard as to be a "probability requirement." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

The "'plausibility standard is an interpretation of the Federal Rule of Civil Procedure 8' and is the 'threshold requirement . . . to show that the pleader is entitled to relief.'" *Boyd v. N.J. Dep't of Corr.*, 583 F. App'x 30, 32 (3d Cir. 2014) (quoting *In re Ins. Brokerage*, 618 F.3d at 320). The Third Circuit has required a three-step analysis to meet this plausibility standard. First, the court should "outline the elements a plaintiff must plead to a state a claim for relief." *Bistrian v. Levi*, 696 F.3d 352, 365 (3d Cir. 2012). Next, the court should "peel away" legal conclusions that are not entitled to the assumption of truth. *Id.*; *see also Iqbal*, 556 U.S. 678–79 ("While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations."). It is well-established that a proper complaint "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (internal quotations and citations omitted).

The final step demands that the court should assume the veracity of all well-pled factual allegations, and then "determine whether they plausibly give rise to an entitlement to relief." *Bistrian*, 696 F.3d at 365 (quoting *Iqbal*, 556 U.S. at 679). A claim is facially plausible when there is sufficient factual content to draw a "reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. "Although factual allegations must be enough to raise a right to relief above the speculative level, a plaintiff need only put forth allegations that raise a reasonable expectation that discovery will reveal evidence of the necessary element." *Thompson v.*

*Real Estate Mortg. Network*, 748 F.3d 142, 147 (3d Cir. 2014) (internal quotations, citations, and alterations omitted).  This third step of the analysis is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense."  *Iqbal*, 556 U.S. at 679.

Motions brought pursuant to Rule 12(c) will be granted where the moving party clearly establishes there are no material issues of fact to be resolved, and that he or she is entitled to judgment as a matter of law.  *DiCarlo v. St. Mary Hosp.*, 530 F.3d 255, 259 (3d Cir. 2008).

**III.   Analysis**

A mutual fund is typically set up by an investment adviser, who then selects the fund's directors, manages the fund's investments, and provides other services.  *See Jones v. Harris Assocs.*, 559 U.S. 335, 338 (2010).  Because of this relationship, "the fund often cannot, as a practical matter sever its relationship with the adviser.  Therefore, the forces of arm's-length bargaining do not work in the mutual fund industry in the same manner as they do in other sectors of the American economy."  *Id.* (internal quotation omitted).

In an attempt to check the inherent potential for abuse in such a structure, *see Daily Income Fund v. Fox*, 464 U.S. 523, 536–38 (1984), the ICA establishes a series of requirements for the composition of the board of trustees and requires the board to act in the shareholders' best interest when negotiating advisory fees with the investment adviser on behalf of the fund.  *See* 15 U.S.C. §§ 80a-2(19), 80a-10, 80a-15(c), 80a-35(a).  The ICA, pursuant to Section 36(b), also imposes a fiduciary duty on investment advisers "with respect to the receipt of compensation of services . . . paid by such registered investment company or by the security holders thereof, to such investment adviser or any affiliated person of such investment adviser."  *Id.* § 80a-35(b).  A fund shareholder who chooses to bring an action on behalf of the fund against the adviser bears the burden of establishing a breach of fiduciary duty.  *See id.*

6

For liability to attach under Section 36(b), "an investment adviser must charge a fee that is so disproportionately large that it bears no reasonable relationship to the services rendered and could not have been the product of arm's length bargaining." *Jones*, 559 U.S. at 346. Courts look to all relevant factors to determine if a fee meets this standard, including those set forth in *Gartenberg v. Merrill Lynch Asset Mgmt., Inc.*, 694 F.2d 923 (2d Cir. 1982), approvingly cited to by the Supreme Court in *Jones*, *see* 559 U.S. at 344–46. The *Gartenberg* factors include "(1) the nature and quality of services provided to fund shareholders; (2) the profitability of the fund to the adviser-manager; (3) fall-out benefits; (4) economies of scale; (5) comparative fee structures; and (6) the independence and conscientiousness of the trustees." *Forsythe v. Sun Life Fin., Inc.*, 417 F. Supp. 2d 100, 114 (D. Mass. 2006) (citing *Krinsk v. Fund Asset Mgmt., Inc.*, 875 F.2d 404, 409 (2d Cir. 1989) (citing *Gartenberg*, 694 F.2d at 929-30)); *see also Kasilag v. Hartford Inv. Fin. Servs., LLC*, Civil No. 11-1083, 2012 U.S. Dist. LEXIS 178234, at *4–5 (D.N.J. Dec. 17, 2012) (citing *Jones*, 559 U.S. 335, 344–45, 344 n.5)). "The plaintiff need not address all of the *Gartenberg* factors to survive a motion to dismiss if, when taken as a whole, the complaint demonstrates a plausible claim for relief under § 36(b)." *Kasilag*, 2012 U.S. Dist. LEXIS 178234, at *6–7 (citing *Reso v. Artisan Partners Ltd.*, Civ. No. 11-873, 2011 U.S. Dist. LEXIS 133526, 2011 WL 5826034, *5-6 (E.D. Wis. Nov. 18, 2011) (collecting cases). In other words, a plaintiff "may state a § 36(b) claim by alleging any combination of facts that plausibly support an inference that a particular fee, given all of the surrounding facts and circumstances, is disproportionately large to the services rendered in exchange for that fee." *Curran ex rel. Principal Funds, Inc. v. Principal Mgmt. Corp., LLC*, 4:09-cv-00433, 2010 U.S. Dist. LEXIS 83730, at *34 (S.D. Iowa June 8, 2010); *see also Goodman v. J.P. Morgan Inv. Mgmt.*, Case No. 2:14-cv-414, 2015 U.S. Dist. LEXIS 26361, at *9– 10 (S.D. Ohio Mar. 4, 2015); *Zehrer v. Harbor Capital Advisors, Inc.*, Case No. 14 C 789, 2014 U.S. Dist. LEXIS 162060, at *7 (N.D. Ill. Nov. 18, 2014)*; Am. Chems. & Equip., Inc. v. Principal*

*Mgmt. Corp.*, No. 4:14-cv-00044-JAJ, 2014 U.S. Dist. LEXIS 146679, at *12 (S.D. Iowa Sept. 10, 2014); *Forsythe*, 417 F. Supp. 2d at 114.

In their Consolidated Complaint, Plaintiffs have relied on three of the *Gartenberg* factors to show that the investment advisory fees BlackRock receives from the Funds are excessive: (1) comparative fee structure; (2) economies of scale; and (3) the independence and conscientious of the directors of the Boards. BlackRock asserts that Plaintiffs have failed to plausibly allege that the advisory fees it receives are so disproportionately large that they bear no reasonable relationship to the services rendered to the Funds based on the foregoing factors. When reviewing the motion, the Court must deny BlackRock's motion to dismiss—even if Plaintiffs have failed to sufficiently allege the existence of certain *Gartenberg* factors—if the Consolidated Complaint, taken as a whole, alleges facts that demonstrate a plausible claim for relief under § 36(b).

First, Plaintiffs have alleged facts that demonstrate substantial differences between the advisory fees BlackRock charges to the Funds and the advisory fees charged to certain "Sub-Advised Funds"[4] by BlackRock for its investment advisory services. Plaintiffs allege that the Funds' fees rates are as much as 106% higher than the fee rates paid by the Sub-Advised Funds, resulting in the Funds collectively paying as much as $280 million more in fees per year for Defendants' investment advisory services than they would pay pursuant to the fee schedules of the Sub-Advised Funds, for the same or substantially the same services. *See* Consol. Compl. ¶¶ 76–80. The Consolidated Complaint supports this allegation by comparing the language in the Funds' IMAs with the language in the Sub-Advised Funds' sub-advisory agreements, which shows that both contracts require BlackRock to provide the same or substantially same type of investment

---

[4] The "Sub-Advised Funds" refer to certain mutual funds that are organized and sponsored by financial institutions independent of BlackRock. *See* Consol. Compl. ¶¶ 56–58. Plaintiffs allege that the Sub-Advised Funds' sponsors, nominally acting as the investment adviser, have subcontracted with BRIM to provide investment advisory services to the Sub-Advised Funds. *See id.* ¶¶ 62–63. Pursuant to these sub-advisory agreements, BRIM acts as a sub-adviser and provides investment advisory services to each of the Sub-Advised Funds in exchange for a fee. *See id.* at ¶ 63.

advisory services.  *Compare id.* at ¶ 36, *with id.* at ¶ 66.  Plaintiffs have also provided language from the disclosures for the Funds' prospectuses which purport to show that BlackRock employs substantially the same investment strategies and invests in substantially the same types of securities for both the Funds and the Sub-Advised Funds.  *Compare id.* at ¶¶ 39, 42, *with id.* at ¶¶ 68, 71.  Plaintiffs have also alleged that the same portfolio managers are involved in providing investment advisory services to both sets of Funds, and that both sets of Funds use the same research, analysis, technology, and other resources.  *See id.* at ¶¶ 69–70, 72–73.

Defendants contend that Plaintiffs' fee comparison is "fatally flawed because it compares apples to oranges," in that it compares the advisory fees paid to BRA with the sub-advisory fees paid to BRIM by the advisers to the Sub-Advised Funds.  *See* Pl.'s Br. at 10.  This argument, however, misses the mark.  Plaintiffs' claim is based on their assertion that the total amount of advisory fees charged to the Funds is excessive in relation to the value of the advisory services provided by all the Defendants.  Accordingly, Plaintiffs' fee comparison is appropriate, as they have alleged that BRIM, in its capacity as a sub-adviser to the Sub-Advised Funds, provides the same or substantially the same investment advisory services as all the Defendants provide to the Funds.   For purposes of this claim, the ultimate weight of this comparison is not before the Court; here, where the Court must take the factual allegations of the Consolidated Complaint as true, the fee comparison contributes to Plaintiffs' basis for their claim.  *See, e.g.*, *Am. Chems.*, 2014 U.S. Dist. LEXIS 146679, at *15–16 (finding that the disagreements over the degree of relevancy of a fee comparison should not be decided at the pleadings stage).

Further, assuming that BRIM provides the same services in both its capacity as a sub-adviser to the Funds and as a sub-adviser to the Sub-Advised Funds, Plaintiffs have alleged that there is no discernible difference in the services provided by BlackRock and provided by BRIM, allowing for an inference that the 14 to 36 basis points in advisory fees retained by BRA is excessive.

BlackRock, citing to the IMAs, contends that BRA retains significant responsibility for the Funds' advisory services, which are not required of BRIM as a sub-adviser to the Sub-Advised Funds. For example, BlackRock asserts that BRA is responsible for "supervis[ing] continuously the investment program of the Fund and the composition of its investment portfolio." Defs.' Reply Br. at 3 (quoting Answer Ex. A, ¶ 2). This is a merit-based argument that is better suited for summary judgment.[5] *See, e.g.*, *Zehrer*, 2014 U.S. Dist. LEXIS 162060, at *11 ("[Defendant's] contention that it retains significant responsibility for the Fund's management is better suited for summary judgment."); *Kasilag*, 2012 U.S. Dist. LEXIS 178234, at *10 (explaining that the defendant-adviser's argument that it provided extensive services that were not delegated to the sub-adviser was more appropriately brought at summary judgment); *Curran*, 2010 U.S. Dist. LEXIS 83730, at *35–36 (refusing to engage in a factual inquiry as to the propriety of advisory fees in the context of a 12(b)(6) motion).

In sum, assuming that the Funds pay as much as 106% higher fees for BlackRock advisory services than the Sub-Advised Funds pay for the same or substantially the same services, Plaintiffs' allegations support the inference that the Funds' fees are disproportionately large and outside the range of what could be negotiated at arm's length for BlackRock's advisory services. *See, e.g.*, *Kasilag*, 2012 U.S. Dist. LEXIS 178234, at *10–11 (denying motion to dismiss where the advisory fee charged to a fund was, on average, three times more than the amount the adviser paid its sub-advisers for substantially the same services because plaintiffs "raised an inference that the

---

[5] While BlackRock argues that Plaintiffs' assertions are clearly rebutted by the IMAs, the Court disagrees. Even if the Court were to assume that BRA provided additional services under the IRA, the Court would also have to assume that the fee retained by BRA was proportionate to the services it performed. Having reviewed the relevant agreements, there is nothing in either the agreements or the pleadings that establish or assert that BRA's responsibilities in supervising the Funds are so "plainly substantial" as to warrant retaining its portion of the advisory fee, meaning that the Court would have to assume—based on the size of the Funds only—that the advisory fee was reasonable. *See* Defs.' Br. at 3–4. Plaintiffs, however, have alleged that the services undertaken by all the BlackRock Defendants are substantially similar to the services performed by BRIM in its capacity as a sub-adviser for the Sub-Advisory Funds, and that the higher fees are not justified by any additional services provide by Defendants. The Court must assume that these allegations are true. Whether or not BRA's fee bears a reasonable relationship to the services it performs in discharging any responsibilities it alone has as the adviser is beyond the scope of this motion.

[defendant's] fees are excessive"); *Curran*, 2010 U.S. Dist. LEXIS 83730, at *34 (finding allegations that adviser-sponsor "charges more than the subadvisors, who allegedly provide the bulk of investment advice . . . support[s] a reasonable inference that [the adviser] collected excessive fees for its investment advising services of the Subject Funds"); *Sins v. Janus Capital Mgmt., LLC*, Civil Action No. 04-cv-01647, 2006 U.S. Dist. LEXIS 90673, at *11–12 (D. Colo. Dec. 15, 2006) (finding that "allegations that Defendant's fees to third parties are significantly lower than that charged to the Funds for identical services support Plaintiffs' claim" under Section 36(b)); *Hunt v. Invesco Funds Grp.*, 2006 U.S. Dist. LEXIS 40944 (S.D. Tex. June 5, 2006) (agreeing that allegations that "investment managers charge fund shareholders higher fees than other clients for equivalent advisory services" are "indicative of a disproportionate relationship between fees and services"). In other words, Plaintiffs have pled a substantial fee disparity exists despite BlackRock allegedly performing substantially the same services while using substantially the same resources, which raises a plausible inference that BlackRock's fees are excessive. Accordingly, Plaintiffs' allegations have satisfied the comparative fee structure factor of *Gartenberg*.

Plaintiffs have also alleged that BlackRock received "economies of scale" benefits, as the Funds' AUM increased, that were not shared with the Fund. Plaintiffs have alleged that the increase in investment advisory fees paid by the Fund was not accompanied by a proportionate increase in the work or cost by BlackRock, resulting in economies of scale benefits to BlackRock. Plaintiffs have further alleged that the breakpoints[6] set forth in the fee schedules fail to provide the Funds with an appropriate share of the benefit of economies of scale, in large part because the fee schedule reduces the fee by too small of an amount and spaces the breakpoints too far apart to provide any meaningful benefit of economies of scale. *See* Consol. Compl. ¶¶ 98–99, 102–110.

---

[6] Breakpoints in a fee schedule "enable a fund to share in the benefits of economies of scale by reducing the fee rate it pays as AUM increase." Consol. Compl. ¶ 100.

11

Plaintiffs calculated the fee reductions resulting from breakpoints in the Funds' fee schedules and compared this reduction to the increase in the dollar amount paid by the Fund to BlackRock in order to show that the increase in the Funds' AUMs produced benefits to BlackRock that were up to 8.5 times greater than the benefits received by the Funds. *See id.* Plaintiffs have also compared the breakpoints in the Funds' fee schedules to the breakpoints in the Sub-Advised Funds' breakpoints, which are negotiated at arm's length.[7]

At this stage, such allegations allow for an inference that the adviser's "breakpoints did not give shareholders meaningful benefits from the economies of scale enjoyed by the Funds." *Kasilag*, 2012 U.S. Dist. LEXIS 178234, at *20. Courts have found similar allegations to sufficiently indicate that the adviser-defendant has received economies of scale not shared with the mutual fund. *See, e.g.*, *Zehrer*, 2014 U.S. Dist. LEXIS 162060, at *11 (finding allegation that "Harbor Capital received 'economies of scale' benefits as the Fund grew that were not passed on to the Fund" sufficient at 12(b)(6) stage); *Reso*, 2011 U.S. Dist. LEXIS 133526 (stating that plaintiff's "strongest allegations relate to the economies of scale factor" where plaintiff alleged facts that defendant's fee was" reduced only slightly over the course of amassing a large amount of assets," but that the defendant did "not suffer significant additional expenditures over the course of that expansion"); *Curran*, 2010 U.S. Dist. LEXIS 83730, at *33 (finding that the plaintiffs had adequately pled the "economies of scale" factor where breakpoints to the fees were "immaterial"); *Sins*, 2006 U.S. Dist. LEXIS 90673, at *11–12 (explaining that where the plaintiff alleged that an increase in fund assets and lack of breakpoint levels could show disproportionality, the "economies of scale" factor was

---

[7] Defendants, relying on *Hoffman v. UBS-AG*, 591 F. Supp. 2d 522 (S.N.D.Y. 2008), assert that this comparison is irrelevant, another "apples-to-oranges" comparison. *See* Defs.' Br at 14 (citing *Hoffman*, 591 F. Supp. 2d at 540 (finding that a "differential in breakpoints between sub-advisors and investment advisors is irrelevant to the issues of economies of scale")). The plaintiffs in *Hoffman*, however, had asserted that the advisers and sub-advisers performed distinct services; accordingly, the *Hoffman* Court found that the "differences in services and compensation packages alone justify the different breakpoint arrangements." *Hoffman*, 591 F. Supp. 2d at 540. Here, Plaintiffs have alleged that BlackRock performs the same or substantially the same services for the Funds as the Sub-Advised Funds.

12

adequately pled). Plaintiffs need not establish that BlackRock failed to pass along economies of scale at this stage of the proceedings; rather, Plaintiffs need to allege sufficient factual content to draw a reasonable inference that BlackRock failed to do so. Here, it is possible to infer from the allegations in the Consolidated Complaint that the Funds' AUM growth was not matched by a proportional decrease in fees and that the lack of significant breakpoints in the fee schedule demonstrates that savings from the economies of scale are not being passed through to the Funds. Therefore, because Plaintiffs' allegations support the inference that the fees are disproportionate and not the product of arm's length negotiations, the Court finds that this factor also weighs in Plaintiffs' favor.

Finally, Plaintiffs claim that the directors of the Boards failed to act independently or conscientiously when they approved the IMAs. Plaintiffs assert that the Boards have oversight responsibilities for numerous mutual funds in BlackRock, which preclude them from spending the necessary time and attention to assess the investment advisory fees paid by the Funds. *See* Consol. Compl. ¶¶ 123–125. Plaintiffs also claim that the Board failed to exercise the appropriate level of conscientiousness when they approved the IMAs charging the Funds investment advisory fees as much as 106% higher than the fees other clients pay for the same or substantially the same services, and failed to consider whether the lower fees purportedly paid by other clients reflect differences in the services rendered to those funds. Plaintiffs claim that truly independent or conscientious directors would not have approved of the economies of scale enjoyed by BlackRock, would have solicited proposals from other investment advisers, would have negotiated a "most favored nation" provision[8] into the IMAs, and would not have solely relied upon information and analyses that were prepared by Blackrock or designed to support BlackRock's rationalization for the advisory

---

[8] A "most favored nation" provision "would require that the fee rates paid by each of the Funds be at least as favorable as the lowest rate other clients pay for the same or substantially the same investment advisory services." Consol. Compl. ¶ 130.

fees charged to the Fund. *See id.* at ¶¶ 126–32. While the Court recognizes that BlackRock takes issue with many of these allegations, including that the Boards only reviewed information from BlackRock and that the Boards could not and did not adequately assess the Funds' advisory fees, the Court finds that there are sufficient allegations that allow for an inference of rubber-stamping by the Boards. Even if it is debatable whether the Consolidated Complaint sets forth allegations of board failure that, alone, would support a plausible claim, Plaintiffs' allegations "inform the amount of deference given to the board's approval and consideration of all the relevant factors that will decide the merits of the claim involved." *Goodman*, 2015 U.S. Dist. LEXIS 26361, at *12; *see also Kasilag*, 2012 U.S. Dist. LEXIS 178234, at *22 ("While these allegations are certainly not dispositive of the *Gartenberg* analysis, when taken together they create an inference that the board of directors may not have adequately considered important facts when approving HIFSCO's management fees."); *Reso*, 2011 U.S. Dist. LEXIS 133526, at *17–18 (finding that, although certain allegations relating to the directors were "threadbare and not well-researched," plaintiff's allegations allowed for an inference "that the directors did not adequately take into account important facts relating to better rates offered to other [defendant]-managed funds").

Overall, the single issue at this stage of the proceedings is whether Plaintiffs' Consolidated Complaint, taken as a whole, pleads sufficient facts to support an inference that the investment advisory fee, given all the surrounding facts and circumstances, "is so disproportionately large that it bears no reasonable relationship to the services rendered and could not have been the product of arm's length bargaining." *Jones*, 559 U.S. at 346. While the *Gartenberg* factors serve as a lens through which to consider the totality of the facts alleged in the Plaintiffs' Consolidated Complaint, it is not a requirement to establish these factors at this stage; rather, the appropriate consideration is whether the alleged facts demonstrate a plausible claim for relief under Section 36(b). Plaintiffs have made factual allegations regarding the nature of BlackRock's services in exchange for the

investment advisory fee, that this fee is high in comparison to what BlackRock charges similar clients for the same or substantial same services, that the value increase of the Funds' assets have come with little additional work for BlackRock, and that BlackRock can charge a higher fee in part because the Boards are not sufficiently independent and conscientious in reviewing these fees. While Plaintiffs' evidence is not overwhelming, they have pled sufficient facts about the advisory fees paid to BlackRock, and their relationship to the services rendered, to present a plausible claim that the fees are disproportionately large. *See, e.g.*, *Am. Chems.*, 2014 U.S. Dist. LEXIS 146679, at *17–18; *Curran*, 2010 U.S. Dist. LEXIS 83730, at *34.

This is not to say that the Defendants' arguments lack merit, or that the Court finds it likely that Plaintiffs will be able to meet the onerous standard for liability under Section 36(b). At this stage of the proceedings, however, the Court's duty is not to challenge or otherwise test the strength of the allegations within the Consolidated Complaint; because Rule 8 demands only that a plaintiff "put forth allegations that raise a reasonable expectation that discovery will reveal evidence of the necessary element," *Thompson*, 748 F.3d at 147, arguments regarding the strength of the Consolidated Complaint when tested by the facts should be made at a later time. Plaintiffs have provided enough information in the Consolidated Complaint to "draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 147; *see also Johnson v. City of Shelby*, 135 S. Ct. 346, 347 (2014) (explaining that, to satisfy Rule 8(a), plaintiff "must plead facts sufficient to show that her claim has substantive plausibility," which occurs when a plaintiff merely informs the defendant of the "factual basis for their complaint"). Hence, construing all the facts in Plaintiffs' favor, there is a plausible inference that BlackRock's investment advisory fees are so disproportionately large that they bear no reasonable relationship to the services rendered and could not have been the result of arm's length bargaining. Accordingly, Plaintiffs have adequately "stave[d] off threshold dismissal." *City of Shelby*, 135 S. Ct. at 347.

## IV. Conclusion

For the foregoing reasons, Defendants' Motion to Dismiss the Consolidated Complaint Pursuant to Rule 12(c) is denied. An appropriate Order accompanies this Opinion.

/s/ Freda L. Wolfson
FREDA L. WOLFSON, U.S.D.J.

Dated: March 25, 2015