**\*FOR PUBLICATION\***

### UNITED STATES DISTRICT COURT
### DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| In re BLACKROCK MUTUAL FUNDS ADVISORY FEE LITIGATION | : | Civil Action No. 14-1165 (FLW) (TJB) |
|  | : | **REDACTED OPINION** |
|  | : |  |
|  | : |  |
|  | : |  |

**WOLFSON, United States District Judge:**

Defendants BlackRock Advisors, LLC ("BRA"), BlackRock Investment Management, LLC ("BRIM"), and BlackRock International Limited ("BRIL") (collectively, "BlackRock" or "Defendants")[1] move for summary judgment, pursuant to Federal Rule of Civil Procedure 56, on Plaintiffs Owen Clancy, Cindy Tarchis, and Brendan Foote's (collectively, "Plaintiffs") Consolidated Complaint (the "Complaint"). Plaintiffs are shareholders in two mutual funds managed by BRA, the BlackRock Global Allocation Fund, Inc. ("Global Allocation") and the BlackRock Equity Dividend Fund ("Equity Dividend") (collectively, the "Funds"). The Complaint asserts claims under § 36(b) of the Investment Company Act of 1940 (the "ICA" or "Act"), 15 U.S.C. § 80a-35(b), alleging that Defendants breached their fiduciary duties by receiving excessive investment advisory fees from the Funds. Plaintiffs oppose Defendants' Motion, and have also moved to preclude Defendants from relying on certain evidence and arguments, pursuant to Federal Rule of Civil Procedure 37, on the ground that Plaintiffs failed to produce complete discovery as to those topics.

---

[1] The abbreviations and defined terms referenced in this Opinion are set forth in the Glossary of Abbreviations and Defined Terms attached as the Appendix thereto.

This Court held oral argument on Defendants' Motion on May 29, 2018. For the reasons that follow, Defendants' Motion for Summary Judgment is granted, insofar as Defendants seek a ruling that the decision of the Funds' board of directors and board of trustees to approve BRA's advisory fees with the Funds is entitled to substantial deference, and denied, insofar as Defendants seek the dismissal of Plaintiffs' claims. Plaintiffs' Motion to Preclude is denied without prejudice.

## I.    BACKGROUND[2]

### A.    The Parties

Plaintiff Owen Clancy has been a shareholder of Global Allocation since October 2011, and filed suit against Defendants on February 21, 2014. Defendants' Local Civil Rule 56.1 Statement of Material Facts Not in Dispute ("SOF"), ¶ 1.[3] Plaintiff Brendan Foote has been a shareholder of Global Allocation since June 2012, and commenced his case against Defendants on March 28, 2014. *Id.* at ¶ 2. Plaintiff Cynthia Tarchis has been a shareholder of Global Allocation since 1993 and Equity Dividend since 2012. *Id.* at ¶ 3. Tarchis joined this action on June 16, 2015. *Id.*

BlackRock was established in 1988, and is one of the world's largest investment advisers, with over $4 trillion in assets under management ("AUM"). *Id.* at ¶ 20. BlackRock provides investment advice and invests capital on behalf of a broad array of clients through various investment products, including open-end and closed-end mutual funds, exchange-traded funds ("ETFs"), and other pooled investment vehicles. *Id.* at ¶ 21.

_____

[2] The facts are taken from the parties' Local Rule 56.1 statements, and are construed in the light most favorable to Plaintiffs, the non-moving parties on Defendants' Motion. These facts are undisputed, except where noted.

[3] For the sake of brevity, all citations to the parties' Rule 56.1 statements in this Opinion incorporate the evidentiary citations contained therein.

**B.    The Funds**

The Funds are open-end mutual funds,[4] registered with the United States Securities and

Exchange Commission (the "Commission" or "SEC") under the ICA.  *Id.* at ¶ 4.  Global

Allocation began offering shares for sale to the public on February 3, 1989.  *Id.* at ¶ 8.  From

February 21, 2013 through November 2015 (the "Relevant Period"),[5] Global Allocation had

AUM of between $51 billion and $58 billion.  *Id*. at ¶¶ 12-13.  Equity Dividend began offering

shares for sale to the public on November 25, 1987.  *Id.* at ¶ 14.  During the Relevant Period,

Equity Dividend managed between $20 billion and $30 billion in assets.  *Id.* at ¶ 19.

### 1.    *The Funds' Investment Management Agreements with BRA*

As with most mutual funds, the Funds do not have employees or facilities of their own.

Plaintiffs' Supplemental Statement of Disputed Material Facts ("PSSOF"), ¶ 5.  Pursuant to

investment management agreements ("IMAs") with Global Allocation and Equity Dividend,

BRA, a subsidiary of BlackRock, serves as the investment adviser to the Funds.  SOF ¶¶ 26-27.

The IMAs are reviewed annually, and are subject to the approval of Global Allocation's board of

directors and Equity Dividend's board of trustees (collectively, the "Board").[6]  *Id*. at ¶ 27.

Pursuant to the IMAs, BRA provides investment advisory services[7] to the Funds, including:  (i)

"supervis[ing] and manag[ing] the investment and reinvestment of the [Funds'] assets"; (ii)

---

[4] "A mutual fund is a pool of assets, consisting primarily of portfolio securities, and belonging to
the individual investors holding shares in the fund."  *Burks v. Lasker*, 441 U.S. 471, 480 (1979).
[5] The Court's reference to the "Relevant Period" is used solely to refer to the period in which the
parties obtained discovery and made certain financial calculations, and should not be construed
as a limitation upon the damages period in this case, which the parties, through a joint stipulation
entered by this Court, have agreed runs from "one year prior to the commencement of the
[original complaint (February 21, 2013)] through the date of trial . . . ."  Stipulation and Order
dated June 16, 2016, ECF No. 68 at ¶ 5.
[6] While Global Allocation is overseen by a board of directors and Equity Dividend is overseen
by a board of trustees, the same individuals comprise both boards.  SOF ¶ 30.
[7] The services that BRA provides to the Funds are set forth in greater detail, *infra*.

3

"supervis[ing] continuously the investment program of the [Funds] and the composition of [their] investment portfolio[ s ]"; (iii) "arrang[ing] . . . for the purchase and sale of securities and other assets held in the investment portfolio of the [Funds]"; (iv) "provid[ing] investment research to the [Funds]"; and (v) "select[ing] brokers" to execute the transactions for the [Funds]." PSSOF ¶ 20; Certification of Andrew Muscato in Support of Defendants' Motion for Summary Judgment ("Muscato Cert."), Ex. 14, GA Fund IMA at §§2, 4(b)(i); Muscato Cert., Ex. 15, ED Fund IMA at §§ 2, 4(b)(i).

In exchange for providing advisory services to the Funds, the IMAs require the Funds to pay BRA an annual advisory fee (the "Advisory Fee"). SOF ¶ 29. The Advisory Fee is calculated as a percentage of the Funds' AUM, pursuant to a fee schedule containing "breakpoints," which operate to reduce BRA's Advisory Fee as the Funds' AUM increase. *Id.* The following table depicts Global Allocation's fee schedule during the Relevant Period:

| Global Allocation Fee Schedule (2013-2015) | |
| --- | --- |
| **AUM** | **Percentage (%) of AUM** |
| Up to $10 billion | .75% |
| $10 billion to $15 billion | .69% |
| $15 billion to $20 billion | .68% |
| $20 billion to $25 billion | .67% |
| $25 billion to $30 billion | .65% |

| $30 billion to $40 billion | .63% |
|---|---|
| $40 billion to $60 billion | .62% |
| $60 billion to $80 billion | .61% |
| Over $80 billion | .60% |

*Id.* at ¶ 68.  Under this fee schedule, the effective Advisory Fee received by BRA from Global

Allocation was .66% of AUM in 2013 and 2014, and .67% of AUM in 2015.  *Id.* at ¶ 69.  In

total, Global Allocation paid BRA more than $1.2 billion in Advisory Fees during the Relevant

Period ($412,500,349 in 2013 + $441,347,281 in 2014 + $407,768,884 in 2015).  PSSOF ¶ 24.

The *pro rata* amount of BRA's Advisory Fee allocable to each of the Fund's shareholders during

the same period ranged between $6 and $7 for every $1,000 invested.  SOF ¶ 70.

      Likewise, under its IMA with Equity Dividend, BRA received an Advisory Fee

calculated as a percentage of Equity Dividend's AUM, pursuant to a fee schedule that included

breakpoints.  *Id.* at ¶¶ 71-72.  In 2013, BRA's Advisory Fee from Equity Dividend was

calculated pursuant to the following fee schedule:

| Equity Dividend Fee Schedule (2013) ||
|---|---|
| **AUM** | **Percentage (%) of AUM** |
| Up to $8 billion | .60% |
| $8 billion to $10 billion | .56% |

5

| | |
|---|---|
| $10 billion to $12 billion | .54% |
| $12 billion to $17 billion | .52% |
| $17 billion to $25 billion | .51% |
| $25 billion to $35 billion | .50% |
| $35 billion to $50 billion | .49% |
| Over $50 billion | .48% |

*Id.* at ¶ 73.  In 2014 and 2015, BRA's Advisory Fee from Equity Dividend was adjusted in accordance with the following fee schedule:

| Equity Dividend Fee Schedule (2014-15) | |
|---|---|
| **AUM** | **Percentage (%) of AUM** |
| Up to $8 billion | .60% |
| $8 billion to $10 billion | .56% |
| $10 billion to $12 billion | .54% |
| $12 billion to $17 billion | .52% |
| $17 billion to $25 billion | .51% |

| | |
|---|---|
| $25 billion to $30 billion | .50% |
| $30 billion to $40 billion | .49% |
| Over $40 billion | .48% |

*Id*. at ¶ 74. Under those fee schedules, the effective Advisory Fee received by BRA from Equity Dividend during the Relevant Period was .54% of AUM. *Id*. at ¶ 76. Equity Dividend paid BRA over $450 million in Advisory Fees during that time ($144,192,714 in 2013 + $162,300,957 in 2014 + $151,855,019 in 2015). PSSOF ¶ 25. The *pro rata* amount of BRA's Advisory Fee allocable to each of Equity Dividend's shareholders during the Relevant Period ranged between $5 and $6 for every $1,000 invested. SOF ¶ 77.

### 2.     *The Funds' Separate Expense Agreements with BRA*

Apart from BRA's Advisory Fee under the IMAs, the Funds also have separate agreements with BRA that provide for the payment of certain expenses incurred by BRA, including accounting, transfer agency, professional, and registration fees. *Id*. at ¶ 78. Pursuant to a Shareholders Administrative Services Agreement (the "SAS Agreement") with BRA, the Funds reimburse BRA for the expenses that it incurs in providing the personnel and infrastructure required to operate a Shareholder Service Center.[8] *Id*. at ¶ 79. Under the SAS

---

[8] Plaintiffs contend that, in addition to reimbursement for the personnel and infrastructure required to operate the Shareholder Service Center, the SAS Agreement separately provides for reimbursement of expenses incurred in: "(i) responding to telephone, written or other inquiries or instructions from shareholders, dealers and prospective investors concerning accounting balances, available shareholder services, account statements, transaction confirmations, procedures for purchasing and redeeming shares and similar matters and services"; and (ii)

Agreement, Global Allocation reimbursed BRA for $764,594 of expenses in 2013, $543,076 of expenses in 2014, and $601,419 of expenses in 2015. *Id.* at ¶ 81. Additionally, Equity Dividend reimbursed BRA for $370,634 of expenses in 2013, $133,544 of expenses in 2014, and $191,989 of expenses in 2015. *Id.*

The Funds also have an Accounting Support Services Agreement (the "Accounting Agreement"), which requires the Funds to partially reimburse BRA for the *pro rata* share of expenses that BRA incurs in providing certain specified accounting services to the Funds, up to an annual maximum of $1.6 million in the aggregate. *Id.* at ¶ 83. The parties dispute whether the services provided pursuant to the Accounting Agreement overlap with the services that BRA renders to the Funds under the IMAs. *See id.*; PRSOF at ¶ 83. Under the Accounting Agreement, Global Allocation reimbursed BRA for $584,806 of expenses in 2013 and $597,630 of expenses in 2014. SOF ¶ 83. Equity Dividend reimbursed BRA for $300,993 of expenses under the Accounting Agreement in 2013, and $306,211 of expenses in 2014. *Id.* at ¶ 84. The expenses paid by the Funds under both the SAS Agreement and the Accounting Agreement required the Board's approval. *Id.*

### 3. The Funds' Agreements with Third-Party Service Providers

Through various agreements with the Funds, third-party service providers also assist in performing various operations necessary to operate the Funds. PSSOF ¶ 6. In that regard, under an Administrative Services Agreement (the "State Street Adm. Agreement") between the Funds and State Street Bank and Trust Company ("State Street"), State Street performs administrative[9]

---

"receiving telephone transaction instructions and inputting such instructions into" a third-party service provider's computer system. Plaintiffs' Response to Defendants' Local Civil Rule 56.1 Statement of Material Facts ("PRSOF"), ¶ 79.

[9] The administrative services listed in the State Street Adm. Agreement include: overseeing the custodian for the Funds in the maintenance of books and records as required under Rule 31a-1(b)

and accounting services [10] for the Funds. *Id.* at ¶¶ 28-30. The parties dispute the number of

employees that provide services for the Funds under the State Street Adm. Agreement. *Id.* at ¶

32; Defendants' Response to Plaintiffs' Supplemental Local Civil Rule 56.1 Statement

("DRSOF"), ¶ 32. The State Street Adm. Agreement requires the Funds to pay an annual fee to

State Street that is calculated as a percentage of the Funds' AUM, plus additional monthly

expenses. PSSOF ¶ 33. Under this agreement, Global Allocation paid State Street $19,820,722 in

administrative fees from 2013 to 2016, and Equity Dividend paid State Street administrative fees

of $9,834,041 during the same period. *Id.* at ¶¶ 34-35.

The Funds also entered into a Transfer Agency and Shareholders Services Agreement

(the "BNY Agreement") with BNY Mellon Investment Servicing (US) Inc. ("BNY"), pursuant to

which BNY served as the Funds' transfer agent, registrar, dividend disbursing agent, and

shareholder servicing agent during the Relevant Period. *Id.* at ¶ 37. According to Plaintiffs, the

services that BNY performs for the Funds under the BNY Agreement include: preparing and

---

of the ICA; calculating and arranging for the payment of the Funds' expenses; preparing the
Funds' financial information for shareholder reports, proxy statements, and other shareholder
communications; preparing and filing the Funds' periodic financial reports required to be filed
with the SEC; preparing reports on the business and affairs of the Funds; making reports and
recommendations to the Board concerning the performance of the Funds' independent accounts,
as well as the performance and fees of the Funds' custodian, transfer agent, and dividend
disbursing agent; consulting with the Funds' officers, independent accountants, legal counsel,
custodian, and transfer agent in establishing accounting policies for the Funds; providing
compliance monitoring services to assist BRA in complying with the requirements of the Internal
Revenue Code ("IRC"), the ICA, and the limitations set forth in the Funds' prospectuses; and
assisting the Funds and the Funds' legal counsel in handling regulatory matters. PSSOF ¶ 30
(citing Declaration of Robert. L. Lakind in Opposition to Defendants' Motion for Summary
Judgment ("Lakind Decl."), Ex. 16, State Street Adm. Agreement at 4-5).
[10] The accounting services listed in the State Street Adm. Agreement include: maintaining the
books of account and other financial records of the Funds in accordance with applicable law;
recording general ledger entries; calculating daily net income; reconciling activity to the trial
balance; calculating and publishing daily net asset value; and preparing account balances.
PSSOF ¶ 29 (citing State Street Adm. Agreement at 3-4).

certifying shareholder lists in conjunction with proxy solicitations; processing and accounting for purchases and redemptions of the Funds' shares, dividends, and distributions; mailing all communications by the Funds to its shareholders; tracking the cumulative effects (gains/losses) of as-of transactions on the Funds' net asset value ("NAV"); and maintaining accurate records of shareholder accounts.[11]  *Id.* at ¶ 38.  Plaintiffs assert that BNY also reports to the Funds on: NAV gains and losses; account activities; fund details; reconciliations; daily prices; correspondence tracking; Rule 12b-1 and load commission reports; trade monitoring reports; and compliance certifications.[12]  *Id.* at ¶ 39.  For the fiscal years 2013 to 2016, Global Allocation paid BNY $208,793,219 in fees under the BNY Agreement.  *Id.* at ¶ 41.  During the same period, Equity Dividend paid BNY $150,303,636 in fees under the BNY Agreement.  *Id.* at ¶ 42.

Additionally, Global Allocation entered into an agreement (the "BBH Custodian Agreement") with Brown Brothers Harriman & Co. ("BBH"), under which BBH served as the custodian and foreign custody manager for Global Allocation during the Relevant Period.  *Id.* at

---

[11] Defendants dispute Plaintiffs' representations regarding BNY's services, stating that the "services actually rendered by BNY to the Funds pursuant to the [BNY Agreement] vary by Fund to the extent applicable to and needed by the Fund."  DRSOF ¶ 38.
[12] Defendants dispute Plaintiffs' representations regarding BNY's reporting services, stating that the reports provided by BNY to the Funds pursuant to the BNY Agreement "vary by Fund."  DRSOF ¶ 39.

¶ 44. Pursuant to the BBH Custodian Agreement, BBH provides custodial,[13] tax,[14] and proxy[15]

services to Global Allocation. *Id.* at ¶¶ 45-48. For the fiscal years 2013 to 2016, Global

Allocation paid BBH $22,437,592 in fees under the BBH Custodian Agreement. *Id.* at ¶ 50.

Similarly, Equity Dividend entered into an agreement (the "State Street Custodian Agreement")

---

[13] The parties dispute the scope of custodial services provided by BBH to Global Allocation. *See* PSSOF ¶ 45; DRSOF ¶ 45. Plaintiffs claim that, under the BBH Custodian Agreement, the custodial services that BBH performs for the Funds include: receiving, maintaining, holding, and keeping safely the property of each Fund; notifying the Fund of property deliveries or transfers; paying for and receiving securities purchases for the account of a Fund; making delivery of securities that have been sold for the account of a Fund; receiving and collecting all stock dividends, rights, and foreign tax reclaims; releasing funds or securities to the Shareholder Servicing Agent or otherwise applying funds or securities, insofar as available, for the payment of dividends or other distributions to the Fund shareholders, and maintaining complete and accurate records with respect to securities and other assets held for the account of each Fund. PSSOF ¶ 45. Defendants contend that the "services actually rendered by BBH to [Global Allocation] under the BBH Custodian Agreement vary according to the needs of the GA Fund." DRSOF ¶ 45.

[14] The parties also dispute the scope of tax services provided by BBH to Global Allocation. *See* PSSOF ¶ 47; DRSOF ¶ 47. Plaintiffs claim that, under the BBH Custodian Agreement, the tax services that BBH performs for the Funds include: "apply[ing] for a reduction of withholding tax and any refund of any tax paid or credits that apply in each applicable market in which a Fund invests"; "promptly fil[ing] any certificates or other affidavits for the refund or reclaim of foreign taxes paid, and otherwise us[ing] all lawful available measures customarily used to minimize the imposition of foreign taxes at the source"; and "perform[ing] tax reclaim services with respect to taxation levied by the revenue authorities of the countries in which the Custodian provides global custody services." PSSOF ¶ 47 (quoting Lakind Decl., Ex. 28, BBH Custodian Agreement, Sch. C). Defendants argue that the tax "services actually rendered by BBH to [Global Allocation] under the BBH Custodian Agreement vary according to the needs of the GA Fund." DRSOF ¶ 47.

[15] Once again, the parties dispute the scope of proxy services provided by BBH to Global Allocation. *See* PSSOF ¶ 48; DRSOF ¶ 48. Plaintiffs claim that the proxy services provided by BBH to Global Allocation include: "notices by the Custodian to a Fund or Series of the dates of pending shareholder meetings, resolutions to be voted upon, and the required return dates"; and "promptly deliver[ing] or mail[ing] to Proxy Monitor, or such other proxy vendor as may be appointed from time to time by the Fund, all forms of proxies and all notices of meetings and any other notices or announcements or related proxy materials," including "annual reports, explanatory material concerning resolutions, management recommendations, or other relevant materials." PSSOF ¶ 48 (quoting Lakind Decl., Ex. 28, BBH Custodian Agreement, Sch. D). Defendants contend that the "services actually rendered by BBH to [Global Allocation] under the BBH Custodian Agreement vary according to the needs of the GA Fund." DRSOF ¶ 48.

with State Street, whereby State Street served as Equity Dividend's custodian during the Relevant Period. *Id.* at ¶ 52. Plaintiffs assert, and Defendants contest, that State Street performs substantially the same custodial services for Equity Dividend that BBH provides to Global Allocation. *See id.* at ¶ 53; DRSOF ¶ 53. From 2013 to 2016, Equity Dividend paid State Street $4,560,375 in custodial fees under the State Street Custodian Agreement. PSSOF ¶ 55.

Finally, the Funds have a distribution agreement (the "Distribution Agreement") with BlackRock Investments, Inc. ("BlackRock Investments"), pursuant to which BlackRock Investments serves as the principal underwriter and distributor for the Funds. *Id.* at ¶ 57. According to Plaintiffs, under the Distribution Agreement, BlackRock Investments is responsible for sales and promotional activities for the Funds, including coordinating and overseeing distribution partners, maintenance of state registration, monitoring market timing, and related distribution services.[16] *Id.* at ¶ 58. Pursuant to the Distribution Agreement, the Funds pay a distribution fee and service or account maintenance fee to BlackRock Investments. *Id.* at ¶ 59. For the fiscal years 2013 to 2016, Global Allocation paid BlackRock Investments $803,669,615 in service and distribution fees under the Distribution Agreement. *Id.* at ¶ 60.

### C. Board Oversight of the Funds

#### *1. The Board*

BRA and the Funds are overseen by the Board. SOF ¶ 30. During the Relevant Period, the Board was comprised of thirteen individuals. *Id.* at ¶ 31. From a statutory perspective, ten of the thirteen Board members (collectively, the "Independent Trustees") were not "interested persons," as that term is defined under § 80a of the ICA. *Id.* at ¶ 31; *see* 15 U.S.C. §§ 80a-10(a)

---

[16] Defendants dispute Plaintiffs' representations regarding BlackRock Investments' services under the Distribution Agreement, arguing that they are "conclusion[s] of law to which no response is required under Local Civil Rule 56.1." DRSOF ¶ 58.

and 80a-2(a)(19(B). The Board is comprised of individuals hailing from diverse professional backgrounds, including chief executive officers of various corporations, law firm partners, former high-ranking government officials, and a graduate professor at Harvard University's Graduate School of Business Administration. SOF ¶ 34. The Chairman of the Board, Robert Hernandez (the "Board Chairman"), is an Independent Trustee and has served as a member of the Board for ten years. *Id*. at ¶ 32. The Board has five standing committees: the Audit Committee, the Governance and Nominating Committee, the Compliance Committee, the Performance Oversight Committee, and the Executive Committee (collectively, the "Standing Committees"). *Id.* at ¶ 53. Each Standing Committee is chaired by an Independent Trustee, and with the exception of the Executive Committee, the Standing Committees met regularly each quarter throughout the Relevant Period to discuss action items pertaining to their respective responsibilities. *Id*. at ¶¶ 53-64.

Under the ICA, the Board is charged with overseeing various aspects of the Funds' management, including reviewing and approving the Funds' IMAs and BRA's Advisory Fee on an annual basis. *Id.* at ¶ 33. During the Relevant Period, the Board met regularly, holding two-day meetings each quarter, and additional ad-hoc in person or telephonic meetings as necessary. *Id*. at ¶¶ 39-41. In the course of performing its oversight responsibilities, the Board received and reviewed voluminous materials pertaining to various aspects of the Funds' operations and performance throughout the Relevant Period, as well as additional information on a broad range of new developments and emerging issues. *Id*. at ¶¶ 42-44. For example, the Board received an update regarding BlackRock's pricing philosophy, including the factors that BRA considers annually when formulating its Advisory Fee proposal to the Board. *Id*. at ¶ 44. The Board also met with senior BlackRock personnel, including its Chairman and Chief Executive Officer, the

heads of its investment divisions, and the Funds' portfolio managers. *Id.* at ¶¶ 45-50. For

example, in May 2015, the Board met with the team responsible for Global Allocation's

investment management to discuss, among other things, Global Allocation's performance

relative to peer funds managed by BRA's competitors. *Id.* at ¶ 46. During the Relevant Period,

the Board also met with leaders in various fields of interest, including a 2013 presentation from

the Chairman of the SEC. *Id.* at ¶ 52.

  The Board receives assistance from various third-party service providers in discharging

its duties under the ICA. *Id.* at ¶ 35. In that regard, during the Relevant Period, the law firm of

Debevoise & Plimpton LLP (the "Board's Counsel"), in its role as counsel to the Board,

provided advice to the Board regarding, *inter alia*, issues related to the renewal of the Funds'

IMAs with BRA. *Id.* at ¶¶ 36, 93. During the same period, the law firm of Willkie Farr &

Gallagher LLP (the "Funds' Counsel") served as counsel to the Funds, providing legal advice

regarding the duties of the Board in connection with reviewing the contracts between the Funds

and their service providers. *Id.* at ¶ 37. Moreover, the Board received analysis and information

from the following third-party service providers: (i) Lipper, Inc. ("Lipper"), a financial services

company that provided the Board with data and information regarding the Funds' performance

and fees relative to peer funds; (ii) Morningstar, Inc. ("Morningstar"), an investment

management company that provided the Board with analysis and ratings of the Funds'

performance relative to peer funds[17]; (iii) PricewaterhouseCoopers ("PwC"), a third-party firm

that, at least on one occasion, provided the Board with analysis of the cost allocation

---

[17] In their response to Defendants' Rule 56.1 statement, Plaintiffs object to consideration of the Lipper and Morningstar reports, arguing that they are inadmissible hearsay. *See* PRSOF ¶¶ 10-11. However, Plaintiffs have not formally moved to preclude consideration of that evidence on this Motion. In any event, because the Court does not rely on that information in this Opinion, the admissibility of those reports are not at issue here.

methodology employed by BRA to estimate its profitability in managing the Funds; and (iv) Ernst & Young LLP ("E&Y"), a third-party firm that provided analysis of the structure of BRA's Advisory Fee. *Id*. at ¶ 38.

### 2. *The Board's Process for Approving BRA's Advisory Fee*

In addition to its quarterly meetings, the Board met each April during the Relevant Period to consider, among other things, whether to renew the Funds' IMAs with BRA (the "Fee Approval Meeting").[18] *Id.* at ¶¶ 39-41. Planning for the relevant Fee Approval Meetings occurred months in advance, and involved BlackRock, the Board's Counsel, and Lipper. *Id*. at ¶ 88. Prior to the Fee Approval Meetings, the Board received extensive information, spanning more than 25,000 pages of material potentially relevant to BRA's Advisory Fee, including comparative fee and performance data from Lipper, and information on each of the factors outlined in *Gartenberg v. Merrill Lynch Asset Mgmt., Inc.*, 694 F.2d 923 (2d Cir. 1982)[19] and adopted in *Jones v. Harris Assocs. L.P.*, 559 U.S. 335 (2010).[20] *Id*. at ¶¶ 95, 97. As the Board Chairman testified, in deciding whether to approve BRA's proposed Advisory Fee, the Board looked at "the *Gartenberg* factors and anything else we consider[ed] relevant," including each of the *Gartenberg* factors. Deposition Transcript of Robert Hernandez ("Hernandez Dep."), 35:3-11. At a subsequent meeting, usually held in May, the Board voted on whether to renew BRA's Advisory Fee. SOF ¶ 87.

---

[18] Plaintiffs dispute that the relevant Fee Approval Meetings were limited to consideration of whether to renew the Funds' IMAs with BlackRock, arguing that the Board also considered BlackRock's contracts with third-party service providers and the renewal of BlackRock's subadvisory agreements with independent mutual funds. *See* PRSOF ¶ 41. Nonetheless, Plaintiffs do not dispute that the Board did, in fact, consider whether to renew BRA's Advisory Fee during the Fee Approval Meetings. *See id*.

[19] The Court will explain the *Gartenberg* factors, *infra*.

[20] As discussed, *infra*, Plaintiffs dispute the sufficiency of the information provided to the Board regarding BRA's Advisory Fee. *See* PRSOF ¶ 97.

During and after the Fee Approval Meetings that were held in 2013, 2014, and 2015, the

Board and the Board's Counsel also submitted to BlackRock written questions and requests for

additional information and materials.[21]  *Id.* at ¶ 142.  During the Relevant Period, BlackRock

provided over 300 pages of written responses and materials to the Board's follow-up inquiries.

*Id.* at ¶ 143.  For example, in 2014, the Board asked BlackRock for additional information

regarding the fees that BlackRock receives for advisory services rendered to institutional

investors, and requested that BlackRock perform a review of the advisory fee breakpoints

contained in fee schedules across all funds under BlackRock's management.  *Id.* at ¶ 145.  The

parties dispute the adequacy of BlackRock's responses to these inquiries.  *See id.*; PRSOF ¶ 145.

On at least two occasions during the Relevant Period, the Board negotiated to obtain fee

concessions in favor of shareholders.  First, in 2014, the Board asked BlackRock to consider a

voluntary fee reduction as a result of Equity Dividend's performance and BRA's estimated profit

margin.  SOF ¶ 146.  Although BlackRock initially rejected the Board's overtures, – based on its

belief that Equity Dividend was priced competitively and the fact that additional breakpoints had

been added to Equity Dividend's fee schedule in recent years – BlackRock ultimately agreed to

modify the breakpoints in Equity Dividend's fee schedule to provide for reductions in BRA's

Advisory Fee.  *See id.* at ¶ 146.  Additionally, in 2015, the Board asked BlackRock to agree to a

temporary reduction in BRA's Advisory Fee for the Funds.  SOF ¶ 148.  After initially objecting

to these proposed fee reductions, BlackRock later agreed to temporarily waive a portion (.025%)

of Equity Dividend's management fee.  *Id.* at ¶ 148.

**D.     BRA's Services to the Funds**

---

[21] Plaintiffs dispute that the Board's inquiries during the Relevant Period related solely to the
Funds, and that BlackRock's responses to the Board's inquiries were complete and accurate. *See*
PRSOF ¶ 143; PSSOF ¶¶ 196-218.

To operate the Funds, BRA relies on a team of investment and non-investment personnel, including portfolio managers, senior analysts, quantitative strategists, marketing and communications strategists, research analysts, and administrative staff. *See id.* at ¶¶ 149-150. It is undisputed that BRA provides certain investment advisory services to the Funds in exchange for the Advisory Fee, including investment research, securities selection and trading, and risk management. *Id.* at ¶ 149. The parties diverge, however, on the degree to which BRA, as opposed to third-party firms, provides the additional services necessary to operate the Funds, and as to whether BRA is compensated for any such additional services under the Advisory Fee, as opposed to under separate agreements.

According to Defendants, in addition to investment advisory services, BRA performs or oversees the following services (collectively, the "Support Services") required to operate the Funds: (i) providing accounting services, including the publication and verification of Funds' NAV, *id.* at ¶¶ 154-58; (ii) designing and implementing the Funds' compliance program, *id.* at ¶¶ 159-176; (iii) providing legal services to the Funds, *id.* at ¶¶ 177-84; (iv) supporting the Board in performing its reporting and management duties, *id.* at ¶¶ 185-97; (v) hiring and overseeing the Funds' service providers, including the Funds' accountant, custodian, and transfer agent, *id.* at ¶¶ 198-222; (vi) coordinating and ensuring compliance with the Funds' regulatory reporting and financial disclosure requirements, *id.* at ¶¶ 223-30; (vii) overseeing the Funds' distribution partners and the distribution of the Funds' shares through various distribution channels, *id.* at ¶¶ 231-34; (viii) managing the Funds' dividend requirements, *id.* at ¶¶ 235-36; (ix) complying and managing tax issues confronted by the Funds, *id.* at ¶¶ 237-39; and (x) providing recordkeeping services. *Id.* at ¶¶ 241-43. Defendants contend that BRA performs these Support Services in exchange for the Advisory Fee.

17

Conversely, Plaintiffs maintain that the Support Services are not performed by BRA under the IMAs or in exchange for the Advisory Fee. PSSOF ¶ 27. In that regard, Plaintiffs point to the language of the Funds' contracts with third-party service providers – including the State Street Adm. Agreement, the BNY Agreement, the BBH Custodian Agreement, the State Street Custodian Agreement, and the Distribution Agreement – and contend that many of the Support Services identified by Defendants are actually provided by third-party service providers, for a separate fee. *See id.* at ¶¶ 27-61.

Moreover, Plaintiffs assert that, to the extent BRA plays a role in providing any of the Support Services to the Funds, the Funds pay fees and expenses to BRA separate from the Advisory Fee. *See id.* at ¶¶ 62-78. Specifically, Plaintiffs claim that, pursuant to certain reimbursement provisions in the IMAs, BRA receives separate compensation for various Support Services, including separate compensation for compliance services such as the compensation of the Funds' Chief Compliance Officer ("CCO"). *See id.* at ¶¶ 62-67. Plaintiffs also assert that the Funds have reimbursed BRA for accounting services under the terms of the Accounting Agreement, and have reimbursed BRA for shareholder services pursuant to the SAS Agreement. *See id.* at ¶¶ 68-73. Finally, Plaintiffs contend that the Funds pay directly for certain operating expenses, including for reimbursement of the CCO's compensation and disinterested directors' fees, printing expenses, professional fees, registration fees, and other miscellaneous expenses. *See id.* at ¶¶ 74-76. In total, Plaintiffs assert that, in addition to and apart from the Advisory Fee, Global Allocation paid BRA and third-party service providers approximately $846,095,752 in fees and expenses during the Relevant Period, with Equity Dividend paying approximately $330,617,830 in additional expenses and fees over the same timeframe. *Id.* at ¶¶ 77-78.

E.    **The Subadvised Funds**

18

The core of this case surrounds the scope and extent of the services that BRIM, an affiliate of BlackRock, performs as a subadvisor for seven mutual funds (collectively, the "Subadvised Funds")[22] organized and sponsored by various financial institutions unaffiliated with BlackRock, which serve as the investment advisers for the Subadvised Funds (collectively, the "Independent Advisers").[23] SOF ¶¶ 244-45. Like the Funds, the Subadvised Funds are open-end mutual funds registered under the ICA. PSSOF ¶ 80. Each Subadvised Fund has its own board of directors or trustees. SOF ¶¶ 253, 255. The Subadvised Funds retain their own service providers, including advisers, transfer agents, and custodians. *Id.* at ¶ 255, PSSOF ¶ 83. These service providers conduct the Subadvised Funds' operations under the oversight of the Independent Advisers. *Id.* at ¶ 255; PSSOF ¶ 83.

Through subadvisory agreements with the Independent Advisers, BRIM renders subadvisory services to the Subadvised Funds in exchange for a fee (the "Subadvisory Fee"). SOF ¶ 244; PSSOF ¶ 85. The parties agree that BRIM performs substantially the same investment advisory (*i.e.*, portfolio management) services for the Subadvised Funds that BRA performs for the Funds, including using substantially the same investment strategies, research

---

[22] The "Subadvised Funds" consist of: (1) the AZL BlackRock Global Allocation Fund (the "Allianz GA Fund"); (2) the Transamerica Global Allocation Fund (the "Transamerica GA Fund"); (3) the JNL/BlackRock Global Allocation Fund (the "Jackson GA Fund"); (4) the MassMutual Select Global Allocation Fund (the "MassMutual GA Fund"); (5) the VALIC Dividend Value Fund (the "VALIC ED Fund"); (6) the LVIP BlackRock Equity Dividend RPM Fund (the "Lincoln ED Fund"); and (7) the MassMutual Income and Growth Fund (the "MassMutual ED Fund"). SOF ¶ 245.

[23] Specifically, Allianz Investment Management, LLC is the investment adviser for the Allianz GA Fund, Transamerica Asset Management, Inc. is the investment adviser for the Transamerica GA Fund; Jackson National Asset Management, LLC is the investment adviser for the Jackson GA Fund; MML Investment Advisors, LLC is the investment adviser for the MassMutual GA Fund and the MassMutual ED Fund; The Variable Annuity Life Insurance Company is the investment adviser for the VALIC ED FUND; and Lincoln Investment Advisors Corporation is the investment adviser for the Lincoln ED Fund. SOF ¶¶ 246-252.

and analysis, and systems, technology, and other resources in providing investment advisory services. SOF ¶¶ 261-63; PRSOF ¶¶ 261-63. Outside of portfolio management services, however, the parties significantly dispute the scope and extent of the subadvisory services that BRIM renders to the Subadvised Funds. *See* SOF ¶¶ 257-93; PRSOF ¶¶ 257-93; PSSOF ¶¶ 88-126; DRSOF ¶¶ 88-126. Specifically, the parties dispute whether BRIM performs the same Support Services, such as risk management, legal and compliance services, shareholder services, and accounting services, for the Subadvised Funds that BRA performs for the Funds, and, to the extent that BRIM does perform any of the same Support Services for the Subadvised Funds, the parties dispute the scope and extent of BRIM's role in providing those services. *See* SOF ¶¶ 257-93; PRSOF ¶¶ 257-93; PSSOF ¶¶ 88-126; DRSOF ¶¶ 88-126.

In the same way that BRA receives an Advisory Fee from the Funds, the Independent Advisers receive an advisory fee for performing advisory services for the Subadvised Funds. SOF ¶ 256. During the Relevant period, those fees were as follows:

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| **The Independent Advisers' Advisory Fees for the Subadvised Funds** | | | | | | | |
| | **Allianz GA Fund** | **Transamerica GA Fund** | **Jackson GA Fund** | **MassMutual GA Fund** | **VALIC ED Fund** | **Lincoln ED Fund[24]** | **MassMutual ED Fund** |
| **2013** | .75% | .68% | .74% | .80% | .73% | .75% | .65% |
| **2014** | .75% | .72% | .72% | .80% | .72% | .74% | .65% |
| **2015** | .75% | .69% | .72% | .78% | .72% | .73% | .65% |

---

[24] Plaintiffs dispute the advisory fee rate listed for the Lincoln ED Fund, contending that it fails to account for the following waivers in Lincoln Investment Advisors Corporation's fee: .07% in 2013, .08% in 2014, and .04% in 2015. PRSOF ¶ 256.

SOF ¶ 256.

Additionally, as noted, BRIM received a Subadvisory Fee for providing services to the Subadvised Funds. *See id.* at SOF ¶¶ 294-303. During the Relevant Period, BRIM's Subadvisory Fee was calculated pursuant to the following fee schedules:

- Jackson GA Fund and the Allianz GA Fund. .42% for the first $500 million of AUM; .40% for AUM between $500 million and $1 billion; and .375% for AUM over $1.5 billion. *Id.* at ¶¶ 294-95.

- Transamerica GA Fund. .44% for the first $100 million of AUM and .32% for AUM over $100 million.[25] *Id.* at ¶ 296.

- MassMutual GA Fund. .60% of AUM up to $500 million and .40% of AUM over $500 million. *Id.* at ¶ 297.

- Lincoln ED Fund. Before October 2015, BRIM received .35% AUM up to $250 million; .325% of AUM from $250 million to $500 million; .30% of AUM from $500 million to $1 billion; and .275% of AUM over $1 billion. *Id.* at ¶ 298. After October 2015, BRIM received .325% of AUM up to $250 million; .305% of AUM from $250 million to $500 million; .275% of AUM from $500 million to $1 billion; and .255% of AUM over $1 billion. *Id.* at ¶ 299.

- MassMutual ED Fund. .375% of AUM up to $250 million; .35% of AUM from $250 million to $500 million; .325% of AUM from $500 million to $1 billion; and .30% of AUM over $1 billion.[26] *Id.* at ¶ 300.

- VALIC ED Fund: BRIM received .35% AUM up to $250 million; .325% AUM from $250 million to $500 million; .30% AUM from $500 million to $1 billion; and .275% AUM over $1 billion.[27] *Id.* at ¶ 301.

_____

[25] Plaintiffs note that on July 1, 2016, the fee schedule for BRIM's Subadvisory Fee from the Transamerica GA Fund was revised in the following way: .42% of AUM for the first $100 million, .32% of AUM between $100 million and $3 billion; and .31% of AUM over $3 billion. PRSOF ¶ 296.

[26] Plaintiffs dispute these figures, contending that effective December 1, 2015, BRIM's Subadvisory Fee for the MassMutual ED Fund was calculated as follows: .325% of AUM up to $250 million; .30% of AUM from $250 million to $500 million; .275% of AUM from $500 million to $1 billion; and .25% of AUM over $1 billion. PRSOF ¶ 300.

[27] Plaintiffs dispute these figures, contending that effective December 1, 2015, BRIM's Subadvisory Fee for the VALIC ED Fund was calculated as follows: .325% of AUM up to $250

21

## II.     PROCEDURAL HISTORY

Following the consolidation of their various individual actions, Plaintiffs filed the

Consolidated Complaint on May 27, 2014, asserting two claims against Defendants under §

36(b) of the ICA.  ECF Nos. 19, 27.  On September 25, 2017, Defendants filed the instant

Motion for Summary Judgment.  ECF Nos. 100-01.  Defendants' Motion has been fully briefed.

ECF Nos. 110, 117.  Plaintiffs filed a Motion to Preclude Defendants from relying upon certain

evidence on November 11, 2017, which Motion has also been fully briefed.  ECF Nos. 108-09,

115-16, 119.  On May 29, 2018 this Court held oral argument on Defendants' Motion.  ECF No.

144.

## III.    STANDARD OF REVIEW

Summary judgment is appropriate where the Court is satisfied that "there is no genuine

issue as to any material fact and that the movant is entitled to a judgment as a matter of law."

FED. R. CIV. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Orson, Inc. v.

Miramax Film Corp.*, 79 F.3d 1358, 1366 (3d Cir. 1996).  A factual dispute is genuine only if

there is "a sufficient evidentiary basis on which a reasonable jury could find for the non-moving

party," and it is material only if it has the ability to "affect the outcome of the suit under

governing law." *Kaucher v. County of Bucks*, 455 F.3d 418, 423 (3d Cir. 2006); *see also

Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Disputes over irrelevant or

unnecessary facts will not preclude a grant of summary judgment. *Anderson*, 477 U.S. at 248.

"In considering a motion for summary judgment, a district court may not make credibility

---

million; .30% of AUM from $250 million to $500 million; .275% of AUM from $500 million to
$1 billion; and .25% of AUM over $1 billion.  PRSOF ¶ 301.

determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence 'is to be believed and all justifiable inferences are to be drawn in his favor.'" *Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004) (citation omitted).

The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 322. If the movant satisfies its initial burden, the nonmoving party cannot rest upon mere allegations in the pleadings to withstand summary judgment; rather, the nonmoving party "must counter with specific facts which demonstrate that there exists a genuine issue for trial." *Orson*, 79 F.3d at 1366. Specifically, the nonmoving party "must make a showing sufficient to establish the existence of each element of his case on which he will bear the burden of proof at trial." *Huang v. BP Amoco Corp*, 271 F.3d 560, 564 (3d Cir. 2001); *see Orsatti v. New Jersey State Police*, 71 F.3d 480, 484 (3d Cir. 1995) ("[A] plaintiff cannot resist a properly supported motion for summary judgment merely by restating the allegations of his complaint, but must point to concrete evidence in the record that supports each and every essential element of his case."). Thus, "a mere 'scintilla of evidence' in the nonmovant's favor" is insufficient to create a genuine issue of fact." *Ramara, Inc. v. Westfield Ins. Co.*, 814 F.3d 660, 666 (3d Cir. 2016) (citation omitted); *see Lackey v. Heart of Lancaster Reg'l Med. Ctr.*, 704 F. App'x 41, 45 (3d Cir. 2017) ("There is a genuine dispute of material fact if the evidence is sufficient for a reasonable factfinder to return a verdict for the nonmoving party."). Ultimately, it is not the Court's role to make findings of fact, but to analyze the facts presented and determine if a reasonable jury could return a verdict for the nonmoving party. *See Brooks v. Kyler*, 204 F.3d 102, 105 n. 5 (3d Cir. 2000).

IV.    **MOTION FOR SUMMARY JUDGMENT**

A.    **The Investment Company Act of 1940**

The Investment Company Act of 1940 "regulates investment companies, including mutual funds." *Jones*, 559 U.S. at 338. A mutual fund, which may have no employees of its own, is typically created and managed by a separate entity known as an investment adviser. *Id.*; *Sivolella v. AXA Equitable Life Ins. Co.*, No. 11-4194, 2016 WL 4487857, at *1 (D.N.J. Aug. 25, 2016). The investment adviser selects the fund's directors, manages its investments, and provides additional managerial services for the fund. *See Jones*, 559 U.S. at 338; *Burks v. Lasker*, 441 U.S. 471, 481 (1979). Because the investment adviser often provides the fund with almost all managerial services, including supervision of the fund's daily operations and selection of its board members, "a mutual fund cannot, as a practical matter sever its relationship with the adviser. Therefore, the forces of arm's-length bargaining do not work in the mutual fund industry in the same manner as they do in other sectors of the American economy." *Burks*, 441 U.S. at 481 (citing S. REP. NO. 91–184, p. 5 (1969)); *see Daily Income Fund, Inc. v. Fox*, 464 U.S. 523, 536 (1984).

Congress enacted the ICA in response to "the potential for abuse inherent in the structure of investment companies." *Burks*, 441 U.S. at 480. "Recognizing that the relationship between a fund and its investment adviser was 'fraught with potential conflicts of interest,'" the ICA provides various protections to mutual fund shareholders. *Jones*, 559 U.S. at 339 (quoting *Daily Income Fund*, 464 U.S. at 536). Among other things, the ICA regulates transactions between investment funds and their advisers, limits the number of persons affiliated with the investment adviser who may serve on the fund's board of directors, and requires that the board of directors and shareholders of the fund approve the fees received by the fund's investment advisers. *See Jones*, 559 U.S. at 339; *Daily Income Fund*, 464 U.S. at 537.

Mutual funds enjoyed enormous growth in the years following the passage of the ICA, "prompting a number of studies of the effectiveness of the Act in protecting investors." *Daily Income Fund*, 464 U.S. at 537. In particular, several studies commissioned or authored by the SEC "identified problems relating to the independence of investment company boards and the compensation received by investment advisers." *Jones*, 559 U.S. at 339. As a response to those issues, Congress amended the ICA in 1970, bolstering shareholder protections in two primary ways. *Id.*

First, recognizing that scrutiny of investment adviser compensation by a fully informed, independent board of directors serves as the principal check on conflicts of interest within mutual funds, the amendments imposed heightened requirements for independence on the board. *See id.* In that regard, the amendments provided that no more than sixty percent of a fund's board of directors may be "persons who are interested persons of such registered company," *i.e.*, persons who have an interest in or affiliation with the investment adviser.[28] 15 U.S.C. § 80a-10(a); *Jones*, 559 U.S. at 339. The ICA assigned those board members "a host of special responsibilities involving supervision of management and financial auditing." *Burks*, 441 U.S. at 483. For example, the independent directors "must 'review and approve the contracts of the

---

[28] For the purposes of the ICA, an "affiliated person" includes:

> (1) a person who owns, controls, or holds the power to vote 5 percent or more of the securities of the investment adviser; (2) an entity which the investment adviser owns, controls, or in which it holds the power to vote more than 5 percent of the securities; (3) any person directly or indirectly controlling, controlled by, or under common control with the investment adviser; (4) an officer, director, partner, copartner, or employee of the investment adviser; (5) an investment adviser or a member of the investment adviser's board of directors; or (6) the depositor of an unincorporated investment adviser.

*Jones*, 559 U.S. at 340 n. 1 (citing 15 U.S.C. § 80a-2(a)(3)). The Act defines an "interested person" to include "not only all affiliated persons but also a wider swath of people such as the immediate family of affiliated persons, interested persons of an underwriter or investment adviser, legal counsel for the company, and interested broker-dealers." *Jones*, 559 U.S. at 340 n. 1 (citing 15 U.S.C. § 80a-2(a)(19)).

investment adviser,' annually, and a majority of these directors must approve an adviser's compensation." *Jones*, 559 U.S. at 340 (quoting *Burks*, 441 U.S. at 483); *see* 15 U.S.C. § 80a-15(c).

Second, and most relevant to the instant action, the ICA "imposed upon investment advisers a 'fiduciary duty' with respect to compensation received from a mutual fund, and granted individual investors a private right of action for breach of that duty." *Jones*, 559 U.S. at 340 (citing 15 U.S.C. § 80a–35(b)). In that regard, prior to the adoption of the 1970 amendments, "shareholders challenging investment adviser fees under state law were required to meet common-law standards of corporate waste, under which an unreasonable or unfair fee might be approved unless the court deemed it 'unconscionable' or 'shocking,' and security holders challenging adviser fees under the [ICA] itself had been required to prove gross abuse of trust." *Jones*, 559 U.S. at 340 (citation and internal quotation marks omitted). The "fiduciary duty" standard contained in § 36(b) represented a "delicate compromise," because, even though it is "more favorable to shareholders than the previously available remedies," it does not "permit a compensation agreement to be reviewed in court for 'reasonableness.'" *Jones*, 559 U.S. at 341. Among other features, § 36(b) places the burden of proving a breach of fiduciary duty on the plaintiff. *See* 15 U.S.C. § 80a-35(b).

### B.    Section 36(b) Excessive Fee Claims

In the case at bar, Plaintiffs challenge BRA's Advisory Fee as excessive under § 36(b) of the ICA. In *Jones*, the Supreme Court resolved a split among the Courts of Appeals over the proper standard for claims brought pursuant to § 36(b). *See* 559 U.S. at 343. In determining the meaning of the phrase "fiduciary duty" within the context of § 36(b), the *Jones* Court explained that "'[t]he essence of the test is whether or not under all the circumstances the transaction

carries the earmarks of an arm's length bargain.'" *Id.* at 347 (quoting *Pepper v. Litton*, 308 U.S. 295, 299 (1939)). Thus, for liability to attach under § 36(b), "an investment adviser must charge a fee that is so disproportionately large that it bears no reasonable relationship to the services rendered and could not have been the product of arm's length bargaining." *Jones*, 559 U.S. at 346.

In determining whether an investment adviser has breached its fiduciary duty by charging an excessive fee under § 36(b), *Jones* teaches that "all relevant circumstances be taken into account," including the factors set forth in *Gartenberg v. Merrill Lynch Asset Mgmt., Inc.*, 694 F.2d 923 (2d Cir. 1982). *Jones*, 559 U.S. at 347; *see Gallus v. Ameriprise Fin., Inc.*, 675 F.3d 1173, 1178 (8th Cir. 2012) ("[A]ll relevant circumstances must be taken into account, and the benchmark for reviewing challenged fees is 'the range of fees that might result from arm's-length bargaining.'") (citation omitted). The *Gartenberg* factors include: (1) the nature and quality of the services provided to fund shareholders; (2) the profitability of the fund to the adviser; (3) fall-out benefits – *i.e.*, collateral benefits accruing to the investment adviser due to the existence of the fund; (4) economies of scale; (5) comparative fee structures; and (6) the independence and conscientiousness of the trustees. *See Jones*, 559 U.S. at 345 n. 5 (citing *Gartenberg*, 694 F.2d at 929-32).

Of particular note, the *Jones* Court explained that *Gartenberg's* approach, which directs courts to consider the independence and conscientiousness of the board of directors in its decision to approve the adviser's fee, properly "reflects § 36(b)'s place in the [ICA's] statutory scheme." *Jones*, 559 U.S. at 348. In that regard, "scrutiny of investment adviser compensation by a fully informed mutual fund board is the 'cornerstone of the [ICA's] effort to control conflicts of interest within mutual funds.'" *Jones*, 559 U.S. at 348 (quoting *Burks*, 441 U.S. at

27

482). Specifically, the ICA places disinterested directors in the role of "independent watchdogs," who furnish a check upon the relationship between mutual funds and their investment advisers. *See Burks*, 441 U.S. at 484. "To provide these directors with the information needed to judge whether an adviser's compensation is excessive, the Act requires advisers to furnish all information 'reasonably . . . necessary to evaluate the terms' of the adviser's contract, and gives the SEC the authority to enforce that requirement." *Jones*, 559 U.S. at 348 (citing 15 U.S.C. §§ 80a–15(c) and 80a-41). Thus, Congress structured the ICA such that "actions under § 36(b), on the one hand, and directorial approval of adviser contracts, on the other, [would] act as independent checks on excessive fees." *Daily Income Fund*, 464 U.S. at 541; *Jones*, 559 U.S. at 348 ("Board scrutiny of adviser compensation and shareholder suits under § 36(b), are mutually reinforcing but independent mechanisms for controlling conflicts.").

In recognition of the watchdog role imposed on disinterested directors, the Act directs courts to give board approval of an adviser's compensation "such consideration . . . as is deemed appropriate under all the circumstances." 15 U.S.C. § 80a-35(b). Interpreting this statutory language, the *Jones* Court observed that a "measure of deference to a board's judgment may be appropriate in some instances," but "the appropriate measure of deference varies depending on the circumstances." *Jones*, 559 U.S. at 349. "Where a board's process for negotiating and reviewing investment-adviser compensation is *robust*, a reviewing court should afford *commensurate deference* to the outcome of the bargaining process." *Jones*, 559 U.S. at 351 (emphasis added). Indeed, it would have been "paradoxical for Congress to have been willing to rely largely upon 'watchdogs' to protect shareholder interests and yet, where the 'watchdogs' have done precisely that, require that they be totally muzzled." *Burks*, 441 U.S. at 485. Thus, "if the disinterested directors considered the relevant factors, their decision to approve a particular

28

fee agreement is entitled to considerable weight, even if a court might weigh the factors differently." *Jones*, 559 U.S. at 351.

Conversely, "where the board's process was deficient or the adviser withheld important information, the court must take a more rigorous look at the outcome. When an investment adviser fails to disclose material information to the board, greater scrutiny is justified because the withheld information might have hampered the board's ability to function as 'an independent check upon the management.'" *Jones*, 559 U.S. at 351-52 (quoting *Burks*, 441 U.S. at 484).

Ultimately, however, "the standard for fiduciary breach under § 36(b) does not call for judicial second-guessing of informed board decisions" or "require courts to engage in a precise calculation of fees representative of arm's-length bargaining." *Jones*, 559 U.S. at 352. To the contrary, Congress' approach in § 36(b) recognizes that that courts are ill-suited to render precise fees calculations. *Id.* at 353. As a result, although the conflicts of interest inherent in the structure of mutual funds warrant some judicial restraint "'upon the unfettered discretion of even disinterested mutual fund directors,' . . . they do not suggest that a court may supplant the judgment of disinterested directors apprised of all relevant information, without additional evidence that the fee exceeds the arm's-length range." *Id.* at 352 (quoting *Burks*, 441 U.S. at 481).

Following *Jones*, plaintiffs bringing cases under § 36(b) of the ICA have, primarily, asserted one of two theories. SEAN M. MURPHY ET AL., Developments in Litigation Under Section 36(b) of the 1940 Act 1 (2017). First, in "manager of managers" cases, plaintiffs challenge an investment adviser's fees as excessive, based on allegations that, even though the adviser has delegated the majority of the services necessary to operate a fund to a subadviser, the adviser is receiving a fee much larger than the fee received by the subadviser for those same

services. *Id.*; *see, e.g.*, *Kasilag v. Hartford Inv. Fin. Servs., LLC*, No. 11-1083, 2017 WL 773880

(D.N.J. Feb. 28, 2017); *Sivolella v. AXA Equitable Life Ins. Co.*, No. 11-4194, 2016 WL 4487857

(D.N.J. Aug. 25, 2016); *Zehrer v. Harbor Capital Advisors, Inc.*, No. 14-789, 2018 WL 1293230

(N.D. Ill. Mar. 13, 2018). Second, in "reverse manager of managers" cases, plaintiffs allege that

an investment adviser's fee is excessive because it is substantially higher than the subadvisory

fee that the same adviser charges to perform substantially the same services as a subadviser for

an independent third-party fund. MURPHY ET AL., *supra,* at 1; *see, e.g.*, *Goodman v. J.P. Morgan*

*Inv. Mgmt., Inc.*, No. 14-414, 2018 WL 1247459 (S.D. Ohio Mar. 9, 2018); *Pirundini v. J.P.*

*Morgan Inv. Mgmt. Inc.*, No. 17-3070, 2018 WL 1084140 (S.D.N.Y. Feb. 14, 2018); *Kennis v.*

*Metro. W. Asset Mgmt., LLC*, No. 15-8162, 2017 WL 8784796 (C.D. Cal. Sept. 22, 2017); *Zoidis*

*v. T. Rowe Price Assocs., Inc.*, No. 16-2786, 2017 WL 1196585 (D. Md. Mar. 31, 2017); *In re*

*Davis New York Venture Fund Fee Litig.*, No. 14-4318, 2015 WL 7301077 (S.D.N.Y. Nov. 18,

2015). This is a reverse manager of managers case.

C.   **Deference to Board Approval**

The evaluation of an investment adviser's fiduciary duty "must take into account both

procedure and substance," and thus, the first phase of this Court's review requires it to

"calibrat[e] the degree of deference" that is due the Board's decision to approve BRA's Advisory

Fee. *Jones*, 559 U.S. at 351-52; *see Gallus*, 675 F.3d at 1178 ("Although § 36(b) is 'sharply

focused' on whether the fees are excessive, we evaluate the fee-negotiation process to determine

the degree of deference that is due a board's decision to approve the adviser's fees."). Unless the

Board's process was deficient or BlackRock withheld material information from the Board, the

Board's decision to approve BRA's Advisory Fee is entitled to considerable weight. *Jones*, 559

U.S. at 351. Because Plaintiffs have failed to raise a triable issue of fact regarding the Board's

process for negotiating and reviewing BRA's Advisory Fee, the Court will accord the Board's decision to approve BRA's Advisory Fee substantial deference.

To begin, the undisputed facts demonstrate that the Board's process for reviewing BRA's Advisory Fee was robust. In that regard, it is undisputed that, in addition to quarterly meetings, the Board, which was comprised of a supermajority of well-qualified individuals who met the statutory requirements for independence under 15 U.S.C. § 80a-10(a), held a Fee Approval Meeting each April to consider whether to approve BRA's Advisory Fee. *See* SOF ¶ 87. Planning for the Fee Approval Meetings occurred months in advance, and involved BlackRock, the Board's Counsel, and Lipper. *Id.* at ¶ 88. Both before and after the relevant Fee Approval Meetings, the Board received extensive information, comprising more than 25,000 pages of material, relevant to BRA's Advisory Fee with the Funds, including comparative fee and performance data from Lipper and information on each of the *Gartenberg* factors. *See id.* at ¶¶ 95, 97. In that regard, when asked what the Board considered in deciding whether or not to approve BRA's Advisory Fee, the Board Chairman testified as follows: "Short answer would be the *Gartenberg* factors and anything else we consider relevant." Hernandez Dep. at 35:3-11. The Board Chairman's testimony is corroborated by Global Allocation's October 31, 2015 Annual Report, which provides that:

> In approving the continuation of the [IMA], the Board considered: (a) the nature, extent and quality of the services provided by BlackRock; (b) the investment performance of the Fund and BlackRock; (c) the advisory fee and the cost of the services and profits to be realized by BlackRock and its affiliates from their relationship with the Fund; (d) the Fund's costs to investors compared to the costs of Expense Peers and performance compared to the relevant performance comparison as previously discussed; (e) the sharing of potential economies of scale; (f) fall-out benefits to BlackRock and its affiliates as a result of its relationship with the Fund; and (g) other factors deemed relevant by the Board Members.

Muscato Cert., Ex. 2., Oct. 31, 2015 BlackRock Global Allocation Fund, Inc. Annual Report, BLKRK-CLANCY0098429, at 8493-95.

Indeed, while, as discussed below, Plaintiffs contest the level of detail and information reviewed by the Board and argue that the Board "primarily considered the Lipper Materials it received in February when approving the Funds' fees, *not* the *Gartenberg* factors," PRSOF ¶ 97 (emphasis in original), Plaintiffs do not dispute that the *Gartenberg* factors were, in fact, considered. *See* SOF ¶ 97; PRSOF ¶ 97. Specifically, although Plaintiffs contest the accuracy and reliability of many of the materials provided to the Board, it is undisputed that the Board reviewed the following information in connection with each of the *Gartenberg* factors:

- Nature and Quality of BRA's Services. The Board reviewed data from Lipper comparing the Funds' performance to peer funds over one, three, five, and ten-year periods, as well as Morningstar's analysis of the Funds.[29] SOF ¶¶ 99-105. The Board also received presentations regarding BRA's advisory and non-advisory operations, including its corporate structure, investment personnel, and administrative personnel, as well as memoranda pertaining to BRA's oversight of service providers. *Id.* at ¶¶ 107, 109.

- Comparative Fees. The Board reviewed a memorandum (the "Fee Comparison Memorandum") each year apprising the Board of the services that BlackRock renders to investment vehicles other than the Funds, including the Subadvised Funds.[30] *Id.* at ¶¶ 114-15. The Board also reviewed comparative fee data prepared by Lipper regarding the BRA's Advisory Fee for the Funds compared to the advisory fees received by other investment advisers from comparable funds.[31] *Id.* at ¶¶ 116-18.

- Fund Profitability. The Board received annual reports prepared by BlackRock regarding BlackRock's profitability (the "15(c) Profit Report"), including estimates of its company-wide profit margin and BRA's profit margin for its management of the Funds. *Id.* at ¶¶

---

[29] Plaintiffs object to consideration of the data from Lipper and Morningstar, and dispute the accuracy and reliability of that data.

[30] Plaintiffs dispute that the information depicted in the Fee Comparison Memoranda accurately explained the different nature of services provided to the Funds and the Subadvised Funds. *See* PRSOF ¶¶ 114-15.

[31] Plaintiffs object to consideration of Lipper data, dispute that the peer funds identified by Lipper are comparable to the Funds, and contest the performance methodology used to created Lipper's rankings. *See* PRSOF ¶¶ 116-18.

124-125. The materials disclosed three different measures of BRA's estimated profit[32] margin for the proceeding year for managing the Funds. *See id.* at ¶¶ 126-27. In 2014, the Board retained PwC to review BlackRock's methodology for estimating its profitability from managing the Funds. *Id.* at ¶ 130. Based on its review, PwC determined that the process, methodologies, and disclosure practices employed by BlackRock to estimate those profit margins were aligned with PwC's guiding principles and industry practice. *Id.* at ¶ 131.

- Economies of Scale. The Board received an annual memorandum prepared by BlackRock pertaining to whether BRA realized economies of scale, and the extent to which any realized benefits from economies of scale were shared with shareholders. For example, the memoranda explained how BRA shared economies of scale with the Funds and shareholders through breakpoints in BRA's Advisory Fee schedules.[33] The Board also requested, and received, at least one presentation regarding economies of scale. *Id.* at ¶¶ 132-38.

- Fall-Out Benefits. The Board received a memorandum each year addressing "fall-out benefits"; *i.e.*, the collateral benefits that accrued to BlackRock or its affiliates based on their relationship with the Funds. *Id.* at ¶ 141.

The record also demonstrates that, after the relevant Fee Approval Meetings, the Board submitted follow-up questions to, and requested additional information from, BlackRock regarding the Board's review and approval of BRA's Advisory Fee, and that the Board received approximately 300 pages of materials in response to those inquiries. *Id.* at ¶ 143. Finally, prior to approving BRA's Advisory Fee, the Board negotiated to obtain at least one fee concession and additional breakpoints in BRA's fee schedule. *Id.* at ¶¶ 75, 144-48.

Despite these extensive procedures for reviewing BRA's Advisory Fee, based on statements in the overview section of a 2014 document that was provided to the Board in connection with the renewal of BRA's IMA with the Funds (the "Contract Renewal

---

[32] Plaintiffs dispute that the figures reported are approximations, and contend that they represent BRA's actual profits. *See* PRSOF ¶ 129.

[33] The parties dispute whether and to what extent those memoranda accurately portrayed any economies of scale realized by BRA, and whether and to what extent BRA shares any savings from economies of scale with shareholders of the Funds. *See* SOF ¶¶ 132-140; PRSOF ¶¶ 132-40.

Presentation"), Plaintiffs contend that the Board's process for reviewing fees was flawed. *See*

PSSOF ¶ 166 (citing Muscato Cert., Ex. 66, 2014 Contract Renewal Overview Presentation at

BLKRK-CLANCY0000158). Specifically, Plaintiffs focus on a portion of the Contract Renewal

Presentation titled, "Product Pricing Philosophy," which provides as follows:

> Open-end Funds in the ███████ quartiles of their peer groups[34] are generally
> considered to be appropriately priced.
>
> . . .
>
> Funds persistently in the ███████ quartile are considered "outliers," and BlackRock will
> assess whether pricing should be adjusted, given the specific circumstances of the fund
> and competitive considerations.

*Id.* Relying on those statements, Plaintiffs argue that the Board's process was deficient, because

it assumed that a fund is appropriately priced if it falls within the ████████ quartile of its

peer group, with no additional evaluation performed unless a fund is persistently in the ███████

███ quartile. *See* Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion for

Summary Judgment ("Pls.' Opp."), at 33. In that connection, Plaintiffs maintain that a

"negotiating stance that seeks only to obtain a fee within the range of the Funds' peers—as

opposed to a true arm's length negotiation to secure the lowest fee for the Funds' shareholders—

is acquiescence, not a 'robust review process.'" *Id.*

Plaintiffs' arguments regarding the Board's process for negotiating fees are unavailing,

because the ICA does not impose a duty on the board of directors of a mutual fund to negotiate

the lowest possible advisory fee as compensation for an investment adviser's services, and thus,

the Board's purported failure to secure the lowest fees for the Funds' shareholders provides no

basis for undermining the Board's decision to approve BRA's Advisory Fee. *See Goodman*,

---

[34] BlackRock evaluates BRA's Advisory Fees against peer funds identified by Lipper.

2018 WL 1247459 at *18 ("Section 36(b) does not create a duty that advisers and administrators receive the lowest possible fee amount as compensation for the services they provide."). Indeed, presented with facts closely resembling those at issue in this case, the court in *Zehrer* rejected the same argument, finding that the plaintiff failed to present a genuine dispute of fact as to the adequacy of the board's approval process. *Zehrer*, 2018 WL 1293230 at *7. In *Zehrer*, it was undisputed that the board: (i) was comprised of well-qualified, disinterested individuals; (ii) met numerous times throughout the year to review and approve the investment advisory agreements at issue; (iii) requested and reviewed materials relevant to all *Gartenberg* factors before approving those agreements; and (iv) negotiated over the terms of the advisory fee agreement, obtaining additional breakpoints on at least one occasion. *Id.* Despite these stipulated facts, the plaintiffs there argued that the court should not give deference to the board's decisions, in relevant part, because the board failed to negotiate each year for the lowest possible advisory fees. *Id.* The *Zehrer* court rejected the plaintiffs' critique of the board's process, finding that the board's "passive" stance towards negotiating further fee reductions or breakpoints was insufficient to undermine the board's process. *Id.* ("Even if the Board might have driven a harder bargain, the legal standard does not require that."). Similarly, here, the record shows that the Board considered each of the *Gartenberg* factors, and negotiated for fee concessions on behalf of the Funds. Under these circumstances, it is beyond dispute that the Board's process for reviewing and negotiating BRA's Advisory Fee with the Funds was robust.

However, my finding that the Board's process for reviewing BRA's Advisory Fee was robust does not end the inquiry. Rather, I must still determine whether BRA failed to disclose material information to the Board, thereby hindering the Board's ability to function as an independent check on management. *See Jones*, 559 U.S. at 351-52. In arguing that the Board's

approval is not entitled to deference in this case, Plaintiffs argue that deficiencies in the

information that BlackRock provided to the Board rendered the Board insufficiently informed

and unable to effectively negotiate BRA's Advisory Fee. *See* Pls.' Opp. at 31-32. Specifically,

Plaintiffs contend that:

1. The Fee Comparison Memoranda that BlackRock provided to the Board comparing the services that BlackRock provides to its different clients, including to the Subadvised Funds, included a chart that failed to accurately portray the services provided by BRA to the Funds and by BRIM to the Subadvised Funds, *see id.* at 31;

2. BlackRock provided only selective information regarding the distribution-related costs of providing investment management services to mutual funds and other types of clients, leading the Board to incorrectly conclude that the costs of managing the Funds and the Subadvised Funds were not comparable, *see id.* at 32; and

3. The economies of scale analysis provided by BlackRock to the Board was deficient, because BlackRock failed to provide the Board with a quantitative analysis of BlackRock's cost data, *see id.* at 32.

Contrary to Plaintiffs' arguments, the Court finds that these purported deficiencies are

insufficient to create a triable issue of fact as to the degree of deference that this Court should

afford the Board.[35]

First, the Court finds that Plaintiffs' arguments regarding the relevant Fee Comparison

Memoranda are without merit. Plaintiffs point to a checklist (the "Services Checklist") in the

Fee Comparison Memoranda, arguing that the Services Checklist did not accurately portray the

---

[35] In arguing that the Board's approval should not be given deference, Plaintiffs also contend that "Defendants fail to present indisputable evidence demonstrating that no issue of fact exists as to the Board's review and negotiation process." Pls.' Opp. at 31. Plaintiffs' argument "misstates the burden of proof in a § 36(b) action," *Zehrer*, 2018 WL 1293230 at *7, which rests with the plaintiff. 15 U.S.C. § 80a-35(b)(1). Thus, once Defendants identified evidence in the record that the Board performed its watchdog duties, including reviewing the *Gartenberg* factors, it was Plaintiffs' "burden to point to evidence that the review was not sufficiently thorough, rather than [Defendants'] burden to provide evidence, conclusive or otherwise, that it was." *Zehrer*, 2018 WL 1293230 at *7.

services provided by BRA to the Funds or BRIM to the Subadvised Funds. The X-axis of the

Services Checklist includes a column for seven types of investment products managed by

BlackRock, including the Funds and the Subadvised Funds. *See* Muscato Cert., Ex. 83,

Memorandum re: Internal Management Fee Comparison by Product Channel, dated Apr. 14,

2015, BLKRK-CLANCY0015797, at 5802. The Y-axis of the Services Checklist lists the

following services, with corresponding check marks for each service provided by BlackRock to

the particular product type:

- Investment & risk management;
- Board management & administration;
- Annual 15(c) management & administration;
- Product management;
- Leverage management;
- AMPS refinancing;
- Broker-dealer / financial intermediary support;
- Subscription and redemption management;
- Review, approval, and negotiation of distribution, service & related agreements;
- Assisting with regulatory examinations;
- Maintenance of expense cap application and recoupments;
- Fair valuation (review & determination, disclosure & reporting);
- SEC prospectus, and/or investment guideline compliance monitoring;
- Annual/semi-annual shareholder reports;
- N-1A creation and updating;
- Filings: N-SAR, N-CSR, Nom, N-PX;

- Tax repotting, planning and compliance (including distributions);
- Dividend policy oversight and review;
- Annual audit assistance;
- Expense budgeting assistance;
- Sarbanes-Oxley compliance;
- Oversight of the distributor function;
- 22c-2 monitoring for market timing and late day trading;
- Blue Sky registration;
- AML monitoring and compliance;
- Oversight of service providers;
- Monitoring of compliance with loan agreements for credit facilities;
- Option Overwriting Committee;
- Stock exchange listing and compliance;
- Secondary market support;
- Monitoring of discounts (of market price relative to NAV);
- Sub-transfer agency function oversight;
- Capital markets (servicing for market makers and/or authorized participants);
- Tax efficiency focus, along with in-kind creations & redemptions;
- Annual proxy;

- Rating agency monitoring and testing for preferred shares;
- Daily NAV oversight;
- Relationship and meetings with portfolio manager;
- Performance reporting;
- Ability to place security restrictions on investments;
- Ability to manage tax constraints;
- Offer wrap fee, with no trading costs to clients;
- Review/arrange for payment of fund expenses;

- Prepare reports not otherwise prepared by the fund's custodian, counsel or auditors;
- Report on performance of independent accountants;
- Report on performance and fees of custodian and TA;
- Consults with service providers regarding accounting policies;
- Prepare reports required by banks from which the funds borrow money; and
- Respond to fund's officers and TA regarding shareholder inquiries.

*Id.* Plaintiffs argue that the Services Checklist did not accurately portray the services provided to the Funds and the Subadvised Funds, because it falls to include the full range of services provided by BRIM to the Subadvised Funds, fails to account for the role of third parties in providing any of the listed services to the Funds, does not distinguish between services provided to the Funds by BRA in exchange for the Advisory Fee or in exchange for other compensation, and does not provide a quantification of the costs associated with the listed services. *See* Pls.' Opp. at 31; PRSOF ¶ 133.

Plaintiffs' arguments regarding the level of detail contained in the Services Checklist fail to raise a triable issue of fact as to the level of deference that the Board's decision should be given. Significantly, the record reflects that the Board received ample information relating to the comparative fees factor of the *Gartenberg* analysis, including information pertaining to the services performed by BRA for the Funds and BRIM for the Subadvised Funds. For example, in addition to the Services Checklist, the Fee Comparison Memorandum dated April 14, 2015, provides:

With regard to sub-advised mutual funds, BlackRock provides a different suite of services for sub-advised mutual funds as opposed to proprietary mutual fund mandates. BlackRock must continually make significant investments to support the proprietary mutual fund business, investments which generally are not required in sub-advised business. For example, the nature and scope of the services provided to the proprietary mutual funds incorporates dedicated teams at BlackRock who work to support various functions, including but not limited to, legal, compliance, board governance, fund accounting, distribution, shareholder servicing, product development, and fund administration. Also, when BlackRock is acting as sub-adviser, we typically do not bear exposure to expense caps (as we do for our proprietary mutual fund business). The exposure to total expense caps on our proprietary mutual fund business exposes BlackRock to the risk of having to potentially subsidize the expenses of funds with small AUM levels.

Naturally, the factors listed above, including the cost and the build out of a dedicated team to service a proprietary mutual fund business to provide a broad array of services to the mutual funds are significant factors in determining prices in that business.

The nature of the limited services we provide institutional and sub-advised accounts and associated costs are relevant to setting appropriate pricing for an institutional or sub-advised account. This is, however, only one of many factors. In addition, we consider, among other things, the capacity, size, and experience of the portfolio management team, the strategy, the amount and the varying level of risk, both with respect to liability and reputational risks, the type of account, the overall client relationship and the distribution level.

. . .

Sub-advisory fees are typically lower than "standalone" advisory fees paid by propriety funds as they take into account the lower risks associated with sub-advising third-party mandates and the limited nature of services being provided to the third-party fund family.

. . .

In summary, when reviewing the management fee for different products managed by BlackRock the following items should be considered:

- Diversity of services provided
- Diversity of distribution channel
- Differing levels of liability exposure and risks (e.g., liability from errors, reputational risk)
- Market driven pricing
- Amount of aggregate assets managed by the team

*Id.* at 5803-04, 5083-05.

The record also reflects that, although not included in the Services Checklist, the Board was provided with separate presentations and documentation regarding the role of third-party service providers in performing services for the Funds, the amounts that BRA receives as reimbursement for expenses from the Funds, and any services provided by BRA pursuant to agreements other than the Funds' IMAs. *See* DRSOF ¶¶ 203-04. Additionally, BlackRock provided the estimated costs of providing the listed services in separate presentations to the Board. DRSOF ¶ 205 (citing Muscato Cert, Ex. 87). Based on that information, the Board determined that the services rendered to the Funds and the Subadvised Funds were not comparable. *See* Hernandez Dep. at 100:10-101:17.

In light of the undisputed evidence that the Board considered information pertaining to the services performed by BRA and BRIM, Plaintiffs' arguments regarding the Services Checklist are insufficient to create a triable issue of fact as to the Board's review. Indeed, Plaintiffs have failed to demonstrate that, if presented, the supposedly withheld or misleading information would have altered the Board's review or negotiation process. *See Kasilag v. Hartford Inv. Fin. Servs., LLC*, No. 11-1083, 2016 WL 1394347, at *12 (D.N.J. Apr. 7, 2016) (rejecting the plaintiffs' argument that a supposedly withheld document undermined the board's review process, where the plaintiffs failed to show how consideration of that document "would have impacted the Board's determination in this case."). Although Plaintiffs may disagree with the level of detail or format of the Services Checklist, "[s]uch carping, if sufficient, would eviscerate the deference that is to be paid to an informed Board's process under *Jones*." *Id.* at *14. As the *Kasilag* court aptly explained:

> [A] plaintiff should not be able to survive summary judgment through armchair quarterbacking and captious nit-picking. Such a standard would put defendants in the untenable posture of defending interminable, manufactured, and protracted litigation involving second-guessing a board's process. Here, [the plaintiffs] seek to do just that.

> They rely only upon their own experts' testimony and cherry-picked deposition excerpts suggesting [plaintiffs] might have negotiated a different deal had they been in the directors' seats, but not showing that the [board] abandoned or failed its watchdog function. . . . As such, the Court determines that the [board's] decision is entitled to "substantial weight."

*Id.* For the same reasons, Plaintiffs' arguments regarding the Services Checklist fail to provide a basis for second-guessing the Board's decision to approve BRA's Advisory Fee.

Moreover, Plaintiffs' quibbles that the Board received only partial information regarding the costs and profitability of BRIM's subadvisory services, and was deprived of the requisite information to consider economies of scale – based on BlackRock's failure to provide a quantitative analysis regarding costs – are insufficient to create a genuine issue of fact regarding the Board's review. The record shows that, after engaging with BlackRock regarding the profitability of BRIM's subadvisory services, the Board determined that such an analysis would not be "meaningful" with regard to evaluating BRA's Advisory Fees. DRSOF ¶ 207 (citing Hernandez Dep. at 152:6-155:16). Similarly, while Plaintiffs take issue with the fact that the Board never received a quantitative analysis of BlackRock's cost data to determine economies of scale, Defendants presented the Board with estimates of BRA's profitability from economies of scale, which were based on a cost allocation methodology developed by BlackRock. *See* DRSOF ¶¶ 208-10. At most, Plaintiffs' arguments raise a dispute regarding the proper methodology for calculating these figures; but that is not a basis to disregard the decision of the Board. Accordingly, because the Board's process was robust, including review of each of the *Gartenberg* factors, and because Plaintiffs have failed to adduce any evidence demonstrating that BRA withheld material information from the Board, the Court finds that the Board's decision to approve BRA's Advisory Fee must be accorded substantial deference.

41

Notwithstanding the considerable weight that I will accord the Board's decision to approve BRA's Advisory Fee in this case, I must still determine whether Plaintiffs have adduced other evidence that the Advisory Fee charged by BRA is so disproportionately large that it bears no reasonable relationship to the services rendered and could not have been the product of arm's-length bargaining. *See Jones*, 559 U.S. at 351 ("[A] fee may be excessive even if it was negotiated by a board in possession of all relevant information, but such a determination must be based on evidence that the fee 'is so disproportionately large that it bears no reasonable relationship to the services rendered and could not have been the product of arm's-length bargaining.'") (citation omitted). To do so, the Court turns to the *Gartenberg* factors at dispute in this case.[36] *See Kasilag*, 2016 WL 1394347 at *14.

### D.  The *Gartenberg* Factors

As the Court has already discussed, to determine whether an advisory fee is so disproportionately large that it bears no reasonable relationship to the services rendered and could not have been the product of arm's-length bargaining, courts look to all pertinent facts, including the *Gartenberg* factors. *See Jones*, 559 U.S. at 344-45. Here, Plaintiffs argue that the fee was excessive under four of the *Gartenberg* factors: (1) comparative fees; (2) economies of scale; (3) profitability; and (4) the independence and conscientiousness of the Board.[37] Given the inherently fact-sensitive nature of the *Gartenberg* analysis, of those few cases that have reached the summary judgment stage with regard to § 36(b) claims, even fewer courts have

---

[36] Indeed, many of the arguments that Plaintiffs attempt to couch within the confines of Board deference are better addressed within the *Gartenberg* factors.

[37] The parties concede that fall-out benefits are not at dispute in this case, *see* SOF ¶ 141; PRSOF ¶ 141, and it does not appear, from Plaintiffs' briefing, Rule 56.1 statement, or statements at oral argument, that Plaintiffs are asserting any arguments as to the nature or quality of the services provided.

granted summary judgment. *Kasilag*, 2016 WL 1394347 at \*14. Indeed, in two recent § 36(b) cases in this District, summary judgment was denied on the grounds that a factual dispute existed regarding several of the *Gartenberg* factors. *See Kasilag*, 2016 WL 1394347 at \*18 (denying summary judgment based on factual disputes over several *Gartenberg* factors, even though the court found that substantial deference was to be afforded to the board's approval of fees); *Sivolella v. AXA Equitable Life Ins. Co.*, No. 11-4194, Hr'g Tr. at 85:11-14 (D.N.J. Aug. 5, 2015). Because material factual disputes exist in this case regarding comparative fees, economies of scale, and profitability, I find that summary judgment is not warranted.

### 1.    *Comparative Fee Structures*

The crux of Plaintiffs' excessive fee claim rests on a theory of comparative fees. To wit, Plaintiffs argue that although BRIM provides substantially the same services for the Subadvised Funds that BRA provides to the Funds, BRA's Advisory Fee is more than double the rate of BRIM's Subadvisory Fee. Plaintiffs further contend that, since BRIM's Subadvisory Fee was negotiated at arm's-length with independent third parties, the Subadvisory Fee provides a benchmark for the true bargaining range of the services rendered by BRIM and BRA, and thus, is indicative of the excessive nature of BRA's Advisory Fee.

In *Jones*, the Supreme Court provided guidance for courts conducting comparative fee analyses between the fees that an investment adviser charges a "captive mutual fund" and the fees that it charges independent clients. *See* 559 U.S. at 349-51. At the outset, the Court rejected the notion that "there can be any categorical rule regarding the comparisons of the fees charged different types of clients." *Id.* at 349. Instead, courts must give comparisons of the fees charged different types of clients "the weight that they merit in light of the similarities and differences between the services that the clients in question require . . . ." *Id.* at 349-50. For example, the

services provided by an investment adviser to different clients may vary, based upon, *inter alia*, the relative "regulatory and legal obligations" required for the investment vehicle at issue. *Id.* at 350. It follows that "courts must be wary of inapt comparisons," and, if the services provided "are sufficiently different that a comparison is not probative, then courts must reject such a comparison."[38] *Id.*

Significantly, the *Jones* Court allayed the advisers' concerns that, where the services rendered by an investment adviser to a captive mutual fund and an independent client are comparable, a comparison with fees charged to the client will necessarily "'doo[m] [a]ny [f]und to [t]rial,'" *Id.* at 350 n. 8 (quoting Brief for Respondent 49), by explaining, first, that "plaintiffs bear the burden in showing that fees are *beyond the range of arm's-length bargaining.*" *Id.* (emphasis added). To that end, "[e]ven if the services provided and fees charged to an independent fund are relevant, . . . the Act does not necessarily ensure fee parity between mutual funds and institutional clients . . . ." *Id.*; *see Paskowitz v. Prospect Capital Mgmt. L.P.*, 232 F. Supp. 3d 498, 505 (S.D.N.Y. 2017) ("Charging a fee that is above the industry average does not violate Section 36(b)," if the fee is not outside the range of arm's-length bargaining). "Second, a showing of relevance requires courts to assess any disparity in fees in light of the different markets for advisory services." *Jones*, 559 U.S. at 350 n. 8. Further, "[o]nly where plaintiffs have shown a large disparity in fees that cannot be explained by the different services *in addition to other evidence that the fee is outside the arm's-length range will trial be appropriate.*" *Id.* (emphasis added).

---

[38] By the same token, the Court warned against relying "too heavily on comparisons with fees charged to [captive] mutual funds by other advisers," noting that such "comparisons are problematic because these fees, like those challenged, may not be the product of negotiations conducted at arm's length." *Jones*, 559 U.S. at 350-51.

The foregoing language establishes that, even where a dispute of fact exists as to the comparative fees factor of the *Gartenberg* test, a plaintiff must also provide additional evidence that a fee falls outside the range of arm's-length bargaining to prove a violation of § 36(b). And, as Plaintiffs conceded during oral argument, outside of the comparative fees factor, the only other evidence of excessive fees proffered by Plaintiffs in this case relates to economies of scale and profitability. See Transcript of Oral Argument ("Tr.") at 6:24-9:11, *In re Blackrock Mut. Funds Advisory Fee Litig.*, No. 14-1165 (D.N.J. May 29, 2018) (ECF No. 144). Accordingly, even assuming that Plaintiffs have met their burden on the comparative fees factor, to withstand summary judgment, they must also have raised a dispute of fact as to either economies of scale or profitability. With that framework in mind, I turn to the parties' arguments on the comparative fees factor.

Defendants contend that a comparison of BRA's Advisory Fee to BRIM's Subadvisory Fee is inapt, because the scope and scale of the services that BRA provides the Funds are vastly different from the services that BRIM provides the Subadvised Funds. Specifically, Defendants argue that, in addition to portfolio management services, BRA provides the Support Services to the Funds. Defendants' Brief in Support of their Motion for Summary Judgment ("Defs.' Br."), at 10. Defendants maintain that although BRIM takes a limited role in performing some of those Support Services for the Subadvised Funds, BRIM's involvement pales in comparison to BRA's role in providing Support Services to the Funds, because BRA is responsible for performing, or supervising the performance of, all services essential to the operation of the Funds, including the Support Services, and bears a different amount of risk than BRIM. Tr. at 14:9-15:8. Thus, in light of the different services provided by BRA and BRIM, Defendants argue that a comparison of the Advisory Fee and the Subadvisory Fee is inapposite.

In opposition, Plaintiffs argue that genuine issues of material fact exist, precluding this Court from determining that any comparison between the Advisory Fee and Subadvisory Fee is inapt as a matter of law. First, Plaintiffs note that BlackRock concedes that: (i) BRA and BRIM perform substantially the same portfolio management services for the Funds and the Subadvised Funds; (ii) the same portfolio managers are responsible for managing the assets of both the Funds and the Subadvised Funds; and (iii) BRA and BRIM employ substantially the same investment strategies, research and analysis, systems, technology, and other resources in providing investment advisory services to the Funds and the Subadvised Funds. Defs.' Br. at 12; SOF ¶¶ 261-63. Plaintiffs argue that because portfolio management is the main service that investment advisers perform for mutual funds, Defendants' concession that BRA and BRIM perform substantially similar portfolio management services, standing alone, is sufficient to find that the comparison between the Advisory Fee and the Subadvisory Fee is apt.

Second, Plaintiffs contend that the Support Services cannot serve as a justification for the disparity between the Advisory Fee and the Subadvisory Fee, because: (i) BRIM performs many of the same Support Services for the Subadvised Funds that BRA performs for the Funds, including providing similar compliance, recordkeeping, reporting, and operational services to the Subadvised Funds; (ii) most of the Support Services for the Funds are performed by third-party service providers under separate agreements and in exchange for separate fees, rather than by BRA in exchange for the Advisory Fee; (iii) to the extent that BRA has an oversight role in providing the Support Services, including monitoring and overseeing the work of third-party service providers, BRA is separately compensated for that role outside of the Advisory Fee; and (iv) BRA's contention that it provides a broader array of services to the Funds than BRIM provides to the Subadvised Funds is undermined by cost data analyzed by Plaintiffs' expert, Ian

Ayres, Ph.D., which shows that BRIM's costs for providing services to the Subadvised Funds were comparable to, and sometimes greater than, the costs incurred by BRA in performing services for the Funds.

Finally, Plaintiffs argue that BRA cannot point to its risk and responsibility as a distinguishing factor, because: (i) there is no evidence in the record as to what that risk is; (ii) BRA's agreements with service providers include indemnification and limitation on liability provisions that limit BRA's risks; and (iii) BRIM has risks with respect to the Subadvised Funds. Tr. at 30:2-25.

Based on the record before me, I cannot find, on this Motion, that Plaintiffs' comparison between the Advisory Fee and the Subadvisory Fee is inapt as a matter of law. Significantly, this is not a case where Plaintiffs have failed to proffer any evidence that would tend to show that BRIM provided the Subadvisory Funds "with the same sort of services that [BRA] provided to the [Funds], or that [BlackRock] incurred the same costs when serving different types of clients." *Jones v. Harris Assocs. L.P.*, 611 F. App'x 359, 361 (7th Cir. 2015). To the contrary, the record reflects that BRIM provides substantially the same portfolio management services for the Subadvised Funds that BRA provides to the Funds, using overlapping personnel and pursuing the same or substantially the same investment strategies, research and analysis, technology, systems, and resources. *See* SOF ¶¶ 261-23. Under these circumstances, Plaintiffs have made a threshold showing of comparability between the investment advisory services rendered by BRA and BRIM.

Additionally, Plaintiffs' submissions also raise a factual dispute regarding the extent to which BRIM performs the Support Services for the Subadvised Funds. *See* PSSOF ¶¶ 88-126. In that connection, Plaintiffs have proffered documentary evidence, including BRIM's

subadvisory agreements with the Subadvised Funds, due diligence questionnaires, client

presentations, and certifications, setting forth BRIM's role in performing the following services

for the Subadvised Funds:

- **Compliance.** Plaintiffs assert that BRIM provides a wide range of compliance services for the Subadvised Funds, including: reviewing the adequacy of the Subadvised Funds' policies and procedures established under Rule 206(4)-7, which is designed to prevent violations of the Investment Advisers Act of 1940 ("IAA") and federal securities laws; employing its proprietary *Alladin* platform for the Subadvised Funds, which platform assists with the monitoring of investment guidelines and restrictions; conducting pre-trade and post-trade monitoring for all trades in the Subadvised Funds; and producing compliance reports and certifications attesting that the Subadvised Funds are in compliance with investment guidelines, diversification requirements, transactions under Rules 10f-3, 12d3-1, 17a-7, 17d-1, 17e-1, and CFTC Rule 4.5; section 12(d)(1)(A) reporting; illiquid and 144A securities; derivatives and segregation of assets, repurchase agreement transactions, brokerage commission reports, and soft dollars. *See id.* at ¶¶ 102-109.

- **Board Reporting.** Plaintiffs contend that BRIM provides the following board reporting services for the Subadvised Funds: responding to Rule 15(c) questionnaires from the Subadvised Funds; communicating with the boards, advisers, and sales forces of the Subadvised Funds regarding investment strategy and fund performance; and providing the Subadvised Funds with portfolio and performance review. *See id.* at ¶¶ 110-14.

- **Regulatory and Financial Reporting.** Plaintiffs assert that BRIM provides the following regulatory and financial reporting services for the Subadvised Funds: reviewing and providing information regarding certain of the Subadvised Funds' SEC filings, including their prospectuses and statements of additional information; and preparing and reviewing portions of the Subadvised Funds' shareholder reports and other disclosures. *See id.* at ¶¶ 115-17.

- **Valuation of Securities and Determination of NAV.** Plaintiffs claim that BRIM is involved in the fair valuation of securities held by the Subadvised Funds, providing information to the Subadvised Funds regarding difficult-to-price securities, and notifying the Subadvised Funds of securities it believes should be fair valued. *See id.* at ¶¶ 118-21.

- **Recordkeeping.** Plaintiffs contend that, pursuant to Rule 31a-3 of the ICA, BRIM is required to maintain all records relating to investments made by BRIM for the Subadvised Funds. *See id.* at ¶ 122.

48

- Proxy Voting. Plaintiffs contend that BRIM votes proxies for the Subadvised Funds. *See id.* at ¶ 123.

- Assistance to the Subadvised Funds' Service Providers. Plaintiffs contend that BRIM provides the following assistance to the Subadvised Funds' service providers: coordinating the onboarding process to ensure connectivity between BRIM's systems and the service providers' systems; providing daily transaction reports to the custodians of the Subadvised Funds and coordinating with those custodians to ensure matching records; and providing monthly reports to the custodians and administrators of the Subadvised Funds listing all illiquid and restricted securities in the Subadvised Funds' portfolios. *See id.* at ¶¶ 124-26.

While Defendants dispute the extent to which BRIM performs many of those services for the Subadvised Funds, *see* DRSOF ¶¶ 88-126, during oral argument on this Motion, Defendants admitted that "there is some overlap" between the Support Services that BRA performs for the Funds and the services that BRIM performs for the Subadvised Funds. Tr. at 20:15-16. Furthermore, Plaintiffs have proffered the comparative cost analysis of Dr. Ayres, who calculated that BRIM's costs for providing services to the Subadvised Funds were comparable to, and sometimes exceeded, BRA's costs for providing services to the Funds. *See* PSSOF ¶¶ 173-79 (citing Lakind Decl., Ex. 8, Expert Report of Ian Ayres amended May 3, 2017 ("Ayres Rpt."), ¶¶ 64-66, 177)). Thus, assuming, on this Motion, that Dr. Ayres' cost analysis is accurate, to the extent that BRA actually performed a broader array of services for the Funds than BRIM performed for the Subadvised Funds, questions exist as to how the negligible differences in costs justify the disparity in fees charged by BRA and BRIM. These are precisely the sort of factual disputes that must be resolved at trial.

Additionally, relying on *Sivolella*, Defendants also argue that Plaintiffs err in comparing the "generalized description of services" in the IMAs between the Funds and BRA with the services listed in the subadvisory agreements between the Subadvised Funds and BRIM, contending that those contracts do not "fully or accurately capture the full suite of services that

49

BRA actually renders to the Funds." Defs.' Br. at 23. To that end, Defendants argue that the scope of the Support Services that BRIM performs for the Subadvised Funds is "*de minimis* relative to those provided by BRA to the Funds." Defendants' Reply Brief in Further Support of their Motion for Summary Judgment ("Defs.' Reply"), at 9. A closer look at the *Sivolella* decision, however, reveals that Defendants' reliance is misplaced.

In *Sivolella*, a manager of managers case, the plaintiffs, relying on similarities in the contractual language of the primary investment management agreement and various subadvisory agreements, argued that the adviser's fees were excessive because the adviser had delegated substantially all of its duties to subadvisers. *See* 2016 WL 4487857 at *1, 33. *After a twenty-five-day bench trial*, the district court rejected the plaintiffs' complete reliance on the contractual language, finding that the comparative "analysis must consider all duties, whether enumerated in a contract or undertaken in a manner to carry out the contractual duties." *Id.* at *34. Specifically, the court reasoned:

> Plaintiffs' assertion that essentially all investment management duties are delegated to sub-advisers is correct, when examining only the contract language. However, in reviewing the administrative contracts, it is clear that FMG retains many of these obligations. Moreover, the *trial testimony* demonstrated that both FMG and AXA perform a number of services beyond those expressly outlined in the agreements. Therefore, the Court is unpersuaded by Plaintiffs' insistence that the contract language itself controls. In disputing the services that FMG and AXA perform, Plaintiffs simply point to contract provisions from the various agreements. However, to adopt Plaintiffs' position would ignore *voluminous testimony of credible witnesses*, which explained the duties that FMG undertakes related to the Funds.

*Id.* (emphasis added).

As the foregoing excerpt demonstrates, although Defendants' argument that the IMAs fail to adequately describe the full suite of services performed by BRA for the Funds – thereby demonstrating that a comparison to BRIM's services to the Subadvised Funds is inapt – may prove to be true, this Court cannot resolve that factual dispute without the benefit of a trial,

where I will be able to make credibility determinations and weigh the evidence. *See Kennis v.*

*Metro. W. Asset Mgmt., LLC*, No. 15-8162, 2017 WL 8784795, at *7 (C.D. Cal. Sept. 11, 2017)

("While the declaration testimony Defendant provides may prove to be more persuasive than text

of the agreements, the agreements are admissible evidence probative as to the nature and scope

of the services Defendant performs in exchange for the Advisory Fee."); *see also Kasilag*, 2016

WL 1394347 at *15 (examining the contractual language of an investment management

agreement in determining that a factual dispute existed on the nature and quality of services

provided).

Moreover, the parties have presented conflicting evidence as to whether BRA provides

additional Support Services to the Funds under the IMAs in exchange for the Advisory Fee, as

opposed to under separate agreements in exchange for separate fees. In that regard, Plaintiffs

rely on the terms of BRA's agreements with various third-party service providers, including

State Street, BNY, and BBH, in arguing that these service providers perform many of the

Support Services that Defendants seek to use as a distinguishing factor from the services

provided by BRIM to the Subadvised Funds.[39] PSSOF ¶¶ 28-61. Plaintiffs contend that, for the

fiscal years 2013 to 2016, Global Allocation paid more than $229 million annually in additional

---

[39] For example, Plaintiffs contend that under the State Street Adm. Agreement, State Street
provides a multitude of administrative and accounting services to the Funds, including, *inter
alia*: (i) overseeing the custodian for the Funds in the maintenance of books and records as
required under Rule 31a-1(b); (ii) calculating and arranging for the payment of the Funds'
expenses; (iii) preparing the Funds' financial information for the shareholder reports, proxy
statements, and other shareholder communications; (iv) preparing and filing the Funds' periodic
financial reports required to be filed with the SEC; (v) consulting with the officers, independent
accountants, legal counsel, custodian, and transfer agent of the Funds on establishing accounting
policies for the Funds; (vi) providing compliance monitoring services to assist BlackRock in
complying with the IRC, ICA, and the guidelines and limitations set forth in the Funds'
prospectuses; (vii) providing tax compliance services; (viii) assisting the Funds in handling
regulatory matters; and (ix) assisting the Funds in preparing reports for the Board. *See* PSSOF ¶
30.

fees and expenses for services other than BRA's advisory services, with Equity Dividend paying more than $85 million annually in additional fees and expenses over the same period. Pls.' Opp. at 5 (citing PSSOF ¶¶ 77-78). And, although Defendants argue that BRA monitors and oversees the work of these third-party service providers, Plaintiffs point to provisions in the IMAs, State Street Adm. Agreement, and the SAS Agreement that raise a dispute of fact as to whether the Funds pay BRA fees and expenses separate from the Advisory Fee for that role. *See* PSSOF ¶¶ 67, 68, 71.

Finally, Defendants' argument that BRA's services and BRIM's subadvisory services are not comparable, because of the different entrepreneurial, reputational, legal, and regulatory risks assumed by BRA, is too fact intensive to be decided on summary judgment. As a preliminary matter, Plaintiffs cite to portions of the prospectuses for the Subadvised Funds that detail the risks faced by the Subadvised Funds, and argue that, based on BRIM's role in providing services to the Subadvised Funds, it shares in those risks. *See* Pls.' Opp. at 22 (citing PSSOF ¶ 89). Moreover, Plaintiffs have identified contractual language that purportedly limits BRA's risks in a wide range of circumstances. *See* PSSOF ¶ 26. Thus, a dispute of material fact exists regarding the degree of risks assumed by BRA and BRIM in performing services for the Funds and the Subadvised Funds, respectively, and whether any differences in risk justify the disparity in fees. In any event, *Jones* provides that courts should give comparisons between the fees an adviser charges a captive mutual fund "the weight that they merit in light of the similarities and differences between the services that the clients in question require . . . ." 559 U.S. at 350. Accordingly, the services rendered to different clients need not be identical to form an apt comparison. *See Kennis*, 2017 WL 8784795 at *9 n. 13 ("[T]he *Jones* holding contemplates fee comparisons between captive, and non-captive funds. . . . Presumably the Supreme Court did so

with an awareness that legal and business risks may differ between a captive fund and independent fund.").

In sum, I reject Defendants' argument that a comparison between BRA's services for the Funds and BRIM's services for the Subadvised Funds is inapt as a matter of law. Under *Jones*, services need not be identical for a comparison to be apt. *See* 559 U.S. at 350; *Kennis*, 2017 WL 8784795 at *9. Here, factual disputes exist regarding the similarities and differences between the services provided by BRA and BRIM, including: (i) the extent to which BRA, as opposed to third-party service providers, perform the Support Services for the Funds; (ii) the extent to which BRIM performs comparable Support Services for the Subadvised Funds; (iii) whether BRA performs the Support Services for the Funds for compensation separate from the Advisory Fee; and (iv) whether any differences in risk assumed by BRA and BRIM justify the disparity in fees. Accordingly, and when viewing the facts in the light most favorable to Plaintiffs, summary judgment on the comparative fees factor is inappropriate. *Cf. Kasilag*, 2016 WL 1394347 at *16 ("Because the true nature of the services performed remains relatively nebulous and wrangled-over, viewing the facts in the light most favorable to Plaintiffs suggests that summary judgment on [the nature and quality of services *Gartenberg* factor] is inappropriate.").

That said, I would be remiss to conclude my comparative fees analysis without offering two observations for the parties. First, although I have found that a factual dispute exists regarding the comparability of the services that BRA renders to the Funds and BRIM renders to the Subadvised Funds, I note that, following *Jones*, those courts that have rendered a comparison of advisory services to subadvisory services beyond the pleadings stage have rejected the notion that these services are comparable. *See, e.g.*, *Kasilag*, 2017 WL 773880 at *7, 22 n. 40 (observing the different entrepreneurial, reputational, legal, and regulatory risks borne by

53

advisers); *Sivolella*, 2016 WL 4487857 at *46 (finding that the duties of an investment adviser were "far more extensive" than those delegated to subadvisors); *Goodman*, 2018 WL 1247459 at *7-10 (finding a comparison of advisory fees and subadvisory fees was inapt, based on the different responsibilities, risks, and scale and scope of services involved between advisory and subadvisory services); *see also Hoffman v. UBS-AG*, 591 F. Supp. 2d 522, 540 (S.D.N.Y. 2008) ("[I]investment advisers and sub-advisers perform distinct services."). While I agree with Plaintiffs that the scope and extent of the services rendered by BRA and BRIM is a fact-specific inquiry, and Plaintiffs will have the opportunity to show that BRA's advisory services and BRIM's subadvisory services are comparable in this case, the legal authority discussed above indicates that Plaintiffs may face an uphill battle in doing so.

Second, I note that my analysis on the comparative fees factor does not account for Defendants' evidence regarding the comparative fee data that the Board received from Lipper. *See* SOF ¶¶ 102-105; 116-18. In that regard, each year during the Relevant Period, the Board received a presentation based on Lipper reports comparing BRA's Advisory Fee to the advisory fees paid by mutual funds identified by Lipper as comparable to the Funds.[40] Among the peer funds selected by Lipper, BRA's Advisory Fee ranked in the ███████ quartiles of one peer group, and ████████ within the other peer group. *Id.* at ¶¶ 117. However, Plaintiffs argue that this Court must reject the Lipper comparisons proffered by Defendants, because: (i) the parameters and reliability of the data used by Lipper to select peer funds is dubious, since

---

[40] According to Defendants, in providing comparative fee data, "Lipper created two custom peer groups for the Funds: (i) one group, the 'Expense Universe,' consisted of open-end mutual funds identified to have a similar investment classification or objective as the Funds; (ii) the other group, the 'Expense Group,' consisted of nine to ten funds within the Funds' Expense Universe that Lipper determined were the most comparable to the Funds based on, among other things, fund type, investment objectives, sales and distribution fees, size and operating structure." SOF ¶ 116.

Lipper does not account for the nature and quality of the services provided by investment advisers in selecting peer funds, and Lipper used comparability parameters that were requested by BlackRock; and (ii) this Court would have to weigh evidence to find that the fees paid by the peer funds identified by Lipper, as opposed to the Subadvisory Fee paid by the Subadvised Funds, constitutes the arm's-length range for BRA's Advisory Fee.

I reiterate that the fiduciary duty imposed under § 36(b) does not require investment advisers to charge the lowest fee in the industry, or to operate on a cost-plus basis. *Paskowitz*, 232 F. Supp. 3d at 505. Rather, the critical inquiry is whether a fee is so disproportionally large in comparison to the services rendered that it could not have been the result of arm's-length bargaining. *See Jones*, 559 U.S. at 346. Ultimately, "the goal is to identify the outer bounds of arm's length bargaining and not engage in rate regulation." *Jones*, 611 F. App'x at 360. The fees paid by comparable mutual funds are highly probative of the bargaining range. *See id.* at 361 (finding that the adviser's "fee was comparable to that produced by bargaining at other mutual-fund complexes, which tells us the bargaining range."). Accordingly, the potential relevance of Lipper in this case is that the investment advisory fees paid by the peer funds identified by Lipper may be indicative of the relevant bargaining range for BRA's Advisory Fee.

Nonetheless, consideration of Lipper data in connection with the bargaining range would amount to impermissible weighing of the evidence in this case, because Plaintiffs have raised a genuine dispute of material fact regarding the comparability of BRA and BRIM's services to the Funds and the Subadvised Funds, respectively. To that end, those courts that have relied on Lipper, both before and after trial, have only done so where there was no other comparative fee data in the record, or where the comparison proffered by the plaintiffs was inapt. *See, e.g.*, *Kasilag*, 2017 WL 773880, at *12 (considering Lipper data in post-trial decision, where, at trial,

the court determined that the Lipper data proffered by the defendants was the only comparative fee data before the court); *Sivolella*, 2016 WL 4487857 at *65 (relying on Lipper's peer-fund data, after trial, as indicative of the arm's-length bargaining range); *Goodman*, 2018 WL 1247459 at *17 (relying on Lipper data showing that the funds "performed better than, and the fees were in line with, other mutual funds of similar scope" in granting summary judgment on the plaintiffs' §36(b) claim, where the plaintiffs' proposed fee comparison was rejected as inapt); *Zehrer*, 2018 WL 1293230 at *13 (granting summary judgment in favor of the adviser, based in part on Lipper data showing that the adviser "charged fees that fall within . . . or . . . below . . . the range of fees paid by similar funds," where the plaintiffs failed to proffer any other apt fee comparisons). Here, however, because a dispute of fact exists regarding the comparability of BRA and BRIM's services, and because Plaintiffs have proffered evidence regarding BRIM's Subadvisory Fee, drawing all inferences in favor of Plaintiffs on this Motion, the potential exists for a finding at trial that the comparison between BRA and BRIM is apt, and therefore, that the Subadvisory Fee received by BRIM constitutes the relevant arm's-length range. While Lipper provides a competing set of data regarding the appropriate bargaining range, the Court cannot weigh those two comparisons at the summary judgment stage. Accordingly, whether the peer funds identified by Lipper set the true arm's-length range for BRA's Advisory Fee is a dispute that must be resolved at trial.

Finally, as noted, *supra*, under *Jones*, a finding that a dispute of fact exists regarding the comparative fees factor, without additional evidence, does not "doom" Defendants to trial. *See* 559 U.S. at 350 n. 8. Rather, to withstand summary judgment, Plaintiffs must also raise a triable issue of fact regarding one of the other *Gartenberg* factors at issue in this case – economies of scale or profitability. Accordingly, I turn to analyzing those factors.

## 2.    *Economies of Scale*

The second *Gartenberg* factor at issue in this case concerns the extent to which any economies of scale realized by BRA through the Funds were passed on to the Funds and their shareholders.  An economy of scale is defined as a "'decline in a product's per-unit production cost resulting from increased output, [often] due to increased production facilities; savings resulting from the greater efficiency of large-scale processes.'"  *Hoffman*, 591 F. Supp. 2d at 540 (quoting BLACK'S LAW DICTIONARY (8th ed. 2004)); *Kasilag*, 2016 WL 1394347 at *18.  Within the context of § 36(b), "[t]he concept of 'economies of scale' assumes that as a mutual fund increases in size, its operational costs decrease proportionally.  If a fund realizes economies of scale, its willingness to let the shareholders participate in the resulting benefits becomes a factor in evaluating the reasonableness of the adviser-manager's fees."  *Kalish v. Franklin Advisers, Inc.*, 742 F. Supp. 1222, 1237 (S.D.N.Y. 1990), *aff'd*, 928 F.2d 590 (2d Cir. 1991).

In § 36(b) cases, the plaintiff's burden in demonstrating economies of scale is twofold.  First, the plaintiff must demonstrate that economies of scale were, in fact, realized.  *Id.* at 1238.  Second, if the threshold showing is made, the plaintiff must then demonstrate that "the savings realized from economies of scale were not sufficiently shared with the Fund and its shareholders."  *Pirundini*, 2018 WL 1084140 at *7.

In seeking to establish economies of scale in this case, Plaintiffs rely exclusively on the report of their expert, Dr. Ayres.  At the outset, Dr. Ayres states that economies of scale "result when a provider of goods or services can increase its output without a proportionate increase in its costs of production."  Ayres Rpt. ¶ 94.  According to Dr. Ayres, in such circumstances, "the provider's per-unit costs of production decrease as output increases," and the resultant savings

can either "be captured by the producer in the form of higher profits, or they can be passed through to the consumer in the form of lower prices or fees." *Id.*

With respect to the mutual fund industry, Dr. Ayres opines that, absent economies of scale, "mutual funds would have no reason to exist, because they would offer no competitive advantage relative to other forms of investment." *Id.* at ¶ 99. In that regard, Dr. Ayres explains that in a mutual fund, investors can pool their money together to pursue an investment strategy based on a diverse portfolio of securities, while spreading the fixed costs of maintaining such a portfolio among investors. *See id.* at ¶¶ 99-100. For example, Dr. Ayres states that mutual funds incur transaction costs "whenever shares are purchased or sold in order to re-balance the mutual fund's portfolio in a manner commensurate with its investment objectives (or to adjust the portfolio in light of changing market conditions)." *Id.* at ¶ 100. According to Dr. Ayres, while these transaction costs would be prohibitively expensive for an individual investor, by pooling the assets of a large number of investors, "mutual funds spread transaction costs among all fund shareholders." *Id.* In turn, "[p]ooling allows mutual funds to exploit scale economies with respect to the major costs involved with maintaining a diversified pool of stocks." *Id.* at ¶ 99. Additionally, Dr. Ayres opines that mutual funds reap the benefits of economies of scale through "increased efficiency in the operations of fund advisors and administrators." *Id.* at ¶ 101.

To show that BRA realized economies of scale from the Funds, Dr. Ayres analyzed BRA's financial statements for the Funds from 2007 to 2015, focusing on AUM, operating expenses, revenue, operating profits, operating margins, and the ratio of operating expenses to AUM over that period. *See id.* at ¶¶ 104-09. Specifically, Dr. Ayres noted that, from 2007 to 2015, BRA's income statements for the Funds reflect the following:

- **AUM**. Global Allocation's AUM grew from approximately $20.1 billion to $52.4 billion (a 159.9% increase, or 12.7% increase annually), and Equity Dividend's AUM grew from approximately $1.5 billion to $24.7 billion (a 1,501.4% increase, or 41.4% increase annually). *Id.* at Figure 32-33.

- **Operating Expenses**. Global Allocation's operating expenses rose from ████████████ ████████████████████████ and Equity Dividend's operating expenses increased from ███████████████████ ████████████████. *Id.*

- **Revenue**. Global Allocation's revenue grew from ████████████████████ ████████████████████████████ and Equity Dividend's revenue grew from ████████████████████████████████████ *Id.*

- **Operating Profits**. Global Allocation's operating profits grew from ████████ ████████████████████and Equity Dividend's operating profits grew from ████████████████████████. *Id.*

- **Operating Margin**. Global Allocation's operating margin increased from ████████ ██████ and Equity Dividend's operating margin increased from ████████ *Id.*

- **Ratio of Operating Expenses to AUM**. Global Allocation's ratio of operating expenses to AUM decreased from ██████████, and Equity Dividend's ratio of operating expenses to AUM decreased from █████████ *Id.*

Relying on this financial information, Dr. Ayres asserts that economies of scale were realized from 2007 to 2015, because the increase in operating expenses[41] for the Funds ████ annually for Global Allocation and ████ annually for Equity Dividend) were "significantly less" than the increases in either AUM (12.7% annually for Global Allocation and 41.4% annually for Equity Dividend) or revenue ████ annually for Global Allocation and ████ annually for Equity Dividend). *Id.* at ¶¶ 106-07. Next, because BRA's profits from the Funds increased at a higher rate than both AUM and costs (██████████████ for Global Allocation, and ████████████████ for Equity Dividend), Dr. Ayres concludes that BRA

---

[41] Dr. Ayres refers to "operating expenses" and "costs" interchangeably.

retained the benefits of economies of scale, rather than passing them along to the Funds' shareholders in the form of lower fees. *See id.* at ¶ 107. Stated another way, after defining economies of scale as increased output without a proportional increase in production costs, Dr. Ayres found that the BRA realized economies of scale from the Funds between 2007 and 2015, because the Funds' AUM (output) and revenue increased without a proportional increase in operating expenses (production costs). And, because BRA's profits from the Funds increased at a higher rate than either AUM or operating expenses over that period, Dr. Ayres submits that BRA retained the benefits of economies of scale, rather than passing them on to the Funds or their shareholders.

Additionally, to show the extent to which BRA benefited from economies of scale, Dr. Ayres conducted an alternative analysis based on a comparison of BRA's actual profits and the profits that BRA would have enjoyed from the Funds, had profits increased at the same rate as the Funds' AUM. *See id.* at ¶ 109. Based on his analysis, Dr. Ayres concluded that, from 2007 to 2015, BRA realized ▆▆▆▆▆▆▆▆ in additional profits than it would have received had BRA's profit margin from Global Allocation increased at the same rate as the Fund's AUM (*i.e.*, at ▆▆▆▆▆▆▆▆▆▆). *Id.* During the same period, Dr. Ayres calculated that BRA realized ▆▆▆▆▆▆▆▆ in additional profits from Equity Dividend than it would have if profits had increased at the same rate as the Fund's AUM (*i.e.*, at ▆▆▆▆▆▆▆▆▆▆). *Id.* Indeed, Dr. Ayres determined that, in the Relevant Period alone, BRA realized ▆▆▆▆▆▆ in additional profits from the Funds than it would have had profits increased in proportion to the Funds' AUM. *See* PSSOF ¶¶ 193, 195 (citing Ayres Rpt. ¶ 109).

Notwithstanding Dr. Ayres' report and deposition testimony, Defendants argue that Plaintiffs have failed to meet their burden on either prong of the economies of scale test.

Specifically, Defendants argue that Dr. Ayres' analysis is flawed, because: (i) it takes into account "additional profits" beginning in 2007, despite the fact that the recoverable damages period for Plaintiffs' § 36(b) claim began in February 2013; (ii) it fails to acknowledge that the economies of scale factor does not require that an adviser share all realized economies of scale with shareholders; and (iii) it fails to account for non-pecuniary benefits, such as BlackRock's investments in personnel, technology, and infrastructure. *See* Defs.' Br. at 28. Defendants also argue that Dr. Ayres' analysis is insufficient, as a matter of law, to establish that BRA realized economies of scale, because Dr. Ayres failed to show that BRA's per-unit transaction costs decreased as the Funds' assets increased. Defs.' Reply at 11. The Court will address each of these arguments as they apply to the relevant prongs of the economies of scale test.

Prior to analyzing whether Plaintiffs have met their summary judgment burden under each prong of the economies of scale test, however, I must first resolve the parties' dispute regarding the applicable timeframe in analyzing economies of scale. Defendants argue that Dr. Ayres' economies of scale analysis is flawed, because Dr. Ayres calculates economies of scale beginning in 2007, when the relevant timeframe on Plaintiffs' § 36(b) claim began in February 2013, one year before the commencement of this action. *See* Defs.' Br. at 28. Conversely, Plaintiffs contend that in analyzing economies of scale, courts routinely have looked to growth beyond the one-year period preceding the filing of a § 36(b) claim. *See* Pls.' Opp. at 27. Indeed, Plaintiffs note that Dr. Ayres explained during his deposition and in his rebuttal report that looking to a broader period is particularly appropriate in this case, because it better corresponds to increases in the Funds' AUM. *See id.* (citing Deposition Transcript of Ian Ayres ("Ayres Dep."), at 8:12-10:11 and Lakind Decl., Ex. 190, Rebuttal Report of Ian Ayres ("Ayres Rebuttal Rpt."), ¶¶ 57-59). Specifically, in his rebuttal report, Dr. Ayres explained that he examined

economies of scale from 2007 to 2015, rather than just in the Relevant Period, because: (i) "[w]hile failures to share profits from economies of scale over the shorter period would be an independent grounds for an opinion, seeing such a failure over a longer time period is also a reasonable basis for an opinion that BlackRock had a continuing policy of not sharing profits from economies of scale, particularly where the longer time period corresponds with significant increases in AUM"; and (ii) "[a]nalyzing multiple time periods also limits the effects of outlier years." Ayres Rebuttal Rpt. ¶ 57. Finally, Plaintiffs argue that, even if limited to the Relevant Period, Dr. Ayres' analysis shows that BRA realized and inequitably retained more than ████ ████ in economies of scale from the Funds. *See* Pls.' Opp. at 27.

Section 36(b) expressly limits the recovery of damages to the one-year period prior to the commencement of the litigation. 15 U.S.C. § 80a-35(b) ("No award of damages shall be recoverable for any period prior to one year before the action was instituted."). However, recognizing that statistical trends outside the one-year period may, in some instances, demonstrate excessive fees within the relevant time period, *In re AllianceBernstein Mut. Fund Excessive Fee Litig.*, No. 04-4885, 2006 WL 74439, at *2 (S.D.N.Y. Jan. 11, 2006), various courts have permitted plaintiffs to present evidence of economies of scale beyond the one-year period preceding the commencement of a § 36(b) action. *See, e.g.*, *Redus-Tarchis v. New York Life Inv. Mgmt. LLC*, No. 14-7991, 2015 WL 6525894, at *9 (D.N.J. Oct. 28, 2015) (collecting cases, and finding that, although "Plaintiffs may only recover fees paid by the Funds in the one-year statutory period, they may point to historic growth to support their assertion that [the adviser] enjoyed economies of scale in 2014 without adequately sharing them with the Funds."); *The Lynn M. Kennis v. First Eagle Inv. Mgmt., LLC*, No. 14-585, 2015 WL 5886178, at *7 (D. Del. Oct. 8, 2015), *report and recommendation adopted sub nom. Lynn M. Kennis Tr. U/A DTD*

62

*10/02/2002 v. First Eagle Inv. Mgmt., LLC*, No. 14-585, 2015 WL 8489956 (D. Del. Dec. 9,

2015) (finding that the complaint sufficiently alleged that the adviser failed to share economies

of scale with the funds, based on the fund's growth since 2009, despite the fact that the

complaint was filed in 2014); *In re Federated Mut. Funds Excessive Fee Litig.*, No. 04-352, 2009

WL 5821045, at *7 (W.D. Pa. Sept. 30, 2009) (analyzing asset growth from 2001 to 2007 in

connection with the economies of scale factor); *Sins v. Janus Capital Mgmt., LLC*, No. 04-

01647, 2006 WL 3746130, at *3 (D. Colo. Dec. 15, 2006) (finding that the plaintiff met its

burden on the economies of scale factor by alleging that the growth in the funds' assets was not

matched by a proportional growth in fees between 1993 and 2002, where complaint was filed in

2005); *Strigliabotti v. Franklin Res., Inc.*, No. 04-00883, 2005 WL 645529, at *3 (N.D. Cal.

Mar. 7, 2005) (finding that the complaint sufficiently alleged economies of scale based on the

growth in the funds over a twenty-year period). I find the reasoning of these cases persuasive,

and thus, although Plaintiffs may only recover fees paid by the Funds in the Relevant Period, on

this Motion, I will consider Plaintiffs' evidence regarding growth in the Funds' AUM since 2007

in connection with the economies of scale factor. *See Redus-Tarchis*, 2015 WL 6525894 at *9.

Turning to the two-part test for economies of scale, I note, first, that although the Third

Circuit has not yet addressed a plaintiff's burden of proof in showing that economies of scale

were realized, courts within both the Second and Ninth Circuits have found that economies of

scale cannot be inferred solely from the fact that operating expenses declined at a time when the

at-issue fund's assets grew. *Kalish*, 742 F. Supp. at 1238; *see, e.g., Krinsk v. Fund Asset Mgmt.,

Inc.*, 875 F.2d 404, 411 (2d Cir. 1989) (affirming the district court's finding that economies of

scale could not be inferred merely from the fact that the ratio of expenses to revenues declined at

a time when the at-issue fund grew in size); *In re Am. Mut. Funds Fee Litig.*, No. 04-5593, 2009

WL 5215755, at *28-29, 51-52 (C.D. Cal. Dec. 28, 2009), *aff'd sub nom. Jelinek v. Capital Research & Mgmt. Co.*, 448 F. App'x 716 (9th Cir. 2011) (rejecting the expert's assertion that economies of scale could be inferred from the fact that the ratio of expenses to assets did not increase proportionally, where the expert did not conduct a per-unit transaction cost analysis). Such an inference, those courts reason, would disregard that fact that "costs can change for many reasons other than economies of scale," such as technological changes, falling input prices, or a change in the level of service provided by an adviser. *In re Am. Mut. Funds Fee Litig.*, 2009 WL 5215755 at *28. As a result, this line of cases requires a plaintiff to make a showing regarding the actual transaction costs at issue and to prove that "the costs per investor increased or decreased as the assets under management grew." *Hoffman*, 591 F. Supp. 2d at 540; *see Krinsk*, 875 F.2d at 411 ("[T]o show economies of scale, plaintiff bore the burden of proving that the per unit cost of performing Fund transactions decreased as the number of transactions increased."); *see also Amron v. Morgan Stanley Inv. Advisors Inc.*, 464 F.3d 338, 345 (2d Cir. 2006) (affirming dismissal of § 36(b) claim, based, in part, on fact that the complaints made "no allegations regarding the costs of performing fund transactions or the relationship between such costs and the number of transactions performed" in connection with the economies of scale factor); *Paskowitz*, 232 F. Supp. 3d at 507 (same). Absent such information, those courts reason, "there is no way to determine whether any economy of scale even existed that could have been passed on to investors or whether there is another explanation for the statistics" identified by the plaintiff. *Hoffman*, 591 F. Supp. 2d at 540.

Three-post trial decisions, *Krinsk*, *Kalish*, and *In re Am. Mut. Funds Fee Litig.*, are illustrative of this point. First, in *Krinsk*, the court observed that "economies of scale 'relate to the costs incurred in doing a unit of something,'" and dismissed the plaintiff's exhibits on

64

economies of scale as unpersuasive, because they "fail[ed] to demonstrate that the per unit cost of Fund transactions . . . decrease[d] as the number of units increase[d]." *Krinsk v. Fund Asset Mgmt., Inc.*, 715 F. Supp. 472, 496 (S.D.N.Y. 1988), *aff'd*, 875 F.2d 404 (2d Cir. 1989) (citation omitted). Specifically, the court rejected the plaintiff's argument that economies of scale could be inferred from the fact that the adviser's expenses, in terms of a percentage of fee-based revenues, declined at a time when the fund grew in size, finding that "merely because the ratio of fee based expenses to fee based revenues declined at a time when the Fund size grew . . . does not establish that such a decline was necessarily due to economies of scale." *Id.* Rather, the court accepted the trial testimony of a defense witness that "one must 'try and create a detailed analysis of each element of a transaction . . . over an extended period of time, over different levels of activity, to determine whether or not there are economies of scale.'" *Id.* (citation omitted). And, because the plaintiff failed to produce any evidence regarding the per unit cost of fund transactions, the court found that the plaintiff failed to sustain its burden of proof on the economies of scale factor. *See id.*

On appeal, the Court of Appeals for the Second Circuit affirmed the district court's finding, observing that "to show economies of scale, plaintiff bore the burden of proving that the per unit cost of performing Fund transactions decreased as the number of transactions increased." *Krinsk*, 875 F.2d at 411. In so finding, the court cited to the district court's opinion in *Gartenberg*, which explained:

> That processing costs do not significantly diminish as Fund assets increase accords with logic and common sense. While it may be almost as easy to invest a block of $100 million as a block of $10 million, it requires substantially more time, money and personnel to process 1 million shareholder orders than 100,000 orders. The ease and speed with which Fund shares can be bought or redeemed is crucial to the success of any money market fund, especially since the investor loses money for every minute his funds lie unemployed. Merrill Lynch added more than 3,000 non-sales personnel to handle the additional transaction volume caused by the Fund.

*Gartenberg v. Merrill Lynch Asset Mgmt., Inc.*, 528 F. Supp. 1038, 1055 (S.D.N.Y. 1981), *aff'd*, 694 F.2d 923 (2d Cir. 1982). Thus, because transaction costs do not necessarily decline as a mutual fund's assets increase, the *Krinsk* court placed the burden on the plaintiff to show that per unit transaction costs actually decreased as the at-issue fund grew in size. *See* 875 F.2d at 411.

Similarly, in *Kalish*, the district court found that the plaintiffs failed to meet their burden of proving that the adviser realized economies of scale from the at-issue fund. *See* 742 F. Supp. at 1239-40. At the outset, the court recounted the findings in *Krinsk*, and explained that a plaintiff bears the following burden of proof on the realization prong of the economies of scale test:

> [T]o demonstrate breach of fiduciary duty in respect of economies of scale, an investor must first prove that in fact the fund realized economies of scale. This requires proof of decreasing costs on a per-unit basis, as the fund increases in size. In *Krinsk* Judge Walker accepted the testimony of a defense witness that one must "try to create a detailed analysis of each element of a transaction . . ., over an extended period of time, over different levels of activity, to determine whether or not there are economies of scale." 715 F. Supp. at 496. While this was a defense witness, Judge Walker accepted his view, and the Second Circuit clearly bestowed its imprimatur of approval in the language I have quoted from its opinion affirming *Krinsk*. To place that burden of proof upon a plaintiff accords with logic and common sense, as Judge Pollack observed in *Gartenberg I*. *Economies of scale do not exist in a vacuum. The concept is meaningful only if increased size of a fund (more shareholders, more assets under management) directly reduces the manager's costs of processing each transaction and servicing each shareholder.* A plaintiff must prove that the fund actually realized such economies of scale.

*Id.* at 1238-39 (emphasis added).

Having set forth the applicable standard, the *Kalish* court turned to whether the plaintiffs satisfied their burden of showing that economies of scale were realized. Significantly, the court noted that, as acknowledged by the plaintiffs' expert at trial, the "plaintiffs did not attempt a study to determine if the per-unit cost of each transaction for the Fund decreased as the number of transactions increased." *Id.* at 1238-39. Rather, to show economies of scale, the expert

66

pointed to the fact that expenses had increased at a slower rate than revenues at a time when the fund's assets grew, and drew an inference from these circumstances that the adviser's per-unit cost of performing fund transactions declined as the fund grew in size. *See id.* at 1239-40. However, the court found that these statistics were insufficient "to carry plaintiffs' burden of proving the realization of economies of scale." *Id.* at 1240. With respect to the declining ratio of expenses to revenues at a time of increasing size, the court explained that "Judge Walker squarely held in *Krinsk* that economies of scale could not necessarily be inferred from those circumstances, and the Second Circuit affirmed him on the point, adding its own analysis of what a plaintiff had to prove." *Id.* Thus, because the plaintiffs did not show that the fund's per-unit transaction costs declined as its assets grew, the court held that the plaintiffs failed to sustain their burden on the economies of scale factor. *See id.* at 1239-40.

Finally, *In re Am. Mut. Funds Fee Litig.*, the court found that the plaintiffs failed to sustain their burden of proving that economies of scale were realized, where their expert did not conduct a per-unit cost analysis. 2009 WL 5215755 at *51. There, the plaintiffs sought to establish the existence of economies of scale by relying on the analyses and trial testimony of their expert, who opined that economies of scale could be inferred from the fact that the ratio of expenses to assets for the at-issue fund did not increase proportionally from one year to the next. *See id.* at *29. The court rejected the expert's analysis – and found that the plaintiffs failed to sustain their burden on the economies of scale factor – for several reasons. *See id.* at *29-30, 51-52. Principally, the court characterized the expert's failure to perform "the requisite per-unit cost analysis" as a "fundamental flaw," which "prevented him from finding that economies of scale existed." *Id.* at *51. Moreover, the court found that the expert's "analyses of whether economies of scale were realized [were] also defective because he improperly assumed that any changes in

Defendants' costs were the result of economies of scale, when in fact those cost changes may have been caused by other factors unrelated to scale," *id.*, such as technological changes, changes in input pricing, or changes in the level of service provided by an adviser. *Id.* at *28. On appeal, the Court of Appeals for the Ninth Circuit affirmed the district court's finding that the plaintiffs failed to meet their burden on the economies of scale factor. *See Jelinek v. Capital Research & Mgmt. Co.*, 448 F. App'x 716, 719 (9th Cir. 2011).

Here, at first read, it appears that Dr. Ayres' analysis for establishing economies of scale is substantially similar to the analyses that were rejected in the foregoing cases. That is, Dr. Ayres has opined that economies of scale existed based on disproportionality between the growth in the Funds' AUM and the increase in operational costs between 2007 and 2015. Significantly, however, it is unclear, from the record before me, whether Dr. Ayres performed the additional step that the courts in *Krinsk*, *Kalish*, and *In re Am. Mut. Funds Fee Litig.* found was necessary to demonstrate the realization of economies of scale; *i.e.*, conducting a per-unit transaction cost analysis. In that regard, my ability to consider this purported deficiency in Dr. Ayres' analysis is limited by the fact that Defendants raised the issue of Dr. Ayres' failure to conduct a per-unit transaction cost analysis for the first time in their reply brief, [42] and failed to question Dr. Ayres on that issue while taking his deposition. Moreover, unlike the post-trial decisions in *Krinsk*, *Kalish*, and *In re Am. Mut. Funds Fee Litig.*, here, the Court is without the benefit of Dr. Ayres'

---

[42] I note that "[a] moving party may not raise new issues and present new factual materials in a reply brief that it should have raised in its initial brief." *Ballas v. Tedesco*, 41 F. Supp. 2d 531, 533 (D.N.J. 1999); *United States v. Concepcion*, 679 F. App'x 230, 232 n. 1 (3d Cir. 2017) (refusing to consider arguments raise for the first time in a reply brief); *Stern v. Halligan*, 158 F.3d 729, 731 n. 3 (3d Cir. 1998) ("A party cannot raise issues for the first time in a reply brief."). Thus, courts ordinarily decline to consider arguments raised for the first time in a reply brief, on the grounds that consideration of the same would prejudice the non-moving party. *See United States v. Boggi*, 74 F.3d 470, 478 (3d Cir. 1996) (declining to consider arguments raised in a reply brief to avoid prejudice to appellees).

trial testimony. Accordingly, based on the limited record regarding transaction costs, this Court lacks a sufficient basis to conclude that Dr. Ayres failed to conduct a per-unit transaction cost analysis in determining the existence of economies of scale, or otherwise failed to exclude external factors that could have resulted in the disproportionate growth rates between BRA's operating expenses and the Funds' AUM.[43]

Moreover, when questioned on this point at the summary judgment hearing, Plaintiffs argued that Dr. Ayres did, in fact, perform a per-unit transaction cost analysis. Specifically, Plaintiffs responded to this Court's inquiries as follows:

> THE COURT: In [Defendants'] reply brief they point to the following standard that: "For economies of scale you must demonstrate that BRA's cost per transaction for the funds decreased as its AUM increased."
>
> So my question for you -- and certainly there are a couple of Circuits that have used that and many cases that have used that -- first, do you agree that that's the proper standard?
>
> PLAINTIFFS: No, your Honor, I do not. It depends on what "cost per transaction" means. Because, your Honor, what we have done here is we have shown that, as these [Funds] have increased in size, [BRA's] cost of providing services to those [Funds] has decreased as a percentage of assets under management. What that means is that for every new dollar that comes into one of these [Funds] [BRA's] cost of managing each dollar decreases.
>
> So insofar as cost per dollar is cost per transaction, then I agree and that's an appropriate standard. If cost per transaction is supposed to mean something different from cost per dollar of assets under management, then I disagree.
>
> Assets under management or AUM is absolutely a standard measure of scale or size in the mutual fund industry. It's regularly used by academics in analyzing scales. That's the measure that Dr. Ayres used –
>
> . . .
>
> The last point I'll mention on the per transaction question is that Dr. Ayres looked at all

---

[43] The landscape on this issue may change if Defendants raise a *Daubert* challenge to exclude or limit the opinions of Dr. Ayres, which Defendants represented will be forthcoming, Tr. 51:19-25, and Dr. Ayres' opinions are limited in some relevant fashion.

of BlackRock's costs including whatever costs there are for supervising the transfer agent, for supervising State Street.

Any costs that they claim are included in there, any costs that they claim to have incurred are included in Dr. Ayres' analysis. So insofar as he's showing cost decreasing as assets increase, he's captured the cost of servicing shareholders or anything else that BlackRock claims to do.

Tr. at 45:21-46:23, 51:3-13. As this excerpt shows, Plaintiffs contend that Dr. Ayres' analysis of BRA's costs for providing services to the Funds does in fact show a decrease in expenses relative to assets on a per-unit (per-dollar) basis. While Defendants have raised the per-unit transaction cost issue on this Motion, they had the opportunity to question Dr. Ayres regarding his purported failure to conduct such an analysis during his deposition, and failed to do so. Without that information, I have no basis for rejecting Plaintiffs' contention that Dr. Ayres performed the requisite analysis, and thus, a dispute of fact exists as to whether BRA realized economies of scale from the Funds.[44]

In short, the fact remains that Plaintiffs' expert witness, Dr. Ayres, opined that the disproportionality between the growth in the Funds' assets and operating expenses shows that BRA realized economies of scale from the Funds, and a factual dispute exists regarding whether Dr. Ayres conducted the requisite per-unit analysis to demonstrate economies of scale. While the post-trial decisions in *Krinsk*, *Kalish*, and *In re Am. Mut. Funds Fee Litig.* ultimately found that the experts' failures to conduct a per-unit transaction cost analysis precluded a finding that economies of scale were realized, at this stage, absent testimony on that issue, this Court cannot conclude that the disproportionality between the increase in operating expenses and AUM was not the result of economies of scale. Indeed, while I agree that it will be Plaintiffs' burden at

---

[44] Additionally, I note that, contrary to Defendants' arguments, Dr. Ayers' testimony raises a factual dispute as to whether non-pecuniary benefits from economies of scale are accounted for in Dr. Ayres' analysis. *See* Ayres Dep. 238:6-14.

trial to prove that the decrease in operating expenses was the result of economies of scale, drawing all reasonable inferences in favor of Plaintiffs on this Motion, the possibility remains that the lack of proportionality was due entirely to economies of scale, rather than other cost changes. Accordingly, although I find that Plaintiffs have sustained their burden of raising a triable issue on the economies of scale factor, as the post-trial decisions in *Krinsk*, *Kalish*, and *In re Am. Mut. Funds Fee Litig.* illustrate, it will be Plaintiffs' burden at trial to show that any disproportionality between the Funds' asset growth and operating expenses is attributable to economies of scale, rather than other cost savings unrelated to scale economies.

Having found that Plaintiffs have raised a triable issue of fact as to whether the Funds realized economies of scale, I turn, next, to the question of whether the Funds have adequately shared any economies of scale with investors. In that regard, once a plaintiff demonstrates that economies of scale have been realized, it then must show that the savings realized from economies of scale were not adequately shared with the at-issue fund or its investors. *Pirundini*, 2018 WL 1084140 at *7; *see Kalish*, 742 F. Supp. at 1239 ("If a plaintiff makes [the threshold] showing, then the question becomes whether the fund has permitted shareholders to participate, at least in part, in the economies of scale it has realized."). "Economies of scale can be shared with fund shareholders in a number of ways, including breakpoints, fee reductions and waivers, offering low fees from inception, or making additional investments to enhance shareholder services." *In re Am. Mut. Funds Fee Litig.*, 2009 WL 5215755 at *52 (internal citations omitted); *see Kalish*, 742 F. Supp. at 1239. Ultimately, the question posed by this prong of the economies of scale test is whether scale economies were "equitably shared." *In re Am. Mut. Funds Fee Litig.*, 2009 WL 5215755 at *52.

Here, Defendants argue that Plaintiffs have failed to sustain their burden of proving that any realized economies of scale were not equitably shared, because BRA's fee concessions and the breakpoints in BRA's Advisory Fee schedule resulted in substantial savings to the Funds. To that end, Defendants contend that the fee concessions and breakpoints – which were negotiated and approved by Board – resulted in savings to the Funds of approximately $192.6 million during the Relevant Period. *See* Defs.' Br. at 28 (citing SOF ¶ 135). Defendants argue that these savings, standing alone, are dispositive on the economies of scale factor.

In opposition, Plaintiffs concede that BRA did share some benefits of economies of scale with the Funds and their investors through fee waivers and breakpoints, but argue that a factual dispute exists regarding the sufficiency of any such sharing and whether additional benefits should have been shared with the Funds. *See* Pls.' Opp. at 26. In that regard, Plaintiffs once again point to the report of Dr. Ayres, who determined that, even after any sharing, BRA captured ████████ in economies of scale from 2007 to 2015, and ██████ in additional profits from economies of scale during the Relevant Period alone. *See* Ayres Rpt. ¶ 109, Figures 38-39; PSSOF ¶¶ 191-95. Thus, Plaintiffs contend, a factual dispute exists as to whether the fee breakpoints were fixed too high, precluding BRA from sharing the benefits of economies of scale with the Funds and their shareholders.

While Plaintiffs' arguments may not ultimately be enough to carry their burden at trial, the foregoing factual disputes are sufficient to withstand summary judgment. In that regard, while "appropriately fixed 'break-points'" may suffice to demonstrate that economies of scale were shared with a fund, *Kalish*, 742 F. Supp. at 1239, here, a factual dispute exists regarding whether the breakpoints in the BRA's fee schedules were "appropriately fixed," and thus, whether BRA adequately shared the benefits of economies of scale with the Funds and their

72

shareholders. *See Kasilag*, 2016 WL 1394347 at *18 (holding that summary judgment was not warranted on the economies of scale factor, because the court could not "ignore expert testimony highlighting a large factual dispute concerning the economies of scale that were passed on to the Funds."); *Sivolella*, Hr'g Tr. at 82:9-83:10 (denying summary judgment on the economies of scale factor based on a factual dispute, despite the defendants' argument that economies of scale were realized through breakpoints). Accordingly, the Court finds that Plaintiffs have raised a factual dispute as to the economies of scale factor.

### 3. *Profitability*

Plaintiffs also contend that BRA's profits from the Funds are indicative of the excessive nature of BRA's Advisory Fee. In analyzing the profitability factor of the *Gartenberg* analysis, "the Court is guided by the notion that it is not a permissible approach under Section 36(b) to argue that the adviser 'just plain made too much money.'" *Kasilag*, 2017 WL 773880 at *22 (quoting *Kalish*, 742 F. Supp. at 1237); *see In re Am. Mut. Funds Fee Litig.*, 2009 WL 5215755 at *50 ("Section 36(b) does not prohibit an investment adviser from making a profit, nor does it regulate the level of profit."). In that regard, it is well-settled that § 36(b) does not require that investment advisers operate on a "cost-plus" basis. *Kasilag*, 2017 WL 773880 at *22; *see Kalish.*, 742 F. Supp. at 1226 (observing that the legislative history of § 36(b) reveals that the statute "does not forbid an adviser-manager from earning a profit on services provided by it to a fund; that a 'cost-plus' type of contract is not required; and that the court is not authorized 'to substitute its business judgment for that of a mutual fund's board of directors in the area of management fees.'") (citation omitted); S. REP. NO. 91–184, at 5 (1970), *reprinted in* 1970 U.S.C.C.A.N. 4897, 4902 ("The investment adviser is entitled to make a profit. Nothing in this Bill is intended to imply otherwise or to suggest that a 'cost-plus' type of contract would be

required."). Nonetheless, evidence that an adviser's profitability is disproportionate to the services rendered may be a sign that the adviser's fees are excessive. *Chill v. Calamos Advisors LLC*, 175 F. Supp. 3d 126, 144 (S.D.N.Y. 2016).

In seeking to demonstrate that BRA's profitability from the Funds shows the excessive nature of the Advisory Fee, Plaintiffs rely on Dr. Ayres' calculation of what BRA's profitability would have been had BRA used the same fee schedules that BRIM negotiated at arm's length with the Subadvised Funds. In quantifying profitability, Dr. Ayres relied on the annual 15(c) Profit Reports prepared in connection with the renewal of BRA's IMAs with the Funds. *See* PSSOF ¶ 151. From 2013 to 2015, the relevant 15(c) Profit Reports disclosed three different methods of BRA's profit margin (or, according to Defendants, estimated profit margin)[45] for managing the Funds. *See* SOF ¶¶ 126-127. To that end, the relevant 15(c) Profit Reports indicated the following profitability information:

| | Global Allocation | | | Equity Dividend | | |
|---|---|---|---|---|---|---|
| | 2013 | 2014 | 2015 | 2013 | 2014 | 2015 |
| Margin (GAAP) | | | | | | |
| Margin Excluding Distribution Costs | | | | | | |

---

[45] While Plaintiffs contend that the 15(c) Profit Report includes the actual revenue, costs, and profitability for the Funds, Defendants argue that the 15(c) Profit Report is merely an estimate of each Fund's profitability based on its revenue and an estimate of the costs allocable to BRA's management of each Fund. *See* PSSOF ¶ 151; DRSOF ¶ 151.

| Margin Excluding Distribution, Servicing & Retention Costs |  |
| --- | --- |

*Id.*

Citing to those profitability figures, Dr. Ayres compared BRA's profits from the Funds under the fee schedule pertaining to the Advisory Fee to what BRA's profits would have been under the fee schedules that BRIM negotiated at arm's length with the Subadvised Funds. *See* PSSOF ¶¶ 180-82. Dr. Ayres determined that between 2013 and 2015, BRA's profits from Global Allocation ranged from ███████████ million per year, with profit margins ranging between ██████████. *See id.* at ¶ 181. Using cost data provided by BlackRock, Dr. Ayres calculated that, had BRA charged Global Allocation the same fee rate that BRIM charges the Subadvised Funds, BRA's profits over the same period would have ranged from ████████████ million, including distribution expenses, with a profit margin of ████ ███. *See id.* In the same way, Dr. Ayres states that BRA's profits from Equity Dividend during the Relevant Period ranged from ██████████ million per year, with profit margins ranging between ██████████ *See id.* at ¶ 182. Dr. Ayres determined that, had BRA employed the same fee schedule that BRIM negotiated with the Subadvised Funds, BRA's profits during the same period would have ranged from ████████████ million each year, including distribution expenses, with a profit margin of ███████ *See id.* In total, Dr.

Ayres determined that, from 2013 to 2015, BRA captured as much as ██████████ in additional profits based on charging a higher Advisory Fee to the Funds than the fee that BRIM negotiated at arm's length with the Subadvised Funds. *See id.* at ¶¶ 181-82 (citing Ayres Rpt. ¶¶ 90-93); Pls.' Opp. at 24-25.

In response, Defendants argue that Plaintiffs fail to cite any support for the proposition that profitability can be established based on a comparison of BRA and BRIM's profit margins. Defendants further maintain that the fact that BRA's profit margins for managing the Funds are within the range upheld by other courts is dispositive on the profitability factor.

First, I reject Defendants' contention that Plaintiffs cannot compare BRA's profitability from the Funds to BRIM's profitability from the Subadvised Funds. In support of their argument, Defendants note that in *Schuyt v. Rowe Price Prime Reserve Fund, Inc.*, 663 F. Supp. 962 (S.D.N.Y.), *aff'd*, 835 F.2d 45 (2d Cir. 1987), the district court rejected the plaintiff's attempt to use the 15% profit margin of a service provider for the fund as a measuring stick for the arm's-length bargaining range, finding such a comparison inappropriate in light of the differences in services rendered by the investment adviser and the service provider. *Id.* at 976 n. 43. Unlike in *Schuyt*, however, here, Plaintiffs have raised a dispute of fact regarding the comparability of the services rendered by BRA to the Funds and BRIM to the Subadvised Funds. Should trial reveal that the services provided by BRA and BRIM are in fact comparable, Plaintiffs may present their theory as proof that BRA's profitability from the Funds is disproportionate to the services that BRA provides to the Funds. Indeed, in light of the substantial disputes regarding the services that BRA actually performs for the Funds, it necessarily follows that a dispute exists regarding the ultimate question on profitability in this case – whether BRA's profitability from the Funds is disproportionate to the services rendered.

Moreover, Defendants have not cited to any authority holding, as a matter of law, that a comparison of profit margins across different clients cannot factor into the profitability analysis.[46] Accordingly, I find that Plaintiffs have raised a genuine dispute of material fact as to whether BRA's profitability from the Funds is disproportionate to the services provided.[47]

Notwithstanding Plaintiffs' comparative profitability arguments, Defendants argue that Plaintiffs cannot demonstrate excessive profitability, because BRA's profit margins for managing the funds are within the range that other courts have upheld as appropriate. *See, e.g., Kasilag*, 2017 WL 773880 at *22 (finding that the plaintiffs "failed to meet their burden of establishing that the Funds were so profitable that their fee could not have been negotiated at arm's-length," where the adviser's pre-tax profit margins ranged between 45.6% and 80.3%, excluding distribution fees); *In re Am. Mut. Funds Fee Litig.*, 2009 WL 5215755 at *50 (finding that the profitability factor did not weigh in favor of finding a § 36(b) violation, where the advisers' pre-tax profit margins, excluding distribution expenses, ranged from 30% to 52%); *Schuyt*, 663 F. Supp. at 979 (finding that a pre-tax profit margin of 77.3% did not support a finding of excessive fees).

Conversely, Plaintiffs contend that those cases are not dispositive on the profitability factor, because: (i) § 36(b) cases vary according to the specific facts presented in each case; (ii) the decisions relied on by Defendants were each rendered after trial; and (iii) none of the cases cited by Defendants involved high profit margins in combination with evidence that the

---

[46] Indeed, *In re Am. Mut. Funds Fee Litig.*, a case cited by Defendants, suggests that a comparison to the profit margins of other advisers may factor into the profitability factor. *See* 2009 WL 5215755 at *50 (observing, in analyzing the profitability factor, that the advisers' profitability from the funds "was also comparable to or less than other similarly structured investment advisers . . . .").

[47] However, as discussed below, Plaintiffs' comparative profitability theory is the sole triable issue on the profitability factor.

investment adviser provided substantially the same services to independent clients for significantly reduced profits. With respect to the non-dispositive nature of the cases cited by Defendants, Plaintiffs emphasize that in *Schuyt*, the court clarified that it was:

> . . . *not holding that a profit margin of up to 77.3% can never be excessive. In fact, under other circumstances, such a profit margin could very well be excessive.* For example, if advisory services being challenged were not of the highest quality and if the directors were not so obviously qualified, fully informed, and conscientious, a similar fee structure could violate section 36(b). This Court is simply holding that on the facts presented here, the fee schedules at issue represent charges within the range of what would have been negotiated at arms-length in the light of all of the surrounding circumstances.

*Id.* at 989 n. 77 (emphasis added).

As a preliminary matter, Defendants' arguments regarding the profit margins upheld by other courts are unavailing, because: (i) a factual dispute exists regarding the differences between BRA and BRIM's profit margins; and (ii) § 36(b) requires a totality of the circumstances approach, and thus, a profit margin that is not excessive upon certain facts may be excessive under another. Indeed, the fact-intensive nature of the profitability inquiry is highlighted by the fact that each of the decisions relied upon by Defendants was rendered after trial. *See Kasilag*, 2017 WL 773880 at *24 (entering judgment in favor of the defendants after a bench trial); *In re Am. Mut. Funds Fee Litig.*, 2009 WL 5215755 at *56 (entering judgment in favor of the defendants after trial); *Schuyt*, 663 F. Supp. at 989 (entering judgment for the defendants after a two-week trial). Nonetheless, I note that the examples cited by the *Schuyt* court as potentially requiring a different result on profitability – the quality of the advisory services and independence and conscientiousness of the board – are not issue in this case, and thus, cannot be asserted at trial as a basis for distinguishing this case from those decisions upholding certain profitability margins on similar facts. Rather, in seeking to overcome the weight of authority holding that the profit margins realized by BRA fail to indicate excessive

fees, as well as the considerable deference afforded the Board on this factor, Plaintiffs will be limited to presenting their comparative theory of profitability.

### 4. *Independence and Conscientiousness of the Board*

The final disputed factor, pertaining to the independence and the conscientiousness of the Board, "dovetails with the procedural aspect of *Jones*." *Kasilag*, 2016 WL 1394347 at *19. In light of this Court's finding that the Board's approval of BRA's Advisory Fee is entitled to substantial deference, this factor does not weigh in favor of finding that the Advisory Fee is outside the range of arm's-length bargaining. *See id.*

### E. *Gartenberg* Outcome

In sum, the Court finds that genuine disputes of material fact exist regarding the comparative fees, economies of scale, and profitability factors of the *Gartenberg* test, and thus, as to whether the Advisory Fee falls outside the range of arm's-length bargaining, rendering summary judgment inappropriate. However, in light of this Court's finding that the Board's decision to approve BRA's Advisory Fee is entitled to substantial deference, the Court expects that trial will be limited to the other relevant *Gartenberg* factors.

## V. **MOTION TO PRECLUDE**

Plaintiffs move, pursuant to Federal Rule of Civil Procedure 37, to preclude Defendants from relying on evidence and arguments regarding the following three topics based on Defendants' failure to provide complete discovery on those matters: (i) the legal services that BRA performs for the Funds; (ii) the distribution-related services that BRA performs for the Funds[48]; and (iii) the analysis conducted by E&Y and provided to the Board regarding BRA's

---

[48] Plaintiffs also argue that Defendants should be precluded from relying on evidence of distribution for the independent reason that distribution-related services and expenses cannot be a justification for BRA's Advisory Fee.

Advisory Fee. Specifically, Plaintiffs contend that preclusion is warranted, because Defendants objected to discovery concerning legal services on the grounds of attorney-client privilege, refused to respond to document requests regarding distribution, and failed to produce the E&Y analysis even though it was responsive to Plaintiffs' requests. Additionally, Plaintiffs seek to strike certain portions of the Certification of John Perlowski in Support of Defendants' Motion for Summary Judgment ("Perlowski Cert.") regarding materials provided to the Board (¶¶ 14, 16) and purported savings from breakpoints (¶¶ 35-36) as violative of Federal Rule of Evidence 1006. Conversely, Defendants maintain that Plaintiffs' Motion to Preclude is both procedurally and substantively defective.

The Court need not resolve Plaintiffs' Motion at this time, because, even though the Court generally referred to the E&Y analysis and BRA's legal and distribution-related services, the Court did not rely on those facts in deciding Defendants' Motion for Summary Judgment. Stated differently, the E&Y analysis and legal and distribution services did not form the basis for this Court's consideration of any of the factors at dispute in this case. Moreover, the Court did not refer to the paragraphs of the Perlowski Certification that Plaintiffs argue must be precluded. Therefore, the Court will deny Plaintiffs' Motion to Preclude without prejudice. To the extent Plaintiffs seek to renew these arguments prior to trial, they may file motions *in limine* to that effect, in accordance with the forthcoming trial scheduling order that will be issued by this Court.

## VI.   **CONCLUSION**

For the foregoing reasons, Defendants' Motion for Summary Judgment is granted, insofar as Defendants seek a ruling that the decision of the Board to approve BRA's Advisory Fee is

entitled to substantial deference, and denied, insofar as Defendants seek the dismissal of

Plaintiffs' claims.  Plaintiffs' Motion to Preclude is denied without prejudice.


Dated:  June 13, 2018                                        /s/ Freda L. Wolfson
                                                            Hon. Freda L. Wolfson
                                                            United States District Judge

# APPENDIX

## Glossary of Abbreviations and Defined Terms

| | |
|---|---|
| "15(c) Profit Report" | BlackRock's Annual Reports to the Board regarding Profitability |
| "Accounting Agreement" | The Funds' Accounting Support Services Agreement with BRA |
| "Act" | The Investment Company Act of 1940 or ICA |
| "Advisory Fee" | The Annual Fee that BRA Receives for serving as the Investment Adviser for the Funds |
| "Allianz GA Fund" | The AZL BlackRock Global Allocation Fund |
| "AUM" | Assets Under Management |
| "Ayres Dep." | Deposition Transcript of Ian Ayres (Sept. 22, 2017) |
| "Ayres Rebuttal Rpt." | Rebuttal Report of Ian Ayres (July 28, 2017) |
| "Ayres Rpt." | Expert Report of Ian Ayres (May 3, 2017) |
| "BBH" | Brown Brothers Harriman & Co. |
| "BBH Custodian Agreement" | Global Allocation's Custodial Agreement with BBH |
| "BlackRock" | BRA, BRIM, and BRIL |
| "BlackRock Investments" | BlackRock Investments, Inc. |
| "BNY" | BNY Mellon Investment Servicing (US) Inc. |
| "BNY Agreement" | The Transfer Agency and Shareholders Services Agreement Between BNY and the Funds |
| "Board" | Global Allocation's Board of Directors and Equity Dividend's Board of Trustees |
| "Board Chairman" | Robert Hernandez, the Chairman of the Board |
| "Board's Counsel" | The Law Firm of Debevoise & Plimpton LLP |

| | |
|---|---|
| "BRA" | BlackRock Advisors, LLC |
| "BRIL" | BlackRock International Limited |
| "BRIM" | BlackRock Investment Management, LLC |
| "CCO" | Chief Compliance Officer |
| "Commission" | The United States Securities and Exchange Commission or SEC |
| "Complaint" or "Compl." | Plaintiffs' Consolidated Complaint (ECF No. 27) |
| "Contract Renewal Presentation" | 2014 Document Provided to the Board in Connection with the Renewal of the IMAs |
| "Defendants" | BlackRock |
| "Defs.' Br." | Defendants' Brief in Support of their Motion for Summary Judgment (ECF No. 101) |
| "Defs.' Reply" | Defendants' Reply Brief in Further Support of their Motion for Summary Judgment (ECF No. 117) |
| "DRSOF" | Defendants' Response to Plaintiffs' Supplemental Local Civil Rule 56.1 Statement (ECF. No. 117-1) |
| "Distribution Agreement" | The Funds' Distribution Agreement with BlackRock Investments |
| "ETFs" | Exchange-Traded Funds |
| "E&Y" | Ernst & Young LLP |
| "Equity Dividend" | The BlackRock Equity Dividend Fund |
| "Fee Approval Meeting" | The Board's Annual April Meeting to Consider the Renewal of the IMAs |
| "Fee Comparison Memorandum" | Annual Memorandum Provided to the Board Regarding BRA's Advisory Fee |
| "Funds" | Equity Dividend and Global Allocation |
| "Funds' Counsel" | The Law Firm of Willkie Farr & Gallagher LLP |

| | |
|---|---|
| "Global Allocation" | The BlackRock Global Allocation Fund, Inc. |
| "Hernandez Dep." | The Deposition Transcript of Robert Hernandez (Jan. 6, 2017) |
| "ICA" | The Investment Company Act of 1940 or the Act |
| "IAA" | The Investment Advisers Act of 1940 |
| "IRC" | The Internal Revenue Code |
| "IMAs" | The Funds' Investment Management Agreements with BRA |
| "Independent Advisers" | The Investment Advisers for the Subadvised Funds |
| "Independent Trustees" | The Ten Members of the Board that Meet the Statutory Requirements for Independence under the ICA |
| "Jackson GA Fund" | The JNL/BlackRock Global Allocation Fund |
| "Lakind Decl." | Declaration of Robert. L. Lakind in Opposition to Defendants' Motion for Summary Judgment (ECF No. 110-3) |
| "Lincoln ED Fund" | The LVIP BlackRock Equity Dividend RPM Fund |
| "Lipper" | Lipper, Inc. |
| "MassMutual ED Fund" | The MassMutual Income and Growth Fund |
| "MassMutual GA Fund" | The MassMutual Select Global Allocation Fund |
| "Morningstar" | Morningstar, Inc. |
| "Muscato Cert." | Certification of Andrew Muscato in Support of Defendants' Motion for Summary Judgment (ECF No. 101-6) |
| "NAV" | Net Asset Value |

| | |
|---|---|
| "Perlowski Cert." | Certification of John Perlowski in Support of Defendants' Motion for Summary Judgment (ECF No. 101-2) |
| "Plaintiffs" | Owen Clancy, Cindy Tarchis, and Brendan Foote |
| "Pls.' Opp." | Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment (ECF No. 110) |
| "PRSOF" | Plaintiffs' Response to Defendants' Local Civil Rule 56.1 Statement of Material Facts (ECF No. 110-2) |
| "PSSOF" | Plaintiffs' Supplemental Statement of Disputed Material Facts (ECF No. 110-1) |
| "PwC" | PricewaterhouseCoopers |
| "Relevant Period" | February 21, 2013 through November 2015 |
| "SAS Agreement" | The Shareholders Administrative Services Agreement Between the Funds and BRA |
| "Services Checklist" | A Checklist in the Fee Comparison Memorandum that Compares the Services that BlackRock Offers its Different Clients |
| "SEC" | The United States Securities and Exchange Commission or Commission |
| "SOF" | Defendants' Local Civil Rule 56.1 Statement of Material Facts Not in Dispute (ECF No. 101-1) |
| "Standing Committees" | The Board's Audit Committee, Governance and Nominating Committee, Compliance Committee, Performance Oversight Committee, and Executive Committee |
| "State Street" | State Street Bank and Trust Company |
| "State Street Adm. Agreement" | The Administrative Services Agreement Between the Funds and State Street |
| "State Street Custodian Agreement" | Equity Dividend's Custodial Agreement with State Street |

| | |
|---|---|
| "Subadvised Funds" | The Allianz GA Fund, Transamerica GA Fund, Jackson GA Fund, MassMutual GA Fund, VALIC ED Fund, Lincoln ED Fund, and the MassMutual ED Fund |
| "Subadvisory Fee" | The Annual Fee Received by BRIM for Serving as a Subadviser to the Subadvised Funds |
| "Support Services" | The Non-Investment Advisory Services Required to Operate a Mutual Fund |
| "Transamerica GA Fund" | The Transamerica Global Allocation Fund |
| "VALIC ED Fund" | The VALIC Dividend Value Fund |