**\*NOT FOR PUBLICATION\***

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

_____
                                                    :
In re BLACKROCK MUTUAL FUNDS        :        Civil Action No. 14-1165 (FLW) (TJB)
ADVISORY FEE LITIGATION                   :
                                                    :        **BENCH MEMORANDUM**
                                                    :            **(Filed Under Seal)**
                                                    :

**WOLFSON, United States District Judge:**

The present suit is brought pursuant to Section 36(b) of the Investment Company Act of

1940. Plaintiffs Owen Clancy, Cindy Tarchis, and Brendan Foote (collectively, "Plaintiffs") are

shareholders in two mutual funds ("the Funds") managed by Defendants BlackRock Advisors,

LLC ("BRA"), and they brought this case against BRA, BlackRock Investment Management,

LLC ("BRIM"), and BlackRock International Limited ("BRIL") (collectively, "Defendants"),

alleging that Defendants breached their fiduciary duties by charging excessive investment

advisory fees from managing the Funds.

Beginning on August 20, 2018 and concluding August 29, 2018, the Court conducted an

eight-day bench trial. Prior to trial, the Court issued a summary judgment Opinion finding that a

key factor under the test set forth in _Gartenberg v. Merrill Lynch Asset Management, Inc._, 694

F.2d 923 (2d Cir. 1982)—the independence and conscientiousness of the board or directors—

weighed in favor of Defendants.[1] Trial was, therefore, limited to whether the fees that

Defendants charged were excessive under the three remaining _Gartenberg_ factors at issue:

comparative fee structure, economies of scale, and profitability. Following trial, the parties

_____

[1] Further explanation of the _Gartenberg_ factors and the summary judgment Opinion appear _infra_.

submitted proposed findings of fact and conclusions of law. For the reasons set forth below, I dismiss Plaintiffs' claims.

## I.    FINDINGS OF FACT[2]

### A.  Parties

Plaintiffs are shareholders in either of two mutual funds managed by BRA: the BlackRock Global Allocation Fund, Inc. ("Global Allocation") and the BlackRock Equity Dividend Fund ("Equity Dividend") (collectively, the "Funds"). Joint Stipulation of Facts ("JSOF") at ¶¶ 1-3.

Plaintiff Owen Clancy has been a shareholder of Global Allocation since October 2011, and filed suit against Defendants on February 21, 2014. *Id.* at ¶ 1. Plaintiff Brendan Foote has been a shareholder of Global Allocation since June 2012, and commenced his case against Defendants on March 28, 2014. *Id.* at ¶ 2. Plaintiff Cynthia Tarchis has been a shareholder of

---

[2] In connection with the preparation of the parties' Joint Pretrial Order, Plaintiffs tendered to Defendants a list of proposed "facts" for stipulation. After Defendants refused to stipulate to the proposed facts, on the eve of trial, Plaintiffs moved to deem certain facts contained in the proposed stipulation as admitted, uncontested, or as party opponent admissions. Defendants have vigorously opposed the motion, asserting that Plaintiffs' stipulated proposed facts are "not faithful representations of Defendants' admissions," and consist of "incomplete quotations of key documents, conclusions of law (not statements of fact), or otherwise inappropriate, advocacy-driven proposals." ECF No. 173 at 1. Under Federal Rule of Civil Procedure 16(c)(2), "the court *may consider* and take appropriate action… [including by] obtaining admissions and stipulations about facts and documents to avoid unnecessary proof, and ruling in advance on the admissibility of evidence." (emphasis added). The Court's authority in this area is discretionary, and "[n]othing in the rule affords basis for clubbing the parties into admissions they do not willingly make; but it is a way of advancing the trial ultimately to be had by setting forth the points on which the parties are agreed after a conference directed by a trained judge." *Padovani v. Bruchhausen*, 293 F.2d 546, 548 (2d Cir. 1961). As Defendants contest the proposed facts, in my discretion, I will not deem them admitted. To the extent that certain of Plaintiffs proposed facts are supported elsewhere in the record, I will consider them in reaching my decision.

Global Allocation since 1993 and Equity Dividend since 2012. *Id.* at ¶ 3. Tarchis joined this action on June 16, 2015. *Id.*

Defendants are subsidiaries of BlackRock, Inc. (together with Defendants and all other affiliates, "BlackRock"). BlackRock was established in 1988, and is one of the world's largest investment advisers, with over $6 trillion in assets under management ("AUM"). *Id.* at ¶ 8. BlackRock invests capital and renders investment advice on behalf of retail and institutional clients in more than one hundred countries through many different investment products, including open-end and closed-end mutual funds, exchange traded funds, separate accounts, and pooled investment vehicles. *Id.* at ¶ 9.

**B. The Funds**

The Funds are open-end mutual funds organized as investment companies and registered with the United States Securities and Exchange Commission (the "Commission" or "SEC") under the Investment Company Act of 1940 (the "ICA"). Defendants Proposed Findings of Fact ("DPFOF") at ¶ 84. Global Allocation began offering shares for sale to the public on February 3, 1989. *Id.* at ¶ 8. From February 21, 2013 through November 2015 (the "Relevant Period"),[3] Global Allocation had AUM of between $51 billion and $58 billion. *Id.*at ¶ 21. Equity Dividend began offering shares for sale to the public on November 25, 1987. *Id.* at ¶ 22. During the Relevant Period, Equity Dividend managed between $20 billion and $30 billion in assets. *Id.* at ¶ 26.

---

[3] As the Court noted in its summary judgment opinion, "Relevant Period" is used solely to refer to the period in which the parties obtained discovery and made certain financial calculations, and should not be construed as a limitation upon the damages period in this case, which the parties, through a joint stipulation entered by this Court, have agreed runs from "one year prior to the commencement of the [original complaint (February 21, 2013)] through the date of trial ...." Stipulation and Order dated June 16, 2016, ECF No. 68 at ¶ 5.

Global Allocation's investment objective is to provide high total investment return through a fully managed investment policy utilizing United States and foreign equity securities and debt and money market securities, in varying proportions in light of changing market conditions and economic trends. *Id.* at ¶ 17. Equity Dividend's investment objective is to seek long-term total return and current income. *Id.* at ¶ 23.

Global Allocation is overseen by a Board of Directors, while a Board of Trustees oversees Equity Dividend. *Id.* at ¶¶ 13-14. The same individuals who serve on the Board of Directors of the Global Allocation Fund also serve on the Board of Trustees of the Equity Dividend Fund (collectively, the "Board"). *Id.* at ¶ 15. Both Funds' portfolio managers are assisted by a team of senior analysts, quantitative strategists, marketing and communications strategists, research analysts, and administrative staff. *Id.* at ¶¶ 18, 24.

1.  The Funds' Investment Management Agreements

BRA has entered into investment management agreements ("IMAs") with the Funds, which set out its role as the investment adviser to the Funds. Plaintiffs' Proposed Findings of Fact ("PPFOF") at ¶ 98. As an investment advisor, BRA "supervise[s] and arrange[s] for the day-to-day operations," meaning, in the words of Defendants' fact witness John Perlowski, the president and CEO of Global Allocation and Equity Dividend, [4] that it is responsible for "all [of] the activities and affairs of the fund." DPFOF at ¶ 10; Trial Transcript ("Tr.") 135:6-7

---

[4] In addition to his role as president and CEO of Global Allocation and Equity Dividend, Mr. Perlowski is head of GFS, the group primarily responsible for providing administrative support to the Funds. Mr. Perlowski is also a member of the Board. Mr. Perlowski has approximately thirty years of experience in mutual fund administration, and has served as the head of a group providing administrative services to mutual funds for over twenty years, including at Goldman Sachs. DPFOF at ¶ 49.

(Perlowski).[5] The IMAs are renewed annually and are subject to the approval of the Board. DPFOF at ¶ 16.

The IMAs require the Funds to pay BRA an annual advisory fee (the "Advisory Fee"). PPFOF at ¶ 101. The Advisory Fee is calculated as a percentage of the Funds' AUM, pursuant to a fee schedule containing "breakpoints," which reduce the percentage amount of BRA's Advisory Fee as the Funds' AUM increase. *Id.* at ¶ 102.

Global Allocation's effective Advisory Fee Rates and total Advisory Fees paid were as follows:

| FY Year | Effective Advisory Fee Rate (% of AUM) | Advisory Fees |
|---------|----------------------------------------|---------------|
| 2013 | 0.66% | $412,500,349 |
| 2014 | 0.66% | $441,347,281 |
| 2015 | 0.67% | $407,768,884 |
| 2016 | 0.67% | $348,513,347 |
| 2017 | 0.68% | $301,394,305 |
| Total | | $$1,911,524,166 |

DPFOF at ¶ 15. Equity Dividend's effective Advisory Fee Rates and total Advisory Fees paid were as follows:

| FY | Effective Advisory Fee Rate (% of AUM) | Advisory Fees |
|----|----------------------------------------|---------------|
| 2013 | 0.54% | $144,192,714 |
| 2014 | 0.54% | $162,300,957 |
| 2015 | 0.54% | $151,855,019 |
| 2016 | 0.53% | $121,267,078 |
| 2017 | 0.55% | $118,140,060 |
| Total | | $697,755,828 |

*Id.* at ¶ 16.

As described in more detail below, the IMAs serve as a "framework" that establishes the parameters of the relationship between BRA and the Funds. *Id.* at ¶ 12. As Perlowski credibly testified, it is not "practicable" "to be able to capture what we do day-in and day-out and keep it

---

[5] Citations to the trial transcript are used for direct quotations from trial witnesses only.

updated into an agreement." Tr. 141:11-13 (Perlowski). Rather, BRA's responsibilities are defined by regular "engagement with the Board." *Id.* at 141:18-19 (Perlowski).  BRA is "always reviewing with the Board the activities of the fund. They are also providing us feedback. . . . That's really how we define what we are doing." *Id.* at 141:20-25 (Perlowski).

### 2. Lipper Data and Dr. Sirri's Peer Group Analysis

In arguing that the Advisory Fees set out in the IMA are well within industry standards, Defendants rely on data from Lipper, Inc., a financial services company that annually provides the Board with data and information regarding the Funds' performance and fees relative to peer funds. DPFOF at ¶¶ 16-19. Perlowski testified that Lipper data is "very heavily used" by other investment advisers and mutual fund boards to analyze comparative fees, and that Lipper tries to "construct a peer group of similar funds with similar investment objectives, guidelines—so to create an apples and apples comparison of our fund against its peer group." Tr. at 173:18, 174:5-8 (Perlowski); *see also* DPFOF at ¶ 303 (noting that, according to Defendants' expert, "peer group fee comparison analysis is commonly used in the mutual fund industry by multiple constituencies, including the SEC, independent trustees in the 15(c) process, fund advisers, investment advisers, investors, and, for example, fiduciaries of 401(k) or 403(b) retirement plans").

Lipper applies a standardized methodology to identify a set of comparable mutual funds called an "Expense Universe," as well as a narrower set of even more similar mutual funds called an "Expense Group," and considers the following comparability factors to assemble an Expense Group for the Funds: (i) fund type; (ii) investment objective; (iii) load type; (iv) fund size; (v) no duplicate advisers; and (vi) operating structure and attributes. DPFOF at ¶ 18. To assemble an Expense Universe for the Funds, Lipper broadens the Expense Group by considering only three of the comparability factors above: (i) fund type; (ii) investment classification/objective; and (iii)

load type. *Id.* Once Lipper determines an Expense Group and Expense Universe, Lipper compares various expense categories between the mutual funds therein, including the Total Expenses incurred by a fund and the "Actual Management Fees" incurred by a fund, which consists of advisory and administrative fees paid during the latest fiscal period. *Id.* According to Plaintiffs, Lipper data is unreliable because it compares funds to potential peers, but does not determine whether fees of the potential peers are negotiated at arms length. PPFOF at ¶ 498. Plaintiffs, through their expert Dr. Ayres, contend that the Lipper peer groups contain proprietary, or "captive," funds (like the Funds here), where the adviser has substantial control of the fund's board, thereby compromising the arms-length nature of the relationship between the adviser and the fund. *Id.* at ¶¶ 499-502.

Between 2013 and 2015, Lipper ranked Equity Dividend's Actual Management Fees within the first and second quartiles of the Fund's Expense Group and Universe—i.e., the least expensive two quartiles. DPFOF at ¶ 20. Between 2013 and 2015, Lipper also ranked Global Allocation's "Actual Management Fees" below the median of the Funds' Expense Group and Universe. *Id.* at ¶ 21. Global Allocation also ranked in the first quartile for the Total Expenses category each year. *Id.*

In addition to the Lipper comparisons, Defendants also rely on independent peer group analysis from their expert, Dr. Erik Sirri. In conducting his analysis, Dr. Sirri considered three peer groups, two from Lipper, and an additional group that Dr. Sirri constructed himself. DPFOF at ¶ 303. For the third group, Dr. Sirri used a methodology similar to that of Lipper, finding twenty-five funds that were most similar to the Funds in terms of investment strategy, structure, load type, and size. *Id.* at ¶ 304. His analysis found that for each share class, for each year, across all comparisons, the Funds fees were in line with their peers. *Id.* at ¶ 308. In particular, Dr. Sirri

looked both at the numerical ranking of the Fund against its peers (*i.e.*, the Equity Dividend Fund ranked fifth out of ten funds in its Expense Group for Actual Management Fees in 2013) and its quartile ranking (*i.e.*, when dividing the peer group into four sub-groups, or quartiles, analyzing which quartile the Fund falls into). *Id.* Dr. Sirri found that for each Fund, across all of his comparisons, the Funds sometimes fell into the first quartile (the cheapest 25% of the funds compared), and otherwise fell into the second and third quartiles (the middle 50%); however, they never fell into the most expensive quartile relative to their peers. *Id.* I find this comparison model probative to the issue of an apt comparator.

### C. Services that BRA Provides to the Funds

In arguing that the fees charged by BlackRock are excessively high, Plaintiffs' case centers on a comparison of the services that BRA provides to the Funds and the services that BRIM provides to the Subadvised Funds.[6] As such, at trial, there was extensive testimony about the scope and extent of BRA's services.

#### 1. Portfolio Management

BRA is responsible for executing the Funds' investment objectives through, among other things, investment research, securities selection and trading, and risk management, which services are performed by the portfolio management team. DPFOF at ¶¶ 67-68. That there is substantial overlap between the portfolio management services provided by BRA to the Funds and by BRIM to the Subadvised funds is not in dispute. *Id* at ¶ 357 n.23; PPFOF at ¶ 622.

#### 2. Compliance

As the Funds operate in a heavily-regulated industry, the compliance measures needed to navigate the myriad laws and regulations governing mutual fund operations are substantial.

---

[6] The Subadvised Funds are a group of mutual funds to which BRIM provides portfolio management and certain related services, and are discussed in more detail *infra* part I.G.

DPFOF at ¶ 108. Defendants elicited testimony at trial from Perlowski and Charles Park, the Chief Compliance Officer of the Funds and BRA,[7] regarding BRA's compliance activities.

Park oversees BRA's Funds Compliance Group, consisting of nine individuals, that is responsible for supervising the Funds' compliance program. *Id.* at ¶ 110. The group is assisted by numerous additional personnel within BRA's Legal and Compliance group, which is made up of over 450 personnel.[8] *Id.* at ¶¶ 110-11. The Funds Compliance Group signs off on "essentially every [BlackRock] policy" in order to ensure compliance with the Funds' legal and regulatory obligations. Tr. 160:7-12 (Perlowski). BlackRock bears the costs of all personnel, systems and infrastructure required to administer the compliance program. DPFOF at ¶ 119.

Park credibly described BRA's management of the Funds' compliance program as an ongoing "life cycle" of activities, which consists broadly of five elements: (i) design; (ii) implementation; (iii) execution; (iv) mitigation; and (v) reporting. BRA is responsible for each stage, which must constantly adjust to changes in the Funds' legal and regulatory environments. *Id.* at ¶ 120.

In the design phase, the compliance team identifies the legal and regulatory standards that the Funds must meet and designs policies and procedures to facilitate compliance with those standards. *Id.* at ¶ 122. For example, the team instituted an "inter-fund lending" program for the Funds, which permitted BlackRock funds to lend to each other as a back-up to normal liquidity

---

[7] Mr. Park has twenty-five years of experience working on legal and compliance matters related to investment companies registered under the 1940 Act and their advisers. DPFOF ¶ 50. Mr. Park has fourteen years of experience as a chief compliance officer to mutual funds and advisers, including at multiple fund complexes prior to joining BlackRock. *Id.*

[8] The groups within BRA's broader Legal and Compliance Group include: Global Regulatory Engagement and Development; Global Corporate Compliance; Global Investment Strategies Group; Global Financial Crime Compliance; Global Risk and Controls; Americas Compliance; EMEA Compliance and APAC Compliance; Legal. DPFOF at ¶ 111.

sources like banks or lines of credit. *Id.* at ¶ 123. To institute this program, BRA obtained an exemptive order from the SEC permitting the transactions under specific circumstances, a process that spanned three-to-four years, approximately twelve meetings with the board, and required the assistance of BRA's legal and compliance personnel, outside counsel and the Funds' Board. *Id.* The design phase also includes constant evaluation and redesign of the compliance program in light of changing legal and regulatory obligations, which includes, for example, redesigning the Funds' compliance controls to comply with the SEC's new liquidity rules. *Id.* at ¶¶ 125-26.

The implementation phase involves identifying the personnel who will be assigned to execute the day-to-day activities required by the compliance program, and training those individuals. *Id.* at ¶ 128. For example, BRA is responsible for policies and procedures for the Funds to comply with regulations set out in the ICA, including the implementation of "information barriers" between groups responsible for selecting brokers and groups with knowledge of a broker's sales of fund shares. *Id.*

The execution phase involves the performance of the day-to-day compliance activities required by the Funds' compliance program. *Id.* at ¶ 129. Funds Compliance is responsible for ensuring that all of these day-to-day activities are being correctly performed on behalf of the Funds. *Id.* at ¶ 130.  To do so, certain personnel within Funds Compliance must, for instance, "review[ ] the Funds' brokerage and Fund share sales activity to ensure compliance with Rule 12b-1(h)." *Id.* at ¶ 131. When exceptions (i.e. violations) are uncovered, they are raised to the broader Funds Compliance group. *Id.*

The mitigation phase involves identifying potential exceptions within the compliance program, evaluating whether an exception has in fact occurred, and determining whether any

remedial action is required. *Id.* at ¶ 133. Funds Compliance is assisted by legal counsel, BRA legal personnel, as well as the personnel responsible for the underlying activities to understand the "root cause" and to evaluate "what the impacts are." *Id.* This includes evaluating transactions that appear to violate the Funds' investment guidelines and transactions that are executed without appropriate anti-money-laundering procedures to determine how to resolve any violations. *Id.* at ¶ 134.

In the reporting phase, BRA informs the Board regarding the state of the Funds' compliance program. *Id.* at ¶ 135. This includes informal meetings with the board as well as formal quarterly and annual reports. *Id.* at ¶¶ 136-37. The annual report, in particular, requires significant effort and manpower, as it provides the Board with an overview of the Funds' compliance program for the year, as well as the results of compliance testing throughout the year. *Id.* at ¶ 140. As part of the annual report, the Funds' CCO evaluates the adequacy of the Funds' compliance program as a whole and certifies to the Board that the program is reasonably designed to comply with federal securities laws, a process that involves year-round testing and evaluation. *Id.* at ¶ 141.

In sum, I find that BRA is responsible for administering a compliance program for the Funds covering virtually all of the Funds' extensive activities, specifically the design, execution and oversight in at least 43 areas of the Funds' business.[9] *Id.* at ¶ 143. In its role administering

---

[9] In all, Defendants' compliance responsibilities extend to the following areas of the Funds' activities: Affiliated Transactions, CFTC Compliance Brokerage, Tax Compliance, Prospectus and Regulatory Compliance, Proxy Voting, Insider Trading, Preparation of Registration Statements and Shareholder Reports, Preparation of Proxy Statements, Preparation of Form 24F-2; Blue Sky Laws; State Law Filings; NAV; Board Reporting; Dividends and Distributions; Distribution Payments; Market-Timing, Short-Term Trading and Late-Day Trading; Anti-Money Laundering; Compliance With Section 17(f); Press Releases and Media Communications; Safeguarding Information; Insurance, Corporate Organization and Governing Documents, Oversight of Governance Requirements, Transfer Agent Oversight, Underwriter Oversight,

the Funds' compliance program, BRA is also assisted by third-party service providers. *See infra* part I.E.2.

### 3. Board Administration

At trial, John Perlowski testified about the Funds' Board, which BlackRock considers to be its "most important client." Tr. 140:23-25 (Perlowski). As adviser, BRA has a duty, pursuant to § 15 of the ICA to provide information to the Board in connection with the Board's approval of the fees paid to BRA for its investment advisory services. PPFOF at ¶ 310. BRA is responsible for (i) coordinating and attending Board and committee meetings; (ii) preparing and presenting materials to the Board; and (iii) responding to Board requests for information or assistance. DPFOF at ¶ 98.

The Board has four quarterly meetings per year, each extending over two days, a fifth one-day meeting to consider specific information surrounding the consideration of renewing the Agreement, and additional in-person and telephonic meetings as needed. *Id.* at ¶ 97. BRA's senior personnel attend every Board meeting, including a team of approximately ten personnel consisting of Perlowski, Park, senior members of BlackRock's legal group, senior members of the Fund Administration group, as well as personnel from other groups, such as Product Management. *Id.* at ¶ 100. In preparation for these meetings, BRA must prepare all of the materials and information required by the Board to oversee the Funds, which must undergo a "comprehensive and iterative" internal review process involving personnel across the firm. *Id.* at ¶¶ 101, 103.

---

Administration Services Oversight, Custodian Oversight, Adviser Oversight, Independent Accountant Oversight, Audit Committee, Rule 12b-1(h), Securities Lending, Agreements With Intermediaries, As-Of Transactions, Demand Deposit Accounts, Rule 18f-3, Use Of Classification Data, Market Disruptions, Regulatory Inspections, Recordkeeping, Corporate Governance, Business Continuity and Disaster Recovery. DPFOF at ¶ 143.

4.   <u>Regulatory and Financial Filings</u>

BRA is responsible for the preparation of the Funds' regulatory and financial filings, including the Funds' (i) annual shareholder reports; (ii) semi-annual shareholder reports; (iii) quarterly schedule of portfolio holdings; (iv) annual report regarding Funds' proxy voting; (v) prospectus; and (vi) summary prospectus. *Id.* at ¶ 180. Preparing these documents requires coordination of numerous personnel and groups within BlackRock as well as third-party service providers and advisers, including the fund accountant, transfer agent, outside counsel, and outside auditors. *Id.* at ¶ 181. BRA manages input received from all of these parties, shepherds the documents through the drafting process, and "attest[s] to the accuracy" of the final document as-filed. *Id*; Tr. 348:10-16 (Perlowski).

BRA is particularly involved in ensuring that the Funds' prospectuses are prepared accurately and satisfy all regulatory requirements. *Id.* at ¶ 182. BRA has primary responsibility for drafting the Funds' prospectus and obtaining, reviewing and implementing edits from all of the necessary participants in the process. *Id.* The Regulatory Filings Services Group manages workflow and timelines for this process, which occurs at least annually, and coordinates with personnel across the firm responsible for participating in the drafting process, including personnel within the product management, business analytics, fund administration, tax, investment strategy, and portfolio compliance groups. *Id.* BRA also coordinates multiple review processes for BRA's in-house legal personnel and external legal counsel. *Id.* To better perform this role, BRA has designed a content management system as "a tool to track changes on the document" and ensure that iterations of the draft documents are provided to the various constituencies involved in the process. *Id*; Tr. 351:17-22 (Perlowski).

5.  <u>NAV Calculation</u>

Each day, the Funds must calculate the price of their shares, a process known as the NAV calculation. DPFOF at ¶ 88. NAVs must be calculated accurately by 8:30 pm each business day. *Id.* Although the Funds' accounting agent, State Street, performs calculations for the daily NAV, it does so under BRA's direction and pursuant to the policies set by BRA. *Id.* at ¶ 91; PPFOF at ¶ 377. Notwithstanding State Street's involvement, BRA must, on a daily basis, determine the number of shareholders in the Funds, the price/value of each of the Funds' hundreds of securities, and the Funds' liabilities. DPFOF at ¶ 88.

Further, BRA is responsible for designing and implementing the policies pursuant to which the Funds' NAVs are to be determined, such as (i) how to account for expenses; (ii) how to account for the disposition of securities; (iii) amortization and accretion policies; (iv) how to allocate income and expenses between share classes; and (v) how to remediate errors in the calculation of NAV. *Id.* at ¶ 90.

As Plaintiffs admit, BRA reviews reports prepared by State Street, such as those comparing changes in the Funds' NAVs relative to movements in benchmarks, reviewing exception reports and coordinating correction of any NAV errors. PPFOF at ¶ 385. In addition, BRA separately calculates the Funds' daily NAV using its own proprietary system (referred to as a "shadow NAV"). DPFOF at ¶ 92. BRA relies on its shadow NAV to verify the accuracy of State Street's calculations, and as a disaster recovery option if State Street is unable to calculate the Funds' NAVs. *Id.* I find convincing the trial testimony of Defendants' expert Dr. Sirri, based on his years of experience working in and around the mutual fund industry, describing the adviser's role in the NAV calculation process:

> What the adviser will do is step in the middle and coordinate with the custodian, the books and records of the fund, the administrator, the transfer agent, do the appropriate reconciliations, make sure the NAV is sound, and then typically, as

> an adviser, what you do on a daily basis is you have your own checks. You check what are known as NAV movements against boundaries. Did the NAV move up when the index for the fund moved down? The adviser does that. And if it did, you might have a problem.

Tr. at 1590:13-22 (Sirri). Although the service provider, e.g., State Street, may "assist the adviser in the computation of the NAV," "provide help with respect to valuation of certain names," "help perhaps in coordination with the subadvised funds's custodian," "they certainly can't and don't strike the NAV. The NAV is the ultimate responsibility of the adviser." *Id*. at 1590:2-7 (Sirri).

6. <u>Other Services</u>

BRA is responsible for a multitude of other services for the funds, including: 1) dividends and distributions: BRA is responsible for the "determination of the taxable income and taxable realized gains [the Funds] pay to shareholders," and the distribution of income to shareholders, Tr. 333:15-18 (Perlowski); DPFOF at ¶¶ 168-71; 2) tax services: BRA is responsible for managing the Funds' tax status and positions, which includes (i) tax compliance; (ii) tax strategy; and (iii) tax reporting, DPFOF at ¶¶ 172-77; 3) expense budgeting: BRA is responsible for managing the Funds' expenses and communicating expense accruals to the fund accountant, *id.* at ¶¶ 178-79; and 4) oversight of service providers. *Id.* at ¶¶ 147-64; *see infra* part I.E.

**D. Funds' Separate Agreements with BRA**

The IMAs provide that the Funds shall "reimburse [BRA] or its affiliates for all out of pocket expenses incurred in connection with the performance of" certain administrative services delineated in the IMAs and "for their costs in providing accounting services to the Funds." PPFOF at ¶ 111. To that end, the Funds have entered into two agreements with BRA in addition to the IMAs, pursuant to which BRA provides certain services as described in the agreements. DPFOF at ¶ 29. As Perlowski explained, these agreements provide for the payment of certain expenses incurred by BRA, including accounting, transfer agency, professional, and registration

fees. PPFOF at ¶ 112. The two agreements at issue here are the Shareholders Administrative Services Agreement (the "SASA") and an Accounting Support Services Agreement (the "ASSA").[10] *Id.*

First, under the ASSA, the Funds reimburse BRA for certain "discrete" "accounting-related" services, including (i) performing calculations necessary to allocate expenses between funds; (ii) overseeing policies relating to the fair valuation of securities, implementing certain disclosure controls and procedures; (iii) overseeing the Funds' auditors; and (iv) performing certain reporting functions such as providing information to industry groups. DPFOF at ¶ 30. Perlowski testified that the services offered pursuant to the ASSA are a "small piece of [BRA's] overall administration support" and are not duplicative of any functions provided by BRA under the IMAs or any functions provided by State Street under the Administration Agreement. Tr. 145:12-13 (Perlowski). The cost of the ASSA to the Funds is approximately 1/10th of a basis point relative to AUM.  DPFOF at ¶ 33. Under the ASSA, Global Allocation reimbursed BRA $2,754,549 between years 2013 and 2017, and Equity Dividend reimbursed BRA $1,380,499 over the same period. PPFOF at ¶¶ 118-19.

Second, under the SASA, the Funds reimburse BRA for costs incurred in providing a set of services specific to a Shareholder Service Center, or call center, for direct shareholders of the Funds. DPFOF at ¶ 34; PPFOF at ¶ 113. The call center consists of two locations where BRA receives client calls, responds to inquiries, and assists in opening new accounts. DPFOF at ¶ 34. As Perlowski testified, "[i]t's basically client support for our clients." Tr. 142:12-13 (Perlowski).

---

[10] In addition to these two agreements, the Funds reimburse BlackRock *pro rata* amounts of Mr. Park's compensation as a result of his reporting relationship to the Funds' Board. DPFOF at ¶ 119.

Under the SASA, Global Allocation reimbursed BRA $2,847,055 between years 2013 and 2017, and Equity Dividend reimbursed BRA $987,102 over the same period. PPFOF at ¶¶ 114-15.

**E.  The Funds' Agreements with Third-Party Service Providers**

In its role as investment adviser, BRA hires third-party service providers to execute components of its operations on behalf of the Funds. As such, BRA administers a vendor management program for the Funds consisting of four primary components: (i) procurement (i.e. selecting service providers for the Funds and negotiating contract terms and fees), DPFOF at ¶ 149; (ii) direction (i.e. providing guidance to the Funds' service providers regarding BRA's expectations and the regulatory and operating policies to be followed), *id.* at ¶ 154; (iii) monitoring (i.e. assessing the quality of services provided and enforcing controls over the providers' operations), *id.* at ¶ 157; and (iv) reporting (i.e. enabling the Board's oversight of service providers through quarterly and annual reporting). *Id.* at ¶ 165. As Perlowski explained, each of these service providers is hired, directed and overseen by BRA, which retains overall responsibility for the functions they perform. *Id.* at ¶ 28. There are three types of third-party service provider agreements at issue here: administrative services agreements, transfer agency and shareholder services agreements, and custody agreements.

1.  <u>Administrative Services Agreement</u>

The Funds have an administrative service agreement with State Street Bank and Trust Company ("State Street") dated December 29, 2000, as amended. PPFOF at ¶ 124. Pursuant to that agreement, the Funds pay a fee to State Street in exchange for serving as accounting agent to the Funds as well as performing specific processing functions, such as performing calculations relating to the Funds' NAV at BRA's direction.[11] DDFOF at ¶ 24; PPFOF at ¶ 125. Under the

---

[11] Financial intermediaries and/or sub-transfer agents also perform transfer agency services for the Funds for a fee. PPFOF at ¶ 128.

Agreement, Global Allocation paid State Street $24,772,708 between years 2013 and 2017, and Equity Dividend paid State Street $11,885,902 over the same period. PPFOF at ¶¶ 130-31.

   As stated earlier, although State Street performs daily NAV calculations, BRA separately calculates its own proprietary "shadow NAV," which it relies on to verify the accuracy of State Street's calculations, and as a disaster recovery option if State Street is unable to calculate the Funds NAV. *See supra* Part I.C.5. Moreover, BRA designs, executes, and oversees policies and procedures governing the services that State Street performs under the Agreement. *Id.*

### 2. Transfer Agency and Shareholder Agreement

   The Funds entered into a Transfer Agency and Shareholders Services Agreement (the "BNY Agreement") with BNY Mellon Investment Servicing (US) Inc. ("BNY"). PPFOF at ¶ 133. Pursuant to that agreement, the Funds pay a fee to BNY in exchange for certain shareholder recordkeeping and transaction processing, as directed by BRA, as well as certain compliance functions. DPFOF at ¶ 25. Under the agreement, Global Allocation paid BNY $247,140,418 between years 2013 and 2017, and Equity Dividend paid State Street $177,594,846 over the same period. PPFOF at ¶¶ 138-39.

   BRA is responsible for managing and keeping accurate records of all of shareholder information, and, to do so, provides "direction and oversight" over BNY, which processes shareholder transactions and maintains shareholder records. DPFOF at ¶¶ 69-70. With respect to compliance, as relevant here, under the agreement, BNY assists the Funds in executing certain activities required by the Funds' compliance program under the direction and supervision of BRA's Funds Compliance group. *Id.* at ¶ 114. For instance, BNY is involved in "helping [BlackRock] pay its Blue Sky filing fees," Tr. 759:1-2 (Park), "participating in the market timing monitoring process," Tr. 60:4-5 (Perlowski), assisting in the Anti-Money-Laundering Program, PPFOF at ¶ 402, and has some involvement in tracking and monitoring as-of transactions. *Id.* at ¶

403. As Park explained, these are "front line" functions, which are generally "repetitive" and are assigned to BNY as transfer agent because of their expertise, as "they do it…for lots of different funds companies." Tr. 931:19, 932:19-22 (Park); *see also* Tr. 931:15-17 (Park explaining that controls are assigned to providers where they are "closest to the activity and report [to BRA] so that [it] could do the monitoring as the adviser").

Although, pursuant to the BNY agreement, BRA allocates these duties to BNY, BRA is ultimately responsible for designing policies and procedures for processing shareholder transactions and keeping shareholder records, including with respect to the Funds' share class eligibility, information sharing, and compliance.[12] DPFOF at ¶ 72. Further, in addition to BRA's own robust compliance program, as discussed *supra*, BRA also plays a significant role in assisting BNY in certain other shareholder servicing functions, including having responsibility for determining whether excessive trading (such as market-timing) is occurring in the Funds' shares, and investigating brokers or clients regarding the nature or purpose of suspect trading. *Id* at ¶ 73. Whereas BNY is responsible for executing specific monitoring functions for market-timing, BRA retains ultimate responsibility—and accountability—for investigating and remediating any suspect activity. *Id.* at ¶ 74.[13]

---

[12] In addition to overseeing BNY's activities as transfer agent, BRA oversees services of certain "sub-transfer-agents" who provide services in place of services provided by BNY. DPFOF at ¶ 76. BRA oversees the Funds' intermediaries and any shareholder services or recordkeeping services those entities provide, including by conducting initial and ongoing due diligence on intermediaries, including by performing on-site visits and obtaining information on the intermediary's financial stability, including reviewing their financial statements, and reputation. DPFOF at ¶ 77. BRA negotiates contracts and fees with intermediaries on behalf of the Funds, and regularly reviews information on the market for sub-transfer-agent fees. *Id.*
[13] BlackRock Investments, Inc., a BlackRock affiliate, also plays a role in various compliance functions, including in "maintenance of state registration," "monitor[ing] market timing by financial intermediaries," and "preparing and reviewing the Funds' marketing and sale materials." PPFOF at ¶¶ 404-408.

### 3. Custody Agreements

Equity Dividend entered into a custody agreement (the "State Street Custodian Agreement") with State Street, PPFOF at ¶140, whereby State Street maintains physical and electronic custody of the Fund's assets and related recordkeeping and transaction processing, as directed by BRA.[14] DPFOF ¶¶ 81-82. Global Allocation entered into a custody agreement with Brown Brothers Harriman & Co. ("BBH") (the "BBH Custodian Agreement") for similar services. PPFOF at ¶¶ 144-45. Under the agreements, Global Allocation paid BBH $26,918,145 between years 2013 and 2017, and Equity Dividend paid State Street $5,967,034 over the same period. *Id.* at ¶¶ 142, 149.

Furthermore, BRA is responsible for safeguarding the stocks, bonds, derivatives, and private investments that the Funds manage. DPFOF at ¶ 81. Under both custody agreements, State Street and BBH assist in this role by providing certain custodial services, tax services, and proxy services. PPFOF at ¶¶ 145-47. Nonetheless, BRA determines the policies pursuant to which the custodian will hold the Funds' assets, including policies with respect to data sharing with BRA and other service providers, the use of foreign sub-custodians, and settlement of transactions. DPFOF at ¶ 83. BRA is also responsible for managing day-to-day issues arising with respect to the custody of the Funds' assets. *Id.* at ¶ 84. For example, if a broker fails to deliver a security to the Funds' custodian or sub-custodian on the settlement date, BRA is responsible for "work[ing] with the custodian to contact the broker to understand what caused the settlement failure," including determining "the impact from a fund accounting perspective." Tr. 309:2-19 (Perlowski).

---

[14] BRA is also responsible for overseeing the Funds' sub-custodians, which are retained to safeguard the Funds' securities held in foreign jurisdictions where the Funds' primary custodian does not have a presence. DPFOF at ¶ 82.

### F. Risks that BRA Assumes in Managing Day-to-Day Operations of Funds

At trial, Park testified regarding the risks that BRA faces in serving as the primary adviser to the Funds. In this role, BRA assumes numerous financial, reputational, and regulatory risks. DPFOF at ¶ 186. Park testified that the risks to the Funds arise from virtually "every activity of the [F]unds." Tr. 923:22-23 (Park). This includes "[e]verything that the funds do, every aspect of their [] operations, from safekeeping of assets, interface of [] shareholders, the supervision of [the Funds'] service providers, every activity that's outlined in [the compliance manual] and the compliance program . . . essentially, the adviser [is] going to be held accountable for exceptions in that space." *Id.* at 924:2-8 (Park).

As to financial risk specifically, Park and Perlowski described changes in the market or regulatory environment that may affect its return on investment. DPFOF at ¶¶ 187-88. In addition, BRA likewise bears financial risk and responsibility stemming from the operations of third-party service providers providing services to the Funds, including, as Perlowksi explained, "if we authorized an incorrect invoice, if we failed to make an accurate financial statement filing, if we made a distribution in error." Tr. 277:10-13 (Perlowski). BRA is ultimately responsible for "making the funds whole" regardless of whether a service provider is at fault and agrees to contribute. Tr. 273:8-275:7 (Perlowski).

BRA also bears reputational risk for mistakes associated with the Funds, regardless of who is at fault. For example, as Perlowski noted at trial, a single mistake in the Funds' NAV calculation "could impact thousands of our clients, [as] the active reprocessing transaction [on] an NAV can take months." *Id.* at 272:21-23. This would have "an incredible impact on our relationship with our clients, and the reputational impact can be pretty significant." *Id.* at 272:23-

25. Moreover, BRA assumes reputational risks even for the mistakes by the Funds' third-party service providers. DPFOF at ¶ 190.

Finally, BRA bears risks for the Funds' compliance with laws and regulations, even within areas of operations assigned to third-party service providers. *Id.* at ¶ 191. BRA's risk is not limited by contractual provisions. *Id.* at ¶ 192. The Funds IMAs include an indemnification provision, and a provision purporting to limit BRA's liability except for willful misfeasance, bad faith or gross negligence. *Id.* However, as Perlowski explained, although these provisions provide BRA with the ability to limit some of its potential liability, they have not significantly limited BRA's financial, reputational or regulatory risks in practice. *Id.* Indeed, at trial the Court pressed Mr. Perlowski on the practical ramifications of these contractual provisions:

> THE COURT: Have there been situations where the request has been made for indemnification?
> PERLOWSKI: No.
> Q. Why not?
> A. We just don't—we think, given our overall responsibility to the fund, that we're just not going to try to take—if there even was an argument to be made under this clause, we just have not tried to go to the Board to invoke it.
> THE COURT: My question was more, was there a situation where it could have been invoked even if you made a decision not to?
> PERLOWSKI: Yes.

Tr. 357:13-25 (Perlowski). Moreover, as to the provision purporting to limit BRA's liability except for willful misfeasance, bad faith, or gross negligence, Perlowski testified that BRA's liability for errors is not limited to mistakes resulting from BRA's gross negligence. Rather, Perlowski testified that "there were moments where we felt as if we might have been able to say that we did not act in violation of our standard of care but we opted not to go to the Board for reimbursement" because of BRA's "overall responsibility to the fund[s]." *Id.* at 357:17-

21, 360:1-7 (Perlowski).

### G. Subadvised Funds

Plaintiffs' case hinges on comparing the fees charged by BRA and those charged by BRIM. BRIM provides portfolio management and certain related services ("subadvisory services") to other mutual funds managed by third-party investment advisers. DPFOF at ¶ 38. These other mutual funds include: (1) BlackRock Global Allocation Fund (the "AZL GA Fund"); (2) the Transamerica Global Allocation Fund (the "Transamerica GA Fund"); (3) the JNL/BlackRock Global Allocation Fund (the "JNL GA Fund"); and (4) the MassMutual Select Global Allocation Fund (the "MML GA Fund") (collectively, the "Subadvised GA Funds"); (5) VALIC Dividend Value Fund (the "VALIC ED Fund"); (6) the LVIP BlackRock EquityDividend RPMFund (the "LVIP ED Fund"); and (7) MassMutual Income and Growth Fund (the "MML ED Fund") (collectively, the "Subadvised ED Funds," and together with the Subadvised GA Funds, the "Subadvised Funds"). PPFOF at ¶ 160.

The Subadvised Funds are open-end mutual funds organized as investment companies and registered with the SEC under the ICA. *Id.* at ¶ 161. Like the Funds, each of the Subadvised Funds issues shares to investors who invest money in the fund, has its own board of directors and trustees, and each one has its own investment advisor.[15] *Id* at ¶ 163-66. As Paul Lucas[16] testified

---

[15] Allianz Investment Management, LLC is the investment adviser for the AZL GA Fund; Transamerica Asset Management, Inc. is the investment adviser for the Transamerica GA Fund; Jackson National Asset Management, LLC is the investment adviser for the JNL GA Fund; MML Investment Advisors, LLC is the investment adviser for the MML GA Fund and the MML ED Fund; The Variable Annuity Life Insurance Company is the investment adviser for the V ALIC ED Fund; and Lincoln Investment Advisors Corporation is the investment adviser for the LVIP ED Fund. PPFOF at ¶ 178.

[16] Mr. Lucas is a former BlackRock employee who served as a relationship manager for institutional accounts within the Financial Institutions Group ("FIG"), including the Insurance Advisers. DPFOF at ¶ 53. Mr. Lucas has more than 12 years of experience with mutual funds and institutional accounts, and also has experience with insurance companies. *Id.* While at

at trial, third-party investment advisers unaffiliated with BlackRock (the "Insurance Advisers") manage the Subadvised Funds and are responsible for the day-to-day operations of those funds, and they have entered into agreements with BRIM ("the Subadvisory Agreements") in exchange for a fee (the "Subadvisory Fee") to manage the investment portfolios of the Subadvised Funds. Plaintiffs contend that, unlike fees that the Funds pay BRA, the subadvisory fees are negotiated at arms length. PPFOF at ¶¶ 167-77.

The Subadvised Funds are not available to investors directly (i.e., as standalone products sold in the retail market), but rather can only be selected as one of many allocation options within variable annuity insurance products sold by insurance companies. Regarding this difference Defendants' expert Dr. Sirri testified at trial:

> A variable annuity fund is an insurance product. It is sold as an insurance product. [A] mutual fund, that is, a portion of it, is not owned by shareholders the way you and I think of shareholders. There is in fact only one shareholder of a mutual fund in a variable annuity setting. It is the insurer itself. The fund is held in a separate account of the insurer. The insurer owns the shares of the mutual fund and the customers of the insurance company who are contract holders have an interest. It's a combination of an investment in one or more of these pools of money that could be mutual funds and the insurance component of that variable annuity. And so they are different products. You can't buy just the mutual fund that is interior to the variable annuity; and, for my purposes, you can't compare those because their fees are different, the product is different, and it's sold through different channels.

Tr. 1574:23-1575:16 (Sirri).

During the Relevant Period, Subadvisory Fees that the Insurance Advisers received for performing advisory services for the Subadvised Funds were as follows:

---

BlackRock, his primary clients were insurance companies, which sold variable annuity products within which the Subadvised Insurance Funds were investment options. *Id.*

|  | AZL GA Fund | Transamerica GA Fund | JNL GA Fund | MML GA Fund |
|---|---|---|---|---|
| 2013 | .75% | .68%[10] | .72% | .80% |
| 2014 | .75% | .68%[11] | .72% | .78% |
| 2015 | .75% | .68% | .71% | .78% |

|  | VALIC ED Fund | LVIP ED Fund[12] | MML ED Fund |
|---|---|---|---|
| 2013 | .73% | .67% | .65% |
| 2014 | .72% | .65% | .65% |
| 2015 | .72% | .64% | .65% |

Defendant's Contested Facts ("DCF") at ¶ 93 (ECF No. 159 at 94).

During the Relevant Period, BRIM's Subadvisory Fee was calculated pursuant to the following fee schedules:

- <u>JNL GA Fund and the Allianz GA Fund.</u>  .42% for the first $500 million of AUM; .40% for AUM between $500 million and $1 billion; and .375% for AUM over $1.5 billion. PPFOF at ¶¶ 180, 182.

- <u>Transamerica GA Fund.</u>  Before July 1, 2016, BRIM received .44% for the first $100 million of AUM and .32% for AUM over $100 million.  *Id*. at ¶ 186. After July 1, 2016, BRIM received .42% of AUM up to $100 million; .32% of AUM from $100 million to $3 billion; and .31% of AUM over $3 billion.  *Id*. at ¶ 187.

- <u>MML GA Fund.</u>  .60% of AUM up to $500 million and .40% of AUM over $500 million.  *Id*. at ¶ 184.

- <u>LVIP ED Fund.</u>  Before October 2015, BRIM received .35% AUM up to $250 million; .325% of AUM from $250 million to $500 million; .30% of AUM from $500 million to $1 billion; and .275% of AUM over $1 billion.  *Id*. at ¶ 189.  After October 2015, BRIM received .325% of AUM up to $250 million; .305% of AUM from $250 million to $500 million; .275% of AUM from $500 million to $1 billion; and .255% of AUM over $1 billion.  *Id*. at ¶ 190.

- <u>MML ED Fund.</u>  Before December 1, 2015, BRIM received .375% of AUM up to $250 million; .35% of AUM from $250 million to $500 million; .325% of AUM from $500 million to $1 billion; and .30% of AUM over $1 billion.  *Id*. at ¶ 192. After December 1 2015, BRIM received .325% of AUM up to $250 million; .300% of AUM from $250 million to $500 million; .275% of AUM from $500 million to $1 billion; and .250% of AUM over $1 billion.  *Id*. at ¶ 193.

- <u>VALIC ED Fund</u>.  Before August 8, 2016, BRIM received .35% AUM up to $250 million; .325% AUM from $250 million to $500 million; .30% AUM from $500 million to $1 billion; and .275% AUM over $1 billion.  *Id*. at ¶ 195. After August 8, 2016, BRIM received .325% of AUM up to $250 million; .300% of AUM from $250 million to $500 million; .275% of AUM from $500 million to $1 billion; and .250% of AUM over $1 billion.  *Id*. at ¶ 196.

The difference in the fees that BlackRock received from Global Allocation and Subadvised GA Funds is as follows:

| *Difference between Actual Fees & Fees Pursuant to Subadvised Global Allocation Fund Fee Schedules* | | | | | | |
|---|---|---|---|---|---|---|
| AZL BlackRock Global Allocation | $159.6 | $167.9 | $154.5 | $134.4 | $30.5 | $646.9 | $626.9 |
| | 28.5 bps | 28.7 bps | 29.0 bps | 29.8 bps | 29.9 bps | 29.0 bps | 29.1 bps |
| JNL/BlackRock Global Allocation | $159.6 | $167.9 | $154.5 | $134.4 | $30.5 | $646.9 | $626.9 |
| | 28.5 bps | 28.7 bps | 29.0 bps | 29.8 bps | 29.9 bps | 29.0 bps | 29.1 bps |
| MassMutual Select BlackRock Global Allocation | $145.1 | $152.7 | $140.7 | $122.6 | $27.9 | $588.9 | $570.9 |
| | 25.9 bps | 26.1 bps | 26.4 bps | 27.2 bps | 27.3 bps | 26.4 bps | 26.5 bps |
| Transamerica BlackRock Global Allocation VP | $190.7 | $200.4 | $184.2 | $161.5 | $37.0 | $773.9 | $749.9 |
| | 34.1 bps | 34.2 bps | 34.6 bps | 35.9 bps | 36.3 bps | 34.7 bps | 34.9 bps |
| *Average* | *$163.8* | *$172.2* | *$158.5* | *$138.2* | *$31.5* | *$664.2* | *$643.6* |
| | *29.3 bps* | *29.4 bps* | *29.7 bps* | *30.7 bps* | *30.9 bps* | *29.8 bps* | *29.9 bps* |

PPFOF at ¶ 200.

The difference in the fees that BlackRock received from Equity Dividend and Subadvised ED Funds is as follows:

| *Difference between Actual Fees & Fees Pursuant to Subadvised Equity Dividend Fund Fee Schedules* | | | | | | |
|---|---|---|---|---|---|---|
| LVIP BlackRock Dividend Value Managed Volatility | $75.4 | $78.7 | $65.4 | $60.0 | $15.7 | $295.2 | $287.0 |
| | 26.2 bps | 26.2 bps | 25.8 bps | 28.4 bps | 29.2 bps | 26.7 bps | 26.9 bps |
| MML Income & Growth | $68.2 | $71.2 | $58.9 | $61.0 | $16.0 | $275.2 | $267.9 |
| | 23.7 bps | 23.7 bps | 23.3 bps | 28.9 bps | 29.6 bps | 24.9 bps | 25.1 bps |
| VALIC Company I Dividend Value | $75.4 | $78.7 | $64.2 | $57.8 | $16.0 | $292.1 | $283.9 |
| | 26.2 bps | 26.2 bps | 25.4 bps | 27.4 bps | 29.6 bps | 26.4 bps | 26.6 bps |
| *Average* | *$73.0* | *$76.2* | *$62.8* | *$59.6* | *$15.9* | *$287.5* | *$279.6* |
| | 25.4 bps | 25.4 bps | 24.8 bps | 28.2 bps | 29.5 bps | 26.0 bps | 26.2 bps |

PPFOF at ¶ 203.

## H. Comparison Between Services That BRA and BRIM Provide to Funds and Subadvised Funds, Respectively

As noted, the crux of Plaintiffs' case is that BRIM performs substantially the same services for the Subadvised Funds that BRA performs for the Funds, yet charges substantially lower advisory fees. The Court heard testimony from numerous fact witnesses regarding the comparability of services, as well from Plaintiffs' expert, Dr. Ayres, and Defendants' expert, Dr. Sirri.

### 1. Fact Witness Testimony

At trial, Rachel Ricci,[17] a former BlackRock employee who served as head of the client service group within FIG, the group primarily responsible for serving subadvised accounts such as the Subadvised Funds, testified regarding the services that BRIM provides to the Subadvised Funds. DPFOF at ¶ 51. Paul Lucas,[18] a former relationship manager for institutional accounts within FIG, including the Subadvised Funds, also testified regarding the same. *Id.* at ¶ 53.

The parties agree that BRIM performs substantially the same investment advisory (i.e., portfolio management) services for the Subadvised Funds that BRA performs for the Funds, including using substantially the same investment strategies, research and analysis, and systems, technology, and other resources in providing investment advisory services. PPFOF ¶ 251. As portfolio manager, BRIM provides research, security selection and trading services to the Subadvised Insurance Funds in much the same way that BRA provides these services to the Funds. DPFOF at ¶ 199.

Outside of portfolio management services, however, the parties significantly dispute the scope and extent of the subadvisory services that BRIM renders to the Subadvised Funds.

---

[17] Ms. Ricci has more than twenty years of experience with mutual funds and institutional accounts. DPFOF at ¶ 51.
[18] Mr. Lucas has more than 12 years of experience with mutual funds and institutional accounts, and also has experience with insurance companies. DPFOF at ¶ 53.

Indeed, as Park testified at trial, BRIM is "simply managing the portfolio, we don't have the same breadth of responsibilities." Tr. 925:11-14 (Park).

With respect to compliance, BRIM provides two functions for the Subadvised Funds: pursuant to Rule 206(4)-(7) of the ICA, as Park testified, BRIM annually reviews the adequacy of the Subadvised Funds' compliance policies and procedures. PPFOF at ¶¶ 288. Second, BRIM performs "portfolio compliance" work for the Subadvised Funds, including providing periodic reports and certifications, as requested, to the Insurance Advisers relating to BRIM's portfolio management services (including portfolio compliance) or policies and procedures required of BlackRock to serve as a registered investment adviser. DPFOF at ¶ 205. This includes: providing information regarding portfolio compliance matters, including the use of derivatives, data regarding the liquidity of the portfolio, and information regarding compliance with investment guidelines and other SEC rules and requirements; providing portfolio and trading information and market commentary. *Id.* Park testified that these activities amount to the Insurance Advisers, "decid[ing] what [portfolio restrictions] to implement" and "instruct[ing]" BRIM how to execute the restriction. Tr. 792:10-12 (Park).

With respect to board reporting, BRIM also provides two functions to the Subadvised Funds' boards. First, upon request from the Subadvised Funds, BRIM fills out "questionnaires," pursuant to Section 15(c) of the ICA, that provide information about BRIM's organization, personnel, and portfolio management in connection with the Subadvised Funds' 15(c) process (which the Insurance Advisers are responsible for). PPFOF at ¶¶ 310-18. Second, BRIM personnel will occasionally join meetings or telephone calls with the Insurance Advisers and the Subadvised Funds' boards to discuss BRIM's portfolio strategy, performance, and market outlook. *Id.* at ¶¶ 321-22. For these meetings, BRIM will prepare certain material with the

Subadvised Funds portfolio management. DPFOF at ¶ 204. According to Ricci's uncontroverted testimony, these materials rely heavily on "stock" information that can be repeated across clients and do not require much additional work to compile. *Id*.; Tr. 555:18-556:8 (Ricci). BRIM may also provide the boards with information on internal policies and procedures, such as its code of ethics and proxy voting policies. *Id.* at ¶ 205.

BRIM is also involved with providing the Subadvised Funds with regulatory reports, and portfolio and performance reviews. PPFOF at ¶ 331. In that regard, certain BlackRock personnel in product strategy, legal or compliance may review certain sections that the Subadvised Insurance Advisers provide in order to ensure that BRIM's portfolio management is accurately described and BlackRock's interests are fairly represented. DPFOF at ¶ 204. Nonetheless, Ricci credibly testified that the Insurance Advisers are ultimately responsible for the Subadvised Funds' regulatory filings and the process for preparing them. *Id.* at ¶ 205.

BRIM has other responsibilities in the administration of the Subadvised Funds, including: BlackRock's FIG Sales Team is involved in marketing and distribution of the Subadvised Funds ("marketing services"), PPFOF at ¶ 365, though the Insurance Advisors do employ their own marketing personnel, DPFOF at ¶ 209; "help[ing] train the [insurance company] partners' wholesaling teams on [BlackRock's] portfolio management capability and other value add content," Tr. 1290:16-18 (Lucas); attending national sales meetings for the Subadvised Funds, PPFOF at ¶ 366; assisting with proxy voting, *id.* at ¶ 353; maintaining portfolio management records for the Subadvised Funds such as trading blotter, *id.* ¶ 344; and providing certain pricing information, such as fair value information, to the Subadvised Funds. *Id.* at ¶ 341.

Although BRIM is accountable to the Insurance Advisers and could potentially be held liable for its conduct, and BlackRock faces a degree of reputational risk because its name and

brand are associated with the Subadvised Funds, Park testified credibly that that there are extensive differences between the potential risks facing BRA and BRIM:

> THE WITNESS: So [BRIM is] the portfolio manager, and, as a consequence of simply managing the portfolio, we don't have the same breadth of responsibilities. We are not going to be held accountable for our class structure, for the existence of the funds, for the way that we onboard our securities, the way that we supervise onboarding and offboarding of fund shareholder purchase and redemptions. We are not going to be held responsible for that because that is not our responsibility.
> THE COURT: Whose responsibility is it for the subadvised funds?
> THE WITNESS: The insurance companies.

Tr: 925:11-23.

In sum, I find, as Ricci explained at trial, BRIM generally, and FIG specifically, have limited support responsibilities to the Insurance Advisers, who have the primary responsibility for administering the Subadvised Funds' operations. FIG personnel respond to portfolio management services, one-off client requests from the Insurance Advisers related to portfolio management, provide periodic reports and certifications, as requested, to the Insurance Advisers, and participate in one-time projects, as requested by the Insurance Advisers, such as onboarding a new institutional account or assisting an Insurance Company Adviser in establishing service with a new service provider. DPFOF at ¶¶ 199-206.

Furthermore, BRIM, as subadviser, does not perform the following services that BRA provides for the Funds: (i) overseeing NAV calculations; (ii) administering a full-service compliance program; (iii) providing legal services; (iv) providing board administration; (v) providing extensive regulatory or financial reporting; (vi) managing tax issues; or (vii) overseeing or monitoring the Subadvised Insurance Funds' custodian, transfer agent, distribution agent, or administrator. *Id.* at ¶ 207. These services, among others, are all "necessary to bring a

fund to market," and the Insurance Advisers, not BRIM, are responsible for providing them to the Subadvised Insurance Funds. Tr. 1337:23-25 (Lucas).

2.  Expert Testimony

To rebut these fact witnesses' testimony, Plaintiffs proffered their expert, Dr. Ian Ayres,[19] to offer both a quantitative and qualitative comparative price analysis between the advisory services provided to the Funds by BRA and the subadvisory services provided to the Subadvised Funds by BRIM.[20] Dr. Ayres' analysis was premised on two propositions: (i) that he should view BRA's Advisory Fees against the "fair market value" of such services; and (ii) that the only comparable transactions for establishing the "fair market value" of such services—his benchmarks—were the Subadvisory Fees. DPFOF at ¶ 238. Dr. Ayres concluded that because the services BRA and BRIM provide to the Funds and Subadvised Funds, respectively, are comparable, and BRIM's Subadvisory Fees are negotiated at arm's length, the Subadvisory Fees should establish the arm's-length bargaining range for the Funds' Advisory Fees. *Id.* at ¶ 237. Dr. Ayres defined an arm's-length transaction as "one where a buyer and a seller come together on terms of relative equality, equal bargaining power; and . . . each party has the option of walking away if they don't come to a term." Tr. 963:2-7 (Ayres).

a.  *Quantitative Analysis*

In his quantitative analysis, Dr. Ayres conducted quantitative tests both to assess the comparability of the services provided to the Funds and Subadvised Funds, and to determine the

---

[19] Defendants challenge the admissibility of Dr. Ayres' testimony on *Daubert* grounds, which will be discussed *infra* part IV.A.

[20] Plaintiffs seek to have certain charts and graphs that Dr. Ayres prepared to explain his opinion admitted under Fed. R. Evid. 1006. The Court initially recognized them as demonstratives. Tr. at 1232:18-19 (Ayres). When Plaintiffs' counsel sought to have Dr. Ayres' calculations included in the record—by testifying to them—the Court noted: "it's a bench trial. I'm fine with it. If you want to adopt these as his opinions, I'll adopt them on the record." *Id.*

reasonableness of the fees BlackRock charged the Funds compared to the Subadvised Funds.[21] PPFOF at ¶ 222.

To conduct his quantitative cost analysis, Dr. Ayres divided BlackRock's estimated costs to service each of the Funds and Subadvised Funds by their AUM, using the same cost-per-dollar-of-AUM methodology to analyze both Global Allocation and Equity Dividend. DPFOF at ¶ 251. Dr. Ayres' analysis determined that, as a percentage of AUM, BlackRock's reported costs for the Subadvised Funds for the period between years 2012 and 2014 were, in all cases, comparable to, if not greater than, BlackRock's reported costs for providing services to the Funds, excluding distribution-related expenses. PPFOF at ¶ 474. For example, in 2014, BRIM's costs of providing services for the Subadvised GA Funds ranged from 0.201% to 0.553% of AUM, in all cases higher than BlackRock's reported costs (excluding distribution expenses) for Global Allocation of 0.176% of AUM. *Id.* at ¶ 475. In 2014, BlackRock's costs of providing services for the Subadvised ED Funds ranged from 12.6 basis points ("bps") to 18.8 bps per dollar of AUM, which were equal to or higher than BlackRock's reported costs (excluding distribution expenses) for Equity Dividend of 0.126% of AUM. *Id.* at ¶ 481. Even including distribution related expenses, the cost of providing services was still generally comparable between the Funds and Subadvised Funds. *Id.* at ¶¶ 476, 482.

At trial, Defendants attacked Dr. Ayres' methodology, presenting witnesses who testified that the numbers on which Dr. Ayres relied could not reliably be used to compare costs between

---

[21] In addition to the quantitative cost analysis discussed herein, Dr. Ayres also performed two quantitative analyses to test if the portfolio management services BlackRock provides to the Funds and Subadvised Funds are substantially similar: (1) he tracked returns of both the Funds and Subadvised Funds and (2) he performed Fama-French regression analyses. PPFOF at ¶ 274. According to Dr. Ayres, these tests revealed a "strong indicia [that] the subadvised funds are similarly situated with regard to the portfolio management service... [b]ecause they are experiencing similar returns." *Id.* at ¶ 277.

the Funds and Subadvised Funds. Dr. Ayres derived the operating expenses he used as the numerator in his costs per dollar of AUM metric from BlackRock's internal cost allocation model. DPFOF at ¶ 253. As Defendants' fact witness Irene Ashkenazy[22] testified, this cost allocation model is used as part of the annual profitability reports that BlackRock provides to the Board for each its 1940 Act mutual funds. *Id.* at ¶ 211. The cost allocation model is an *estimate* of these funds' profitability, which it calculates by approximating the portion of the expenses attributable to each one of BlackRock's tens of thousands of financial products and accounts with the goal of identifying the estimated costs for its 1940 Act fund. *Id.* at ¶ 212. The mechanics of the cost allocation model are complex, but, in a nutshell, the model divides BlackRock's total expenses—grouped into more than 600 "cost centers" aligning to various business functions— across nearly 20,000 investment products. *Id.* at ¶ 218. Though a minority of costs are directly attributable to a single investment product (i.e., a particular mutual fund), nearly all of BlackRock's expenses must be allocated in some way. *Id.* at ¶ 219. That is, even where certain costs or cost centers do not affect all of BlackRock's tens of thousands of products, they still must be allocated across several products. *Id.*

As Askhenazy convincingly explained, facts and circumstances outside of a particular fund can impact the costs allocated to that fund under BlackRock's cost allocation methodology. *Id.* at ¶ 220. For example, if the proportion of the Funds' AUM to BlackRock's total AUM decreased—because, as occurred here, AUM in other asset classes increased—the model would allocate less cost to Global Allocation and Equity Dividend. *Id.*  In this circumstance, the model's output would change not because those Funds became less costly to service, but merely

---

[22] Ms. Ashkenazy is a BlackRock employee in the finance department. DPFOF at ¶ 52. Ms. Ashkenazy has more than twenty years of experience in financial planning and analysis, as well as developing and analyzing cost allocation methodologies for financial firms. *Id.*

because the costs would be spread out across more products according to their AUM and revenue. *Id.*; Tr. 1369:17-25 ("So while there has been an incredible amount of investment in that platform over that point in time to be able to handle all of that diversified business, you are now part of a larger pie. So the allocation that would go to those funds[,] their proportion of total assets of total revenue[,] would be lower. Q. So the pie might grow but you might get a smaller slice? A. Yes.")

Indeed, at trial, Defendants' expert, Dr. Sirri, opined that Dr. Ayres's cost analysis is not an appropriate method by which to compare the services rendered by BRA and BRIM to the Funds and Subadvised Funds, respectively. DPFOF at ¶ 285. In reviewing Dr. Ayres' work, Dr. Sirri opined that, regardless of the comparability of such costs, he "would not use cost data to assess comparability of services," because, among other things, "just'cause two things cost the same doesn't mean they are the same."[23] Tr. 1520:5-6, 15-16 (Sirri).

According to Dr. Sirri, Dr. Ayres's cost analysis was "misleading and flawed" because it improperly utilized allocated cost data for the Funds and Subadvised Insurance Funds in a mathematical exercise that resulted in illogical conclusions. DPFOF at ¶ 286. Adding to Ms. Ashkenazy's explanation, Dr. Sirri reiterated why allocated costs, as a general matter, cannot be used to assess what services are provided to the funds. To do so, he created a hypothetical in which a single fund was allocated $100,000, but once a second fund was added, depending on the cost allocation methodology used, the first hypothetical fund received $90,000 in allocated

---

[23] Dr. Sirri also noted that Dr. Ayres reviewed evidence showing that, among other things, BRIM discounted its subadvisory fees based upon BlackRock's overall relationship with its clients, and also reviewed a document that stated that "Subadvisory fees are typically lower than stand-alone advisory fees paid by proprietary funds as they take into account the lower risks associated with subadvising third-party mandates and the limited nature of services being provided to the third-party fund families." DPFOF at ¶ 241.

costs, $50,000, or $70,000, even though nothing changed in the services provided to the first fund as its allocated costs changed. *Id.* at ¶ 287.

    b. *Qualitative Analysis*

    To conduct his qualitative analysis, Dr. Ayres reviewed parts of the record and concluded that the services provided by BRA to the Funds were substantially similar to the subadvisory services provided by BRIM to the Subadvised Funds. *Id* at ¶ 243. Specifically, Dr. Ayres looked at the prospectuses and subadvised agreements to determine if the Subadvised Funds and the Funds were similarly situated as to services such as portfolio management. PPFOF at ¶ 270. Dr. Ayres concluded that the Subadvised Funds were appropriate comparables. He concluded that "the description of the portfolio management objectives and strategies in the prospectuses," and "the description of those services in BlackRock's response to RFPs [submitted to the sponsors of the Subadvised Funds]" showed that the portfolio services were substantially the same. Tr. 978:3-8 (Ayres). As to "other services" (i.e. non-portfolio management), Dr. Ayres largely compared the language of the IMAs and other agreements, such as the subadvisory agreements, third-party service provider agreements, the ASSA and the SASA.[24] DPFOF at ¶ 244.

    Dr. Sirri conducted his own qualitative analysis based on his years of experience in the mutual fund industry. Dr. Sirri concluded generally that the services provided by an adviser and subadviser are substantially different. *Id.* at ¶ 292. With respect to the parties here, he found that, consistent with his general conclusion, the portfolio management services that BRA and BRIM provide to their respective clients are substantially the same, but that the overall package of

---

[24] Defendants also point out that Dr. Ayres never considered the deposition testimony of Robert Hernandez, Chairman of the Board of the Funds, who testified in his deposition that the Board, unlike Dr. Ayres, did not consider the Funds and Subadvised Funds comparable products for purposes of a comparative fees analysis. DPFOF at ¶ 241.

services provided to the Funds is substantially different and greater than that provided to the Subadvised Funds. *Id.*

In particular, Dr. Sirri echoed the testimony of Defendants' fact witnesses and opined that there were key differences between the functions performed by advisers and subadvisers generally, and BRA and BRIM here, in the following areas: (i) NAV determination and security valuation; (ii) fund distribution and marketing; (iii) maintaining and safekeeping of portfolio securities; (iv) transfer agency and shareholder servicing; (v) regulatory compliance; (vi) oversight/coordination of external service providers; and (vii) other, including regulatory reporting and supporting fund boards. *Id.* at ¶ 293.

## I.    Economies of Scale

Plaintiffs' only evidence supporting the next *Gartenberg* factor, economies of scale, is the report and testimony of Dr. Ayres. To determine whether economies of scale existed at the Funds, Dr. Ayres analyzed the relationship between operating costs and the Funds' AUM. In particular, Dr. Ayres analyzed BlackRock's costs, operating expenses and operating margins as reflected in the 15(c) profitability analysis BlackRock presented to the Boards of the Funds. PPFOF at ¶ 539. Specifically, Dr. Ayres noted that, from years 2007 to 2015, BRA's income statements for the Funds reflect the following:

- **AUM**. Global Allocation's AUM grew from approximately $20.1 billion to $52.4 billion (a 159.9% increase, or 12.7% increase annually), and Equity Dividend's AUM grew from approximately $1.5 billion to $24.7 billion (a 1,501.4% increase, or 41.4% increase annually). PPFOF at ¶¶ 542, 547.

- **Operating Expenses**. Global Allocation's operating expenses rose from $77.7 million to $153.3 million (a 97.4% increase, or 8.9% increase annually), and Equity Dividend's operating expenses increased from $6.4 million to $58.2 million (a 807.7% increase, or 31.7% increase annually). *Id.* at ¶¶ 543, 549.

- **Operating Profits**. Global Allocation's operating profits grew from $71.7 million to $217.8 million (a 203.7% increase, or 14.9% increase annually), and Equity Dividend's operating profits grew from $4.3 million to $83.2 million (a 1,847.3% increase, or 44.9% increase annually). *Id.* at ¶¶ 558, 563.

- **Operating Margin**. Global Allocation's operating margin increased from 48.0% to 58.7%, and Equity Dividend's operating margin increased from 40.0% to 58.8%. *Id.* at ¶¶ 555, 561.

Relying on this financial information, Dr. Ayres asserts that economies of scale were realized from years 2007 to 2015, because the increase in operating expenses[25] for the Funds (8.9% annually for Global Allocation and 31.7% annually for Equity Dividend) were "significantly less" than the increases in AUM (12.7% annually for Global Allocation and 41.4% annually for Equity Dividend). *Id.* at ¶¶ 544, 553. Next, because BRA's profits from the Funds increased at a higher rate than both AUM and costs (14.9% to 12.7% and 8.9% for Global Allocation, and 44.9% to 41.4% and 31.7% for Equity Dividend), Dr. Ayres concludes that BRA retained the benefits of economies of scale, rather than passing them along to the Funds' shareholders in the form of lower fees. *See id.* at ¶¶ 558, 564.

At trial, the Court questioned Dr. Ayres to clarify the full scope of his economies of scale analysis:

> THE COURT: Before you go on to damages, I want to ask Dr. Ayres a couple of questions. Dr. Ayres, having listened to your testimony and having read your report, is it fair to say that essentially your analysis on economies of scale was to crunch the numbers of finding what the assets under management were, seeing that they increased substantially over time, that during that same time period the expenses decreased, and, as a result, there must have been [ ] economies of scale?
> THE WITNESS: Yes, your Honor.
> . . .

Tr. 1017:14-24 (Ayres).

---

[25] Dr. Ayres refers to "operating expenses" and "costs" interchangeably.

In addition, Dr. Ayres admittedly did not take into account any other potential factors that might cause costs to decrease while AUM increases, including changes at BlackRock external to the Funds that might impact the allocated cost data he utilized:

> THE COURT: I guess what I wanted to confirm, though, your analysis is largely based on the assets under management and the expenses and looking at what that relationship is?
> THE WITNESS: That's right.
> THE COURT: And you did not analyze any other factors in determining economies of scale. Correct?
> THE WITNESS: Yes, your Honor.

Tr. 1019:2-1019:9 (Ayres).

However, other witnesses testified at trial that numerous other factors could have caused BRA's estimated costs in operating the Funds to fall as AUM increased over the period Dr. Ayres examined. For instance, Dr. Sirri opined that "technology," "recontracting," and obtaining lower prices from service providers could cause falling costs at a mutual fund complex as assets under management rise. Tr. 1545:10-18 (Sirri). In addition, a July 2015 analysis prepared by BlackRock of potential economies of scale, that was shared with the Board explained that "the imprecision of the allocation methodology, exposure to market beta, continuous reinvestment in the business, and a constantly changing regulatory landscape" all contributed to falling estimated costs even where AUM increases. DPFOF at ¶ 226. Ms. Ashkenazy and Dr. Sirri also explained that BlackRock's cost allocation methodology could cause the trend that Dr. Ayres pointed out; namely, that the Funds' allocated costs decreased as AUM increased. As Ms. Ashkenazy and Dr. Sirri explained, this is because BlackRock's entire business grew and changed over time, thereby resulting in fewer allocated costs to those Funds as additional products and additional AUM in other products "pooled costs from the at-issue [F]unds to the new funds . . . and those new

products were allocated costs that had previously just been allocated to the at-issue funds." Tr. 1545:21-1546:3 (Sirri).

### J.  Profitability

Plaintiffs assert that under their "comparative theory of profitability," BRA's estimated profit margins on the Funds indicate that the Advisory Fees are excessive because BRA provides substantially the same services to the Subadvised Funds according to fee schedules that, if applied to the Funds, would still result in positive profit margins for BRA. DPFOF at ¶ 440. Ayres calculated what BRA's profitability would have been had BRA used the same fee schedules that BRIM negotiated at arm's length with the Subadvised Funds.  In quantifying profitability, Dr. Ayres relied on the annual 15(c) Profit Reports prepared in connection with the renewal of BRA's IMAs with the Funds. *See* PPFOF ¶ 151. From 2013 to 2015, the relevant 15(c) Profit Reports indicated the following profitability information:

| | **Global Allocation** | | | **Equity Dividend** | | |
|---|---|---|---|---|---|---|
| | **2013** | **2014** | **2015** | **2013** | **2014** | **2015** |
| **Operating Income (GAAP)** | $235.7 mm | $249.1 mm | $217.8 mm | $102.6 mm | $107.9 mm | $83.2 mm |
| **Margin (GAAP)** | 59.9% | 60.3% | 58.7% | 61.5% | 62.4% | 58.8% |

*Id.* at ¶¶ 510, 512.

Citing to those profitability figures, Dr. Ayres compared BRA's profits from the Funds under the fee schedule pertaining to the Advisory Fee to what BRA's profits would have been under the fee schedules that BRIM negotiated at arm's length with the Subadvised Funds.  *See* PPFOF ¶¶ 521-33.  Dr. Ayres determined that between 2013 and 2015, BRA's profits from

Global Allocation ranged from $217.8 million to $249.1 million per year, with profit margins ranging between 58.7% and 60.3%.  PPFOF at ¶ 484.  Using cost data provided by BlackRock, Dr. Ayres calculated that, had BRA charged Global Allocation the same fee rate that BRIM charges the Subadvised Funds, BRA's profits over the same period would have ranged from $33.6 million to $96.4 million, including distribution expenses, with a profit margin of 18.0% to 37.0%. *See id* at ¶ 510. In the same way, Dr. Ayres states that BRA's profits from Equity Dividend during the Relevant Period ranged from $83.2 million to $107.9 million per year, with profit margins ranging between 58.8% and 62.4%. *See id*. at ¶ 512.  Dr. Ayres determined that, had BRA employed the same fee schedule that BRIM negotiated with the Subadvised Funds, BRA's profits during the same period would have ranged from $17.7 million to $36.8 million each year, including distribution expenses, with a profit margin of 23.4% to 36.1%. *See id* at ¶ 532.  In total, Dr. Ayres determined that, from 2013 to 2015, BRA captured as much as $630 million in additional profits based on charging a higher Advisory Fee to the Funds than the fee that BRIM negotiated at arm's length with the Subadvised Funds. *See id.* at ¶ 533.

## II.    **STANDARD OF PROOF**

Plaintiffs have the burden of proving their case by the preponderance of the evidence. The Court adopts the definition in the Model Jury Instructions:

> Plaintiffs have to prove that their claims are more likely than not ... To say it differently, if one puts the evidence favorable to Plaintiffs and the evidence favorable to Defendants on opposite sides of the scales, Plaintiffs would have to make the scales tip somewhat to their side. If Plaintiffs fail to meet this burden, the verdict must be for Defendants.

*See* Model Jury Charge 1.10, "Preponderance of the Evidence," *available at*

http://www.ca3.uscourts.gov/model-civil-jury-table-contents-and-instructions (October 2017).

## III.    **LEGAL STANDARD**

This case was tried pursuant to Section 36(b) of the Investment Company Act of 1940. The ICA "regulates investment companies, including mutual funds," *Jones v. Harris Associates L.P.*, 559 U.S. 335, 338 (2010), and imposes a "fiduciary duty" on investment advisers with respect to the compensation they receive for providing services to mutual funds. 15 U.S.C. § 80a-35. In the case at bar, Plaintiffs challenge BRA's Advisory Fee as excessive under § 36(b) of the ICA. In *Jones*, the most recent Supreme Court case to interpret this statute, the Supreme Court resolved a split among the Courts of Appeals over the proper standard for claims brought pursuant to § 36(b). *See* 559 U.S. at 343. In determining the meaning of the phrase "fiduciary duty" within the context of § 36(b), the *Jones* Court explained that "'[t]he essence of the test is whether or not under all the circumstances the transaction carries the earmarks of an arm's length bargain.'" *Id*. at 347 (quoting *Pepper v. Litton*, 308 U.S. 295, 299 (1939)). Thus, for liability to attach under § 36(b), "an investment adviser must charge a fee that is so disproportionately large that it bears no reasonable relationship to the services rendered and could not have been the product of arm's length bargaining." *Jones*, 559 U.S. at 346.

In determining whether an investment adviser has breached its fiduciary duty by charging an excessive fee under § 36(b), *Jones* teaches that "all relevant circumstances be taken into account," including the factors set forth in *Gartenberg v. Merrill Lynch Asset Management, Inc.*, 694 F.2d 923 (2d Cir. 1982). *Jones*, 559 U.S. at 347; *see Gallus v. Ameriprise Fin., Inc.*, 675 F.3d 1173, 1178 (8th Cir. 2012) ("[A]ll relevant circumstances must be taken into account, and the benchmark for reviewing challenged fees is 'the range of fees that might result from arm's-length bargaining.'") (citation omitted). The *Gartenberg* factors include:  (1) the nature and quality of the services provided to fund shareholders; (2) the profitability of the fund to the adviser; (3) fall-out benefits – *i.e.*, collateral benefits accruing to the investment adviser due to

41

the existence of the fund; (4) economies of scale; (5) comparative fee structures; and (6) the independence and conscientiousness of the trustees. *See Jones*, 559 U.S. at 345 n. 5 (citing *Gartenberg*, 694 F.2d at 929-32). It is important to note that the *Gartenberg* factors embody a non-exclusive list of considerations. Courts should instead consider "all relevant circumstances." *Id.* at 347 (citing *Gartenberg*, 694 F.2d at 929); *see also Sivolella v. AXA Equitable Life*, No. 11-4194, 2016 WL 4487857, at *4 (D.N.J. Aug. 25, 2016) ("The Court weighs all of the evidence presented and the gravity of each factor adjudicate the case." (citation omitted)).

Of particular note, the *Jones* Court explained that *Gartenberg's* approach, which directs courts to consider the independence and conscientiousness of the board of directors in its decision to approve the adviser's fee, properly "reflects § 36(b)'s place in the [ICA's] statutory scheme." *Jones*, 559 U.S. at 348.  In that regard, "scrutiny of investment adviser compensation by a fully informed mutual fund board is the 'cornerstone of the [ICA's] effort to control conflicts of interest within mutual funds.'" *Jones*, 559 U.S. at 348 (quoting Burks v. Lasker, 441 U.S. 471, 482 (1979)). Specifically, the ICA places disinterested directors in the role of "independent watchdogs," who furnish a check upon the relationship between mutual funds and their investment advisers.  *See Burks*, 441 U.S. at 484. In recognition of the watchdog role imposed on disinterested directors, the Act directs courts to give board approval of an adviser's compensation "such consideration . . . as is deemed appropriate under all the circumstances."  15 U.S.C. § 80a-35(b).  Interpreting this statutory language, the *Jones* Court observed that a "measure of deference to a board's judgment may be appropriate in some instances," but "the appropriate measure of deference varies depending on the circumstances." *Jones*, 559 U.S. at 349.  "Where a board's process for negotiating and reviewing investment-adviser compensation

is *robust*, a reviewing court should afford *commensurate deference* to the outcome of the bargaining process." *Jones*, 559 U.S. at 351.

This Court first addressed the evidence in this case at the summary judgment stage. Upon the record at that time, the Court limited the issues to be resolved at trial. The Court first analyzed the evidence as it related to the Board approval of the fees. Consistent with *Jones*'s instruction to give considerable weight to disinterested approval, this Court found that the Board's process for reviewing BRA's Advisory Fee was "robust," and, consequently, held that "the Board's decision to approve BRA's Advisory Fee must be accorded substantial deference." ECF No. 153 at 41.

Nevertheless, a determination of an informed and disinterested Board is entitled to considerable, but not conclusive weight. Consequently, the Court also looked to all pertinent facts, including the *Gartenberg* multifactor analysis, to determine if there existed a triable issue of fact as to whether the Advisory Fee charged by BRA is so disproportionately large that it bears no reasonable relationship to the services rendered and could not have been the product of arm's-length bargaining. Due to the presence of disputed facts, the Court ruled that Defendants' motion for summary judgment should be denied as to three *Gartenberg* factors, which remained in genuine dispute, and that a trial was necessary to resolve them:

- What comparative fee structures indicate about the size of the Advisory Fee.
- Whether economies of scale were realized and the extent to which those realized economies of scale were shared with the Funds.
- The profitability of the Funds, including testimony concerning the proper method of accounting for sub-advisory services.

These were the grounds upon which the Court proceeded at trial.

## IV.   **DISCUSSION**

Although trial focused on Plaintiffs' substantive arguments as to the three *Gartenberg* factors at issue, Plaintiffs' expert, Dr. Ayres, at the outset, is subject to a pending *Daubert* motion to exclude his testimony. The Court first addresses this motion, as well as Plaintiffs' objections to the testimony of Defendants' expert, Dr. Sirri, before turning to the *Gartenberg* factors.

## A. Expert Testimony and *Daubert*

Defendants move to exclude or limit the testimony of Plaintiffs' expert, Dr. Ayres. The admission of expert testimony is governed by Federal Rule of Evidence 702, which provides that:

> If scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts in the case.

The Supreme Court in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), clarified the operation and scope of Rule 702 with regard to expert testimony. In that case, the Supreme Court held that an "expert's opinion must be based on the 'methods and procedures of science' rather than on 'subjective belief or unsupported speculation;' the expert must have 'good grounds' for his or her belief." *Crowley v. Chait*, 322 F.Supp.2d 530, 535 (D.N.J. 2004) (citing *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 742 (3d Cir. 1994) (quoting *Daubert*, 509 U.S. at 590)). Put another way, "Rule 702 imposes three distinct substantive restrictions on the admission of expert testimony: qualifications, reliability, and fit." *Id.* (quoting *Elcock v. Kmart Corp.*, 233 F.3d 734, 741 (3d Cir. 2000)). The standards set forth in Daubert operate as a framework to ensure the relevance and reliability of expert testimony. *Kumho Tire Co., Ltd. v.*

*Carmichael*, 526 U.S. 137, 151 (1999). It is the trial judge's role to serve as the gate-keeper in scrutinizing the evidentiary relevance and reliability of the proposed expert submission. *See Daubert*, 509 U.S. at 588–89, 595–97.

Critically, however, "[t]he main purpose of *Daubert* exclusion is to protect juries from being swayed by dubious [expert] testimony." *In re Tropicana Orange Juice Mktg. & Sales Practices Litig.*, No. 11-07382, 2017 WL 2362848, at *2 (D.N.J. May 31, 2017) (citing *In re Zurn Pex Plumbing Liab. Litig.*, 644 F.3d 604, 613 (8th Cir. 2011)). The trial court's "gatekeeping function" is, therefore, reduced "'when the gatekeeper is keeping the gate only for himself.'" *See id.* (quoting *United States v. Brown*, 415 F.3d 1257, 1269 (11th Cir. 2005)); *see also Metavante Corp. v. Emigrant Sav. Bank*, 619 F.3d 748, 760 (7th Cir. 2010) (noting that the "usual concerns" of *Daubert*—i.e., "keeping unreliable expert testimony from the jury"—are not present during a bench trial). As such, in spite of Defendants' pending *Daubert* motion, the Court permitted Dr. Ayres to testify at trial. *See In re Salem*, 465 F.3d 767, 777 (7th Cir. 2006) (where the fact finder and the "gatekeeper" are the same, that is, the judge, the court does not err in admitting expert evidence subject to the ability later to exclude it or disregard it if it turns out not to meet the standard of reliability established by Rule 702).

1. Dr. Ayres

Here, Plaintiffs seek to qualify Dr. Ayres as an economist specifically in the areas of quantitative corporate finance, industrial organization and behavioral economics. PPFOF ¶ 205. In this role, Dr. Ayres offered, as relevant here, four opinions:[26]

   (a) The services BlackRock provides to the Funds and Subadvised Funds are substantially the same;

---

[26] Dr. Ayres also opined that the Funds suffered monetary damages from paying BlackRock at an excessive fee rate; however, as the Court finds that that Plaintiffs' have not carried their burden of proving a 36(b) violation, the Court does not reach the issue of damages.

> (b) The costs that BlackRock incurs from its services to the Funds are comparable to those it incurs from its services to the Subadvised Funds;
> (c) BlackRock achieves economies of scale that it does not fully share with the Funds; and
> (d) BlackRock would be profitable if the Funds paid BlackRock investment advisory fees at the same level as the Subadvised Funds pay to BlackRock.

*Id.* at ¶ 44. For the following reasons, the Court finds that Defendants' objections go more to the weight of the evidence rather than admissibility, and so will not exclude Dr. Ayres' expert testimony.

In seeking to qualify Dr. Ayres as an economist in the areas of industrial organization, quantitative corporate finance and behavioral economics, Plaintiffs note that Dr. Ayres has received degrees from, and teaches economics at, prestigious universities, and that he has written extensively on issues of economics, including articles and books that touch upon the mutual fund industry. *Id* at ¶ 738. Defendants do not challenge Dr. Ayres' qualifications generally, but argue that he offered opinions at trial that exceeded the scope of his expertise, namely that any expertise in economics fields is irrelevant to his qualitative analysis, which required expertise in the operation of mutual funds. However, as I noted at trial, this was "an issue of not qualifications in those areas, but what those areas do to the opinions he is going to give and the relevance." Tr. 961:17-20 (Ayres). Indeed, Dr. Ayres' qualitative analysis consisted of analyzing BlackRock's advisory fee agreements and 15(c) profitability and cost analyses for the Funds, and extrapolating the economic and financial implications of any differences or similarities in the services offered by BRA and BRIM. Although lacking extensive specific experience in the mutual fund industry, Dr. Ayres, as an economist, meets the minimum requirements of *Daubert* to offer such expert testimony. *See Voilas v. Gen. Motors Corp.*, 73 F. Supp. 2d 452, 457 (D.N.J. 1999) (permitting expert testimony of economist in case related to automotive industry because the expert's lack of "specific experience in the automotive industry or in creating or evaluating

business plans does not impact upon his qualifications to review such plans and to summarize [the business plans] in a concise, easy to understand fashion"). While an expert in the mutual fund industry may have been better positioned to opine on the differences in services between the Funds and Subadvised Funds, "it is an abuse of discretion to exclude testimony simply because the trial court does not deem the proposed expert to be the best qualified or because the proposed expert does not have the specialization that the court considers most appropriate." *Holbrook v. Lykes Bros. Steamship Co., Inc.*, 80 F.3d 777, 782 (3d Cir. 1996). Thus, Dr. Ayres' qualifications will not be a basis for excluding his testimony.

Defendants also challenge the reliability of Dr. Ayres' quantitative and qualitative comparative fees analyses, and his opinions on economies of scale. In order to satisfy the standards of *Daubert*, the testimony must be reliable. This has been interpreted to mean that "an expert's opinion must be based on the 'methods and procedures of science' rather than on 'subjective belief or unsupported speculation.'" *In re Paoli*, 35 F. 3d at 742 (quoting *Daubert*, 509 U.S. at 590). In *Paoli,* the Third Circuit explained that even if the judge believes "there are better grounds for some alternative conclusion," and that there are some flaws in the scientist's methods, if there are "good grounds" for the expert's conclusion, it should be admitted. *Id.* at 744. Therefore, "an expert opinion is not inadmissible because it may contain flaws, nor is it excludable because it provides testimony regarding only one facet or aspect of an action but does not prove the whole case; such vulnerabilities affect the weight of the testimony, not its admissibility." *Feit v. Great-W. Life & Annuity Ins. Co.,* 460 F. Supp. 2d 632, 641 (D.N.J. 2006).

Defendants present numerous objections to the reliability of each of Dr. Ayres' opinions. Defendants first contend that Dr. Ayres' quantitative comparative fee analysis was flawed

because it inappropriately relied on the Subadvised Funds as comparators to the exclusion of any actual peer funds, and also relied on misleading numbers from BlackRock's cost allocation model.[27] Second, Defendants argue Dr. Ayres qualitative comparative fees assessment was deficient because, due to Dr. Ayres' lack of experience in the workings of the mutual fund industry, it almost exclusively consisted of a comparison of language in the fund prospectuses, the IMAs, and other agreements, such as the subadvisory agreements, third-party service provider agreements, the ASSA and the SASA. They also assert that Dr. Ayres devoted a substantial portion of his opinions to the comparability of BRA and BRIM's portfolio management services, notwithstanding that the comparability of these services is not at issue in this matter. Third, Defendants argue that Dr. Ayres' economies of scale analysis is unreliable because it relies on cost allocation methodology, and because Dr. Ayres did not offer an opinion on whether BlackRock sufficiently shared those savings.

Defendants' objections, though well taken, go more towards weight than admissibility. First, in contesting Dr. Ayres' quantitative assessment, Defendants do not contest the accuracy of his calculations, instead only arguing that Dr. Ayres misinterpreted BlackRock's data, and that he should have used more reliable comparisons than the Subadvised Funds. Defendants, in essence, ask the Court to exclude all of Dr. Ayres' opinions because of "some flaws" in his methodologies and because there "may be some better grounds for an alternative conclusion," an approach that the Third Circuit has rejected. *In re Paoli*, 35 F.3d at 744. This is also true for Dr. Ayres' economies of scale analysis, which Defendants also contest due to his improper use of

---

[27] Defendants also contest the relevance of Dr. Ayres' use of Fama-French regressions to determine the comparability of BRA and BRIM's portfolio management services. As Defendants concede the similarity of portfolio management services, the Court does not rely on Dr. Ayres' Fama-French analyses.

BlackRock data. Although a closer call, Dr. Ayres' qualitative analysis is also admissible.

Defendants assert that Dr. Ayres reliance on fund documents renders his methods unreliable

when these documents do not account for the full scope of services that BRA provides the Funds.

As the Third Circuit has written, however:

> In *Daubert,* the Court noted that "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence," …. Clearly, the Court envisioned cases in which expert testimony meets the *Daubert* standard yet is "shaky" and cases in which admissible expert testimony provides only a "scintilla" of support for a claim or defense. Put differently, an expert opinion must be based on reliable methodology and must reliably flow from that methodology and the facts at issue—but it need not be so persuasive as to meet a party's burden of proof or even necessarily its burden of production.

*Heller v. Shaw Industries, Inc.,* 167 F.3d 146, 152 (3d Cir. 1999) (citations omitted). Here,

Defendants thoroughly cross-examined Dr. Ayres on his methods and presented numerous other

fact witnesses and an expert witness to rebut Dr. Ayres' opinions. Thus, Ayres' opinions, while

arguably "shaky," are not inadmissible. *See Kasilag v. Hartford Inv. Fin. Servs., LLC*, No. 11-

1083, 2017 WL 773880, at *15 n.33 (D.N.J. Feb. 28, 2017), *aff'd,* No. 17-1653, 2018 WL

3913102 (3d Cir. Aug. 15, 2018) (finding that objection to expert's methodology in mutual fund

fees case "goes more to weight" as "[w]hether his assessment…was fulsome enough is a subject

ripe for cross-examination, not one of admissibility). Therefore, the Court will not

exclude these opinions, but, as discussed below, will accord them little weight.[28]

---

[28] Dr. Ayres testified over a period of two days, separated by a weekend. I must comment that I found the first day of his testimony to be particularly lacking, as he seemed unprepared. While on his second day he seemed to have taken the opportunity to prepare more, I did not find Dr. Ayres, despite his academic credentials, to be particularly helpful, knowledgeable, or convincing in his opinions on the issues.

2. Dr. Sirri

Although they did not submit a *Daubert* motion seeking the exclusion of Dr. Sirri's testimony, at trial, Plaintiffs raised an objection to what they deemed to be the overbroad proffer of Dr. Sirri as an expert with qualifications that did not pertain to the opinions he disclosed in his report. [29] I disagree. I qualified Dr. Sirri broadly as "an expert in the mutual fund industry, including financial and mutual fund economics, mutual fund administration, operations, pricing and services, and to respond to the opinions offered by Dr. Ayres." Tr. 1504:15-20, 1505:2-6 (Sirri). I qualified Dr. Sirri as an expert in the mutual fund industry because his experience in this area is vast, including tenures as Chief Economist at the SEC and as Director of Trading and Markets at the SEC, as well as his service as an independent trustee on a mutual fund board and as an independent fee consultant for another family of mutual funds. DPFOF at ¶ 283.

Plaintiffs also raised an objection to the testimony of Dr. Sirri "newly amplifying the lone paragraph" in his expert report that Dr. Ayres misused BlackRock's cost allocation methodology. PPFOF at ¶ 47 n.3. However, the I ruled on this objection at trial, noting that the Magistrate Judge had previously refused to bar Dr. Sirri from testifying on the issue because it could be

_____

[29] Although Plaintiffs did not object to Dr. Sirri's presence in the courtroom before or during trial, they now assert that he should have been sequestered. Rule 615 of the Federal Rules of Evidence states, in part: "At a party's request, the court must order witnesses excluded so that they cannot hear other witnesses' testimony. Or the court may do so on its own." Fed.R.Evid. 615. However, "[t]here is little, if any, reason for sequestering a witness who is to testify as an expert and not to the facts of the case." *Indem. Ins. Co. of N. Am. v. Electrolux Home Prod., Inc.*, 520 F. App'x 107, 112 (3d Cir. 2013) (citation omitted). "Where a party seeks to except an expert from sequestration so that the expert can hear firsthand the testimony of witnesses, the decision whether to permit the expert to remain is within the discretion of the trial judge." *Id.* As Plaintiffs have failed to cogently explain how Dr. Sirri's presence prejudiced their case, the Court has no basis to find that Dr. Sirri's presence in the courtroom during the length of the trial was prejudicial, and, moreover, by not raising the argument before or during trial, the argument is now "essentially waived." *Lorenzo v. Moore*, No. 06-2717, 2011 WL 2784437, at *1 (D.N.J. July 12, 2011) ("Plaintiff apparently believes that the Court's failure to sequester Baggitt and Esposito—even though Plaintiff never requested that they be excluded—prejudiced his case. We disagree.").

"dealt with at trial through actual testimony and impeachment." Tr. at 1512:8-16 (Sirri). I also noted that Dr. Sirri had expanded on this section of his report during his deposition, which an expert is permitted to do, and concluded that Plaintiffs "could have at him on cross-examination, but I will let him testify." *Id.* at 1505:8-9. As such, Dr. Sirri's opinions will not be excluded.[30] *See Heller*, 167 F.3d at 152; *Kasilag*, 2017 WL 773880, at *15 n.33.

### B. *Gartenberg* Factors

To determine whether an advisory fee is so disproportionately large that it bears no reasonable relationship to the services rendered and could not have been the product of arm's-length bargaining, courts look to all pertinent facts, including the *Gartenberg* factors. *See Jones*, 559 U.S. at 344–45. Plaintiffs' burden at trial was even higher because I have already determined that *Gartenberg*'s board process factor (i.e., the "independence and conscientiousness of the board")—"among the most important factors," *Krinsk v. Fund Asset Mgmt., Inc.*, 875 F. 2d 404, 412 (2d Cir. 1989)—did not support their claims. I determined that "it is beyond dispute that the Board's process for reviewing and negotiating BRA's Advisory Fee with the Funds was robust." ECF No. 153 at 35. In order to overcome the "considerable weight" and substantial deference afforded to the Board's decision to approve the fee, Plaintiffs, argue that the fee was excessive under three of the *Gartenberg* factors: (1) comparative fees; (2) economies of scale; and (3) profitability.

#### 1. Comparative Fee Structure

Of the *Gartenberg* factors at issue in this case, Plaintiffs devoted the most time, both in their briefing and at trial, to arguing that the BRA offered substantially the same services to the

---

[30] Even if the Court were to exclude this portion of Dr. Sirri's testimony, it would not alter the result, as Ms. Ashkenazy also credibly, extensively, and convincingly testified about the flaws in Dr. Ayres' use of BlackRock's cost allocation methodology.

Funds that BRIM provided to the Subadvised funds while charging substantially higher fees. In *Jones*, the Supreme Court provided guidance for courts conducting comparative fee analyses between the fees that an investment adviser charges a "captive mutual fund" and the fees that it charges independent clients. *See* 559 U.S. at 349-51. At the outset, the Court rejected the notion that "there can be any categorical rule regarding the comparisons of the fees charged different types of clients." *Id.* at 349. Instead, courts must give comparisons of the fees charged different types of clients "the weight that they merit in light of the similarities and differences between the services that the clients in question require…." *Id.* at 349-50. For example, the services provided by an investment adviser to different clients may vary, based upon, *inter alia*, the relative "regulatory and legal obligations" required for the investment vehicle at issue. *Id.* at 350. It follows that "courts must be wary of inapt comparisons," and, if the services provided "are sufficiently different that a comparison is not probative, then courts must reject such a comparison." *Id.*

Jones also cautioned, "[o]nly where plaintiffs have shown a large disparity in fees that cannot be explained by the different services in addition to other evidence that the fee is outside the arm's-length range will trial be appropriate." *Id.* at 350 n.8 (citations omitted). As such, at summary judgment, I determined that trial was necessary because, based upon the record before me then, at least four areas of factual dispute existed regarding the similarities and differences between the services provided by BRA and BRIM: "(i) the extent to which BRA, as opposed to third-party service providers, perform the Support Services for the Funds; (ii) the extent to which BRIM performs comparable Support Services for the Subadvised Funds; (iii) whether BRA performs the Support Services for the Funds for compensation separate from the Advisory Fee; and (iv) whether any differences in risk assumed by BRA and BRIM justify the disparity in

fees." ECF No. 153 at 53. After trial, I am persuaded that the preponderance of the evidence demonstrates that the services offered by BRA and BRIM are not comparable.

> a.  *Comparability of BRA's and BRIM's Support Services*

*Jones* warned that "[i]f the services rendered [between the fund advisor and the plaintiffs' proposed comparison] are sufficiently different that a comparison is not probative, then courts must reject such a comparison." *Jones*, 559 U.S. at 350."  At the summary judgment stage, the parties disputed whether the IMAs adequately described the full suite of services that BRA provided the Funds, which, according to Plaintiffs, would have made the comparison apt, or whether BRA provided additional services, which, according to Defendants, made the comparison inapt. At the time, I noted that while Defendants' argument "may prove to be true, this Court cannot resolve that factual dispute without the benefit of a trial, where I will be able to make credibility determinations and weigh the evidence." ECF No. 153 at 50-51.  The evidence proffered at trial, both exhibits and the credible testimony of fact witnesses, demonstrated that the services that BRA offers the funds are significantly more extensive and varied than what is described in the IMAs, and, thus, a comparison between the fees charged by the Funds and the Subadvised Funds is inapt.

As an initial matter, Perlowski testified about the differences in servicing models between BRA and BRIM, a factor that *Jones* advised could be indicative that a comparison may not be appropriate. In *Jones*, the plaintiffs attempted to compare the services that an investment adviser to a mutual fund provides and those that an investment adviser to a pension fund provides. The Court noted that, in contrast to a mutual fund, the greater cost of services in a pension fund may be "attributable to the greater frequency of shareholder redemptions in a mutual fund, the higher turnover of mutual fund assets, the more burdensome regulatory and legal obligations, and higher marketing costs." *Jones*, 559 U.S. at 350 (citation omitted). As Perlowski credibly

explained at trial, the difference in the servicing models between BRA, the primary adviser to BlackRock mutual funds, and BRIM, the subadvisor to insurance funds that have their own primary advisors, is significant. Indeed, the Subadvised Funds are insurance funds that have very few shareholders and investors who are serviced at the policyholder level, whereas the Funds have tens of thousands of shareholders. DPFOF at ¶ 47. Whereas BRA retains ultimate responsibility over all aspects of the day-to-day operations of the Funds, it is the primary Insurance Advisers, and not BRIM, who are responsible for providing all of the services necessary to operate the mutual funds as well as any and all services provided under the insurance contract. *Id.* at ¶¶ 40, 197, 207-09.  BRIM, on the other hand, is a service provider to the underlying mutual fund, with only portfolio management responsibilities. *Id.* at ¶ 195. From BRIM's perspective, a subadvised account is functionally similar to an institutional account rather than a mutual fund: BRIM manages the portfolio and provides only limited additional services to the Insurance Advisers upon request. DPFOF at ¶¶ 194-97, 204. Indeed, other courts in mutual fund fee cases have recognized these crucial differences between the business of the Funds and Subadvised Funds. *See, e.g.*, *Kasilag*, 2017 WL 773880, at *6 n.13 ("It is generally undisputed that [subadviser]'s profit margin was lower than [adviser]'s, a fact that is not that significant or surprising given that the businesses are different.").

As to specific differences in services, the trial record elucidated substantial distinctions in: (i) compliance; (ii) board administration; (iii) regulatory and financial reporting; (iv) determination and publication of daily NAV; and (v) managing service providers. Additionally, though on summary judgment the Court found disputed facts with respect to the comparability of BRA and BRIM's advisory and subadvisory services regarding proxy voting and recordkeeping, Plaintiffs devoted little time to those topics at trial.

First, as to compliance, Plaintiffs contend that BRIM's responsibilities are equal to the services that BRA provides for the Funds. However, the two compliance functions that BRIM provides—Rule 206(4)(7) annual reviews of the adequacy of the Subadvised Funds' compliance policies and procedures and its "portfolio compliance" responsibilities—pale in comparison to the comprehensive compliance program that BRA provides for the Funds. BRA, unlike BRIM, is responsible for all of the design, implementation, execution, mitigation and reporting functions required to administer the Funds' compliance program (the "compliance life cycle"). DPFOF at ¶¶ 120-21. As the Funds' CCO, Park, credibly explained, the compliance life cycle is continuous, and BRA must constantly oversee and update the program as exceptions or regulatory rule changes arise. *Id.* Plaintiffs presented no evidence that BRIM offers any comparable services to the Subadvised Funds in this case.

As to Board administration and reporting, the evidence adduced at trial demonstrates that BRIM's periodic reporting to the Insurance Advisers, filing of 15(c) questionnaires, and responses to one-off requests are not comparable to BRA's year-round, extensive obligations to the Funds' independent Board. BRA coordinates all of the Board and committee meetings throughout the year and tracks dozens of regular and follow-up items requiring the Board's attention. *Id.* at ¶¶ 97-99. Multiple senior BlackRock personnel attend every Board meeting, including operational, compliance, and legal personnel in addition to portfolio managers. *Id.* at ¶ 100. BRA prepares extensive materials in advance of Board meetings covering all manner of topics, where BRIM provides only a limited suite of materials. *Id.*

The same is true for the regulatory and reporting services that BRA and BRIM provide. BRIM provides only limited assistance to the Insurance Advisers by reviewing sections of the Subadvised Insurance Funds' filings regarding BRIM's portfolio management, but it is the

Insurance Advisers who are ultimately responsible for these filings. *Id.* at ¶ 204. In contrast, BRA is responsible for all of the Funds' regulatory filings and it oversees the process for preparing them, including (i) annual shareholder reports; (ii) semi-annual shareholder reports; (iii) quarterly schedule of portfolio holdings; (iv) annual reports regarding Funds' proxy voting; (v) prospectuses; and (vi) summary prospectuses.  *Id.* at ¶ 180. It is BRA's job to manage the entire process, which requires coordination of numerous personnel and groups within BlackRock as well as third-party service providers and advisers, including the fund accountant, transfer agents, outside counsel and outside auditors. *Id.* at ¶ 180.

BRIM lacks the same servicing responsibilities that BRA does in various other areas, including NAV calculation, managing service providers (*see* next section), determining dividends and distributions, providing tax services, and expense budgeting.

In the face of the voluminous evidence supporting these conclusions, Plaintiffs presented little evidence that BRIM offered services remotely comparable to those that the fact witnesses credibly testified about; rather, Plaintiffs merely rely on the testimony and report of their expert witness, Dr. Ayres.[31] Dr. Ayres' qualitative analysis was based on an examination of the funds' prospectuses, IMAs, and other written agreements, and did not capture the full suite of services that BRA offers. Weighing this evidence against the testimony from fact witnesses with years of experience working in the mutual fund industry who painstakingly and credibly recounted the details of the services that BRA provides, it is clear that Dr. Ayres' analysis was superficial.

---

[31] In addition, Plaintiffs argue that any differences in these support services should be disregarded because BRA's portfolio management services (which are not in dispute) are the most valuable, and that any other support services carry little value. However, a court should not "artificially bifurcate" component parts of management fees in analyzing the services provided. *See Kasilag*, 2018 WL 3913102, at *2. Moreover, the testimony presented at trial conclusively demonstrated that the other support services that BRA provides are much more significant than Plaintiffs contend.

While evaluation of these governing documents may be relevant to determining the services that the advisers provide, it lacks the practical day-to-day implementation of these programs in the way that Defendants' fact witnesses had described. Similarly, in *Sivolella*, the plaintiffs argued that fees were excessive because the adviser had delegated substantially all of its duties to subadvisers, relying in part on similarities in contractual language in the primary and subadvisory agreements. *Sivolella*, 2016 WL 4487857, at *17. The court, there, squarely rejected this theory, holding that "the analysis must consider all duties, whether enumerated in a contract or undertaken in a manner to carry out the contractual duties." *Id.* at *34

In determining that the Subadvised Funds are not appropriate comparisons for a comparative fee structure analysis, this Court is guided by numerous other courts that, either after trial or at summary judgment, came to the same conclusion. *See, e.g.*, *Sivolella*, 2018 WL 3359108 at *3 (no clear error in trial court's determination that there are "many, varied services that [the adviser] performs for the Funds" that were "significant" and go beyond those responsibilities performed by a subadviser). *See also Zehrer v. Harbor Capital Advisors, Inc.*, No. 14-00789, 2018 WL 1293230, at *10 n.23 (N.D. Ill. Mar. 13, 2018) (finding that the adviser retains "full responsibility for [administering] the affairs of" the funds, notwithstanding any subadvisers); *Goodman v. J.P. Morgan Inv. Mgmt., Inc.*, 301 F. Supp. 3d 759, 770-72 (S.D. Ohio 2018) (finding that a comparison of advisory fees and subadvisory fees was inapt because of the different responsibilities, risks, and scope and scale of services); *accord Jones,* 559 U.S. at 350 (noting that "there may be significant differences" between an adviser's services to a sponsored fund and other clients, i.e., "the more burdensome regulatory and legal obligations"); *Hoffman v. UBS AG*, 591 F. Supp. 2d 522, 540 (S.D.N.Y. 2008) ("[I]nvestment advisers and sub-advisers perform distinct services.").

As such, based upon the evidence introduced at trial, including the credible and knowledgeable fact witnesses who testified, and Dr. Ayres' cursory testimony, the Court finds that services that BRA provides to the Funds are much more extensive than the services that BRIM provides to the Subadvised Funds.

b. *BRA's Agreements with Third-Party Service Providers*

A second area of factual dispute that the Court recognized at the summary judgment stage is whether BRA, as opposed to its third-party service providers, performed certain support services for the Funds. Plaintiffs contend that many of the services that BRA claims to perform in exchange for the advisory fee, are, in fact, performed by service providers for a separate fee and, therefore, must be discounted when analyzing the differences in services offered by BRA and BRIM. I noted then that, "although Defendants argue that BRA monitors and oversees the work of these third-party service providers, Plaintiffs point to provisions in the IMAs, State Street Adm. Agreement, and the SAS Agreement that raise a dispute of fact as to whether the Funds pay BRA fees and expenses separate from the Advisory Fee for that role." ECF No. 153 at 52.

Having considered the evidence from trial, it is clear that, notwithstanding any similarities in the various agreements, BRA provides substantially more services than the service providers, even in the areas ostensibly covered by the service provider agreements. As to the State Street Administrative Agreement, Plaintiffs point to the fact that State Street, not BRA performs daily NAV calculations, yet neglect the fact that BRA provides considerable work with NAV pricing—including providing State Street with certain inputs and calculating the "shadow NAV"—without which the work of State Street would not be feasible. DPFOF at ¶¶ 88-96. Plaintiffs also argue that compliance functions are covered in the BNY Transfer Agency and Shareholder Agreement, but, as Park credibly testified at trial, BRA employs a robust and

iterative compliance program with which BNY's limited role cannot compare. *Id* at ¶ 120. Finally, as to the State Street and BBH Custody Agreements, State Street and BBH assist in BRA's custodial duties by providing certain custodial services, tax services, and proxy services. PPFOF at ¶¶ 145-47. Nonetheless, BRA determines the policies pursuant to which the custodian will hold the Funds' assets, and is also responsible for managing day-to-day issues arising with respect to the custody of the Funds' assets. DPFOF at ¶ 84.

Moreover, BRA's oversight responsibilities of the service providers require substantial effort that BRIM does not undertake, and are not, as Plaintiffs argue, "periodic and infrequent." PPFOF at ¶ 420. BRA is responsible for the procurement, direction, and oversight of all of these entities, and regularly communicates with the Board to enable its oversight. DPFOF at ¶ 147. As Defendants' expert, Dr. Sirri, explained at trial, based on his vast experience within the mutual fund industry, which I find to be particularly relevant here:

> It seems to me sometimes people don't appreciate a mutual fund, is not just a nexus of contracts of service providers in the sense that you could just contract and go. It's not you strike a contract and then you just wait a year. The conversations that you have to have and the policies and procedures that you need to have in place to get the fund to operate well are substantial. You need experience in the adviser, and the adviser has a day-to-day job of integrating those service providers and causing the right things to happen. That falls to the adviser. You got to get that to work and they don't just work by themselves. I know it's also the case, from my experience in our fund, the squeaky wheel gets the grease. And the more you are on your service providers, the better service you are going to get from them.

Tr. 1597:21-1598:12 (Sirri). In sum, as in *Sivolella,* the "managerial role that [BRA] plays in coordinating" with service providers is "far more extensive than Plaintiffs' contention" and "warrant[s] compensation through [the advisory fee]." *Sivolella*, 2016 WL 4487857, at *46.

In arguing that an evaluation of the BRA's Advisory Fee cannot include an analysis of the services described in the various third-party contracts, Plaintiffs rely on a case where, at the

summary judgment stage, the court noted that "[s]ervices performed by third party vendors, instead of Defendant would be similarly irrelevant to the question of whether Defendant provides substantially similar services to the Fund *in exchange for the Advisory Fee*, as the services it performs for the Sub–Advised Funds *in exchange for the Sub–Advisory Fee*." *Kennis v. Metro. W. Asset Mgmt., LLC*, No. 15-8162, 2017 WL 8784795, at *8 (C.D. Cal. Sept. 11, 2017) (emphasis in original). However, for the foregoing reasons, trial testimony contradicted Plaintiffs' argument that third-party vendors, as opposed to BRA, perform the bulk of the work for which BRA receives an advisory fee. Assuredly, BRA hires third-party vendors who perform work related to administration, shareholder and transfer agency services, and custody, but, in all of these areas, BRA performs many functions on its own that BRIM does not provide the Subadvised Funds. Therefore, that BRA employs third-party vendors to assist in its work for the Funds does not undermine the extensive evidence indicating that the robust services that BRA offers the funds are reflected in the fees that it charges.

c. *Support Services Under Separate Agreements*

The parties also presented evidence at trial regarding the support services that BRA provides pursuant to ancillary agreements for which BRA receives compensation separate from the Advisory Fee. According to Plaintiffs, the services that BRA performs under these agreements should be discounted because they are not reflected in the Advisory Fee. However, the evidence at trial demonstrated that the services that BRA provides pursuant to these agreements are discrete and limited. Under the SASA, the Funds reimburse BlackRock *pro rata* amounts for the operation of a shareholder call center. DPFOF at ¶ 34. Under the ASSA, the Funds reimburse BlackRock up to an annual cap for certain accounting services largely related to accounting functions required under Sarbanes-Oxley. *Id.* at ¶ 30. Finally, the Funds reimburse BlackRock a *pro rata* portion of Park's compensation in order to capture that he maintains a

reporting relationship to the Funds' Board. *Id.* at ¶ 119. These reimbursements and additional agreements are discussed with, and approved by, the Board, and amount to less than 1/10th of a basis point. *Id.* at ¶¶ 32-33, 36-37, 119. These relatively small reimbursements for such limited services in comparison with the entire suite of services that BRA provides do not alter the Court's conclusion that a comparison of the Advisory Fee and Subadvisory Fee is inapt.

             d.   *Differences in Risk*

The parties also dispute the extent to which different entrepreneurial, reputational, legal, and regulatory risks assumed by BRA and BRIM impact comparability. At summary judgment, I concluded that this dispute was too fact intensive to be decided without trial due to similarities between the risks outlined in the prospectuses for the Funds and the Subadvised Funds, as well as certain contractual language that purportedly limits BRA's risks in a wide range of circumstances. ECF No. 153 at 52.

At trial, Plaintiffs continued with this line of argument, attempting to show that the IMAs limit BRA's potential liability to the Funds, by contending that BRA may be liable only for a breach of fiduciary duty under Section 36(b) and for losses "resulting from willful misfeasance, bad faith or gross negligence on its part in the performance of its duties or from reckless disregard…of its duties under [the IMA]," PPFOF at ¶ 451; that indemnification provisions in the IMA significantly limit BRA's potential liability, *id.* at ¶ 452; and that similar to BRA's potential liability, BRIM's subadvisory agreements with the Subadvised Funds provide that BRIM may be liable for untrue statements of material fact it provides to the Subadvised Funds in connection with the Subadvised Funds' regulatory filings. *Id.* at ¶ 458.

However, the witnesses at trial credibly testified that the risks faced by BlackRock were all-encompassing, including "[e]verything that the funds do, every aspect of their [] operations, from safekeeping of assets, interface of [] shareholders, the supervision of [the Funds'] service

providers, every activity that's outlined in [the compliance manual] and the compliance program . . . essentially, the adviser [is] going to be held accountable for exceptions in that space." Tr. 924:2-8 (Park). These are risks that BRIM, as the portfolio adviser, simply does not face. To that end, Park and Perlowski, two BlackRock employees intimately involved in managing the risks faced by the Funds, testified about the specific risks facing BRA that BRIM, as a subadviser, does not need to consider, including the reputational and financial harm associated with hiring and overseeing the work of third-party service providers. Thus, even assuming the legal risks that BRA and BRIM face are identical—an assumption on which the trial testimony casts doubt— Plaintiffs have not offered evidence that BRIM faces similar reputational or financial risk in performing its subadvisory services. Indeed, as Park testified at trial, many of the areas in which BRA can be held responsible—"[for] class structure, for the existence of the funds, for the way that we onboard our securities, the way that we supervise onboarding and offboarding of fund shareholder purchase and redemptions"—are the responsibilities of the Insurance Advisers, not BRIM. Tr: 925:14-19.

Moreover, numerous courts have found that differences in risk faced by advisers to funds and by advisers to subadvised funds, is a contributing factor in rejecting the comparison.  In *Kasilag*, for instance, the court found that an adviser assumes entrepreneurial, reputational and legal/regulatory risks in managing its funds that are not shared by subadvisers providing services in a subadvisory agreement, noting that "a sub-adviser with a different role and different risks, among other differences" cannot be compared to an adviser. *Kasilag*, 2017 WL 773880, at *23; *Sivolella*, 2016 WL 4487857, at *22 n.40 (considering risks faced by the adviser in determining services were not comparable); *Goodman*, 301 F. Supp. 3d at 771 (concluding that the "risks faced by JPMIM in its role as adviser differ in type and magnitude from those faced by JPMIM

in its role as subadviser such that JPMIM faces greater risk as an adviser. Because a subadviser faces a different risk profile than an adviser, the fees collected in each role are not directly comparable. An analysis of the fees of an adviser or a subadviser would be incomplete without assessing the relevant risks faced by each.").

Therefore, differences in risk faced by BRA and BRIM further indicate that the fees charged to the Funds and Subadvised Funds are not comparable.

e. *Lipper Data and Dr. Sirri's Peer Group Analysis*

As trial testimony demonstrated that the Subadvised Funds are not appropriate comparables in this case, the Court turns to Defendants' reliance on Lipper comparisons and Dr. Sirri's independent analysis.[32]

At the summary judgment stage, I rejected Defendants' attempt to use Lipper data in connection with the bargaining range because there remained "a genuine dispute of material fact regarding the comparability of BRA and BRIM's services to the Funds and the Subadvised Funds, respectively." ECF No. 153 at 55. Reviewing the Lipper data then would have meant disregarding Plaintiffs' argument that BRIM's fees were better comparisons than those of the Lipper peer funds, and would have "amount[ed] to impermissible weighing of the evidence in this case." *Id.* Even after summary judgment, Plaintiffs continue to dispute the reliability of the Lipper data because it compares funds to potential peers, but does not determine whether fees of the potential peers are negotiated at arms length. Plaintiffs, through their expert Dr. Ayres, contend that the Lipper peer groups contain proprietary, or "captive," funds (like the Funds

---

[32] Aside from the fact that Dr. Ayres' comparative price analysis relied on questionably accurate numbers from BlackRock's cost allocation model, his analysis focused on a comparison with the Subadvised Funds, which, as already discussed, is a qualitatively inapt comparison. Therefore, Dr. Ayres' quantitative analysis is of little assistance to the Court.

here), where the adviser has substantial control of the fund's board, thereby compromising the arms-length nature of the relationship between the adviser and the fund.

After trial, however, and having determined that BRA's fees cannot be compared with BRIM's, the Court finds the Lipper data to be suggestive that the fees that BRA charges are not excessive. Dr. Sirri and Perlowski testified at length about the Lipper methodology and its extensive use within the mutual fund industry. Therefore, "there is sufficient evidence before this Court to determine Lipper performance reports are relied upon in the mutual fund industry and Plaintiffs' attempts to discredit Lipper performance data is unpersuasive to this Court." *Kasilag*, 2017 WL 773880, at *24 n.19 ((considering Lipper data in post-trial decision, where, at trial, the court determined that the Lipper data proffered by the defendants was the only comparative fee data before the court). While it is true that Lipper does not ensure that the fee negotiations at the funds it compares are negotiated at arm's-length, Plaintiffs have offered no more appropriate comparison than Lipper. As such, I follow the other courts that have relied on Lipper data when there is no other comparative fee data in the record, or where the comparison proffered by the plaintiffs was inapt. *See id; Sivolella*, 2016 WL 4487857 at *65 (relying on Lipper's peer-fund data, after trial, as indicative of the arm's-length bargaining range); *Goodman*, 301 F.Supp.3d at 769 (relying on Lipper data showing that the funds "performed better than, and the fees were in line with, other mutual funds of similar scope" in granting summary judgment on the plaintiffs' § 36(b) claim, where the plaintiffs' proposed fee comparison was rejected as inapt); *Zehrer*, 2018 WL 1293230 at *13 (granting summary judgment in favor of the adviser, based in part on Lipper data showing that the adviser "charged fees that fall within…or…below…the range of fees paid by similar funds," where the plaintiffs failed to proffer any other apt fee comparisons).

I will also rely on Dr. Sirri's independent analysis, which I find to be convincing. Two of the three peer groups that Dr. Sirri considered were from Lipper, and the third, which Dr. Sirri constructed himself, was premised on a methodology very similar to that which Lipper uses, as it consisted of twenty-five funds that were most similar to the Funds in terms of investment strategy, structure, load type, and size. DPFOF at ¶¶ 303-304.

Here, both the Lipper data and Dr. Sirri's analysis indicate that the fees that BRA charges are reasonable. The Lipper data demonstrates that the fees that Equity Dividend and Global Allocation charged never ranked below median when compared against the Lipper peer funds. DPFOF at ¶ 21. Moreover, Dr. Sirri demonstrated that the Funds' Advisory Fees were squarely in line with their peers during the relevant period, typically falling in the second and third quartiles—or the middle 50%—across time and peer groups; they were sometimes in the first quartile (*i.e.*, the cheapest) but *never* in the fourth quartile. *Id.* at ¶ 308. The Lipper data, therefore, supports Defendants' argument that its fees are reasonable in light of industry standards.

In sum, because the Subadvised Funds are not apt comparisons, and because independent data suggests that BRA's fees were reasonable, Plaintiffs' comparative fees argument fails.

### 2. Economies of Scale

The second *Gartenberg* factor at issue in this case concerns the extent to which any economies of scale realized by BRA through the Funds were passed on to the Funds and their shareholders. An economy of scale is defined as a "'decline in a product's per-unit production cost resulting from increased output, [often] due to increased production facilities; savings resulting from the greater efficiency of large-scale processes.'" *Hoffman*, 591 F.Supp.2d at 539 n.32 (quoting BLACK'S LAW DICTIONARY (8th ed. 2004)). Within the context of § 36(b), "[t]he concept of 'economies of scale' assumes that as a mutual fund increases in size, its

operational costs decrease proportionally. If a fund realizes economies of scale, its willingness to let the shareholders participate in the resulting benefits becomes a factor in evaluating the reasonableness of the adviser-manager's fees." *Kalish v. Franklin Advisers, Inc.*, 742 F.Supp. 1222, 1237 (S.D.N.Y. 1990), *aff'd*, 928 F.2d 590 (2d Cir. 1991). In § 36(b) cases, the plaintiff's burden in demonstrating economies of scale is twofold. First, the plaintiff must demonstrate that economies of scale were, in fact, realized. *Id.* at 1238. Second, if the threshold showing is made, the plaintiff must then demonstrate that "the savings realized from economies of scale were not sufficiently shared with the Fund and its shareholders." *Pirundini v. J.P. Morgan Inv. Mgmt. Inc.*, 309 F. Supp. 3d 156, 166 (S.D.N.Y. 2018) (citing *Kalish*, 742 F.Supp. at 1239).

Under the first prong of the economies of scale analysis, to prove the existence of economies of scale, the plaintiff must "create a detailed analysis of each element of a transaction surrounding [the fund], over an extended period of time, over different levels of activity," and show that the *per unit* cost of servicing the fund decreased as its assets grew. *Krinsk v. Fund Asset Mgmt., Inc.,* 715 F. Supp. 472, 496 (S.D.N.Y. 1988), *aff'd*, 875 F.2d 404 (2d Cir. 1989) (citations omitted). This information is important because "processing costs do not significantly diminish as Fund assets increase." *Gartenberg v. Merrill Lynch Asset Mgmt., Inc.*, 528 F.Supp. 1038, 1055 (S.D.N.Y. 1981), *aff'd*, 694 F.2d 923 (2d Cir. 1982). Indeed, "while it may be almost as easy to invest a block of $100 million as a block of $10 million, it requires substantially more time, money and personnel to process 1 million shareholder orders than 100,000 orders." *Id.* Therefore, absent the *per unit* transaction cost information, "there is no way to determine whether any economy of scale even existed that could have been passed on to investors or whether there is another explanation for the statistics" identified by the plaintiff. *Hoffman*, 591 F. Supp. 2d at 540. *See also Amron v. Morgan Stanley Inv. Advisors Inc.*, 464 F.3d 338, 345 (2d

Cir. 2006) (affirming dismissal of § 36(b) claim, based, in part, on fact that the complaints made "no allegations regarding the costs of performing fund transactions or the relationship between such costs and the number of transactions performed" in connection with the economies of scale factor); *Paskowitz v. Prospect Capital Mgmt. L.P.*, 232 F. Supp. 3d 498, 507 (S.D.N.Y. 2017) (same).

At summary judgment I explained that, at first read, it appeared that Dr. Ayres' analysis for establishing economies of scale was "substantially similar to the analyses that were rejected in the foregoing cases," i.e. that he had "opined that economies of scale existed based on disproportionality between the growth in the Funds' AUM and the increase in operational costs between 2007 and 2015." ECF No. 153 at 68. Nonetheless, the record at the time was unclear "whether Dr. Ayres performed the additional step that the courts…found was necessary to demonstrate the realization of economies of scale; i.e., conducting a per-unit transaction cost analysis." *Id.* As such, I directed Plaintiffs to demonstrate at trial "that any disproportionality between the Funds' asset growth and operating expenses is attributable to economies of scale, rather than other cost savings unrelated to scale economies." *Id.* at 71.

The trial evidence, in fact, bore out that Dr. Ayres' methods were substantially similar to the analyses that were rejected in cases such as *Krinsk*, *Kalish*, and *In re American Mutual Funds Fee Litigation*, 04-5593, 2009 WL 5215755 (C.D. Cal. Dec. 28, 2009) ("*In re American*"). Indeed, Dr. Ayres' only analysis on economies of scale was to assert that the increase in operating expenses for the Funds (8.9% annually for Global Allocation and 31.7% annually for Equity Dividend) was "significantly less" than the increases in either AUM (12.7% annually for Global Allocation and 41.4% annually for Equity Dividend) or revenue (12% annually for Global Allocation and 38.1% annually for Equity Dividend). PPFOF at ¶ 544. When pressed on

this issue at trial, Dr. Ayres verified that he did not perform the required per-unit transaction cost analysis, confirming that his "analysis on economies of scale was to crunch the numbers of finding what the assets under management were, seeing that they increased substantially over time, that during that same time period the expenses decreased." Tr. 1017:18-22 (Ayres). In doing so, Dr. Ayres also confirmed that he did not analyze any other factors that could have impacted the results of his calculations. *Id.* at 1019:7-9.

Plaintiffs contend that analyzing changes relative to dollars of AUM is a "standard way" of measuring economies of scale in the mutual fund industry because "'[t]he central service that is being provided is the service of investing dollars,' so dollars of AUM are the relevant 'unit of production' for a mutual fund adviser." PPFOF at ¶ 678 (quoting Tr. 1011:23-1012:4 (Ayres)). However, Plaintiffs cite no legal authority for this proposition, and, in fact courts that have analyzed the issue have concluded that this purportedly "standard" approach, is insufficient to carry a plaintiff's burden at trial that a fund realized economies of scale. In *In re American*, for instance, the plaintiffs' expert performed a "traditional" analysis of economies of scale, opining that economies of scale could be inferred from the fact that the ratio of expenses to assets for the at-issue fund did not increase proportionally from one year to the next. 2009 WL 5215755, at *29. The court rejected the expert's analysis and found that the plaintiffs failed to sustain their burden on the economies of scale factor. *See id.* at *51-52. Principally, the court characterized the expert's failure to perform "the requisite per-unit cost analysis" as a "fundamental flaw," which "prevented him from finding that economies of scale existed." *Id.* at *51; *see also Kalish*, 742 F.Supp. at 1239 (rejecting Plaintiffs expert's testimony because "plaintiffs did not attempt a study to determine if the per-unit cost of each transaction for the Fund decreased as the number of transactions increased").

Moreover, Dr. Ayres' analysis is also defective because he improperly assumed that any changes in BRA's allocated costs were the results of economies of scale, when in fact those cost changes may have been caused by other factors unrelated to scale. As Dr. Sirri opined, "economies of scale in the context of mutual funds is a causal statement, by which I mean economies of scale exists if the [per unit] costs of production unit [sic], costs of production falls *because* the fund got larger." Tr. 1545:3-6 (Sirri). Thus, Dr. Sirri concluded that Dr. Ayres' opinion on economies of scale is flawed because "he observed an association between falling costs and a rising fund size. But he has not demonstrated a causal linkage." *Id.* at 145:7-9. Plaintiffs claim that Dr. Sirri could not identify any authoritative source requiring there to be a causal connection between the cost savings and increased output, but the case law dealing with the issue is clear that Dr. Sirri was correct. As the court in *Kalish* wrote,

> Economies of scale do not exist in a vacuum. The concept is meaningful only if increased size of a fund (more shareholders, more assets under management) *directly* reduces the manager's costs of processing each transaction and servicing each shareholder.

*Kalish*, 742 F.Supp. at 1239 (emphasis added). Thus, if plaintiffs, as here, are unable to rule out other potential reasons for the observed effects, then its economies of scale analysis must fail. Further, witnesses such as Dr. Sirri and Ms. Ashkenazy credibly testified at trial that numerous other factors could have caused BRA's estimated costs in operating the Funds to fall as AUM increased over the period Dr. Ayres examined. For instance, Dr. Sirri opined that "technology," "recontracting," and falling input prices could cause falling costs at a mutual fund complex as assets under management rise. Tr. 1545:10-18 (Sirri).

Thus, Plaintiffs have failed to demonstrate that the Funds realized economies of scale. As such, I need not reach whether the Funds' sufficiently shared any increases in efficiencies with investors.

3.  Profitability

Plaintiffs contend that BRA's profits from the Funds are indicative of the excessive nature of BRA's Advisory Fee. In analyzing the profitability factor of the *Gartenberg* analysis, "the Court is guided by the notion that it is not a permissible approach under Section 36(b) to argue that the adviser 'just plain made too much money.'" *Kasilag*, 2017 WL 773880 at *22 (quoting *Kalish*, 742 F.Supp. at 1237); *see In re American*, 2009 WL 5215755 at *50 ("Section 36(b) does not prohibit an investment adviser from making a profit, nor does it regulate the level of profit."). In that regard, it is well-settled that § 36(b) does not require that investment advisers operate on a "cost-plus" basis. *Kasilag*, 2017 WL 773880 at *22; *see Kalish*, 742 F.Supp. at 1226 (observing that the legislative history of § 36(b) reveals that the statute "does not forbid an adviser-manager from earning a profit on services provided by it to a fund; that a 'cost-plus' type of contract is not required; and that the court is not authorized 'to substitute its business judgment for that of a mutual fund's board of directors in the area of management fees.'") (citation omitted); S. Rep. No. 1–184, at 5 (1970), *reprinted in* 1970 U.S.C.CA.N. 4897, 4902 ("The investment adviser is entitled to make a profit. Nothing in this Bill is intended to imply otherwise or to suggest that a 'cost-plus' type of contract would be required."). Nonetheless, evidence that an adviser's profitability is disproportionate to the services rendered may be a sign that the adviser's fees are excessive. *Chill v. Calamos Advisors LLC*, 175 F.Supp.3d 126, 144 (S.D.N.Y. 2016).

Plaintiffs have presented a "comparative theory of profitability," asserting that BRA's estimated profit margins on the Funds indicate that the Advisory Fees are excessive because BRA provides substantially the same services to the Subadvised Insurance Funds according to fee schedules that, if applied to the Funds, would still result in positive profit margins for BRA. As the Court noted in its summary judgment opinion, Plaintiffs' profitability argument went

hand-in-hand with its argument that the services offered by BRA and BRIM are comparable. As such, I denied Defendant's summary judgment motion because

> here, Plaintiffs have raised a dispute of fact regarding the comparability of the services rendered by BRA to the Funds and BRIM to the Subadvised Funds. Should trial reveal that the services provided by BRA and BRIM are in fact comparable, Plaintiffs may present their theory as proof that BRA's profitability from the Funds is disproportionate to the services that BRA provides to the Funds. Indeed, in light of the substantial disputes regarding the services that BRA actually performs for the Funds, it necessarily follows that a dispute exists regarding the ultimate question on profitability in this case – whether BRA's profitability from the Funds is disproportionate to the services rendered.

ECF No. 153 at 76. I also rejected Defendants' attempt to rely on cases indicating that BRA's profitability was not excessive because "36(b) requires a totality of the circumstances approach, and thus, a profit margin that is not excessive upon certain facts may be excessive under another." *Id.* at 78.

As trial revealed vast differences in the services that BRA and BRIM provide, Plaintiffs can no longer sustain their argument that BRA's profits are unjustified in light of any similarity in services. There is also no longer any basis to find that the facts here are unlike those in the other relevant cases. That is, trial has shown that BRA's suite of services is robust and, at the least, not disproportionate with the profits it reaps. Thus, the weight of authority indicates that the estimated profit margins on the Funds—which never exceeded 65% pre-tax during the relevant period—do not indicate excessive fees. *See, e.g., Kasilag*, 2017 WL 773880 at *23 (finding that the plaintiffs "failed to meet their burden of establishing that the Funds were so profitable that their fee could not have been negotiated at arm's-length," where the adviser's pre-tax profit margins ranged between 45.6% and 80.3%, excluding distribution fees); *In re American.*, 2009 WL 5215755 at *50 (finding that the profitability factor did not weigh in favor of finding a § 36(b) violation, where the advisers' pre-tax profit margins, excluding distribution

expenses, ranged from 30% to 52%); *Schuyt v. Rowe Price Prime Reserve Fund, Inc.*, 663 F. Supp. 962, 979 (S.D.N.Y.), *aff'd*, 835 F.2d 45 (2d Cir. 1987) (finding that a pre-tax profit margin of 77.3% did not support a finding of excessive fees). Plaintiffs have, therefore, failed to carry their burden in proving profitability, the final *Gartenberg* factor at issue in the case.

## V.   <u>CONCLUSION</u>

After the Court determined at the summary judgment stage that the independence and conscientiousness of the Board cut in favor of Defendants, Plaintiffs' burden at trial was steep, as "the standard for fiduciary breach under § 36(b) does not call for judicial second-guessing of informed board decisions" or "supplant[ing] the judgment of disinterested directors apprised of all relevant information." *Jones*, 559 U.S. at 352 (citations omitted). Plaintiffs were, therefore, limited to presenting evidence at trial that the fee charged by BRA is so disproportionate that it could not be one that was negotiated at arms' length based upon a select few of the *Gartenberg* factors: comparative fee structure, economies of scale, and profitability. For the foregoing reasons, Plaintiffs have failed to carry their burden with respect to each of these factors, and judgment in favor of Defendants is, therefore, proper. An appropriate Order will follow.

Dated: February 8, 2019                                          /s/ Freda L. Wolfson
                                                                Hon. Freda L. Wolfson
                                                                United States District Judge